# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1. MADELYN CASILAO, | Case No.: |
| 2. HARRY LINCUNA, | |
| 3. ALLAN GARCIA, on behalf of themselves and all others similarly situated, | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | CIV-17-800-M |
| 1. HOTELMACHER LLC, dba HOLIDAY INN EXPRESS, | |
| 2. STEAKMACHER, LLC, dba MONTANA MIKE'S STEAKHOUSE, | |
| 3. SCHUMACHER INVESTMENTS, LLC, dba WATER ZOO, | |
| 4. APEX USA, INC., | |
| 5. WALTER SCHUMACHER, | |
| 6. CAROLYN SCHUMACHER, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

1.      Plaintiffs Madelyn Casilao, Harry Lincuna and Allan Garcia (collectively,

"Plaintiffs") bring this action on behalf of themselves and all others similarly situated,

against Defendants Hotelmacher LLC, dba Holiday Inn Express; Steakmacher, LLC, dba

Montana Mike's Steakhouse; Schumacher Investments, LLC, dba Water Zoo; APEX

USA, Inc.; Walter Schumacher; and Carolyn Schumacher (collectively, "Defendants").

Plaintiffs allege as follows:

## INTRODUCTION

2.      This is an action brought by survivors of human trafficking.  Defendants

Walter and Carolyn Schumacher own and operate several hospitality businesses in Clinton,

Oklahoma, including a hotel, a large restaurant, and a waterpark.  To obtain cheap and

easily exploited labor for these businesses, Defendants engaged directly in a recruitment

scheme in the Philippines whereby they induced Filipino nationals to pay hefty fees to work

under the H-2B temporary foreign worker visa program.  Plaintiffs and putative class

members were promised full time work with good pay, free housing (or a housing

allowance), food, transportation, and stable, long-term work potential.  Instead of the

conditions they were promised, Plaintiffs and others similarly situated were transported to

Oklahoma and forced to work under conditions that carried little semblance to those to

which they had agreed.

3.      Defendants' recruiting agents in the Philippines defrauded Plaintiffs and other

putative class members throughout the recruitment process, inducing them into paying

substantial fees for recruitment, immigration processing and travel, under promises of

receiving full-time good paying jobs and reimbursement of some recruitment expenses.  By

employing Plaintiffs and putative class members under the auspices of temporary and

restricted H-2B guest worker visas, Defendants further caused Plaintiffs and the putative

class members to believe that if they did not work exclusively for Defendants, they would

suffer abuse or threatened abuse of the legal process, and/or serious financial and/or reputational harms.  Defendants' scheme was designed to make Plaintiffs and other putative class members afraid, intimidated, and powerless to leave Defendants' employment.

4.     Upon Plaintiffs' and the putative class members' arrival in the United States, Defendants blatantly disregarded the terms of employment they had promised and required Plaintiffs and the putative class members to labor under Defendants' imposed terms and conditions.  Specifically, Plaintiffs and the putative class members' hourly wage rate were significantly reduced from what they had agreed, and Defendants failed to provide full-time employment as promised.  Further, Defendants failed to provide Plaintiffs and the putative class members with free housing or housing allowances, but instead referred them to overcrowded and costly motel room accommodations at Plaintiffs' and the putative class members' own expense; failed to reimburse Plaintiffs and the putative class members for their travel expenses to the United States as required; failed to provide return travel expenses to the Philippines as required; and failed to provide free food and transportation to/from the worksite in Clinton as promised.

5.     Defendants intentionally created a situation where Plaintiffs and the putative class members were working few hours for little pay, barely earning enough to survive, let alone leave Clinton or cover the thousands of dollars they paid in recruitment fees and travel expenses.  This left Plaintiffs and the putative class members with no choice but to labor for Defendants on Defendants' terms.

6.     Plaintiffs Madelyn Casilao, Harry Lincuna, and Allan Garcia bring this action to recover damages on behalf of themselves and similarly situated "guest workers" from the Philippines who worked for Defendants in Oklahoma.  Plaintiffs and the putative class members were low-wage workers whom Defendants brought to the United States on temporary work visas because of an asserted shortage of U.S. workers to fill Defendants' available jobs.

7.     Plaintiffs assert class action claims for damages against Defendants arising from violations of their rights under the Trafficking Victims Protection Reauthorization Act ("TVPRA") and class action claims for damages arising from breach of contract.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 18 U.S.C. § 1595(a) (civil trafficking).

9.     This Court has supplemental jurisdiction over the claims based on state law pursuant to 28 U.S.C. § 1367(a), as the state law claims arise out of the same nucleus of facts which support the federal claims.

10.     Venue in the Western District of Oklahoma is proper under 28 U.S.C. § 1391 in that various Defendants and/or agents of Defendants reside and/or may be found in this District, and a substantial portion of the communications, transactions, events or omissions underlying Plaintiffs' claims occurred in this District.

## PARTIES

**A.     Plaintiffs.**

11.    Plaintiff Madelyn Casilao is an individual who was recruited in 2012 from the Philippines for work in the United States pursuant to an H-2B visa.  After arriving in the United States in 2012, Plaintiff Casilao worked at Hotelmacher LLC, doing business as the Holiday Inn Express in Clinton, Oklahoma.

12.    Plaintiff Harry Lincuna is an individual who was recruited in 2012 from the Philippines for work in the United States pursuant to an H-2B visa.  After arriving in the United States in 2012, Plaintiff Lincuna worked at Hotelmacher LLC, doing business as the Holiday Inn Express in Clinton, Oklahoma, and Schumacher Investments, LLC, doing business as Water Zoo in Clinton, Oklahoma.

13.    Plaintiff Allan Garcia is an individual who was recruited in 2012 from the Philippines for work in the United States pursuant to an H-2B visa.  After arriving in the United States in 2012, Plaintiff Garcia worked at Steakmacher LLC, doing business as Montana Mike's Steakhouse in Clinton, Oklahoma.

**B.    Defendants.**

14.    Defendant Hotelmacher LLC is a limited liability company organized under the laws of Oklahoma, doing business as the Holiday Inn Express in Clinton, Oklahoma.

15.    Defendant Steakmacher LLC is a limited liability company organized under the laws of Oklahoma, doing business as Montana Mike's Steakhouse in Clinton, Oklahoma.

Case No.:

CLASS ACTION COMPLAINT

16.     Defendant Schumacher Investments, LLC is a limited liability company organized under the laws of Oklahoma, doing business as Water Zoo Indoor Water Park in Clinton, Oklahoma.

17.     Upon information and belief, Defendant Walter Schumacher ("W. Schumacher") is an individual who resides in Clinton, Oklahoma and who owns and operates Defendant Hotelmacher LLC, Defendant Steakmacher LLC, and Defendant Schumacher Investments, LLC, together with his wife Carolyn Schumacher.

18.     Upon information and belief, Defendant Carolyn Schumacher ("C. Schumacher") is an individual who resides in Clinton, Oklahoma and who owns and operates Defendant Hotelmacher LLC, Defendant Steakmacher LLC, and Defendant Schumacher Investments, LLC, together with her husband Walter Schumacher.

19.     Defendant APEX USA Inc. ("APEX") is a not-for-profit corporation organized under the laws of Oklahoma and headquartered in Clinton, Oklahoma.  Upon information and belief, Defendant APEX engaged in the business of recruiting and providing foreign students and workers to United States companies, including for Defendants Hotelmacher LLC, Steakmacher LLC, Schumacher Investments, LLC, W. Schumacher and C. Schumacher.  APEX functioned as the human resources department for the other Defendants.

20.     All defendants listed above are referred to collectively herein as "Defendants."  Individually and through their agents, associates, attorneys, and/or employees, all Defendants have significant contacts with Clinton, Oklahoma.

Case No.:

CLASS ACTION COMPLAINT

21.    Plaintiffs are informed and believe and thereon allege that each of the Defendants acted in concert with each and every other defendant, intended to and did participate in the events, acts, practices, and courses of conduct alleged herein, and was a proximate cause of damage and injury thereby to Plaintiffs as alleged herein.  Each of the Defendants is jointly and severally liable to Plaintiffs and to the putative class members.

## RELEVANT NON-PARTIES

22.    Defendants employed agents, associates, representatives and/or recruiters in the Philippines to engage in direct recruitment of candidates on their behalf, including, without limitation, April Bayabos and Irah Ugboracion.  Such individuals are referred to herein as the "Recruiters."  The Recruiters were and held themselves out to be direct agents and representatives of Defendants.

## STATEMENT OF FACTS

### A.    The Global Human Trafficking Epidemic.

23.    Plaintiffs and putative class members are Filipino nationals who were trafficked from the Philippines to the United States by Defendants at various times beginning in 2008.

24.    Trafficking in human persons is a growing scourge around the world.  The United States government estimates that there are currently more than 20 million victims of human trafficking worldwide.[1]

---

[1] U.S. DEP'T OF STATE, TRAFFICKING IN PERSONS REPORT 7 (2013) (hereinafter "TIP 2013") (reporting that social scientists estimate that as many as 27 million persons are trafficking victims at any given time); U.S. DEP'T OF STATE, TRAFFICKING IN PERSONS REPORT 45 (2012) (estimate of modern slavery worldwide increased from 12.3 million

25.     Human traffickers prey on the most vulnerable members of society. Traffickers often trick, coerce, or win the confidence of their victims through promises of a better life,[2] frequently using "bait-and-switch scenarios."[3]

26.     Human trafficking is a profitable and prolific clandestine criminal enterprise operating underground in every country across the globe, producing an estimated $150 billion USD in profits each year for traffickers.[4]

27.     In an early effort to combat human trafficking domestically and abroad, Congress passed and repeatedly reauthorized the Trafficking Victims Protection Act of 2003 ("TVPRA").

28.     The TVPRA authorizes victims of human trafficking to file a civil action against any perpetrator or whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which that person knew or should have known was engaged in slavery, peonage, forced labor, involuntary servitude, unlawful conduct with respect to documents, and human trafficking.  The United States' commitment to prioritize anti-trafficking efforts is also manifest in its decision to become party to the United Nations' Protocol to Prevent, Suppress and Punish Trafficking in Persons, along with 163 other nations.

---

victims in 2005 to 20.9 million victims in 2012).

[2] U.S. DEP'T OF STATE, TRAFFICKING IN PERSONS REPORT 8 (2009).

[3] U.S. DEP'T OF STATE, TRAFFICKING IN PERSONS REPORT 27 (2011).

[4] INT'L LABOUR ORG. (ILO), PROFITS AND POVERTY: THE ECONOMICS OF FORCED LABOR 22 (2014), http://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_243391.pdf.

CLASS ACTION COMPLAINT

**B.    Human Trafficking Is Prevalent in the U.S. Hospitality Industry.**

29.    The hospitality industry in the U.S. is repeatedly recognized as one of the common industries vulnerable to trafficking.[5]

30.    A 2004 report by the University of California, Berkeley and Free the Slaves found, "Forced labor occurs in poorly regulated industries with a high demand for cheap labor- sweatshops, restaurants and hotels, in addition to agriculture and domestic work. A lack of official monitoring in these areas means unscrupulous employers and criminal networks can gain complete control over workers."[6]

31.    Human trafficking can manifest in the hotel industry in a variety of ways, including "[s]taff, especially those recruited or subcontracted via unscrupulous agencies, being victims of forced or bonded labour… The risk is higher in properties where there is sub-contracted staff, hiring of migrant workers, lack of policy and enforcement and lack of awareness in staff."[7]

32.    An analysis by Polaris reported that victims of labor trafficking have been found in hospitality businesses, where "[m]ost victims enter the job with an H-2B visa, which restricts visa portability, tying victims to their abusive employers."  The methods

---

[5]  Karen Schwartz, *New Report Details Exploitation of Hotel Industry Workers*, N.Y. TIMES (April 10, 2017), https://www.nytimes.com/2017/04/10/travel/new-report-human-trafficking-exploitation-of-hotel-industry-workers.html.

[6] University of California, Berkeley, *Modern slavery thriving in the U.S* [Press Release] (September 23, 2004), http://www.berkeley.edu/news/media/releases/2004/09/23_16691.shtml.

[7] Holly Tuppen, *Addressing Human Trafficking in the Hospitality Industry*, GREEN HOTELIER (July 18, 2013), http://www.greenhotelier.org/know-how-guides/addressing-human-trafficking-in-the-hospitality-industry/.

CLASS ACTION COMPLAINT

of control used by the traffickers, which may include hotel management or labor recruiters, include economic abuse and altered or fake contracts.  Further, "[d]ue to the lack of visa portability, threats of deportation and police involvement often keep workers from seeking help."[8]

33.    The Philippines is recognized as one of the top countries of origin of federally identified victims of trafficking in the United States.[9]  An estimated 10 million Filipinos work abroad, and a significant number of them are subjected to forced labor, including in hospitality-related jobs.[10]

**C.    Laws Regulating the Recruitment of Filipino Nationals for H-2B Employment in the U.S.**

34.    The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101(a)(15)(H)(ii)(b), provides for the admission into the United States of certain temporary workers.  These workers are referred to as "H-2B workers," which refers to the type of visa that the worker receives. Provisions related to the administration of the H-2B visa program are found in INA § 214, 8 U.S.C. § 1184, 8 C.F.R. § 214.2(h) (Department

---

[8]  POLARIS, THE TYPOLOGY OF MODERN SLAVERY: DEFINING SEX AND LABOR TRAFFICKING IN THE UNITED STATES  43-45 (Mar. 2017), https://polarisproject.org/sites/default/files/Polaris-Typology-of-Modern-Slavery.pdf.

[9]  U.S. DEP'T OF STATE, TRAFFICKING IN PERSONS REPORT 352 (2015); U.S. DEP'T OF STATE, TRAFFICKING IN PERSONS REPORT 397 (2014); TIP 2013 at 381.

[10]  U.S. DEP'T OF STATE, TRAFFICKING IN PERSONS REPORT 326 (2017).

of Homeland Security regulations), and 20 C.F.R § 655 (Department of Labor

regulations).

35.    An employer in the United States may sponsor foreign guest workers to

perform unskilled labor of a temporary nature if the United States Department of Labor

("DOL") certifies that (a) there are insufficient available workers within the United States

to perform the jobs, and (b) the employment of foreign guest workers will not adversely

affect the wages or working conditions of similarly situated U.S. workers.  8 U.S.C. §

1101(a)(15)(H)(ii)(b).

36.    An employer seeking the admission of H-2B workers must first file a

temporary labor certification application with DOL.  20 C.F.R. § 665.20 (2008).[11]  This

application must include an attestation from the employer that it will abide by applicable

regulatory requirements.  These requirements include:

    a.    Payment to all workers of at least the applicable H-2B prevailing

       wage during the entire period of the H-2B labor certification.

       20 C.F.R. § 665.22(e) (2008); and

    b.    Limiting any deductions from wages only to those that are

       "reasonable."  DOL has determined that expenses related to the

       worker's procurement of a visa and travel from his home to the

       employer's worksite primarily benefit the employer and are not

---

[11] The current DOL application for temporary employment certification of H-2B workers is entitled "ETA Form 9142B" and is available at: https://www.foreignlaborcert.doleta.gov/pdf/ETA_Form_9142B.pdf.

Case No.:

CLASS ACTION COMPLAINT

"reasonable" within the meaning of the Fair Labor Standards Act ("FLSA"). As such, an employer may not shift these costs to the workers when doing so would bring the worker's earnings below the applicable minimum and/or prevailing wage for the first workweek of employment. 20 C.F.R. § 655.22(g)(1) (2008); Field Assistance Bulletin No. 2009-2, August 21, 2009.

37.     Under the terms of the H-2B visa and the program's regulations, H-2B workers are permitted to work only for the specific employer that sponsored them.

**D.     Laws Regulating the Overseas Employment of Filipino Nationals.**

38.     Additionally, pursuant to Filipino law, Filipinos working overseas must receive exit approval from the Philippine Overseas Employment Administration ("POEA"), the Filipino government entity which regulates the recruitment of nationals from the Philippines to work abroad. The POEA's rules and regulations state that, unless otherwise provided, the employer will be responsible for the payment of the visa fee, airfare, POEA processing fee, and Philippine Overseas Workers Welfare Administration membership fee.

39.     In the course of the POEA application, employers must submit documentation to the POEA regarding the terms of employment offered to the Filipino overseas worker, including a POEA form that sets forth the job position, location, wages, hours, and other included benefits. The documentation must also be verified by the Philippine Overseas Labor Office ("POLO") to ensure that the terms of employment

comply with the minimum standards of the POEA and the government of the country of

destination.

**E.    In Order to Staff Hospitality Jobs in Oklahoma, Defendants Intentionally Misrepresented That They Would Comply with H-2B Program Requirements.**

40.    Defendants sponsored the H-2B visas of Plaintiffs and other putative class

members in order to fill their purported labor shortages.

41.    Defendants applied with the DOL for temporary labor certifications to

employ foreign workers in Oklahoma as H-2B workers at various times between January

1, 2008 and December 31, 2014 (the "Relevant Time Period"), as identified below:

> a.  2008: thirty-five workers certified for Steakmacher LLC;
>
> b.  2009: thirty-five workers certified for Steakmacher LLC;
>
> c.  2012: twelve workers certified for Hotelmacher LLC;
>
> d.  2012: twenty  workers certified for Steakmacher LLC; and
>
> e.  2014: six  workers certified for Schumacher Investments LLC.

42.    Each of these temporary labor certifications contained an attestation

pursuant to 20 C.F.R. § 655.20 (2008) that each of the requesting Defendants would

abide by applicable regulatory requirements pertaining to the H-2B temporary work

program and federal and state laws, including the requirement that the guest workers be

paid at least the H-2B prevailing wage.

43.    For example, the ETA Form 9142 for the twelve  workers certified for

Defendant Hotelmacher LLC in 2012 included a basic rate of pay of $8.59 to $8.97 per

hour for 40 hours per week.  The ETA Form 9142 for the twenty  workers certified for

Defendant Steakmacher LLC in 2012 included a basic rate of pay of $7.81 per hour for

40 hours per week.  Both the ETA Forms for Defendants Hotelmacher LLC and

Steakmacher LLC were signed by Defendant W. Schumacher.

44.     In connection with both applications, Defendant W. Schumacher signed an

employer declaration under penalty of perjury attesting, among other things, that:

    a.  The employer (Hotelmacher LLC and Steakmacher LLC) would pay
the offered wage;

    b.  The offered position was for full-time employment;

    c.  The employer and its agents did not seek or receive any payment
from employees for their labor certifications, including recruitment
costs or application fees;

    d.  The offered wage was not based on commissions, bonuses or other
incentives, unless the employer guarantees a wage paid on a weekly,
bi-weekly, or monthly basis that equals or exceeds the prevailing
wage, or the legal federal or state minimum wage, whichever is
higher; and

    e.  The information contained in the ETA Form 9142 was true and
accurate to the best of his knowledge.

CLASS ACTION COMPLAINT

45.    At the time Defendant W. Schumacher signed each of the temporary labor certification applications, he knew that Defendants would not pay the offered wage rates set forth in the applications.

46.    Upon information and belief, the ETA Form 750[12] for the thirty-five workers certified for Steakmacher LLC in 2008 included a basic rate of pay of $6.13 per hour and included an employer declaration signed by one of the Defendants or their agent making the same attestations.

47.    Upon information and belief, the ETA Form 9142 for the thirty-five workers certified for Steakmacher LLC in 2009 included a basic rate of pay of $7.25 per hour and included an employer declaration signed by one of the Defendants or their agent making the same attestations.

48.    Upon information and belief, the ETA Form 9142 or ETA Form 9412B for the six  workers certified for Schumacher Investments LLC in 2014 included a basic rate of pay of $9.73 per hour and included an employer declaration signed by one of the Defendants or their agent making the same attestations.

49.    DOL reviewed and ultimately approved each of the fraudulent temporary labor certification applications, which allowed Defendants to import H-2B workers to fill their labor needs pursuant to their applications.

**F.    Defendants Recruited Plaintiffs and Putative Class Members in the Philippines under Fraudulent Terms to Work in Oklahoma.**

---

[12] In 2008 the ETA Form 9142 was a different form called the ETA 750.

CLASS ACTION COMPLAINT

50.     During the Relevant Time Period, Defendants hired Recruiters who used various methods to recruit workers in the Philippines, including advertisements on websites, word of mouth, and referrals.

51.     Upon information and belief, the Recruiters engaged in such recruitment efforts under the direction of Defendant W. Schumacher, including communications via mail, fax, e-mail and/or telephone communications, in addition to in-person coordination with Defendant W. Schumacher, who traveled periodically to the Philippines in furtherance of Defendants' operations.

52.     Upon establishing contact with an interested candidate, the Recruiters supplied further information including an offer of employment letter (hereinafter "Offer Letter").  The Offer Letter was signed by Defendants' agent and/or representative, and included general employment terms such as the job location, dates of employment, basic pay, housing, and job description.  Candidates were required to sign and return the Offer Letter to the Recruiters in order to receive more information about the positions.  The basic pay rates in the Offer Letter equaled or exceeded the offered wage Defendants had included in their temporary labor certifications.

53.     In 2012, the Recruiters informed Plaintiff Casilao of a housekeeping position and sent her the corresponding Offer Letter.  The Recruiters explained that the position paid $8.29 to $8.97 per hour and that housing, food and transportation would be provided.  The Recruiters also promised that any processing and travel fees would be

reimbursed on arrival in Oklahoma, and that her H-2B visa would be renewed to continue to work for Defendants.

54.     In 2012, the Recruiters informed Plaintiff Lincuna of a housekeeping position that paid $8.29 to $8.97 per hour and sent him the corresponding Offer Letter. The Recruiters promised that housing, food and transportation would be provided and that any travel fees would be reimbursed on arrival in Oklahoma.

55.     In 2012, the Recruiters informed Plaintiff Garcia of a server position that paid $9.63 per hour and sent him the corresponding Offer Letter. The Recruiters promised that housing, food and transportation would be provided and that any travel fees would be reimbursed on arrival in Oklahoma.

56.     Similarly, other putative class members contacted or were contacted by the Recruiters regarding positions with Defendants. In emails, contracts, and other documents and communications, the Recruiters promised putative class members full-time jobs with hourly pay rates higher than the U.S. minimum wage; free housing (or housing allowance), food and transportation; reimbursed travel and recruitment expenses; and renewals of the H-2B visas once they arrived, resulting in long-term work and income potential in Oklahoma.

57.     The terms of employment included in the documents Defendants submitted to POEA and POLO formalized the verbal promises made to Plaintiffs and putative class members by the Recruiters. These forms were signed by Defendants W. Schumacher and/or C. Schumacher and included an employment contract signed by Defendants W.

Schumacher and/or C. Schumacher and the putative class members.  The terms of

employment included, among other things:

      a.  The job title, job location and basic rate of pay included in the Offer

          Letter;

      b.  Guaranteed wages no lower than the United States minimum wage

          or the minimum wage of the Philippines, whichever was highest;

      c.  Travel to Clinton and return travel to the Philippines upon contract

          completion at the employer's expense; and

      d.  Free food and lodging or a housing allowance.

58.    Upon information and belief, Defendants coordinated with the Recruiters to

offer these promises and written signed contracts, in order to induce Plaintiffs and

putative class members to pursue the work opportunities and pay the recruitment fees.

However, Defendants flagrantly misrepresented the terms of employment, and did not

have any intention of complying with the promises made in the Philippines to Plaintiffs

and putative class members.

**G.    Defendants Hid the Extent of Recruitment and Travel Fees from
Putative Class Members.**

59.    In reasonable reliance on promises made by Defendants, Plaintiffs and

putative class members invested their time and significant financial resources, including

taking out large loans, to secure what were represented to be desirable positions.

60.    Prospective H-2B workers must undertake a lengthy process to obtain an H-

2B visa, consisting of employment interviews, medical processing, and consular

interviews.  Prospective Filipino overseas workers must undertake additional steps to

obtain exit approval from POEA, including additional interviews and medical exams.

Defendants organized these processes through the Recruiters in the Philippines.

61.    Throughout the recruitment process, the Recruiters demanded and collected

various fees from Plaintiffs and the putative class members.  The extent of the required

fees was not disclosed at the outset of the recruitment process.  Instead, the extent of the

fees were intentionally hidden and payment was staggered throughout the process so that

Plaintiffs and the putative class members felt compelled to continue paying the required

fees, in fear of losing the previously paid fees.

62.    Throughout the recruitment process, the Recruiters charged Plaintiffs and

putative class members various types of fees, including, but not limited to, the following:

airfare and travel expenses, consular fees, U.S. embassy interview fees, medical exam

fees, POLO fees and POEA fees.  Additionally, upon information and belief, the

Recruiters also charged Plaintiffs and putative class members recruiter fees, or charged

inflated processing fees in excess of the actual costs of the services.

63.    The total out-of-pocket expense to pay these fees typically totaled between

approximately $2,000 and $3,000 USD.  This was a significant amount of money in the

Philippines, where the annual average income per family in 2012 was less than $6,000

USD.[13]

---

[13] *Filipino Families in the Poorest Decile Earn Six Thousand Pesos Monthly, on Average in 2012 (Results from the 2012 Family Income and Expenditure Survey)*, PHILIPPINE STATISTICS AUTHORITY (Oct. 24, 2013), https://psa.gov.ph/content/filipino-

CLASS ACTION COMPLAINT

64.    To pay these fees, Plaintiffs and putative class members used their savings and borrowed staggering sums of money from family members, friends, banks, and loan sharks, often at high interest rates, or mortgaged or sold property or land belonging to them or their families.

65.    Upon information and belief, Defendants were aware that Plaintiffs and putative class members had to pay recruitment fees in order to secure these positions.

66.    Plaintiffs and putative class members paid the foregoing fees in reasonable reliance on the terms of their contracts with Defendants, and would not have paid the extraordinary fees charged by the Recruiters for travel, visas, and work opportunities had they known that Defendants' promises and representations were false.

67.    As a direct result of Defendants' intentional and fraudulent misrepresentations of Plaintiff and putative members' hourly wage rates, full-time employment, and reimbursement of travel expenses, Plaintiffs and putative class members paid considerable sums in recruitment costs, often taking on considerable debt. Those recruitment costs could have been repaid in a fraction of the time for which their H-2B visas were valid, under the terms originally promised.  Instead, under the actual terms of employment, it would take Plaintiffs and putative class members several months to repay the recruitment costs.

68.    Upon information and belief, Defendants also fraudulently did not disclose to Plaintiffs and putative class members that the money they were required to pay as part

families-poorest-decile-earn-six-thousand-pesos-monthly-average-2012-results-2012.

CLASS ACTION COMPLAINT

of the recruitment process was for fees and expenses that were actually the responsibility of the petitioning employers, pursuant to regulations governing the H-2B visa program.

69.    After Plaintiffs and putative class members paid recruitment fees, Defendants prepared and sent Plaintiffs' and putative class members' I-129 applications for Plaintiffs and putative class members to United States Citizenship and Immigration Services, which included the temporary labor certifications approved by the DOL, whereby Defendants had fraudulently attested that employees would not be required to pay for fees and expenses that were the responsibility of the petitioning employer, pursuant to regulations governing the H-2B visa program.

**H.    Plaintiffs and Putative Class Members are Forced to Labor for Defendants in Oklahoma under Terms and Conditions that Breached Their Employment Contracts, and Violated Regulatory Requirements, Resulting in Threats of Serious Harm.**

70.    Once in Oklahoma, Defendants openly and consistently disregarded the employment terms contained in, or incorporated by law into, the written contracts between Plaintiffs and other putative class members on the one hand and Defendants on the other, and/or the government-certified H-2B visa applications.

71.    Upon arrival to the United States, Plaintiffs and putative class members were directed to report to the APEX office to commence work.  APEX employees informed Plaintiffs and putative class members that they would be working for certain Defendants, regardless of whether that Defendant was the party named in the putative class members' contracts and/or government-certified H-2B visa applications.

72.    For their own benefit, Defendants ignored their representations in the POEA documents, H-2B applications, and contracts with workers regarding which Defendant would employ each worker and in which position the worker would work at each Defendant.  Instead, Defendants treated Plaintiffs and the putative class workers as a disposable and malleable pool of labor that could be utilized by any of the Defendants for any purpose, under any employment terms Defendants were inclined to offer.  By employing Plaintiffs and putative class members in different positions than what was reflected on their visas and in their contracts, Defendants were in direct violation of the law and the H-2B program regulations.

73.    Defendants took advantage of the H-2B status of Plaintiffs and putative class members, which tied their immigration status to their petitioning employer, to mistreat Plaintiffs and putative class members—knowing that they could not legally leave Defendants' employment due to the H-2B program restrictions.

74.    Most critically, Defendants systematically paid Plaintiffs and putative class members significantly less than what was promised and what federal law mandated.  For example, Plaintiffs and putative class members working as housekeepers were paid approximately $4.25 per room cleaned.  This piece rate scheme did not satisfy Defendants' contractual promises or federal wage and hour law.  Plaintiffs and putative class members working as servers at Montana Mike's Restaurant were paid by Defendants just over $2.00 per hour plus tips.  Plaintiffs and putative class members working as breakfast cooks or Water Park employees were paid approximately $1 to $2

CLASS ACTION COMPLAINT

per hour less than they had been promised when offered employment as housekeepers or servers pursuant to their contracts with Defendants.

75.    Defendants also failed to provide Plaintiffs and putative class members with the full-time work that was promised.  Defendants modified the schedules of Plaintiffs and other putative class members arbitrarily based on their business needs. Several putative class members only worked a few hours per day, three to four days per week.  Due to their sparse and fluctuating work hours, Plaintiffs and other putative class members were barely able to earn enough to pay their living expenses in Oklahoma, and were not able to send money home to the Philippines to repay any debts they had incurred to obtain the H-2B visas.

76.    Defendants refused to reimburse Plaintiffs and other putative class members for their travel expenses to the United States or for the amounts paid in recruitment expenses.

77.    Defendants failed to provide Plaintiffs and putative class members with free food and free lodging or a housing allowance.  Instead, Plaintiffs and other putative class members were each required to pay approximately $150 to $300 per month - even if they shared a room with several others – at a local motel referred to them by Defendants. Plaintiffs and other putative class members also had to purchase their own food and did not have access to a kitchen to cook for themselves.  These conditions were in direct contradiction to the promises made by Defendants.

78.     Defendants further failed to provide transportation to the worksites; instead, Plaintiffs and other putative class members had to walk along or across a highway in order to get to their worksites, or pay for their own transportation.

79.     Defendants refused to extend the terms of the work visas for Plaintiffs and putative class members.  Due to Defendants' failure to extend the temporary work visas, many putative class members did not work in Oklahoma for the length of time they had counted on and did not make sufficient money to cover the recruitment fees they had paid.

80.     Defendants refused to pay return travel expenses for Plaintiffs and putative class members at the end of their H-2B employment term.

81.     Plaintiffs and putative class members complained to Defendants about Defendants' numerous breaches of Plaintiffs' contracts, which Defendants ignored.  For example, when Plaintiff Lincuna complained about the lack of promised transportation to the worksite and the danger of walking along or across a highway, Defendant W. Schumacher told him he would need to pay for a taxi or a shuttle..

82.     Through the additional living expenses, lower pay, and arbitrarily cut work hours, Defendants created a scheme whereby Plaintiffs and putative class members felt powerless and financially vulnerable, and feared the further serious financial harm they would face if they attempted to leave Defendants' employment, as they could not legally work elsewhere.

**I.     Defendants' Ongoing Methods of Intimidation and Manipulation.**

83.    Because they had paid massive recruitment fees, often taking on significant amounts of debt in the Philippines, and were struggling to make ends meet in Oklahoma, Plaintiffs and putative class members had no choice but to continue working for Defendants.

84.    Defendants refused to pay for Plaintiffs' and putative class members' return travel to the Philippines, and Plaintiffs and putative class members could not afford to pay for the costly return travel on their own.

85.    Further, Plaintiffs and putative class members could not return to the Philippines, because they would face serious financial harm due to the investments they had made in the recruitment fees and expenses, as many had already incurred substantial debt, often to unregulated lenders, in order to work for Defendants. Thus, Plaintiffs and putative class members could not have returned home or left Defendants' employ without first earning enough to repay those debts, which became impossible once Defendants deliberately reduced Plaintiffs' and putative class members' working hours and wage rates, and imposed unexpected living expenses.

86.    Plaintiffs and putative class members further felt as though they had no other choice but to continue working for Defendants because their immigration status was directly tied to Defendants and because of their limited English skills and unfamiliarity with the United States' legal system. Further, there was no Filipino community in Clinton, Oklahoma to assist Plaintiffs and putative class members with their situation.

87.     Plaintiffs and putative class members were also subjected to threats of implied physical harm from Defendant W. Schumacher.  For example:

      a.  Defendant W. Schumacher threatened Plaintiff Garcia and other putative class members by telling Plaintiff Garcia and other putative class members  that he carried a firearm in his car, as he was driving Plaintiff Garcia and other putative class members from the airport to Clinton, just after their arrival to the United States; and

      b.  When Plaintiff Garcia and other putative class members inquired about the promised airfare to and from the Philippines, Defendant W. Schumacher informed them that he would only pay for return airfare to the Philippines if the employee was returning "in a box."

88.     Other putative class members who witnessed and/or heard of these threats reasonably feared that they would suffer the same harms if they left employment with Defendant W. Schumacher.

89.     Defendant W. Schumacher further made it widely known to Plaintiffs and putative class members that he was a current and/or former police sheriff, suggesting his close ties with law enforcement.  Defendant W. Schumacher reinforced this intimidation by using a police patrol car and talking to Plaintiffs and putative class members from the police patrol car.

90.     Deeply fearful, isolated, disoriented, and unfamiliar with their rights, these workers felt compelled to continue working for Defendants.

Case No.:

91.     When Plaintiffs and other putative class members complained and attempted to obtain further employment locally to supplement their low wages, they were told that they could only work for Defendants as their H-2B employers.  Further, upon information and belief, Defendant W. Schumacher was a prominent figure in Clinton and it was widely known that he had ties to law enforcement.  Defendant W. Schumacher used his status to ensure that Plaintiffs and putative class members had no other options.  For example, upon information and belief, Defendant W. Schumacher confronted and threatened at least one local employer who previously hired putative class members.  Thus, other employers refused to take the risk of hiring any of his temporary guest workers that were in need of additional work.

## CLASS ACTION ALLEGATIONS

92.     Plaintiffs bring claims for actual and punitive damages on behalf of themselves and all similarly situated persons pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3).

93.     At all times relevant to this action, Plaintiffs and other putative class members were admitted to the United States under the H-2B temporary foreign worker visa program, 8 U.S.C. § 1101(a)(15)(H)(ii)(b), administered in part by the DOL.

94.     The class is defined as all Filipino nationals who obtained H-2B visas at any time from January 1, 2008 through December 31, 2014, who were admitted to the United States as H-2B temporary foreign workers, and for whom one of the Defendants was the H-2B petitioner or de facto employer upon arrival in the United States (the "Class").

A.     **Rule 23(a).**

95.    The precise number of individuals in the class is known only to Defendants, but the Class is believed to include at least 50 to upwards of 100 individuals.  Because of the number of putative class members and because putative class members are foreign nationals and migrant workers, joinder of all putative class members is impracticable.

96.    This action involves questions of law common to the class, including:

a.    Whether Defendants' conduct violated the forced labor and trafficking provisions of the TVPRA (18 U.S.C. §§ 1589, 1590, 1593A, and 1594);

b.    The terms of Plaintiffs' and other putative class members' contracts with Defendants ;

c.    Whether Defendants breached contracts with Plaintiffs and other putative class members;

d.    Whether Plaintiffs and other putative class members are third party beneficiaries of Defendants' contracts with the POEA;

e.    Whether Plaintiffs and other putative class members are third party beneficiaries of Defendants' contracts with the DOL; and

f.    The nature of damages available to Plaintiffs and other putative class members, including the applicability of compensatory and/or punitive damages.

97.    This action involves questions of fact common to the Class, including:

CLASS ACTION COMPLAINT

a. Whether Defendants used and/or threatened Plaintiffs and other putative class members with physical restraint, serious harm, and/or abuse of the legal process in order to obtain Plaintiffs' and other putative class members' labor or services;

b. Whether Defendants recruited, harbored, transported, obtained and/or provided Plaintiffs and other putative class members for the purpose of subjecting them to forced labor and/or involuntary servitude;

c. Whether Defendants knowingly benefitted from participating in a venture that Defendants knew or should have known was engaged in providing and/or obtaining Plaintiffs' and other putative class members' labor or services through physical restraint, serious harm, and/or abuse of the legal process;

d. Whether Defendants knowingly benefitted from participating in a venture that Defendants knew or should have known was engaged in the recruitment, harboring, transporting, obtaining and/or providing Plaintiffs and other putative class members for the purpose of subjecting them to forced labor and/or involuntary servitude;

e. Whether Defendants used standardized recruitment, record-keeping, and employment policies and practices for Plaintiffs and putative class members;

Case No.:

f.   Whether Defendants failed to comply with the terms of their contracts with Plaintiffs and other putative class members and, if so, which terms of which contracts were breached; and

g.   The source and amount of Plaintiffs' and other class members' damages.

98.    The claims asserted by Plaintiffs are typical of the claims of the Class.

99.    Plaintiffs will fairly and adequately protect the interests of the Class.

100.    Plaintiffs' counsel are experienced in handling class action litigation on behalf of immigrant workers like Plaintiffs and are prepared to advance costs necessary to vigorously litigate this action.

**B.    Rule 23(b)(3).**

101.    Common questions of law and fact relevant to the claims for relief, as identified above, predominate over any pertinent questions involving only individual members.

102.    A class action is superior to other available methods of adjudicating the claims set forth in the claims for relief because, *inter alia*:

a.   Common issues of law and fact, as identified in part above, substantially diminish the interest of putative class members in individually controlling the prosecution of separate actions;

b.   The putative class members are foreign nationals and migrant workers who lack the means and/or resources to secure individual legal

CLASS ACTION COMPLAINT

assistance and/or who are particularly likely to be unaware of their

rights to prosecute these claims;

c.  No member of the class has already commenced litigation to

determine the questions presented; and

d.  A class action can be managed with efficiency and without undue

difficulty because Defendants have systematically and regularly

committed the violations complained of herein and have used

standardized recruitment, record-keeping, and employment policies

and practices.

### FIRST CLAIM FOR RELIEF
**Violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA")**
**18 U.S.C. § 1595**
**Against All Defendants**

103.    Plaintiffs re-allege and incorporate by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

104.    Plaintiffs bring this claim on behalf of themselves and all other similarly

situated individuals against all Defendants.

105.    Plaintiffs are authorized to bring these civil claims against Defendants

pursuant to the civil remedies provision of the Trafficking Victims Protection

Reauthorization Act of 2003 (TVPRA), 18 U.S.C. § 1595.

106.    Plaintiffs are victims of forced labor, involuntary servitude and human

trafficking in violations of Title 18 U.S.C. §§ 1589, 1590, 1593A, and 1594.

107.    Defendants attempted to and did subject Plaintiffs and putative class members to forced labor in violation of 18 U.S.C. § 1589.

108.    Defendants knowingly obtained the labor and services of Plaintiffs and putative class members through serious harm and threats of serious harm, including serious financial and physical harm, in violation of 18 U.S.C. § 1589(a)(2).  Defendants induced Plaintiffs and putative class members to work in rural Oklahoma under the pretense of fraudulent contracts and promises, and then intentionally kept Plaintiffs and putative class members in a condition of financial vulnerability so that they had no choice but to labor for Defendants.

109.    Defendants knowingly obtained the labor and services of Plaintiffs and putative class members by means of a scheme, plan, or pattern which, in the totality of the circumstances, was intended to coerce and did coerce Plaintiffs and other putative class members to believe that they would suffer serious harm if they were to leave the employ of Defendants, in violation of 18 U.S.C.§ 1589(a)(4).  Defendants' scheme included fraudulent recruitment practices to induce Plaintiffs and putative class members to enter into employment contracts in the Philippines, making significant financial investments and/or incurring substantial debt in order to secure such positions, and material changes to the promises made on arrival in Oklahoma such that Plaintiffs and the putative class members had no choice but to work for Defendants under unlawful conditions to which they never agreed.  Defendants further threatened Plaintiffs and the putative class members with implied physical harm.

Case No.:

CLASS ACTION COMPLAINT

110.    Defendants flagrantly violated the H-2B program requirements, and further used the restrictive terms of the H-2B visas to coercive ends, in a manner that constitutes an abuse of the legal process under 18 U.S.C. § 1589(a)(3).

111.    Defendants knowingly recruited, harbored, transported, and/or obtained Plaintiffs and the putative class members for labor or services in violation of laws prohibiting involuntary servitude and/or forced labor, in violation of 18 U.S.C. § 1590.

112.    Alternatively, Defendants have knowingly benefitted financially and/or by receiving the value of labor from H-2B workers through their participation in a venture which Defendants knew or should have known was engaged in violations the TVPRA, or in reckless disregard of the fact that the venture was engaged violations of the TVPRA, in violation of sections 1589, 1593A, and 1595.  Defendants intentionally entered into contracts with no intention of complying with the terms promised, intentionally violated the regulatory requirements imposed by the POEA and the H-2B program, and ignored the various complaints made by Plaintiffs and putative class members regarding such fraudulent and coercive conditions.

113.    As a result of their participation in such venture, Defendants were to receive, and did knowingly receive, numerous benefits including:

    a.  having workers recruited from the Philippines;

    b.  not being required to pay for the fees and expenses related to the H-2B visa process or to pay for the procurement of Filipino work with H-2B visas; and

c.  having cheap and easily exploitable labor available to staff

Defendants' businesses.

114.  Defendants and Recruiters conspired to commit the violations of the

Trafficking Victims Protection Reauthorization Act described herein, in violation of section

1594.  Defendants worked in partnership with the Recruiters in the Philippines to implement

a scheme of fraudulent recruitment practices, designed to induce Plaintiffs and putative class

members to make significant financial investments to enter into employment contracts with

Defendants in the Philippines.  Defendants used the financial vulnerability created by this

recruitment scheme, along with the restrictive terms of the H-2B program, to obtain the

labor of Plaintiffs' and putative class members through serious harm and/or the threat of

serious harm, as described above.

115.  Plaintiffs and other putative class members suffered injury as a proximate

result of these actions.

116.  Plaintiffs and other putative class members are entitled to compensatory and

punitive damages in an amount to be determined at trial and any other relief deemed

appropriate, including reasonable costs and attorneys' fees.

## SECOND CLAIM FOR RELIEF
### BREACH OF WRITTEN EMPLOYMENT CONTRACT
### (Under Oklahoma State Law)
### Against All Defendants

117.  Plaintiffs re-allege and incorporate by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

118.    Plaintiffs bring this claim on behalf of themselves and all other similarly situated individuals against all Defendants.

119.    This claim sets forth a claim for damages resulting from Defendants' breach of the contracts between Plaintiffs and putative class members on the one hand and Defendants on the other.

120.    The DOL-approved temporary labor certifications for Plaintiffs' and other putative class members' H-2B visas (ETA Form 9142 or ETA Form 9142B), the accompanying attestations, and the applicable regulatory requirements were incorporated by law into the contracts between Defendants on the one hand and Plaintiffs and other putative class members on the other, with enforceable terms and conditions of employment, including an enforceable guarantee of wages no less than the federal minimum and H-2B prevailing wages.

121.    Further, the documents submitted to the POEA, including the applicable regulatory requirements, were incorporated by law into the contracts between Defendants on the one hand and Plaintiffs and other putative class members on the other, with enforceable terms and conditions of employment, including guaranteed wages of at least minimum wage or the amount that Defendants represented that they would pay Plaintiffs and other putative class members, regular work hours of eight hours per day, and free lodging (or a housing allowance), food and transportation.

122.    As set forth in the preceding paragraphs, Defendants, individually and through their agents, employees and/or representatives, offered Plaintiffs and putative class

Case No.:
CLASS ACTION COMPLAINT

members jobs in the United States under certain terms and conditions as set forth in the

contracts between Plaintiffs and putative class members on the one hand and Defendants on

the other.  In reasonable reliance upon these specified terms and conditions, Plaintiffs and

other putative class members invested large sums of money and/or entered into substantial

debts, surrendered other employment opportunities, and incurred other financial losses.

123.    Plaintiffs and the other putative class members satisfactorily performed all

employment duties and responsibilities required of them under their contracts.

124.    Defendants uniformly and systematically breached their obligations under the

contracts by:

    a.  failing to provide or reimburse Plaintiffs and other putative class members for visa and recruitment fees incurred in securing approval to work for Defendants;

    b.  failing to compensate Plaintiffs and other putative class members at the hourly rates promised;

    c.  compensating Plaintiffs and other putative class members below the federal minimum wage and/or applicable H-2B prevailing wage for their work

    d.  scheduling Plaintiffs and other putative class members to work fewer than full-time hours;

    e.  directing Plaintiffs and other putative class members to work for Defendants other than the Defendant indicated in the putative class

CLASS ACTION COMPLAINT

members' contracts, POEA documents, and/or H-2B visa application, or in positions other than the positions indicated in the putative class members' contracts, POEA documents, and/or H-2B visa application;

f.   failing to provide free lodging (or a housing allowance), food, transportation, and travel expenses;

g.   failing to reimburse Plaintiffs and other putative class members for their airfare to Clinton, Oklahoma; and

h.   failing to provide return travel to the Philippines upon contract completion.

125.    Defendants' breaches of Plaintiffs and the putative class members' contracts caused Plaintiffs' and the putative class members substantial injuries, for which they are entitled to actual and consequential damages and prejudgment interest.

## THIRD CLAIM FOR RELIEF
## THIRD-PARTY BENEFICIARY CLAIM FOR BREACH OF CONTRACT
### (Under Oklahoma State Law)
### Against All Defendants

126.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

127.    Plaintiffs bring this claim on behalf of themselves and all other similarly situated individuals against all Defendants.

128.    This claim sets forth a third-party beneficiary claim for damages resulting from Defendants' breach of the agreement between Defendants and the POEA (the "POEA

Case No.:

Contract"), the terms of which may be ascertained by reference to the documents submitted to POEA to secure exit permits for Plaintiffs and the putative class members.

129.   The documents submitted to POEA formed valid and enforceable contracts between Defendants and POEA, which were entered into for the benefit of Plaintiffs, and/or such benefit was the direct result of the performance within the contemplation of Defendants and POEA, including the guarantee that Plaintiffs and the putative class members would not be paid less than the federal minimum wage or the amount that Defendants represented that they would pay Plaintiffs and the putative class members, and that Plaintiffs and the putative class members would be entitled to free lodging, food and transportation.

130.   As set forth in the preceding paragraphs, Defendants, individually and through their agents, employees and/or representatives, entered into the POEA Contract with the POEA in order to secure the employment of Plaintiffs and putative class members in the United States.  The POEA Contract constitutes a valid and enforceable contract.

131.   The POEA Contract was entered into for the benefit of Plaintiffs and the putative class members, and/or such benefit was the direct result of the performance within the contemplation of Defendants and the POEA.

132.   Both Defendants and POEA owed Plaintiffs and putative class members a legal obligation and/or duty.

133.    Defendants' and POEA's legal obligation and/or duty to Plaintiffs and putative class members connect Plaintiffs and the putative class members with the contracts between Defendants and POEA.

134.    Plaintiffs and putative class members are third-party beneficiaries of the contracts Defendants entered into with POEA.

135.    Defendants breached their contracts with POEA by:

    a.   failing to compensate Plaintiffs and other putative class members at the hourly rates promised;

    b.   compensating Plaintiffs and other putative class members below the federal minimum wage for their work;

    c.   failing to provide free food and lodging or a housing allowance;

    d.   failing to provide travel to Clinton, Oklahoma; and

    e.   failing to provide return travel to the Philippines upon contract completion.

136.    Defendants' breach of its contracts with the POEA caused Plaintiffs and the putative class members substantial injuries, for which Plaintiffs are entitled to actual and consequential damages and prejudgment interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

CLASS ACTION COMPLAINT

a.  Certifying Plaintiffs' First through Third Claims for Relief in this action as class claims pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure;

b.  Designating Plaintiffs as class representatives pursuant to Federal Rule of Civil Procedure 23, and designating counsel for Plaintiffs as counsel for the Class;

c.  Compensatory damages;

d.  Punitive damages;

e.  Awarding Plaintiffs' reasonable attorneys' fees and costs; and

f.  Such other relief as the Court deems just and appropriate.

CLASS ACTION COMPLAINT

Dated:  July 26, 2017    Respectfully Submitted,

           Brady Henderson


      By: s/Brady Henderson
        AMERICAN CIVIL LIBERTIES UNION
        OF OKLAHOMA
        3000 Paseo Drive
        Oklahoma City, OK 73103
        Telephone (405) 525-3831
        Fax:  (405) 524-2296
        Email:  BHenderson@acluok.org

        Attorney(s) for Plaintiffs and the Proposed
        Class

        Carole Vigne, *Pro Hac Vice* Pending
        Mana Barari, *Pro Hac Vice* Pending
        LEGAL AID AT WORK
        180 Montgomery Street, Suite 600
        San Francisco, CA  94104
        Telephone: (415) 864-8848
        Facsimile: (415) 593-0096
        Emails:  cvigne@legalaidatwork.org
            mbarari@legalaidatwork.org

        Eben Colby, *Pro Hac Vice* Pending
        Catherine Fisher, *Pro Hac Vice* Pending
        Adam Sleeper, *Pro Hac Vice* Pending
        500 Boylston Street
        Boston, MA 02116
        Telephone: (617) 573-4855
        Facsimile: (617) 305-4855
        Emails: Eben.Colby@probonolaw.com
           Catherine.Fisher@probonolaw.com
           Adam.Sleeper@probonolaw.com


        Daniele Schiffman, *Pro Hac Vice* Pending

CLASS ACTION COMPLAINT

1440 New York Avenue NW
Washington, DC 20005
Telephone:    (202) 371-7372
Facsimile:    (202) 661-0512
Email:  Daniele.Schiffman@probonolaw.com

Christopher J. Willett, *Pro Hac Vice* Pending
Caitlin Boehne, *Pro Hac Vice* Pending
EQUAL JUSTICE CENTER
510 Congress Ave., Ste. 206
Austin, Texas  78704
Telephone:    (512) 474-0007
Facsimile:    (512) 474-0008
Emails:        cwillett@equaljusticecenter.org
              cboehne@equaljusticecenter.org

CLASS ACTION COMPLAINT