# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

MADELYN CASILAO, HARRY
LINCUNA, and ALLAN GARCIA, on
behalf of themselves and all others
similarly situated,
Plaintiffs,

v.

Case No.:  5:17-CV-00800-M

HOTELMACHER LLC, dba HOLIDAY
INN EXPRESS; STEAKMACHER,
LLC, dba MONTANA MIKE'S
STEAKHOUSE; SCHUMACHER
INVESTMENTS, LLC, dba WATER
ZOO; APEX USA, INC.; WALTER
SCHUMACHER; and CAROLYN
SCHUMACHER,

Defendants.

## PLAINTIFFS' MEMORANDUM
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Brady Henderson
AMERICAN CIVIL LIBERTIES
    UNION OF OKLAHOMA
3000 Paseo Drive
Oklahoma City, OK 73103

Carole Vigne, *Pro Hac Vice*
Mana Barari, *Pro Hac Vice*
LEGAL AID AT WORK
180 Montgomery Street, Suite 600
San Francisco, CA  94104

Christopher J. Willett, *Pro Hac Vice*
Caitlin Boehne, *Pro Hac Vice*
EQUAL JUSTICE CENTER
510 Congress Ave., Ste. 206
Austin, Texas 78704

Eben Colby, *Pro Hac Vice*
Catherine Fisher, *Pro Hac Vice*
500 Boylston Street
Boston, MA 02116

Daniele Schiffman, *Pro Hac Vice*
1440 New York Avenue NW
Washington, DC 20005

Date:  October 13, 2017

*Attorneys for Plaintiffs and Proposed Class*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.............................................................................iii

PRELIMINARY STATEMENT ...................................................................... 1

STATEMENT OF FACTS............................................................................. 4

ARGUMENT................................................................................................. 6

    I.       STANDARD OF REVIEW ................................................................ 6

    II.     THE COMPLAINT PLAUSIBLY ALLEGES TVPRA CLAIMS.............. 7

          A.     The Complaint States A Claim Under 18 U.S.C. § 1589.................. 7

               1.     The Complaint Alleges Threats Of  Serious Harm And A Scheme Intended To Cause Plaintiffs To Believe They Would Suffer Serious Harm ........................................... 9

               2.     The Complaint Alleges Abuse Of Legal Process.................. 12

          B.     The Complaint Alleges TVPRA Claims Against All Defendants........................................................................ 14

               1.     The Complaint Alleges That All Defendants Participated In And Benefited From The Forced Labor Scheme ........................................................... 15

               2.     The Complaint Alleges Claim Against All Defendants As Knowing Beneficiaries Of Forced Labor ....................... 16

               3.     The Complaint Alleges Claim Against All Defendants As Conspirators ................................................... 17

    III.    THE COMPLAINT ALLEGES BREACH OF CONTRACT CLAIMS UNDER OKLAHOMA LAW.................................................... 18

          A.     The Complaint Alleges Contract Claims Under Three Theories ................................................................ 18

          B.     Defendants' Various Arguments Do Not Support Dismissal of The Contract Claims......................................................... 21

               1.     H-2B Regulations Do Not Preclude Workers From Asserting State Law Claims For Breach Of Contact ........... 21

i

        2.      Plaintiffs' Employment Contracts Had Sufficient Consideration ....................................................................... 24

        3.      The Complaint Alleges Contract Claims Against All Defendants............................................................................ 26

        4.      FLSA Does Not Preempt Plaintiffs' Contract Claims .......... 28

  IV.    THE COMPLAINT ADEQUATELY ALLEGES CLASS CLAIMS ........ 29

      A.    The Complaint Adequately Pleads Factual Allegations Sufficient To Establish That Joinder Would Be Impracticable ....... 30

      B.    Defendants Have Not Shown That Individualized Inquiries Will Preclude Predominance ............................................................ 33

CONCLUSION ................................................................................................. 35

## TABLE OF AUTHORITIES

**CASES**                                                                   **PAGE(S)**

*Adhikari v. Daoud & Partners*,
    697 F. Supp. 2d 674 (S.D. Tex. 2009) ................................................................ 16

*Al-Watan v. American Airlines Inc.*,
    570 F. Supp. 23d 925 (E.D. Mich. 2008) ............................................................ 26

*Anderson v. Sara Lee Corp.*,
    508 F.3d 181 (4th Cir. 2007) .............................................................................. 29

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................. 6

*Auer v. Robbins*,
    519 U.S. 452 (1997) ........................................................................................... 24

*Aviles-Cervantes v. Outside Unlimited, Inc.*,
    No. 16-1214, 2017 WL 3916985 (D. Md. Sep. 7, 2017) .................................... 25

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................. 6

*Belote v. Rivet Software*,
    No. 12–cv–02792, 2013 WL 2317243 (D. Colo. May 28, 2013) ........................ 31

*Bennett v. Sprint Nextel Corp.*,
    298 F.R.D. 498 (D. Kan. 2014) .......................................................................... 31

*Bojorquez-Moreno v. Shores & Ruark Seafood Co.*,
    92 F. Supp. 3d 459 (E.D. Va. 2015) ............................................................. 22, 23

*Camayo v. John Peroulis & Sons Sheep, Inc.*,
    Nos. 10–cv–00772, 11–cv–01132,
    2012 WL 4359086 (D. Colo. Sept. 24, 2012) ......................................... 12, 13, 14

*CGC Holding Co., LLC v. Broad & Cassel*,
    773 F.3d 1076 (10th Cir. 2014) ..................................................................... 33, 34

*Cherokee Lines, Inc. v. Bailey*,
    1993 OK 111, 859 P.2d 1106 ........................................................................ 19, 28

**CASES (cont.)**                                                    **PAGE(S)**

*Colorado Cross Disability Coalition v. Abercrombie & Fitch Co.*,
    765 F.3d 1205 (10th Cir. 2014)........................................................... 30

*Cordova v. R & A Oysters, Inc.*,
    101 F. Supp. 3d 1192 (S.D. Ala. 2015)......................................... 23, 24

*Cordova v. R & A Oysters, Inc.*,
    169 F. Supp. 3d 1288, 1292-23 (S.D. Ala. 2016) ........................... 25, 26

*Cuellar-Aguilar v. Deggeller Attractions, Inc.*,
    812 F.3d 614 (8th Cir. 2015).................................................................. 22

*David v. Signal Intern., LLC*,
    No. 08-1220, 2012 WL 10759668, at *22 (E.D. La. Jan. 4, 2012)...................... 34

*David v. Signal Int'l, LLC*,
    37 F. Supp. 3d 822  (E.D. La. 2014) ..................................................... 10

*DeLeon-Granados v. Eller & Sons Trees, Inc.*,
    497 F.3d 1214 (11th Cir. 2007)............................................................. 29

*Digital Design Group, Inc. v. Information. Builders, Inc.*,
    2001 OK 21, 24 P.3d 834....................................................................... 18

*Dollison v. American National Ins. Co.*,
    No. 13-CV-0100, 2013 WL 1944891 (N.D. Okla. May 9, 2013)........................ 29

*East Central Okla. Elec. Coop., Inc. v. Public Service Co.*,
    1970 OK 80, 469 P.2d 662................................................................. 20, 22

*Elat v. Ngoubene*,
    993 F. Supp. 2d 497 (D. Md. 2014) ...................................................... 15

*Fast v. Applebee's Intern., Inc.*,
    638 F.3d 872 (8th Cir. 2011)................................................................ 24

*Garcia v. Frog Island*,
    644 F. Supp. 2d 696 (E.D.N.C. 2009)................................................ 22, 23

*George v. Urban Settlement Services*,
    833 F.3d 1242 (10th Cir. 2016)............................................................... 6

iv

**CASES (cont.)**                                              **PAGE(S)**

*Gragg v. James,*
    1969 OK 58, 452 P.2d 579................................................................. 24, 25

*Hockenbury v. Hanover Ins. Co.,*
    No. CV-15-1003, 2016 WL 552967 (W.D. Okla. Feb. 10, 2016) ....................... 30

*Home Owners' Loan Corp. v. Thornburgh,*
    1940 OK 424, 187 Okla. 699, 106 P.2d 511 ........................................ 25

*In re OnStar Contract Litigation,*
    278 F.R.D. 352 (E.D. Mich. 2011) ....................................................... 32

*In re Urethane Antitrust Litigation,*
    768 F.3d 1245 (10th Cir. 2014).......................................................... 33

*Jimenez v. GLK Foods LLC,*
    Nos. 12-cv-209, 12-cv-210,
    2016 WL 2997498 (E.D. Wis. May 23, 2016)............................... 23, 24

*Kiwanuka v. Bakilana,*
    844 F. Supp. 2d 107 (D.D.C. 2012) ................................................... 11

*Lagasan v. Al-Ghasel,*
    92 F. Supp. 3d 445 (E.D. Va. 2015) ............................................. 17, 18

*Landrum v. Ownby,*
    1955 OK 343, 209 P.2d 400.............................................................. 19

*Matter of Estate of Vose,*
    2017 OK 3, 390 P.3d 238.......................................................... 22, 24, 28

*Menocal v. GEO Group, Inc.,*
    320 F.R.D. 258 (D. Colo. 2017).................................................... 31, 34

*Mojsilovic v. Oklahoma ex rel. Bd. of Regents for the University of Oklahoma,*
    No. CIV-14-886, 2015 WL 1542236 (W.D. Okla. Apr. 7, 2015) ................. 13, 16

*Moodie v. Kiawah Island Inn Co., LLC,*
    124 F. Supp. 3d 711 (D.S.C. 2015)...............................................passim

**CASES (cont.)**                                                        **PAGE(S)**

*Muchira v. Al-Rawaf*,
    850 F.3d 605 (4th Cir. 2017) .................................................................... 9

*Nuñag-Tanedo v. E. Baton Rouge Parish School Bd.*,
    790 F. Supp. 2d 1134 (C.D. Cal. 2011) ...................................................... 8, 9, 11

*Nuñag-Tanedo v. E. Baton Rouge Parish School Bd.*,
    No. SACV 10-01172, 2011 WL 7095434 (C.D. Cal. Dec. 12, 2011) ................. 34

*Panwar v. Access Therapies, Inc.*,
    975 F. Supp. 2d 948 (S.D. Ind. 2013) ........................................................... 10, 12

*Ramos-Madrigal v. Mendiola Forestry Serv., LLC*,
    799 F. Supp. 2d 958 (W.D. Ark. 2011) ......................................................... 13

*Rao v. Covansys Corp.*,
    No. 06-c-5451, 2007 WL 3232492 (N.D. Ill. Nov. 1, 2007) ................... 24, 25, 26

*Rex v. Owens ex rel. State of Okla.*,
    585 F.2d 432 (10th Cir. 1978) ...................................................................... 31, 32

*Ricchio v. McLean*,
    853 F.3d 553 (1st Cir. 2017) ........................................................................ 16, 18

*Roberts v. Target Corp.*,
    No. CIV-11-951, 2012 WL 2357420 (W.D. Okla. June 20, 2012) ..................... 32

*Safe Streets Alliance v. Hickenlooper*,
    859 F.3d 865 (10th Cir. 2017) ...................................................................... 6

*SEC v. Shields*,
    744 F.3d 633 (10th Cir. 2014) ...................................................................... 6

*Tal v. Hogan*,
    453 F.3d 1244 (10th Cir. 2006) .................................................................... 26

*Teoba v. TruGreen Landcare LLC*,
    No. 10-cv-6132, 2013 WL 1560208 (W.D.N.Y. Apr. 10, 2013) ....................... 29

*Trevizo v. Adams*,
    455 F.3d 1155 (10th Cir. 2006) .................................................................... 32

**CASES (cont.)**                                                                 **PAGE(S)**

*United States v. Farrell*,
  563 F.3d 364 (8th Cir. 2009)..................................................................... 11

*United States v. Askarkhodjaev*,
  No. 09–00143–01–CV,
  2010 WL 4038783 (W.D. Mo. Sept. 23, 2010) ...................................... 15

*United States v. Bradley*,
  390 F.3d 145 (1st Cir. 2004) ..................................................................... 11

*United States v. Calimlim*,
  538 F.3d 706 (7th Cir. 2008)......................................................... 10, 13, 14

*United States v. Cook*,
  782 F.3d 983 (8th Cir. 2015)..................................................................... 17

*United States v. Dann*,
  652 F.3d 1160 (9th Cir. 2011)............................................................... 9, 11

*Williams v. CitiMortgage, Inc.*,
  No. CIV-13-354, 2014 WL 1406601 (W.D. Okla. Apr. 10, 2014) .................... 32

*Willis v. Enter. Drilling Fluids, Inc.*,
  No. 1:15-CV-00688, 2015 WL 6689637 (E.D. Cal. Oct. 28, 2015).................... 32

*Wornicki v. Brokerpriceopinion.com, Inc.*,
  No. 13-CV-03258, 2015 WL 1403814 (D. Colo. Mar. 23, 2015) ...................... 30

*Zuniga v. Bernalillo County*,
  319 F.R.D. 640 (D.N.M. 2016) ............................................................... 31

**STATUTES**                                                                      **PAGE(S)**

18 U.S.C. § 1589 ............................................................................... passim

18 U.S.C. § 1590 ............................................................................... passim

18 U.S.C. § 1591 ..................................................................................... 16

18 U.S.C. § 1593 ..........................................................................7, 8, 16, 17

**STATUTES (cont.)**                                    **PAGE(S)**

18 U.S.C. § 1594 ................................................................................. 7, 8, 18

18 U.S.C. § 1595 ................................................................................... 7, 16

Okla. Stat. Ann. tit. 15 § 29 ................................................................. 20, 21

**RULES AND REGULATIONS**                               **PAGE(S)**

20 C.F.R. § 655.5 ........................................................................................ 27

20 C.F.R. § 655.10 ...................................................................................... 27

20 C.F.R. § 655.20 ...................................................................................... 28

20 C.F.R. § 655.102 .................................................................................... 23

29 C.F.R. § 503 ........................................................................................... 23

Fed. R. Civ. P. 8 ........................................................................................... 6

Fed. R. Civ. P. 12 ............................................................................... 2, 6, 26

Fed. R. Civ. P. 23 ....................................................................................... 29

**OTHER AUTHORITIES**                                   **PAGE(S)**

77 Fed. Reg. 10038 (Feb. 21, 2012) ......................................................... 24

H.R. Conf. Rep. 106–939 (2000) ................................................................. 8

Restatement (Third) of Contracts, Employment Law, § 2.01 .......................... 19

## PRELIMINARY STATEMENT

Plaintiffs are victims of forced labor and human trafficking brought to the United States by Defendants under the H-2B guest worker program to work in the hospitality industry in Clinton, Oklahoma.  Defendants Walter Schumacher and Carolyn Schumacher own and operate several hospitality businesses in Clinton, Oklahoma, including the hotel, restaurant, and waterpark for which they recruited H2-B workers, also named as Defendants.  The Complaint sets forth detailed factual allegations that Defendants subjected Plaintiffs and putative class members to forced labor in violation of the Trafficking Victims Protection Reauthorization Act of 2003 ("TVPRA"), and breached employment contracts with Plaintiffs and putative class members, as well as contracts with the Philippine Overseas Employment Administration ("POEA") to which Plaintiffs and putative class members were third party beneficiaries.

Defendants have ostensibly moved to dismiss all claims in six nearly identical motions,[1] but these partial, meritless and muddled motions ignore the precise, sufficiently plead allegations in the Complaint, improperly insert factual disputes that are incompatible with a motion to dismiss, and fundamentally misconstrue Plaintiffs' claims by attacking "strawman" arguments (even, in one instance, attacking a cause of action that Plaintiffs do not assert).

*Disputing Factual Allegations.*  Defendants' motions improperly quarrel with the Complaint's factual allegations and rely on highly unreasonable and improper inferences

---

[1]     Although each Defendant filed a separate motion to dismiss, Plaintiffs are addressing the motions collectively because they make largely identical arguments.

1

in Defendants' favor. As an initial matter, Defendants attempt to introduce material outside of the four corners of Complaint. ECF No. 28 at 1-2. Although Defendants disingenuously disclaim reliance on this material, it is a transparent and improper attempt to influence this Court's view of the plausibility of Plaintiffs' factual allegations. <u>Id.</u> With respect to other allegations, where Plaintiffs have alleged precisely the type of threats that can support a TVPRA claim, Defendants' only response is to posit a highly unreasonable inference that such conduct was innocuous. For example, Defendants assert that Mr. Schumacher telling Plaintiffs about a firearm carried in his car was harmless "innuendo," and his reference to Plaintiffs being sent back to the Philippines "in a box" -- plainly a reference to a coffin -- "does not resemble a threat of physical force." ECF No. 28 at 14-15. Such inferences are not only illogical, they are inconsistent with the Rule 12(b)(6) requirement to draw all inferences in the Plaintiffs' favor.

*Addressing Claims Not Plead.* Defendants' motions rely on attacking legal theories not advanced by Plaintiffs. For example, Defendants spend pages of argument on why Plaintiffs could not bring claims under the Fair Labor Standards Act ("FLSA"), even though Plaintiffs have not made any claim under the FLSA. Further, Defendants' argument that Plaintiffs' contract claims should be dismissed because the FLSA provides the sole remedy for wage-based claims misunderstands the basis for those claims (Oklahoma contract law) and the law concerning FLSA preemption.

*TVPRA Claim.* Defendants seek dismissal of Plaintiffs' TVPRA claim on the grounds that Plaintiffs have not plausibly alleged a particularly extreme form of forced labor. This argument fails because Plaintiffs do not claim to have experienced that form

of trafficking, nor is that extreme type of trafficking a necessary condition for a TVPRA claim.  Defendants' argument relies on a misstatement of the scope of the TVPRA, despite the clear language and case precedent indicating that Plaintiffs' experiences *as plead* fall squarely within the statute: a fraudulent recruiting scheme, the threat of financial harm, implied threats of immigration consequences, and other thinly veiled threating conduct.  (Further, as noted above, to the extent that Defendants actually do respond to Plaintiffs' factual allegations, they draw unreasonable inferences in their own favor.)

*Contract Claim.*  Plaintiffs have alleged that Defendants breached the terms of their employment contract by failing to pay promised wages and provide other benefits such as transportation to and from the United States.  The Complaint alleges that these terms of employment are captured in signed offers of employment, as well certain Department of Labor ("DOL") and POEA documents and regulations.  In their motions, Defendants completely ignore signed offers of employment setting out the terms of employment that Defendants later breached, and their motions should fail on that basis alone.  Further, with respect to the DOL and POEA documents and regulations, Defendants rely on cases since discredited and contrary to Oklahoma law to argue that such documents cannot be the basis of a state law breach of contract claim.

For these reasons and others stated below, Defendants' motions should be rejected in their entirety.

## STATEMENT OF FACTS

Plaintiffs are individuals recruited from the Philippines by the Defendants and their agents to work in the United States pursuant to a H-2B visa, and they seek to represent a class of similarly situated H-2B workers recruited from the Philippines to work for Defendants between 2008 and 2014.  Compl.  ¶¶ 11-13, 94.  Defendants Walter Schumacher and Carolyn Schumacher own and operate several hospitality businesses in Clinton, Oklahoma, including Defendant Hotelmacher LLC (a hotel), Defendant Steakmacher LLC (a restaurant) and Defendant Schumacher Investments, LLC (a water park).  Id.  ¶¶ 2, 14-18.  Defendant APEX USA Inc. ("APEX") functioned as the human resources department for the other Defendants, including by providing them with foreign workers.  Id. ¶ 19.  During this period, Defendants recruited workers in the Philippines with false promises of gainful employment in order to obtain cheap and easily exploited labor for their businesses.  Id. ¶ 2.

Through coordination between Mr. and Mrs. Schumacher and recruiters in the Philippines ("Recruiters"), Defendants promised Plaintiffs full-time jobs with hourly pay rates higher than the U.S. minimum wage; free housing (or housing allowance), food and transportation; reimbursed travel and recruitment expenses; and renewals of the H-2B visas.  Compl. ¶¶ 50-58.  These promises were made in offer of employment letters provided to the Plaintiffs.  Id. ¶ 52.  Moreover, in order to secure H-2B certifications from the Department of Labor and exit approval from POEA, Defendants submitted various documents signed by Mr. and Ms. Schumacher in which they reiterated these terms of employment.  Id. ¶¶ 40-49, 57.

4

Plaintiffs relied on these promises when they took on staggering costs associated with the H-2B recruitment process.  Throughout the recruitment process, the Recruiters demanded and collected various fees, totaling between approximately $2,000 and $3,000 USD -- an enormous amount of money in the Philippines, where the annual average income per family in 2012 was less than $6,000 USD.  Compl. ¶ 63.  To pay these exorbitant fees, Plaintiffs were forced to hand over their savings, borrow large sums of money, or mortgage or sell property.  Id. ¶ 64.

Once Plaintiffs arrived in the United States, Defendants failed to hold up their end of the bargain, leveraging their position of power to exploit and intimidate Plaintiffs, forcing them to labor for Defendants on Defendants' terms or face losing their legal status in the United States.  Id. ¶¶ 70-82.  Defendants systematically failed to provide full-time work and paid Plaintiffs significantly less than what was promised.  Id. ¶¶ 74-75.  Defendants thus created a situation where Plaintiffs were barely able to pay their living expenses in Oklahoma, let alone recover costs or repay any debts incurred in the Philippines.  Id. ¶ 74-76.  Defendants also refused to reimburse Plaintiffs for their travel or recruitment expenses, id. ¶¶ 76-77, and refused to pay for return travel back to the Philippines, knowing Plaintiffs could not afford the costly return travel on their own, id. ¶¶ 80, 84, effectively forcing Plaintiffs to remain in Oklahoma.

Exacerbating the foregoing vulnerabilities, Mr. Schumacher told Plaintiffs that he was a current and/or former police sheriff and rode around in a police patrol car, made it known that he carried a firearm in his car, and stated that he would only pay for return tickets to the Philippines if the employee was returning "in a box."  Id. ¶¶ 87-89.  Mr.

Schumacher also made it impossible for Plaintiffs to secure other local employment in order to potentially escape from under his control.  Id. ¶ 91.

As a result of Defendants' scheme, Plaintiffs were powerless and financially vulnerable, fearing the further serious harm they would face if they attempted to leave Defendants' employment, as they could not legally work elsewhere and could not repay their debts if they returned to the Philippines.  Id. ¶ 82.

## ARGUMENT

## I.   STANDARD OF REVIEW

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A party need only plead "sufficient factual matter" to "state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  In determining the plausibility of a claim, courts "look to the elements of the particular cause of action, keeping in mind that the Rule 12(b)(6) standard [does not] require a plaintiff to 'set forth a prima facie case for each element.'"  Safe Streets All. v. Hickenlooper, 859 F.3d 865, 878 (10th Cir. 2017) (quoting George v. Urban Settlement Servs., 833 F.3d 1242, 1247 (10th Cir. 2016)) (alternation in original).  Further, courts "'accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the' plaintiff."  Id. (quoting SEC v. Shields, 744 F.3d 633, 640 (10th Cir. 2014)).

6

## II.     THE COMPLAINT PLAUSIBLY ALLEGES TVPRA CLAIMS

In Count I of the Complaint, Plaintiffs allege that the Defendants have violated the TVPRA or knowingly benefited from violations of the TVPRA in a number of ways:[2] obtaining forced labor (18 U.S.C. § 1589), recruiting or trafficking in individuals for the purpose of forced labor (18 U.S.C. § 1590), knowingly benefiting from forced labor (18 U.S.C. §§ 1589(b), 1593A, 1589(a)) and conspiring to violate the TVPRA (18 U.S.C. § 1594).  See Compl. ¶¶ 103-116.

### A.     The Complaint States A Claim Under 18 U.S.C. § 1589

Section 1589 of the TVPRA prohibits forced labor obtained by multiple possible means.  As relevant here, a forced labor violation includes:

> provid[ing] or obtain[ing] the labor or services of a person ... (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint. . . .

18 U.S.C. § 1589(a).

Defendants argue that Plaintiffs have not plausibly alleged an underlying forced labor violation under 18 U.S.C. § 1589, ECF No. 28 at 12-19, and that Plaintiffs' allegations against each Defendants are not sufficiently particularized, e.g., id. at 20.

---

[2]     Section 1595 provides that victims of violations of the TVPRA may bring actions for damages against both the perpetrator and "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of" the TVPRA.  18 U.S.C. § 1595.

Defendants do not otherwise contest that Plaintiffs have sufficiently alleged violations under §§ 1589(b), 1590, 1593A, 1594 and 1595(a).

Defendants' assertion that the Plaintiffs have not alleged a forced labor violation under § 1589 fails because it is premised on a gross misstatement of the scope of the TVPRA.  While the "trafficking of persons" the TVPRA was designed to combat includes "the sex trade, slavery, and slavery-like conditions," H.R. Conf. Rep. 106–939, at 1 (2000), the TVPRA also addresses less extreme forms of forced labor.  "[T]he TVPA[3] not only protects victims from the most heinous human trafficking crimes, but also various additional types of fraud and extortion leading to forced labor."  Nuñag-Tanedo v. E. Baton Rouge Par. Sch. Bd., 790 F. Supp. 2d 1134, 1145 (C.D. Cal. 2011). In passing the TVPRA, Congress made clear that "[t]rafficking also involves violations of other laws, including labor and immigration codes. . . ."  H.R. Conf. Rep. 106–939, at 4.  The Congressional intent "shows the broad reach of the TVPA and the broad class of individuals whom it protects," and it is the court's duty to "provide a forum for the alleged victims of forced labor, regardless of the severity of the alleged circumstances." Nuñag-Tanedo, 790 F. Supp. 2d at 1147.

---

[3]      The forced labor provisions were originally enacted by the Trafficking Victims Protection Act of 2000 ("TVPA"), and have been reauthorized by the Trafficking Victims Protection Reauthorization Acts of 2003, 2005, 2008 and 2013 ("TVPRA").

      **1.**    **The Complaint Alleges Threats Of**
                    **Serious Harm And A Scheme Intended To Cause**
                    **Plaintiffs To Believe They Would Suffer Serious Harm**

A forced labor violation may be based on either threats of serious harm or on a scheme intended to cause an individual to believe that they would be subject to serious harm. 18 U.S.C. § 1589(a)(2), (4). For purposes of a TVPRA claim, serious harm is defined as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). To determine whether a plaintiff was subject to a threat of serious harm, courts look to whether a "defendant's misconduct has created a situation where ceasing labor would cause a plaintiff serious harm," recognizing that what constitutes serious harm for that plaintiff must be determined by considering the totality of the circumstances presented. Nuñag-Tanedo, 790 F. Supp. 2d at 1145. The applicable standard is whether someone's conduct "would compel someone in [the employee's] circumstances to continue working to avoid that harm." United States v. Dann, 652 F.3d 1160, 1170 (9th Cir. 2011). Here, Plaintiffs have plausibly alleged serious harm.

First, the seriousness of the employer's conduct must be considered in light of "the particular vulnerabilities of a person in the victim's position." Muchira v. Al-Rawaf, 850 F.3d 605, 618 (4th Cir. 2017), as amended (Mar. 3, 2017) (internal citations omitted). Plaintiffs have alleged that they and putative class members were in particularly

9

vulnerable circumstances because they had their immigration status directly tied to Defendants, had limited English skills, and were unfamiliar with the United States' legal system.  Compl. ¶ 86.

Second, serious harm includes  "threats of being in debt and being unable to repay those debts."  David v. Signal Int'l, LLC, 37 F. Supp. 3d 822, 832 (E.D. La. 2014); see also Panwar v. Access Therapies, Inc., 975 F. Supp. 2d 948, 958 (S.D. Ind. 2013) (denying motion to dismiss TVPRA claim where the threat of being in debt to the defendants and having his visa revoked kept plaintiff from voluntarily terminating his employment).  In United States v. Calimlim, for example, the Seventh Circuit concluded that, for a Filipino worker whose family in the Philippines depended on her salary, not being able to send money to them if she did not comply with her employer's demands constituted a serious harm.  538 F.3d 706, 711 (7th Cir. 2008).  Similarly, in David, the court found that the plaintiffs have sufficiently plead a TVPRA claim by alleging that they were recruited by misleading promises and went into debt to pay recruitment fees that compelled them to continue working to repay those debts.  David, 37 F. Supp. 3d at 832.

Similarly here, Plaintiffs have alleged a scheme in which they were induced to pay thousands of dollars in order to secure good work opportunities in Oklahoma that never materialized, thus creating a situation where they were barely able to pay their living expenses in Oklahoma, let alone recover their recruiting costs or repay any debts incurred in the Philippines.  Compl. ¶¶ 50-91.  Further, Defendants induced Plaintiffs to travel to the United States on the promise that they would be reimbursed for airfare upon arrival

and provided with return travel home, and then broke these promises when they arrived

in the United States.  Id. ¶ 76.  Finally, Mr. Schumacher made it impossible for Plaintiffs

and other putative class members to secure other local employment in order to potentially

escape from his control.  Id. ¶ 91.

Third, Defendants flagrantly misrepresented the employment terms they were

offering in order to induce Plaintiffs and putative class members to pursue the

opportunities and pay recruitment fees, and had no intention to complying with the

promises made.  Compl. ¶¶ 50-91.  These deceptive recruitment practices and

misrepresentations are a hallmark of human trafficking cases.  See, e.g., United States v.

Bradley, 390 F.3d 145, 148 (1st Cir. 2004) (wages misrepresented to victims), vacated on

Booker grounds, 545 U.S. 1101 (2005); Kiwanuka v. Bakilana, 844 F. Supp. 2d 107, 111

(D.D.C. 2012) (lured to the U.S. with unfulfilled promises of educational opportunities

and decent pay); Nuñag-Tanedo, 790 F. Supp. 2d at 1145 (amount of recruitment fees

misrepresented to victims).

These allegations are sufficient to show that Plaintiffs were compelled to work for

the Defendants based on the threat of serious harm.[4]

---

[4]     See also United States v. Farrell, 563 F.3d 364, 373 (8th Cir. 2009) (difficult
employment and living conditions provided support for jury's conclusion that victims
were forced to labor); Dann, 652 F.3d at 1171 (noting that a jury could find that "the
failure to pay [an immigrant]—and thus the lack of money to leave or live—was
sufficiently serious to compel [the immigrant] to continue working").

### 2.      The Complaint Alleges Abuse Of Legal Process

Under the TVPRA, abuse of the law or legal process is defined as "the use or threatened use of a law or legal process . . . in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action."  18 U.S.C. § 1589(c)(1). As with the serious harm prongs, to assess this prong of the TVPRA, the employer's conduct must be considered as a whole, based on all of the surrounding circumstances. Camayo v. John Peroulis & Sons Sheep, Inc., Nos. 10–cv–00772, 11–cv–01132, 2012 WL 4359086, at *5 (D. Colo. Sept. 24, 2012).  Due to this circumstantial inquiry, "resolution of whether a certain statement amounts to an abuse of legal process is one that is particularly difficult on the sparse record of a motion to dismiss."  Id. at 5, n. 6. Here, Plaintiffs have sufficiently alleged that their labor was provided and obtained through abuse of legal process.

First, "Congress explicitly contemplated that the TVPA could apply where a defendant engages a plaintiff in forced labor by means of violations of immigration and labor laws."  Panwar, 975 F. Supp. 2d at 958.  In Panwar, the court found that the plaintiff had plausibly alleged a forced labor claim where the employer violated the terms of his H-1B visa by failing to pay for time worked, the employer paid less than the rate required by the employment agreement and the plaintiff had gone into substantial debt to the recruitment company.  Id.  Similarly here, Defendants misused the legal process to recruit H-2B workers, who paid thousands of dollars in recruitment costs, and then refused to pay them at the rates promised when securing their visas.  Compl. ¶ 86.  This

12

abuse of legal process created a situation in which, despite Defendants' disregard of the H-2B regulations, Plaintiffs and putative class members could not leave Defendants' employment without violating the terms of their H-2B visas, falling out of legal status and becoming vulnerable to deportation.  This misuse of the H-2B program for a purpose for which it was not designed is abuse of legal process.

Second, "[t]hreatening H–2B workers with serious immigration consequences in order to prevent them from leaving employment constitutes 'threatened abuse of legal process' and states a valid claim pursuant to the TVPRA."  Ramos-Madrigal v. Mendiola Forestry Serv., LLC, 799 F. Supp. 2d 958, 960 (W.D. Ark. 2011); see also Mojsilovic v. Oklahoma ex rel. Bd. of Regents for the Univ. of Okla., No. CIV-14-886, 2015 WL 1542236, at *3 (W.D. Okla. Apr. 7, 2015) (abuse of legal process to threaten to terminate plaintiffs' employment contracts when termination "would have implicated their visa status").  Here, Defendants ensured that Plaintiffs and other putative class members could not work for other employers, by informing them directly that it would be a violation of their visa and also by confronting at least one local employer who hired putative class members.  Compl. ¶ 91.  Thus, Defendants "used the restrictive terms of the H-2B visas to coercive ends," id. ¶ 110, facilitating their exploitation of a captive work force.  See Calimlim, 538 F.3d at 713 (7th Cir. 2008) (finding defendant's "'warnings' about the consequences [of plaintiff's immigration status] were directed to an end different from those envisioned by the law and were thus an abuse of legal process").

Third, abuse of legal process may also be found where an "employer threatens to involve law enforcement . . . in order to persuade the employee to remain faithful or

continue working." Camayo, 2012 WL 4359086, at *4.  In Camayo, for example, the court found that the plaintiffs had sufficiently alleged abuse of legal process where they alleged, among other things, that the defendant had "bragged to [one of the plaintiffs] about involving the local police in arresting co-workers who had left the [worksite]."  Id. at *5.  Here, Plaintiffs have alleged that Mr. Schumacher made it widely known that he was a current and/or former police sheriff and used a police patrol car; made it known that he carried a firearm in his car; and stated that he would only pay for return tickets to the Philippines if the employee was returning "in a box."[5]  Compl. ¶¶ 87-89.

Based on all the foregoing circumstances, Plaintiffs have plausibly alleged abuse of legal process under § 1589(c).

### B.    The Complaint Alleges TVPRA Claims Against All Defendants

Plaintiffs have sufficiently plead that all Defendants participated in and knowingly benefited from the forced labor scheme, and that they conspired with the other Defendants and the Recruiters to violate the TVPRA.

---

[5]    Defendants' assertion that these actions have a potentially innocuous meaning are unavailing on a motion to dismiss, when plaintiffs are entitled to all inferences in their favor.  Telling your newly-arrived employees that you had a firearm in the vehicle and that -- despite promising to provide return airfare to the Philippines -- you would only pay for them to return "in a box" are both reasonably interpreted as threats of physical harm.  "A statement is a threat if a reasonable person would believe that the intended audience would receive it as a threat, regardless of whether the statement was intended to be carried out."  Calimlim, 538 F.3d at 713.

## 1.   The Complaint Alleges That All Defendants Participated In And Benefited From The Forced Labor Scheme

Defendants claim that they may only be held liable for forced labor claims with respect to employees that worked for them (for the corporate Defendants) and employees they had contact with (for the individual Defendants).  Defendants provide no support for this overly narrow reading of what it means to "obtain" or "provide" forced labor under § 1589 or to recruit or traffic in forced labor under § 1590, and ignore the well-pled allegations in the Complaint.  Elat v. Ngoubene, 993 F. Supp. 2d 497, 525 (D. Md. 2014) ("[T]he threat need not be that the defendant himself or herself will take action."); see also United States v. Askarkhodjaev, No. 09–00143–01–CV, 2010 WL 4038783, at *3 (W.D. Mo. Sept. 23, 2010) ("The statute does not specify that the 'serious harm' be at the defendant's hand.  It . . . prohibits intentionally creating the belief that serious harm is possible, either at the defendant's hands or those of others.").

As alleged in the Complaint, each Defendant was instrumental in Plaintiffs' reasonably held belief that they would suffer serious financial harm if they did not labor for Defendants.  Each of the employer Defendants "treated Plaintiffs and the putative class workers as a disposable and malleable pool of labor that could be utilized by any of the Defendants for any purpose," Compl. ¶ 72, a pool of labor that was managed by APEX, which functioned as the human resources department for the other corporate Defendants, id. ¶ 19.  As to the individual Defendants, Plaintiffs have alleged that they were personally involved in recruiting Plaintiffs, id. ¶¶ 43-45, 51, 57, that they owned and operated the corporate Defendants, id. ¶¶ 2, 17-18, and that Mr. Schumacher

personally threatened Plaintiffs and refused to pay them promised benefits.  Id. ¶¶ 87-89;
see Mojsilovic, 2015 WL 1542236, at *3 (plaintiffs adequately alleged § 1589 claim
against individual who coerced them to provide free labor for entity that he owned).

### 2. The Complaint Alleges Claim Against All Defendants As Knowing Beneficiaries Of Forced Labor

Alternatively, each Defendants is also liable as a knowing beneficiary of the
forced labor and trafficking scheme.  Sections 1589(b), 1593A and 1595 impose liability
for knowingly benefitting, financially or otherwise, from forced labor and other TVPRA
violations.  The statute also imposes liability for knowingly benefitting from participation
in a venture,[6] "knowing or in reckless disregard" of the fact that the venture has engaged
in prohibited conduct.  18 U.S.C. §§ 1589(b), 1593A.

To establish that Defendants were knowing beneficiaries, their acts are not viewed
in isolation, but instead must be viewed in light of "the whole body of allegations as
circumstantially supplying meaning to particular acts. . . ."  Ricchio v. McLean, 853 F.3d
553, 557 (1st Cir. 2017) (holding that complaint had plausibly alleged that hotel and hotel
owners were aware of trafficking by hotel guest and were knowing beneficiaries based on
receiving payment for the room); see also Adhikari v. Daoud & Partners, 697 F. Supp. 2d
674, 684 (S.D. Tex. 2009)  (holding that plaintiffs had plausibly alleged that defendant

---

[6]    A venture, under this provision, refers to a "group of two or more individuals
associated in fact."  18 U.S.C. § 1591(e)(5).  Plaintiffs have alleged that the Defendants
(2 individuals and 4 entities) operated as a group and so qualify as a venture.  E.g.,
Compl. ¶ 21 (alleging that "each of the Defendants acted in concert with each and every
other defendant, intended to and did participate in the events, acts, practices, and courses
of conduct alleged herein"); see Ricchio, 853 F.3d. at 556.

had knowledge that the alleged trafficking conduct was occurring and "deliberately formed an enterprise with the purpose of trafficking cheap labor . . . in order to earn a profit, and that they performed concrete acts to further this purpose"). In Lagasan v. Al-Ghasel, for example, the plaintiffs alleged that the defendants violated 1593A by "receiving plaintiff's labor for meager wages" and that the defendants' "knowledge is evidenced by the fact that they entered into an employment contact which promised her the 'prevailing wages of Pennsylvania' for her services but then refused to honor the terms of that 'contract." 92 F. Supp. 3d 445, 455 (E.D. Va. 2015).

Likewise here, Plaintiffs allege that Defendants knowingly benefitted from participating in the scheme to lure H-2B workers to Oklahoma in order to obtain "a disposable and malleable pool of labor that could be utilized by any of the Defendants for any purpose, under any employment terms Defendants were inclined to offer," including paying Plaintiffs less than promised. Compl. ¶ 72-74. Plaintiffs allege that Defendants received numerous benefits from such participation, including recruiting workers from the Philippines, not paying the fees and expenses related to the H-2B visa process, and having cheap and exploitable labor available for Defendants' businesses. Id. ¶ 113. All Defendants benefitted from such participation. United States v. Cook, 782 F.3d 983, 988 (8th Cir. 2015) ("The phrase 'anything of value' is extremely broad.").

### 3. The Complaint Alleges Claim Against All Defendants As Conspirators

Plaintiffs plausibly alleged that all Defendants and the Recruiters conspired to violate sections of the TVPRA, including, as applicable here, §§ 1589 and 1590. Compl.

¶ 114; <u>Lagasan</u>, 92 F. Supp. 3d at 455 (defendants, a husband and wife, conspired with others, including an overseas recruiter, "by agreeing to obtain plaintiff's services for the purpose of forced labor, involuntary servitude, and trafficking").  Defendants' only argument to the contrary is that such a claim depends on Plaintiffs plausibly alleging "facts showing that at least one Defendant actually violated 18 U.S.C. § 1589."[7]  <u>E.g.</u>, ECF. 28 at 13.  For the reasons stated above, Plaintiffs have plausibly alleged at least one § 1589 violation by at least one Defendant, so there is no basis for dismissing the conspiracy claim against all Defendants.

## III.   THE COMPLAINT ALLEGES BREACH OF CONTRACT CLAIMS UNDER OKLAHOMA LAW

Plaintiffs have properly alleged the existence of a valid, enforceable employment contract under Oklahoma law.  A claim for breach of contract under Oklahoma law has the following elements:  (1) formation of a contract; (2) breach of the contract; and (3) damages as a direct result of the breach.  <u>Digital Design Group, Inc. v. Info. Builders, Inc.</u>, 2001 OK 21, 24 P.3d 834, 843.

### A.   The Complaint Alleges Contract Claims Under Three Theories

Plaintiffs have alleged sufficient facts to support a breach of contract claim on three independent bases: (1) the terms and conditions expressly promised to Plaintiffs by Defendants in the offer letters signed by Plaintiffs and Defendants, and promised by

---

[7]     Contrary to Defendants' assertion, §§ 1590 and 1594 do not require a predicate violation of § 1589, because "the objective of forced labor, forced services, or the intended trafficking need not be satisfied for liability to attach" under those sections. <u>Ricchio</u>, 853 F.3d at 558.

Recruiters acting on behalf of Defendants, constituted a contract; (2) the terms and conditions provided in the temporary labor certification (ETA Form 9142B), its accompanying attestations, and the laws and regulations applicable to the H-2B program, as well as the terms and conditions of employment promised in the documents submitted by Defendants to POEA and the Philippines Overseas Labor Office ("POLO"), are incorporated into and/or constituted employment contracts between Plaintiffs and Defendants; and (3) the contract between Defendants and the POEA constitute a contract between Defendants and the POEA, of which Plaintiffs were the third-party beneficiaries.

First, employment is, as a matter of law, a contractual relationship between a worker and his employer.  <u>Landrum v. Ownby</u>, 1955 OK 343, 209 P.2d 400, 402; <u>Restatement of Law Third, Employment Law</u>, § 2.01, comment a ("At its core, employment is a contractual relationship.").  Under Oklahoma law, "an employer-employee relationship is created by contract, either express or implied, or by the unequivocal acts of the parties recognizing the relationship." <u>Cherokee Lines, Inc. v. Bailey</u>, 1993 OK 111, 859 P.2d 1106, 1110 (internal quotation marks and citation omitted). A contract of employment "is deemed to have been made where the final assent is given."  <u>Id</u>.

The Complaint plainly alleges that Defendants, individually and through their agents, employees and/or representatives, entered into valid, enforceable employment contracts with Plaintiffs.  Compl. ¶¶ 56-57, 71.  Specifically, Plaintiffs have alleged the following facts to support the existence of Plaintiffs' employment contracts with Defendants: as an offer for employment, Defendants made promises to Plaintiffs

concerning the specific wage rate, the job position, and the job location; Defendants promised that the position was for full-time employment, that Plaintiffs would not be charged recruitment fees, that the wage rate would not be based on commissions, bonuses, or incentives, and that housing, food and transportation would be provided; and Defendants promised that any processing and travel fees would be reimbursed on arrival in Oklahoma.  Id. ¶¶ 51-56.  In e-mails, contracts, and other documents and communications, these terms were communicated to each Plaintiff by the Recruiters, acting as agents of the Defendants.  Id. ¶¶ 22, 56.  Further, Defendants submitted documents to the POEA and the POLO that formalized the promises made by the Recruiters and the Defendants.  Id. ¶ 57.

Second, the terms and conditions of the DOL-approved temporary labor certifications for Plaintiffs' H-2B visas, as well as the promises made in the documents submitted to the POEA, were incorporated by law into the employment contracts between Plaintiffs and Defendants.  See East Central Okla. Elec. Coop., Inc. v. Public Service Co., 1970 OK 80, 469 P.2d 662, 664 ("It is well settled that the existing applicable law is a part of every contract, the same as if expressly referred to or incorporated in its terms.").  Plaintiffs' final assent was given, at the very latest, when they arrived in Oklahoma and reported to the APEX office to commence work.  Compl. ¶ 71.

Third, Plaintiffs have properly stated a claim that they can enforce the terms of the documents submitted to the POEA under a third-party beneficiary theory.  Under Oklahoma law, "[a] contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it."  Okla. Stat. Ann. tit. 15,

20

§ 29.  As alleged in Plaintiffs' Complaint, Defendants submitted documents to the POEA that formed valid and enforceable contracts, and those contracts were for the benefit of Plaintiffs and/or such benefit was the direct result of the performance contemplated by the Defendants and the POEA.  Compl. ¶¶ 57-58.  As detailed in the Complaint, those contracts laid out the terms and conditions of Plaintiffs' employment.  Id. ¶ 57.  As such, the POEA documents created contracts between Defendants and the POEA that were made expressly for the benefit of the H-2B worker, and Plaintiffs have properly alleged a third-party beneficiary claim to enforce the terms of those contracts.

Finally, the Complaint alleges that, upon Plaintiffs' arrival in Oklahoma, Defendants openly and systematically breached these employment contracts, id. ¶¶ 70-82, and that Plaintiffs suffered damages as a direct result of these breaches, id. ¶¶ 83-84, 125.

**B.**     **Defendants' Various Arguments Do Not Support Dismissal of The Contract Claims**

Defendants advance several arguments regarding Plaintiffs' contact claims.  Each of these arguments is contrary to established case law and basic contract principles.

**1.**     **H-2B Regulations Do Not Preclude Workers From Asserting State Law Claims For Breach Of Contact**

Defendants assert that H-2B workers do not have binding contracts of employment with their employers.[8]  ECF No. 28 at 5.  This argument ignores longstanding case law addressing state law claims brought on behalf of H-2B workers.

---

[8]     Notably, Defendants do ***not*** refute that Plaintiffs' acceptance of the written offers of employment created an employment contract, but rather argue that the terms of the H-2B visa petitions and POEA documentation were not incorporated into such an agreement.  See ECF No. 28 at 3-4 ("Plaintiffs allege that Defendants recruited Plaintiffs

*(cont'd)*

Federal courts have long recognized that the terms under which labor certification is granted for H-2B workers become a part of a worker's employment contract as a matter of law, and that H-2B workers can enforce those terms. See Cuellar-Aguilar v. Deggeller Attractions, Inc., 812 F.3d 614, 620 (8th Cir. 2015) ("[T]he terms of the labor certification applications [for H-2B workers], including the agreement to pay the prevailing wage, represented 'the law in effect at the time [the] contract[s] [were] made,' . . . and therefore, under Arkansas law, these terms form a part of the workers' contracts.") (internal citation omitted); Moodie v. Kiawah Island Inn Co., LLC, 124 F. Supp. 3d 711, 726 (D.S.C. 2015) (similar).

Under Oklahoma contract law, "extant applicable law is a part of every contract in this state as if it were expressly cited or its terms incorporated in the contract." Matter of Estate of Vose, 2017 OK 3, 390 P.3d 238, 249; see also East Central Okla. Elec. Coop., 469 P.2d at 664. Thus, the existing laws and regulations governing the H-2B program applicable to Plaintiffs' employment were incorporated as a matter of law into Plaintiffs' employment contracts. Id.

In an attempt to avoid these long-standing principles, Defendants focus on two district court opinions from the Fourth Circuit. See Bojorquez-Moreno v. Shores & Ruark Seafood Co., 92 F. Supp. 3d 459 (E.D. Va. 2015); Garcia v. Frog Island, 644 F.

_____

*(cont'd from previous page)*
through the use of an Offer Letter that was signed by Defendants' agent and included general employment terms. . . . These claims are without merit because H-2B visa petitions and the accompanying [temporary labor certifications] and POEA documentation do not constitute a contract of employment between a worker and an employer.").

Supp. 2d 696 (E.D.N.C. 2009).  Relying on these decisions, Defendants draw a

distinction between the H-2A (agricultural) and H-2B (non-agricultural) programs[9] and

argue that only the regulations governing the former are enforceable in contract law.

     This argument is erroneous and has repeatedly been rejected by other courts.  In at

least four cases decided after Frog Island, defendants have presented this same argument

and the courts have rejected the argument, noting that the plaintiffs' breach of contract

claim was asserted under state, rather than federal, law.  Deggeller, 812 F.3d at 618;

Jimenez v. GLK Foods LLC, Nos. 12-cv-209, 12-cv-210, 2016 WL 2997498, at **68-72

(E.D. Wish. May 23, 2016); Cordova, 101 F. Supp. 3d at 1199; Moodie, 124 F. Supp. 3d

at 725-26.

     Notably, the Department of Labor itself agrees with the conclusions reached in

these later cases and disagrees with the court's decision in Frog Island.  In 2012, the

Department published new, comprehensive H-2B regulations and directly addressed the

Frog Island decision to dispel any concerns that "the Department endorsed that court's

---

[9]    DOL's H-2A regulations include a provision stating that "[i]n the absence of a
separate, written work contract entered into between the [H-2A] employer and the
worker, the required terms of the job order and application shall be the work contract," 20
C.F.R. § 655.102(b)(14), while the H-2B regulations do not contain a similar provision,
see 29 C.F.R. § 503.  The Bojorquez and Frog Island courts relied on this distinction to
find that no employment contract existed between the plaintiff H-2B workers and their
employers.  As later courts have noted, however, "[i]n determining the existence of a
state-law contract . . . [courts] must look to [state] law, rather than the pronouncements of
federal agencies."  Deggeller, 812 F.3d at 618.  Defendants did not -- and cannot --
"explain how a federal agency's thoughts on whether a contract exists does or could
preclude the existence of a contract under state law."  Cordova v. R & A Oysters, Inc.,
101 F. Supp. 3d 1192, 1199 (S.D. Ala. 2015).

view that the terms and conditions of H-2B job orders are not enforceable under state contract law." 77 Fed. Reg. 10038, 10068 (Feb. 21, 2012). The Department "clarif[ied] that it does not endorse this view" and "note[d] that it views the terms and conditions of the job order as binding." Id. DOL's interpretation of its own regulations is entitled to deference, unless it is plainly erroneous or inconsistent with its regulations. Auer v. Robbins, 519 U.S. 452, 461 (1997); Fast v. Applebee's Intern., Inc., 638 F.3d 872, 878 (8th Cir. 2011).

The conclusion of the courts in Deggeller, Jimenez, Cordova, and Moodie, and of the Department of Labor itself, apply equally here. Under Oklahoma law, the law and regulations of the H-2B program were part of Plaintiffs' employment contracts with Defendants and created binding and enforceable contracts. See Vose, 390 P.3d at 249.

### 2.     Plaintiffs' Employment Contracts Had Sufficient Consideration

Defendants argue that the terms and conditions provided in the temporary labor certification, the H-2B program regulations, and the documents submitted by Defendants to the POEA and the POLO could not have formed employment contracts because they lacked sufficient consideration. Defendants assert that their obligations under these documents were merely a promise to comply with the law, and that "[a] party may not rely on promises made to do, or refrain from doing, something that the promising party is already legally obligated to do or refrain from doing." ECF No. 28 at 6; see also Gragg v. James, 1969 OK 58, 452 P.2d 579, 587. However, the case that Defendants rely on to support their argument, Rao v. Covansys Corp., No. 06-c-5451, 2007 WL 3232492 (N.D. Ill. Nov. 1, 2007), is both distinguishable from this case and, as other courts have

recognized, based on flawed and faulty reasoning.  See Moodie, 124 F. Supp. 3d at 726-27; Cordova v. R & A Oysters, Inc., 169 F. Supp. 3d 1288, 1292-23 (S.D. Ala. 2016)

In Rao, the district court concluded that the terms of a visa petition did not create an employment contract because the employer was legally obligated to file a visa petition containing those terms (that the employer would comply with particular immigration statutes).  Rao, 2007 WL 3232492, at *4.  But, as the Court in Moodie explained, a promise to perform a legal obligation is not consideration for a contract only "if a party is legally obligated to do something ***prior to entering into the contract***."[10] 124 F. Supp. 3d at 727 (emphasis in original).  In contrast, the court explained, H-2B obligations that are contingent on entering an employment contract are sufficient consideration:

> Defendant is not under any ***prior*** obligation to pay Plaintiffs anything and, thus, not "already legally bound" to pay Plaintiffs the prevailing wage. Instead, the H-2B regulations set the minimum consideration that Defendant must offer for this specific type of employment contract.  It is a contingent legal obligation, dependant [sic] on Defendant entering into employment contracts with H-2B workers. This obligation arose with the contract, and . . . became a term of the contract.

Id. at 727 (emphasis in original).

That rationale applies here.  Defendants were not bound to comply with the terms of the H-2B program until they entered into employment contracts with Plaintiffs.  See id.; Aviles-Cervantes v. Outside Unlimited, Inc., No. 16-1214, 2017 WL 3916985 at *10-

---

[10]   See also Gragg, 452 P.2d at 587 (modification of contract was invalid because not supported by any additional consideration other than what was promised under the original contract); Home Owners' Loan Corp. v. Thornburgh, 1940 OK 424, 187 Okla. 699, 106 P.2d 511, 512 (former owner's promise to vacate after foreclosure sale was not sufficient consideration because he was already legally obligated to vacate).

11 (D. Md. Sep. 7, 2017) (agreeing with <u>Moodie</u>); <u>Cordova</u>, 169 F. Supp. 3d at 1292-93

(rejecting <u>Rao</u> and agreeing with <u>Moodie</u>).  Defendants' argument to the contrary

"misunderstands this long-standing doctrine of contract law," <u>Cordova</u>, 169 F. Supp. 3d

at 1292, and should be rejected.[11]

### 3.    The Complaint Alleges Contract Claims Against All Defendants

Defendants argue that no contract existed between any one of them and the

Plaintiffs who worked at the locations owned by the other entities.  ECF No. 28 at 4.

These arguments "confuse the merits of the underlying claims [with] whether the

plaintiffs allege state law causes of action."  <u>Al-Watan v. Am. Airlines, Inc.</u>, 570 F. Supp.

2d 925, 939 (E.D. Mich. 2008).  "The court's function on a Rule 12(b)(6) motion is not to

weigh potential evidence that the parties might present at trial, but to assess whether the

plaintiff[s]' complaint alone is legally sufficient to state a claim for which relief may be

granted."  <u>Tal v. Hogan</u>, 453 F.3d 1244, 1252 (10th Cir. 2006).

---

[11]     Defendants repeat this same argument with regards to the Plaintiffs' third-party-beneficiary claims related to the POEA contracts.  Once again, Defendants misunderstand the legal principle and misapply it to these facts.  <u>See</u> <u>Cordova</u>, 169 F. Supp. 3d at 1292; <u>Moodie</u>, 124 F. Supp. 3d at 727.

Some of Defendants' motions to dismiss describe the third-party beneficiary claim as stemming from "documents the Defendants submitted to DOL and POEA."  ECF No. 31 at 7; No. 32 at 7; No. 33 at 7.  However, Plaintiffs' Complaint specifies that the third-party beneficiary claim arises from breaches of "the agreement between Defendants and the POEA," with no reference to agreements between the Defendants and DOL.  Compl. ¶ 128.  This contract is not between Defendants and the United States government, but between Defendants and a foreign government agency.  Defendants' suggestion that this claim should fail because it is an attempt to avoid exhausting administrative remedies or to circumvent the purported lack of a private right of action under the POEA regulations must fail because Defendants have presented no evidence or legal authority to support that either of these concepts apply under Filipino law.

The Complaint plainly alleges that all Defendants had contractual relationships with Plaintiffs and putative class members that give rise to liability.  Compl. ¶¶ 117-24. As detailed in the Complaint, Mr. and Mrs. Schumacher own and operate the entities Hotelmacher LLC, Schumacher Investments, LLC, and Steakmacher LLC and used their business APEX USA Inc. as a human resources department for each of their businesses. Id. ¶¶ 14-20.  The Complaint further alleges that "each of the Defendants acted in concert with each and every other [D]efendants," and "employed agents, associates, representatives, and/or recruiters in the Philippines to engage in direct recruitment of candidates on their behalf."  Id. ¶¶ 21-22.  Having been recruited to work for Mr. and Mrs. Schumacher in Oklahoma, Plaintiffs reported to the APEX office to start working and "APEX employees informed Plaintiffs . . . that they would be working for certain Defendants, regardless of whether that Defendant was the party named in the . . . contracts and/or government-certified H-2B visa applications."  Id. ¶ 71.  "Defendants treated Plaintiffs . . . as a disposable and malleable pool of labor that could be utilized by any of the Defendants for any purpose."  Id. ¶ 72.  Plaintiffs have thus properly alleged breach of contract claims against each of the Defendants.

Additionally, the obligations relating to the H-2B program and incorporated into the terms of Plaintiffs' employment contract apply to each of the Defendants.  H-2B regulations apply to all "employer[s]" of H-2B workers.[12]  See, e.g., 20 C.F.R. § 655.10

---

[12]     The definitions of "employer," "joint employer," and "employee" in the H-2B program largely comport with the meaning given to those terms under the common law. See 20 CFR § 655.5.  Under these definitions, each of the Defendants was the employer

(cont'd)

and 20 C.F.R. § 655.20.  Because, as described above, an offer to work accepted by the worker forms an employment contract that incorporates the laws existing at the time, any "employers" of Plaintiffs were contractually obliged to comply with the terms of the employment contracts, including those stemming from the H-2B regulations.  See Cherokee Lines, 859 P.2d at 1110; Vose, 390 P.3d at 249.  Therefore, liability for breach of the employment contracts extends to each "employer" or "joint employer" of Plaintiffs.

### 4.    FLSA Does Not Preempt Plaintiffs' Contract Claims

Finally, Defendants' argument that the FLSA provides the exclusive remedy for any of Plaintiffs' wage-based claims fundamentally mischaracterizes Plaintiffs' claims and the law concerning FLSA preemption.  First, Plaintiffs ***do not allege a violation of the FLSA.***  Instead, Plaintiffs' claims for unpaid wages are premised on Plaintiffs' right to the wage rate expressly promised to them, which was higher than the minimum wage rate of $7.25 per hour promised by the FLSA.  "[T]he FLSA does not create the exclusive remedy for unpaid wages, nor does the FLSA preempt a state law claim compensable pursuant to a contract but not the FLSA."  Hammond v. Lowe's Home Ctrs., Inc., 316 F. Supp. 2d 975, 979 (D. Kan. 2004).  The FLSA does not preempt Plaintiffs' state law

---

*(cont'd from previous page)*
of some or all Plaintiffs.  See id. (defining "joint employer[s]" as two or more employers who "each have sufficient definitional indicia of being an employer to be considered the employer of a worker"; requiring that an "employer" have an "employer relationship" with the employee such as the ability to hire, fire, pay, supervise or otherwise control the work of employees; and noting that "employee means a person who is engaged to perform work for an employer, as defined under the general common law").

contact claims to a higher, promised wage rate, and the case relied on by the Defendants, Anderson v. Sara Lee Corp., 508 F.3d 181 (4th Cir. 2007), is inapposite.

In Anderson, plaintiffs brought five state law claims -- for breach of contract, negligence, fraud, conversion, and unfair trade practices -- ***premised exclusively*** on their employer's failure to comply with the FLSA.  Id. at 184.  The Fourth Circuit held that the plaintiffs "invoke[d] state law only as a source of remedies for the alleged FLSA violations," and found that "Congress prescribed exclusive remedies in the FLSA for violations of its mandates."  Id. at 193-94.  Here, unlike the plaintiffs' claims in Anderson, Plaintiffs' state law claims do not depend on establishing that Defendants violated the FLSA, and accordingly, are not preempted.  See DeLeon-Granados v. Eller & Sons Trees, Inc., 497 F.3d 1214, 1218-20 (11th Cir. 2007); Moodie, 124 F. Supp. 3d at 724-25; Teoba v. TruGreen Landcare LLC, No. 10-cv-6132, 2013 WL 1560208, at *3-4 (W.D.N.Y. Apr. 10, 2013).

## IV.   THE COMPLAINT ADEQUATELY ALLEGES CLASS CLAIMS

Defendants also argue that Plaintiffs' class allegations should be stricken pursuant to Rule 23(d)(4), contending that Plaintiffs have not adequately alleged numerosity or predominance.  ECF No. 28 at 20-25.  Defendants do not challenge that the remaining requirements of Rule 23(a) (commonality, typicality, and adequacy) and Rule 23(b)(2) (superiority) have been adequately plead.

Rule 23(d)(1)(D) permits a court to strike class allegations "before discovery if it is apparent from the plaintiff's complaint that a class ***cannot*** be certified."  Dollison v. Am. Nat. Ins. Co., No. 13-CV-0100, 2013 WL 1944891, at *9 (N.D. Okla. May 9, 2013)

29

(internal quotations omitted) (emphasis added).  District courts in this circuit and elsewhere "view motions to strike or dismiss class allegations at the pleading stage with particular disfavor," because they seek to terminate class claims before the plaintiff has had any meaningful chance to conduct discovery.  Hockenbury v. Hanover Ins. Co., No. CV-15-1003, 2016 WL 552967, at *3 (W.D. Okla. Feb. 10, 2016) (citing cases); see also Wornicki v. Brokerpriceopinion.com, Inc., No. 13-CV-03258, 2015 WL 1403814, at *4 (D. Colo. Mar. 23, 2015) (holding that defendants' motion to strike class allegations would only be granted "if they are able to show conclusively that plaintiffs will be unable to establish facts that would make class treatment appropriate").

Defendants cannot and have not met that standard here, and so instead rely on speculation and unsupported assertions that Plaintiffs will not be able to establish facts to support class certification.

### A. The Complaint Adequately Pleads Factual Allegations Sufficient To Establish That Joinder Would Be Impracticable

According to the Tenth Circuit, "the numerosity requirement is not a question of numbers," but rather involves consideration of several factors going to the impracticability of joinder, including "the nature of the action, the size of the individual claims, and the location of the members of the class or the property that is the subject matter of the dispute."  Colorado Cross Disability Coal. v. Abercrombie & Fitch Co., 765 F.3d 1205, 1215 (10th Cir. 2014) (finding, on a class certification motion, sufficient evidence to establish numerosity where the plaintiffs had submitted declarations from five putative class members and evidence from which it was "reasonable to infer" a

substantial number of class members existed).  In particular, courts considering

numerosity in the context of TVPRA class claims have found that "joinder would be

impracticable due to the unique characteristics of the class members, namely that many

are spread around the world and are not fluent in English or the U.S. legal system."

Menocal v. GEO Grp., Inc., 320 F.R.D. 258, 263 (D. Colo. 2017); see Compl. ¶¶ 86, 95,

102(b).

      In determining whether a proposed class meets the numerosity requirement, "the

exact number of potential members need not be shown," and a court "may make

'common sense assumptions' to support a finding that joinder would be impracticable."

Zuniga v. Bernalillo Cty., 319 F.R.D. 640, 661–62 (D.N.M. 2016).  "Class actions have

been deemed viable in instances where as few as 17 to 20 persons are identified as the

class."  Rex v. Owens ex rel. State of Okla., 585 F.2d 432, 436 (10th Cir. 1978); see also

Bennett v. Sprint Nextel Corp., 298 F.R.D. 498, 504–05 (D. Kan. 2014) ("[A] good faith

estimate of at least 50 members is a sufficient size to maintain a class action."); Belote v.

Rivet Software, No. 12–cv–02792, 2013 WL 2317243 at *2 (D. Colo. May 28, 2013)

(numerosity met where "there are approximately 125 class members").

      Here, Plaintiffs have alleged sufficient facts from which numerosity could be

established.  Plaintiffs allege that the DOL granted the Defendants temporary labor

certifications for 108 workers during the Relevant Time Period, Compl. ¶¶ 41-49, and

estimate that the putative class contains between 50 and 100 class members, id. ¶ 95.  The

Complaint also contains allegations demonstrating that the Plaintiffs have personal

knowledge of other class members.  See id. ¶¶ 87, 89 (allegations regarding interactions

between Mr. Schumacher and Plaintiffs where other putative class members were

present).

Such allegations are precisely the types of allegations that the authority cited by

Defendants suggest are sufficient to allege numerosity.  For example, in <u>Roberts v. Target

Corp.</u>, the court held that the operative complaint, which sought to certify a Oklahoma

class of employees over 40 who had been fired by the defendant, did not sufficiently

allege numerosity because the complaint did not include "allegations regarding the

number of stores operated by defendant in Oklahoma, the number of employees at those

stores, or an estimate of the number of individuals who might meet the class definition."

No. CIV-11-951, 2012 WL 2357420, at *3 (W.D. Okla. June 20, 2012).  Plaintiffs'

Complaint here, however, does contain such allegations.[13]  Compl. ¶¶ 2, 41-49, 95.

Because Plaintiffs have alleged sufficient facts from which it is reasonable to infer that

---

[13]     Defendants' other cited authority involving motions to dismiss class claims
involved cases where the plaintiffs alleged <u>no</u> facts to support the class size allegations.
<u>See</u> <u>Willis v. Enter. Drilling Fluids, Inc.</u>, No. 1:15-CV-00688, 2015 WL 6689637, at *4
(E.D. Cal. Oct. 28, 2015) ("Plaintiff fails to provide any factual allegations to support
[his] belief" that the class exceeded 200 employee); <u>Williams v. CitiMortgage, Inc.</u>, No.
CIV-13-354, 2014 WL 1406601, at *2 (W.D. Okla. Apr. 10, 2014) (same); <u>cf.</u> <u>Rex</u>, 585
F.2d at 436 (motion for class certification denied where "Rex did not set forth further
allegations or other pleadings demonstrating the truth of" his assertion that joinder would
be impracticable).

        The remaining authority provided by Defendants considered whether numerosity
had been established after discovery on that issue.  <u>Trevizo v. Adams</u>, 455 F.3d 1155,
1162 (10th Cir. 2006) (joinder practicable because "all the names and addresses of
potential plaintiffs had been provided during discovery"); <u>In re OnStar Contract Litig.</u>,
278 F.R.D. 352, 373 (E.D. Mich. 2011) (numerosity not established after "extensive class
certification discovery" because class is inascertainable).

joinder would be impracticable, Defendants' request to strike the class allegations should be denied.

> **B.      Defendants Have Not Shown That Individualized Inquiries Will Preclude Predominance**

Defendants further contend that predominance will not be satisfied because -- they assert -- each class member's claims will turn on five individualized issues.  ECF No. 28 at 24-25.

Defendants, however, offer no support for their assertion that four of those issues will require individualized, rather than class-wide, proof.  <u>See</u> <u>CGC Holding Co., LLC v. Broad & Cassel</u>, 773 F.3d 1076, 1087 (10th Cir. 2014) (to evaluate whether predominance was met, the court "must characterize the issues in the case as common or not, and then weigh which issues predominate").  In fact, all four those issues are common issues of either fact or law.[14]  <u>See</u> Compl. ¶¶ 96(b), 96(c), 97(a), 97(b), 97(e), 97(f), 97(g).  For example, although Defendants claim that the terms of the class members' employment contracts is an individualized factual question, the terms of those contracts are set forth in (and so, could be proven by) standardized documents submitted to the DOL and POEA and in related government regulations.  <u>Id.</u> ¶¶ 120, 121.  Indeed, the claim that such documents constitute a contract of employment is one which Defendants have themselves argued has a class-wide answer.  ECF No. 28 at 5 ("The H-

---

[14]      Moreover, on the issue of damages, it is well settled that individual variations in damages will not preclude class certification.  <u>In re Urethane Antitrust Litig.</u>, 768 F.3d 1245, 1255 (10th Cir. 2014) ("The presence of individualized damages issues would not change this result. Class-wide proof is not required for all issues.").

2B regulations do not form binding employment contracts between an H-2B worker and his employer").

Only on the issue of class members' vulnerability to coercion have Defendants argued that individualized proof would be required, citing a single out-of-circuit district court opinion denying a motion to certify TVPRA claims.  ECF No. 28 at 25, n.4 (citing David v. Signal Intern., LLC, No. 08-1220, 2012 WL 10759668, at *22 (E.D. La. Jan. 4, 2012)).  Even in David, however, the court expressly rejected the argument that "a § 1589 claim can never be suitable for class certification" and noted that individuals' responses to coercion become irrelevant "based on the type of coercion used."  David, 2012 WL 10759668 at *20.

More recently, a court in this Circuit rejected David's conclusion and certified just such a class, relying on CGC Holding Co. and finding that individualized inquiries into why each class member was compelled to perform forced labor were not necessary, because the serious harm element of the TVPRA claim could be proven on a class-wide basis through reasonable inferences and circumstantial evidence.  Menocal, 320 F.R.D. at 267; see also Nuñag-Tanedo v. E. Baton Rouge Par. Sch. Bd., No. SACV 10-01172, 2011 WL 7095434, at *8 (C.D. Cal. Dec. 12, 2011) (certifying class and finding that predominance was satisfied where "the gravamen of Plaintiffs' TVPA claim is that it was the scheme of hidden fees and contracts that ultimately compelled them to work").

Similarly here, Plaintiffs have sufficiently alleged class claims that should not be prematurely dismissed based on Defendants' bare speculation of what that evidence will show.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request this Court to deny all aspects of Defendants' Motions to Dismiss.  If this Court determines that the Complaint is subject to dismissal for failure to state a claim, Plaintiffs respectfully request leave to amend the Complaint in order to cure any deficiency.

Dated:  October 13, 2017          Respectfully Submitted,


By:    */s/ Eben Colby*_____

Brady Henderson
AMERICAN CIVIL LIBERTIES UNION OF
OKLAHOMA
3000 Paseo Drive
Oklahoma City, OK 73103
Telephone (405) 525-3831
Fax:       (405) 524-2296
Email:      BHenderson@acluok.org


Carole Vigne, *Pro Hac Vice*
Mana Barari, *Pro Hac Vice*
LEGAL AID AT WORK
180 Montgomery Street, Suite 600
San Francisco, CA  94104
Telephone:   (415) 864-8848
Facsimile:   (415) 593-0096
Emails:      cvigne@legalaidatwork.org
             mbarari@legalaidatwork.org


Eben Colby, *Pro Hac Vice*
Catherine Fisher, *Pro Hac Vice*
500 Boylston Street
Boston, MA 02116
Telephone:   (617) 573-4855
Facsimile:   (617) 305-4855
Emails:      Eben.Colby@probonolaw.com
             Catherine.Fisher@probonolaw.com


Daniele Schiffman, *Pro Hac Vice*
1440 New York Avenue NW
Washington, DC 20005
Telephone:   (202) 371-7372
Facsimile:   (202) 661-0512
Email:       Daniele.Schiffman@probonolaw.com


36

Christopher J. Willett, *Pro Hac Vice*
Caitlin Boehne, *Pro Hac Vice*
EQUAL JUSTICE CENTER
510 Congress Ave., Ste. 206
Austin, Texas  78704
Telephone:     (512) 474-0007
Facsimile:     (512) 474-0008
Emails:          cwillett@equaljusticecenter.org
                     cboehne@equaljusticecenter.org

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2017, I filed the attached document with the

Clerk of Court. Based on the records currently on file in this case, the Clerk of Court will

transmit a Notice of Electronic Filing to those registered participants of the Electronic

Case Filing System.

Dated:  October 13, 2017                    */s/ Eben Colby*
                                            Eben Colby

37