## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

MADELYN CASILAO, HARRY
LINCUNA, and ALLAN GARCIA, on
behalf of themselves and all others
similarly situated,

          Plaintiffs,

     v.

HOTELMACHER LLC, dba HOLIDAY
INN EXPRESS; STEAKMACHER, LLC,
dba MONTANA MIKE'S STEAKHOUSE;
SCHUMACHER INVESTMENTS, LLC,
dba WATER ZOO; APEX USA, INC.;
WALTER SCHUMACHER; and
CAROLYN SCHUMACHER,

         Defendants.

Case No.: 5:17-CV-00800-SLP

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
## AND OPENING MEMORANDUM OF LAW IN SUPPORT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iv

PRELIMINARY STATEMENT ...............................................................1

STATEMENT OF FACTS ......................................................................1

    A.    The Defendants ..................................................................1

    B.    Defendants' Recruitment Of The Putative Class ....................................2

        1.    Defendants' Fraudulent Promises .................................................3

        2.    Based On The Schumachers' Promises, Class Members Incurred Significant Costs To Travel To The United States .....................................5

        3.    Once Class Members Arrived In The United States, Those Promises Were Quickly Broken........................................................6

        4.    Class Members Were Also Subjected To  Threats Of Deportation And Implied Physical Harm..........................................................10

    C.    NATURE AND SCOPE OF THE PROPOSED CLASS ....................................11

ARGUMENT ...................................................................................12

    A.    Standard for Class Certification...............................................12

    B.    The Requirements of Rule 23(a) Are Satisfied...................................13

        1.    The Class Is So Numerous That Joinder Of All Members Would Be Impracticable .............................................................13

        2.    The Class Members Share Common Questions Of Law And Fact ...........15

        3.    The Named Plaintiffs' Claims Are Typical Of The Class .........................16

        4.    The Named Plaintiffs And Class Counsel Will Fairly And Adequately Protect The Interests Of The Class ......................................17

    C.    The Requirements of Rules 23(b)(3) Are Satisfied .............................19

        1.    Common Questions Predominate ...........................................19

            (a)    Common Issues Predominate For Plaintiffs' Forced Labor Claim.............................................................21

                i.    Evidence that Defendants Obtained or Provided Class Members' Labor Is Either Not In Dispute Or Will Require Only Common Evidence to Establish .........21

                ii.    Plaintiffs Can That Show Defendants Obtained Class Members' Labor Via Prohibited Means Using Common Evidence That A Jury Can Use To Infer Class-Wide Practices .....................................22

ii

a.    Defendants Used A Common Scheme To Obtain Class Members' Labor ...................................................... 24

b.    Defendants Used Threats Of Abuse Of The Legal Process To Obtain Class Members' Labor ........................ 29

c.    Defendants Used Serious Harm, And Threats Thereof, To Obtain Class Members' Labor ...................... 31

i.    Plaintiffs Can Also Prove Defendants' Knowledge Through Common Evidence ................................ 33

ii.    Whether Plaintiffs Can Establish Venture Liability Will Be A Common Issue ................................... 33

(b)    Common Issues Predominate For Plaintiffs' Contract Claims ........................................................................ 35

2.    Class Treatment Is Superior to Individual Litigation. .............................. 38

CONCLUSION ................................................................................................................ 40

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### CASES

In re Access Cardiosystems, Inc.,
    776 F.3d 30 (1st Cir. 2015) ..................................................................... 19

Adamson v. Bowen,
    855 F.2d 668 (10th Cir. 1988) .......................................................... 9, 13

Allapattah Services, Inc. v. Exxon Corp.,
    333 F.3d 1248 (11th Cir. 2003) ............................................................. 36

Anderson v. City of Albuquerque,
    690 F.2d 796 (10th Cir. 1982) ................................................................. 8

Barrientos v. CoreCivic, Inc.,
    951 F.3d 1269 (11th Cir. 2020) ............................................................. 28

Bhasker v. Kemper Casualty Insurance Co.,
    361 F. Supp. 3d 1045 (D.N.M. 2019) ..................................................... 8

Bistline v. Parker,
    918 F.3d 849 (10th Cir. 2019) ............................................................... 32

Bouaphakeo v. Tyson Foods, Inc.,
    765 F.3d 791 (8th Cir. 2014), aff'd, Tyson Foods v. Bouaphakeo, 136 S. Ct.
    1036 (2016) ........................................................................................... 35

Braver v. Northstar Alarm Services, LLC,
    329 F.R.D. 320 (W.D. Okla. 2018) ........................................................ 14

Bryan v. United States,
    524 U.S. 184 (1998) .............................................................................. 29

CGC Holding Co., LLC v. Broad & Cassel,
    773 F.3d 1076 (10th Cir. 2014) ............................................................. 16

Colorado Cross Disability Coalition v. Abercrombie & Fitch Co.,
    765 F.3d 1205 (10th Cir. 2014) ............................................................. 10

Cortez v. Vieira Custom Chopping, Inc.,
    No. 17-cv-01647-DAD-SKO, 2019 U.S. Dist. LEXIS 162454 (E.D. Cal.
    Sept. 20, 2019), cert. granted, 2020 U.S. Dist. LEXIS 135595 (E.D. Cal.
    July 30, 2020) .............................................................................................. 37

Covarrubias v. Capt. Charlie's Seafood, Inc.,
    No. 10-CV-10-F (JCF), 2011 U.S. Dist. LEXIS 72636 (E.D.N.C. July 6,
    2011) ............................................................................................................ 10

Cruz v. TMI Hospitality, Inc.,
    No. 14-cv-1128 (SRN/FLN), 2015 U.S. Dist. LEXIS 147479 (D. Minn.
    Oct. 30, 2015) .............................................................................................. 36

Cuzco v. Orion Builders, Inc.,
    262 F.R.D. 325 (S.D.N.Y. 2009) ................................................................ 37

Daye v. Community Financial Service Centers, LLC,
    313 F.R.D. 147 (D.N.M. 2016) ................................................................... 33

Digital Design Group, Inc. v. Information Builders, Inc.,
    594 F.3d 1188 (10th Cir. 2010) ............................................................ 12, 13

DG ex rel. Stricklin v. Devaughn,
    2001 OK 21, 24 P.3d 834 (2001) ................................................................ 33

Erica P. John Fund, Inc. v. Halliburton Co.,
    563 U.S. 804 (2011) .............................................................................. 17, 18

Esplin v. Hirschi,
    402 F.2d 94 (10th Cir. 1968) ........................................................................ 9

Foster v. Apache Corp.,
    285 F.R.D. 632 (W.D. Okla. 2012) ............................................................ 14

Garcia-Celestino v. Ruiz Harvesting, Inc.,
    280 F.R.D. 640 (M.D. Fla. 2012) ............................................................... 35

Iglesias-Mendoza v. La Belle Farm, Inc.,
    239 F.R.D. 363 (S.D.N.Y. 2007) ................................................................ 37

Jackson v. Oppenheim,
    533 F.2d 826 (2d Cir. 1976) ....................................................................... 19

United States v. Kalu,
    791 F.3d 1194 (10th Cir. 2015) .................................................... 20, 27, 30

Loughrin v. United States,
    573 U.S. 351 (2014) ............................................................................ 20

Menocal v. GEO Group, Inc.,
    320 F.R.D. 258 (D. Colo. 2017), aff'd, 882 F.3d 905 (D. Colo. 2018),
    cert. denied., 139 S.Ct. 143 (2018)...................................................*passim*

Menocal v. Geogroup, Inc.,
    882 F.3d 905 (D. Colo. 2018), cert. denied., 139 S.Ct. 143 (2018)...............*passim*

MidAmerica Federal Savings & Loan Association v. Shearson/American Express,
    Inc.,
    886 F.2d 1249 (10th Cir. 1989) ............................................................ 19

Moodie v. Kiawah Island Inn Co., LLC,
    309 F.R.D. 370 (D.S.C. 2015)......................................................... 10, 35

Moreno-Espinosa v. J & J Ag Products, Inc.,
    247 F.R.D. 686 (S.D. Fla. 2007) .......................................................... 10

Naylor Farms, Inc. v. Chaparral Energy, LLC,
    923 F.3d 779 (10th Cir. 2019) ......................................................... 12, 34

Neder v. United States,
    527 U.S. 1 (1999)

Nunag-Tañedo v. East Baton Rouge Parish School Board,
    No. LA CV10-01172 JAK, 2011 WL 7095434 (C.D. Cal. Dec. 12, 2011) .......... 32

Paguirigan v. Prompt Nursing Employment Agency LLC,
    No. 17-CV-1302 (NG), 2018 WL 4347799 (E.D.N.Y. Sept. 12, 2018) ............... 32

Payne v. Tri-State CareFlight, LLC,
    332 F.R.D. 611 (D.N.M. 2019), leave to appeal denied, No. 19-702, 2019
    WL 8329300 (10th Cir. Dec. 3, 2019) .................................................... 9

Recinos-Recinos v. Express Forestry, Inc.,
    233 F.R.D. 472 (E.D. La. 2006) ........................................................... 37

Rodriguez v. Carlson,
    166 F.R.D. 465 (E.D. Wash. 1996) ....................................................... 37

Rodriguez v. Hermes Landscaping, Inc.,
    No. 17-2142, 2018 U.S. Dist. LEXIS 151454 (D. Kan. Sept. 5, 2018) ................ 33

Rosario-Guerrro v. Orange Blossom Harvesting, Inc.,
    265 F.R.D. 619 (M.D. Fla. 2010) ........................................................................ 35

Rosas v. Sarbanand Farms, LLC,
    329 F.R.D. 671 (W.D. Wash. 2018) ................................................................... 35

Rutter & Wilbanks Corp. v. Shell Oil Co.,
    314 F.3d 1180 (10th Cir. 2002) ......................................................................... 14

Salas-Mateo v. Ochoa,
    No. 03-14357-CIV, 2004 WL 1824124 (S.D. Fla. Mar. 26, 2004) ...................... 10

Sanders v. John Nuveen & Co., Inc.,
    619 F.2d 1222 (7th Cir. 1980) .......................................................................... 19

Saur v. Snappy Apple Farms, Inc.,
    203 F.R.D. 281 (W.D. Mich. 2001) .................................................................... 38

Sharpless Separator Co. v. Gray,
    1916 OK 1037, 62 Okla. 73, 161 P. 1074 (1916) ................................................. 36

Shook v. El Paso County,
    386 F.3d 963 (10th Cir. 2004) ............................................................................. 8

Smith v. MCI Telecommunications Corp.,
    124 F.R.D. 665 (D. Kan. 1989) .......................................................................... 38

United States v. Toure,
    965 F.3d 393 (5th Cir. 2020) ............................................................................. 28

Turner v. Murphy Oil USA, Inc.,
    234 F.R.D. 597 (E.D. La. 2006) ........................................................................ 36

Tyson Foods, Inc. v. Bouaphakeo,
    136 S.Ct. 1036 (2016) ...................................................................... 12, 17, 24

United Food & Commercial Workers Union v. Chesapeake Energy Corp.,
    281 F.R.D. 641 (W.D. Okla. 2012) .................................................................... 16

United States ex rel Trim v. McKean,
    31 F. Supp. 2d 1308 (W.D. Okla. 1998) ............................................................ 32

United States v. Calimlim,
    538 F.3d 706 (7th Cir. 2008) .................................................................. 26, 28, 30

United States v. Dann,
    652 F.3d 1160 (9th Cir. 2011) ................................................................. 28

United States v. Ho,
    311 F.3d 589 (5th Cir. 2002) ................................................................... 29

United States v. Powell,
    982 F.2d 1422 (10th Cir. 1992) ............................................................... 30

United States v. Stewart,
    872 F.2d 957 (10th Cir. 1989) ......................................................... 20, 27

Wal-Mart Stores, Inc. v. Dukes,
    564 U.S. 338 (2011) ...................................................................... 12, 18

Whitton v. Deffenbaugh Disposal, Inc.,
No. 12-2247-CM, 2014 U.S. Dist. LEXIS 153405 (D. Kan. Oct. 28, 2014)   38

## STATUTES

18 U.S.C. § 1589 ....................................................................................... 2

18 U.S.C. § 1589(a)(1)-(4) ...................................................................... 18

18 U.S.C. § 1589(b) .......................................................................... 18, 32

18 U.S.C. § 1589(c) .......................................................................... 27, 28

## RULES

Fed. R. Civ. P. 23(a) ................................................................................. 9

Fed. R. Civ. P. 23(a)(1)-(4) ...................................................................... 9

Fed. R. Civ. P. 23(b) ................................................................................. 9

Fed. R. Civ. P. 23(b)(3) .............................................................. 9, 16, 17, 37

## PRELIMINARY STATEMENT

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Madelyn Casilao, Harry Lincuna, and Allan Garcia (the "Named Plaintiffs") hereby move to certify a class of approximately 25 H-2B visa holders from the Philippines who were brought by Defendants to work in Clinton, Oklahoma at a restaurant and hotel complex controlled and operated by Defendants Walter and Carolyn Schumacher.

## STATEMENT OF FACTS

**A.    The Defendants**

Defendants Walter Schumacher and Carolyn Schumacher own and operate several hospitality businesses in Clinton, Oklahoma, including Defendant Hotelmacher LLC (a Holiday Inn Express hotel) and Defendant Schumacher Investments, LLC (a water park). Plfs Ex. 1, W. Schumacher 8/24 Dep. Tr. 17:12-15, 74:10-15, 77:10-24. During the class period, Mr. and Mrs. Schumacher also owned and operated Defendant Steakmacher LLC (a Montana Mike's restaurant), Plfs Ex. 1, W. Schumacher 8/24 Dep. Tr. 18:17-19:4, and Defendant APEX USA, Inc. ("APEX"), a company that until 2012 recruited foreign workers and served as a Department-of-State-designated J-1 visa sponsor, Plfs Ex. 2, W. Schumacher 3/4 Dep. Tr. 23:22-24:7, 24:12-13, 27:6-28:1. Mr. and Mrs. Schumacher were closely involved in the operations of all four business. Plfs Ex. 1, W. Schumacher 8/24 Dep. Tr. 68:8-72:3; Plfs Ex. 2, W. Schumacher 3/4 Dep. Tr. 27:6-28:1. Payroll and other human resources functions for all of the businesses were performed by the office

1

staff at APEX's office during the relevant time period. See, e.g., Plfs Ex. 3, W.

Schumacher 8/13 Dep. Tr. 45:10-47:5; Plfs Ex. 4, DEFS-H2B006300.

**B.      Defendants' Recruitment Of The Putative Class**

As discussed in detail in the corresponding motion for class certification in the

Francis action, between 2008 and 2012, the Defendants preyed on vulnerable J-1

students, forcing them into labor, in violation of 18 U.S.C. § 1589, via a common scheme

of false promises, excessive fees, charges, and costs, low wages, threats and harassment,

and threats of termination and deportation.

In January 2012, while the Department of State was investigating multiple

complaints from J-1 workers, Plfs Ex. 6, DEFS-J1-010192-93; Plfs Ex. 7, DEFS-J1-

010259-60, APEX withdrew as a J-1 sponsor, Plfs Ex. 8, DEFS-J1-010232-33. To

compensate for the lack of a captive pool of J-1 workers, Defendants found a new source

of vulnerable foreign workers to staff their properties, applying to the U.S. Department of

Labor ("DOL") for approval to hire waiters and housecleaners under the H-2B program.

Plfs Ex. 9, DEFS-H2B000001, Plfs Ex. 10, DEFS-H2B000017. At the same time, they

began recruiting workers from the Philippines through two recruiting agencies, one run

by Issac Yehuda and his agents in the Philippines, April Tan (also known as April

Bayabos) and Irah Ugdoracion, and one run by Jose Bedayo. Plfs Ex. 3, W. Schumacher

8/13 Dep. Tr. 91:17-92:7, 110:16-21. Defendants ultimately brought over around 25 Filipino workers on H-2B visas.[1]

1.    **Defendants' Fraudulent Promises**

When recruiting workers in the Philippines, Defendants falsely promised the Filipino workers that they would be paid a guaranteed hourly wage and be given full-time work. Plfs Exs. 18, 35, 36, 38 & 55 (collectively "Class Member Decls.") ¶¶ 4, 5. These promises were made both by Defendants' recruiters and in written documents signed by Mr. and Mrs. Schumacher and submitted to the United States and Filipino governments to secure, respectively, class members' H-2B and exit visas.

Defendants knew that Filipino workers could not leave their home country without authorization from the Philippine Overseas Employment Administration ("POEA"), which reviews employment offers made by foreign employers to Filipino citizens to ensure that the offers contain certain minimum terms and conditions: free food and free housing, or a comparable allowance; free inbound and outbound transportation; reimbursement for all travel expenses; and sick leave, vacation pay, and just-cause termination. Plfs Ex. 19, DEFS-H2B007209-10. To gain approval from the POEA, Defendants signed contracts with the workers and the POEA promising to provide employment meeting these standards. Plfs Ex. 20, DEFS-H2B007214 (draft contract

---

[1] Defendants also brought two workers from the Dominican Republic on H-2B visas who are not part of the proposed class. In addition, State Department records and documents in Defendants' production suggest that they were approved to hire H-2B workers in 2008, 2009 and 2010. Plfs Ex. 1, W. Schumacher 8/24 Dep. Tr. at 23:12-19, 26:10-22; Plfs Ex. 11, DEFS-H2B007579.

containing noncompliant terms); Plfs Ex. 21, DEFS-H2B007485 (email instructing Mr. Schumacher to remove noncompliant terms); Plfs Ex. 22, DEFS-H2B007382-85 (final contract excluding those terms).

For each class member, Defendant prepared a standard job offer letter setting out basic employment terms. E.g., Plfs Ex. 22, DEFS-H2B007382-85; see also Plfs Ex. 76, Summary of Contract Terms. Once the job offer letter was signed by the H-2B worker, the contract was submitted to POEA for review, along with, among other things, an information card completed by the Defendants that described the offered position and salary. Plfs Ex. 19, DEFS-H2B007209-10; Plfs Ex. 23, DEFS-H2B006520. As part of the review, the Philippines Overseas Labor Office ("POLO") of the Embassy in Washington, D.C., evaluated the contracts and prepared a contract verification form, which Defendants were then required to sign to confirm that certain additional terms were included in their offer of employment. Plfs Ex. 19, DEFS-H2B007209-10 (referring to the form as a "Compliance Letter"). Those additional terms included full-time work of eight hours per day, free food and free housing or a comparable allowance, free transportation, reimbursement for all travel expenses, and sick leave, vacation pay, and just-cause termination. Plfs Ex. 22, DEFS-H2B007384. The signed form was then returned to the Filipino government, which verified and authenticated the documents submitted to POLO before providing the worker with a "red ribbon" copy that was necessary to secure an exit visa. Plfs Ex. 19, DEFS-H2B007209-10; Class Member Decs. ¶ 7.

Defendants made similar representations about the terms and conditions of the class members' employment to the United States government in order to gain approval to

secure the necessary H-2B visa. In their applications for temporary labor certification submitted to the DOL, Defendants stated that they would pay their foreign workers the prevailing wage on a set hourly basis and that the positions were full-time, 40 hours a week. Plfs Ex. 9, DEFS-H2B000005; Plfs Ex. 10, DEFS-H2B000027. In the corresponding I-129 petitions filed with the U.S. Department of Homeland Security, Defendants also represented that they were not working with any recruitment agencies. Plfs Ex. 24, DEFS-H2B000044; Plfs Ex. 25, DEFS-H2B000069.

> **2.    Based On The Schumachers' Promises, Class Members Incurred Significant Costs To Travel To The United States**

During the recruitment process, the class members were required to incur significant costs. As Defendants knew, the recruiters they hired collected various fees related to the processing of class members' H-2B and exit visas. Plfs Ex. 1, 8/24 W. Schumacher Dep. at 92:12-13 ("Well, obviously I had some idea that someone was collecting fees."); Plfs Ex. 26, DEFS-H2B007232-33; Plfs Ex. 19, DEFS-H2B007209-10. To get to the United States, class members paid fees totaling between approximately $2,000 and $3,000 USD—an enormous amount of money in the Philippines. Compl. ¶ 63; Plfs Ex. 26, DEFS-H2B007232; Class Member Decls. ¶ 6. This included fees paid by all class members at standard rates set by the United States and Filipino governments, such as the $190 interview fee charges by the U.S. Embassy in the Philippines and a 6,000 Philippine peso fee for the exit visa. Plfs Ex. 27, DEFS-H2B002136. The class members were also required to pay the cost of their airfare to the United States up front, although the POEA contract required employers to pay for the cost of transportation to

the United States, Plfs Ex. 22, DEFS-H2B007384. Defendants' recruiters promised class members that they would be reimbursed for their travel expenses once they arrived in Oklahoma. Class Member Decls. ¶¶ 6-7; Plfs Ex. 28, DEFS-H2B007320.

To pay these fees and afford their flights to the United States, the class members were forced to hand over their savings, borrow large sums of money, and/or mortgage or sell property. Plfs Exs. 12-18, Class Member Decls. ¶ 7; Plfs Ex. 29, Garcia Depo. Tr. 66:21-67:1, 69:24-70:1, 71:5-71:13; Plfs Ex. 30, Lincuna Depo. Tr. 43:16-43:21; Plfs Ex. 31, Casilao Dep. Tr. 112:13-113:2. Defendants, through their experience recruiting J-1 workers, understood that class members would almost certainly have to borrow money to pay these costs. Plfs Ex. 2, W. Schumacher 3/4 Dep. Tr. 163:11-25.

### 3. Once Class Members Arrived In The United States, Those Promises Were Quickly Broken

When they arrived in Clinton, class members were brought to APEX's offices, where they learned that they would not be receiving their promised hourly rate, but instead would be paid on a tipped or piece-rate basis or at the federal minimum wage of $7.25 per hour, compare, e.g., Plfs Ex. 32, DEFS-H2B006390 (offer letter listing hourly wage of $8.29 to $8.97), with DEFS-H2B006399 (new hire form listing wages of $7.25 an hour or $4.25 a room); Plfs Exs. 12-18, Class Member Decls. ¶ 8; that they would need to find and pay for their own lodging, Plfs Ex. 1, W. Schumacher 8/24 Dep. Tr. 157:14-159:8; and that their airfare from the Philippines would not be refunded, Plfs Ex. 1, W. Schumacher 8/24 Dep. Tr. 151:14-23. Class members were directed to complete "new hire information" forms that included these and other new material terms. E.g., Plfs

Ex. 33, DEFS-H2B006493 (listing pay rate for housekeeper at Hotelmacher as $7.25 per hour for training and $4.25 per room); Plfs Ex. 34, DEFS-H2B006537 (changing position from housekeeper at Hotelmacher to server at Steakmacher).

Defendants systematically breached their contracts with the class members. They failed to provide the promised full-time work, good hourly pay rates, transportation, food, or housing to the workers. See, e.g., Class Member Decls. ¶¶ 8-11. Instead of the promised hourly rates, Defendants routinely paid class members on a tipped or piece-rate basis, which netted them significantly less than the promised wage, or paid them the federal minimum wage, $7.25 per hour. See, e.g., Plfs Ex. 33, DEFS-H2B006493; Plfs Ex. 34, DEFS-H2B006537; Plfs Ex. 1, 8/24 W. Schumacher Dep. At 109:11-14 ("[T]he only time [an H-2B housekeeper] would . . . not be paid by the room is while they were training, which is a short-term process."). When workers complained about the change in pay, they were told that they would be able to earn more than their promised wage by cleaning more rooms or earning better tips. Plfs Ex. 35, Lincuna Decl. ¶ 9; Plfs Ex. 36, Garcia Decl. ¶ 11. Mr. and Mrs. Schumacher also told workers that they had included the straight hourly rate in the offer letter and documents provided to the government agencies because they knew it would not approved otherwise. Plfs Ex. 36, Garcia Decl. ¶ 11.

In reality, class members were assigned less than full-time work, which prevented them from earning as much as their promised hourly rate on a full time schedule. Housekeepers were given only a limited number of rooms per day. Plfs Ex. 30, Lincuna Dep. Tr. 65:8-11; Plfs Ex. 31, Casilao Dep. Tr. 88:2-7; Plfs Ex. 37, DEFS-H2B006328 ("Walt never needed housekeepers. . . . The H2Bs just could not survive on the money

they were paid"). Servers' hours were regularly cut, even mid-shift, when business was slow, and H-2B servers were assigned areas of low traffic in the restaurant, with correspondingly low tip potential. Plfs Ex. 38, Cleto Decl. ¶ 10 ("Although I was promised full-time work, I worked about three hours per day. The reduction in hours meant that I was unable to earn enough."); Plfs Ex. 29, Garcia Dep. Tr. 72:7-73:7, 109:11-110:22. Defendants also refused to pay class members for time worked outside of scheduled hours. Plfs Ex. 39, DEFS-H2B000552; Plfs Ex. 40, DEFS-H2B000651.

Instead of providing housing for two people per room, Defendants told class members that they needed to find their own housing and directed them to local motels. Plfs Ex. 41, DEFS-H2B007478 (Mr. Schumacher informing Ms. Bayabos that after they arrive class members "go to their own housing" and directing her to tell class members to "check with one of the Philippinos [sic] who are already here and see if they have any room in their housing"); Plfs Ex. 29, Garcia Dep. Tr. 137:20-138:16. Like J-1 students before them, class members ended up sharing a single motel room with three to five other workers—which still cost them $200-$250 per person per month. Class Member Decs. ¶ 13; Plfs Ex. 30, Lincuna Dep. Tr. 59:24-60:4, 85:5-86:6; Plfs Ex. 31, Casilao Dep. Tr. 98:9-13, 99:17-21; Plfs Ex. 29, Garcia Dep. Tr. 137:20-138:16. Mr. Schumacher was aware of these conditions, since he personally visited the motel while class members were living there, Plfs Ex. 31, Casilao Dep. at 60:7-65:7.

Defendants created a situation where the Filipino workers were barely able to pay their living expenses in Oklahoma, let alone recover costs or repay any debts incurred in the Philippines. See, e.g., Plfs Ex. 42, DEFS-H2B007408, Plfs Ex. 43, DEFS-

H2B007445. Defendants also refused to reimburse the workers for their travel or recruitment expenses and refused to pay for return travel back to the Philippines, despite promising to do so and knowing that class members could not afford the costly return travel on their own, effectively forcing the workers to remain working for the Defendants. Plfs Ex. 28, DEFS-H2B007320. As a result, the Filipino workers were put in a position where they were financially vulnerable and feared they would face further serious financial or immigration harm if they attempted to leave Defendants' employment, as they could not legally work elsewhere and could not repay their debts if they stopped working for Defendants. Plfs Exs. 12-18, Class Member Decls. ¶¶ 16-18.

Defendants also freely transferred the workers into different positions between their businesses as their own staffing needs required, without regard to the workers' contractual job placements. E.g., Plfs Ex. 33, DEFS-H2B006510 (describing Mr. Lincuna as "breakfast host," not housekeeper); Plfs Ex. 44, DEFS-H2B006758 (noting two "servers" would "be dishwashers, busers or something like that at MMs"); Plfs. Ex. 45, DEFS-H2B001313 (email placing arriving server as a dishwasher or busser); Plfs. Ex. 1, W. Schumacher 8/24 Dep. Tr. 185:17-7 (testifying that job assignments for class members were made by himself and Mrs. Schumacher); compare Plfs Ex. 46, DEFS-H2B001059, with Plfs Ex. 34, DEFS-H2B006537. Defendants went so far as to have H-2B workers clean Mr. and Mrs. Schumacher's home. Plfs Ex. 37, DEFS-H2B006328; Plfs Ex. 31, Casilao Dep. at 83:6-24; Plfs Ex. 1, 8/24 W. Schumacher Dep. at 199:17-200:16.

### 4.      Class Members Were Also Subjected To
### Threats Of Deportation And Implied Physical Harm

Exacerbating the foregoing vulnerabilities, Defendants continued to engage in the same types of threatening and coercive practices that they had long used to compel the J-1 students to work. For example, Mr. Schumacher made it known to numerous class members that he was a police sheriff, Plfs. Ex. 30, Lincuna Dep. at 82:20-83:11, and that he carried a firearm and handcuffs in his car, Plfs Ex. 47 DEFS-H2B006290; Plfs Ex. 48, DEFS-H2B006295; Plfs. Ex. 29, Garcia Dep. 96:20-102:2; Plfs Ex. 38, Cleto Decl. ¶ 14. When workers asked to be reimbursed their airfare, Mr. Schumacher told them that he would only pay for return tickets to the Philippines if the employee was returned "in a box" - a reference to the provision in the POEA contracts requiring that Defendants cover the costs of repatriation of their remains to the Philippines. Plfs. Ex. 29, Garcia Dep. at 41:22-46:24; Plfs Ex. 36, Garcia Decl. ¶ 13. Ms. Schumacher told workers who raised concerns about their work conditions "if they walked out, that they would be finished." Plfs Ex. 49, DEFS-H2B007461.

As the class members' testimony makes clear, even when the threat was only made in the presence of one or a small group of workers, it nevertheless reached the other putative class members, who worked for the same employers and lived in the same overcrowded housing, and served as a warning to the entire class to fear Mr. Schumacher. Plfs. Ex. 30, Lincuna Dep. at 111:9-112:8; Plfs Ex. 29, Garcia Dep. at 145:15-20. For example, although Mr. Schumacher showed his gun to a subset of the H-2B workers who worked for Defendants, Plfs Ex. 48 DEFS-H2B006295; Plfs Ex. 47, DEFS-H2B006290;

Plfs Ex. 29, Garcia Depo. 96:20-102:9, other class members learned that Mr. Schumacher had a gun, that he had shown it to fellow H-2B workers, and were afraid of him. Plfs Ex. 31, Casilao Depo. 56:1-23.

Defendants also spent considerable effort searching for class members once they had left or escaped Defendants' employ and threatening them with immigration consequences, including not allowing other class members to pick up checks on behalf of a class member, Plfs Ex. 50, DEFS-H2B007398; not providing final payment to class members unless they provided Defendants with their present address, Plfs Ex. 51, DEFS-H2B006564-65; Plfs Ex. 52, DEFS-H2B006678; reaching out to family members to find out where class members were living, Plfs Ex. 4, DEFS-H2B006300; and telling class members that Defendants had sent their information to immigration authorities, Plfs Ex. 31, Casilao Dep. at 57:4-59:16.

## C.   <u>NATURE AND SCOPE OF THE PROPOSED CLASS</u>

Named Plaintiffs bring this action on behalf of themselves and a group of similarly situated H-2B workers to recover damages arising from violations of their rights under the Trafficking Victims Protection Reauthorization Act ("TVPRA") and from breach of contract. <u>See</u> Compl., ¶ 1, 7 & Prayer for Relief. In their Complaint, Named Plaintiffs assert claims against Defendants for violations of the TVPRA (Count One), breach of written employment contract (Count Two), and third-party-beneficiary breach of contract (Count Three). Named Plaintiffs assert these claims on behalf of the following class:

> "All Filipino nationals who obtained H-2B visas at any time from January 1, 2008 through December 31, 2014, who were admitted to the United States as H-2B temporary foreign workers, and for whom one of the Defendants was

11

the H-2B petitioner or de facto employer upon arrival in the United States
(the 'Class')."

Id. ¶ 94.

## ARGUMENT

### A.  Standard for Class Certification

"In determining the propriety of a class action, the question is not whether the
plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather
whether the requirements of Rule 23 are met." Anderson v. City of Albuquerque, 690
F.2d 796, 799 (10th Cir. 1982) (citation omitted). The Named Plaintiffs have met the
Rule's requirements.

The party seeking class certification bears the burden of proving that Rule 23's
requirements are satisfied. Shook v. El Paso Cty., 386 F.3d 963, 968 (10th Cir. 2004).
When making this determination, the district court "must accept the substantive
allegations of the complaint as true." Id. Even "in doubtful cases, class certification is
favored." Bhasker v. Kemper Cas. Ins. Co., 361 F. Supp. 3d 1045, 1089 (D.N.M. 2019)
(citing Esplin v. Hirschi, 402 F.2d 94, 101 (10th Cir. 1968)).

All classes must satisfy the prerequisites of Rule 23(a): numerosity, commonality,
typicality, and adequacy. Fed. R. Civ. P. 23(a). Once the court concludes that these
threshold requirements have been met, "it must then examine whether the action falls
within one of three categories of suits set forth in Rule 23(b)." Adamson v. Bowen, 855
F.2d 668, 675 (10th Cir. 1988). Here, Plaintiffs move under subsection (b)(3). As

12

outlined below, Plaintiffs have satisfied each of the subsection (a) threshold requirements, as well as Rule 23(b)(3)'s requirements of predominance and superiority.

**B.** **The Requirements of Rule 23(a) Are Satisfied**

Plaintiffs have satisfied the threshold Rule 23(a) requirements.

### 1. The Class Is So Numerous That Joinder Of All Members Would Be Impracticable

Under Rule 23, the numerosity requirement is met if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. Pro 23(a)(1). "The Tenth Circuit has stated that there is 'no set formula' to determine whether the numerosity requirement is met; instead, it is a fact-specific inquiry best left to the district court's discretion." Payne v. Tri-State CareFlight, LLC, 332 F.R.D. 611, 658 (D.N.M. 2019) (citation omitted), leave to appeal denied, No. 19-702, 2019 WL 8329300 (10th Cir. Dec. 3, 2019). Despite the name, evaluating numerosity is "not a question of numbers." Colorado Cross Disability Coal v. Abercrombie & Fitch Co., 765 F.3d 1205, 1215 (10th Cir. 2014) (internal quotations and citation omitted). Rather, a finding of numerosity requires consideration of several factors going to the impracticability of joinder, including "the unique characteristics of the class members." Menocal v. GEO Grp., Inc., 320 F.R.D. 258, 263 n.1 (D. Colo. 2017) (hereinafter "Menocal I"), aff'd, 882 F.3d 905 (10th Cir. 2018) (hereinafter "Menocal II"), cert. denied., 139 S.Ct. 143 (2018). In particular, courts, including the Tenth Circuit, have found that joinder is impracticable in cases like these, where the putative class members "are spread around the world and are not fluent in English or the U.S. legal system." Id.; see also Moodie v. Kiawah Island Inn Co., LLC,

13

309 F.R.D. 370, 377 (D.S.C. 2015) ("The proposed class members are temporary foreign workers who permanently reside in a foreign country, likely lack financial resources, lack familiarity with the U.S. Court system and have relatively small claims. . . . Due to these factors, joinder of all members of the class is impractical."); Covarrubias v. Capt. Charlie's Seafood, Inc., No. 10-CV-10-F, 2011 U.S. Dist. LEXIS 72636, *10-11 (E.D.N.C. 2011) ("Where, as here, class members are geographically dispersed, lack sophistication, and are non-English-speaking migrant workers, courts have found that these additional factors make joinder impracticable."); Moreno-Espinosa v. J & J Ag Products, Inc., 247 F.R.D. 686, 688 (S.D. Fla. 2007) (same); Salas-Mateo v. Ochoa, No. 03-14357-CIV, 2004 WL 1824124, at *2 (S.D. Fla. Mar. 26, 2004) (same).

The characteristics of the class members in this case, including their geographic dispersion, lack of financial resources, and lack of familiarity with the English language and the U.S. court system, make joinder impracticable. Defendants employed at least 26 foreign H-2B workers[2] during the class period. Members of the proposed class were born and grew up in the Philippines, and only came to the United States to work. Plfs Ex. 47, DEFS-H2B006289 ("This was actually my first time working in the United States."). The class members were in the United States on temporary visas, and the Defendants reported that some class members dispersed geographically when they left Clinton.. See, e.g., Plfs

---

[2] The true number of H2-B workers employed during the class period is known only to Defendants. Plaintiffs have reason to believe that there are more class members than Defendants identified on their produced class list, as Defendants Hotelmacher and Steakmacher applied for and received 32 H-2B visas in 2012. Plfs Ex. 53, CASILAO-0000591 (excerpt).

Ex. 54, SCHUMACHER00492-93. They are unfamiliar with the U.S. legal system and

their English is limited to what was required to work as a server or hotel employee.

Indeed, the Named Plaintiffs have used a translator to testify at their depositions and to

communicate with counsel. Plfs Ex. 29, Garcia Depo. Tr. 121:15-20; Plfs Ex. 30, Lincuna

Dep. Tr. 135:2-135:14. Class members also lack the financial resources to bring

individual cases of their own. Plfs Exs. 12-18, Class Member Decls. ¶ 19. Given the

circumstances of the class members in this action, joinder is clearly impracticable.

### 2.      The Class Members Share Common Questions Of Law And Fact

"A plaintiff seeking class certification satisfies Rule 23(a)(2)'s commonality

requirement by demonstrating that 'there are questions of law or fact common to the

class.'" Naylor Farms, Inc. v. Chaparral Energy, LLC, 923 F.3d 779, 788 (10th Cir.

2019) (quoting Fed. R. Civ. P. 23(a)(2)). This is not a heavy burden: "A finding of

commonality requires only a single question of law or fact common to the entire class."

DG ex rel. Stricklin v. Devaughn, 594 F.3d 1188, 1195 (10th Cir. 2010). A common

question is one for which the answer "will resolve an issue that is central to the validity

of each one of the [class members'] claims in one stroke." Wal-Mart Stores, Inc. v.

Dukes, 564 U.S. 338, 350 (2011). Where the question is a factual one, the question is

common if there is sufficient common evidence that could allow a reasonable jury to

decide that issue for each class member. Tyson Foods, Inc. v. Bouaphakeo, 136 S.Ct.

1036, 1048 (2016) (noting that common evidence at issue "could have been sufficient to

sustain a jury finding as to hours worked if it were introduced in each employee's

individual action"). In the discussion of predominance, infra Part C.1, Plaintiffs set forth

15

more than a dozen common questions of law and fact where "the same evidence will suffice" to answer each question as to every class member's claim. Tyson Foods, 136 S. Ct. at 1045 (citation omitted). This satisfies commonality. Dukes, 564 U.S. at 350.

### 3.    The Named Plaintiffs' Claims Are Typical Of The Class

Rule 23(a)(3) requires the claims of Named Plaintiffs to be typical of the claims of the class they seek to represent. Typicality is satisfied when the representative plaintiffs' claims arise from the same event, practice or course of conduct that provides the basis of class claims and are grounded in the same legal or remedial theory. Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988). "Provided the claims of Named Plaintiffs and class members are based on the same legal or remedial theory, differing fact situations of the class members do not defeat typicality." Devaughn, 594 F.3d at 1198-99.

The Named Plaintiffs' claims are plainly typical of the claims of the proposed class. The harm and threat of harm suffered by the Named Plaintiffs as a result of Defendants' alleged scheme is typical of the harm and threat of harm suffered by all class members because all were promised the same material terms and conditions of employment, all acted in reliance on Defendants' false recruitment promises, all worked for the Defendants under substantially the same terms, with limited hours and no compensation for food or housing, and all possessed the same economic and immigration-related vulnerabilities. See generally Plfs Exs. 35, 36 & 55. Because the Named Plaintiffs and the class members suffered a common legal injury, the Named Plaintiffs have satisfied the requirement of typicality. See id. at 1199 ("Due to the

16

common risk of harm and the common underlying legal theory for asserting that risk, the

district court acted within its discretion to find that typicality was satisfied.").

### 4. The Named Plaintiffs And Class Counsel Will Fairly And Adequately Protect The Interests Of The Class

Rule 23(a)(4) requires that the class representatives must "fairly and adequately

protect the interests of the class." In order to determine whether the requirements of Rule

23(a)(4) have been satisfied, "two questions must be resolved: (1) do the named plaintiff

and his counsel have any conflicts of interest with other class members? and (2) will the

named plaintiff and his counsel prosecute the action vigorously on behalf of the class?"

Braver v. Northstar Alarm Servs., LLC, 329 F.R.D. 320, 330 (W.D. Okla. 2018) (citing

Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1187-88 (10th Cir. 2002)).

With respect to the first question, "[a]n alleged conflict must be more than merely

speculative or hypothetical; there must be a showing that the conflict is a real

probability." Braver, 329 F.R.D. at 330. As to the second question, "Rule 23(a)(4) does

not require a detailed knowledge of the class's claims. Instead, the class representative

need only demonstrate a basic understanding of the class claims as well as an

understanding of his or her duties as the class representative and a willingness to fulfill

those duties." Foster v. Apache Corp., 285 F.R.D. 632, 645 (W.D. Okla. 2012) (internal

citations omitted).

In the present case, there is no apparent conflict of interest between the potential

class members and either the Named Plaintiffs or Named Plaintiffs' counsel. Plfs Ex. 36,

Garcia Decl. 21; Plfs Ex. 55, Casilao Dec. 21; Plfs Ex. 35, Lincuna Dec. 21; Plfs Exs. 56-

17

59. All class members have the same interest in obtaining compensation and other relief for their injuries caused by Defendants' labor trafficking and other unlawful acts. The Named Plaintiffs will not benefit in any way from actions that will prove harmful to the interests of the members of the class. Indeed, the Named Plaintiffs can only recover if they succeed on legal theories that would also lead to recovery for the class. See infra Part C.1.

Moreover, the three putative class representatives have shown willingness to represent the class vigorously. The Named Plaintiffs have appeared for depositions despite considerable inconvenience: two travelled by plane to Oklahoma City to appear at their depositions in person, while the third navigated the stress and disruption caused by the COVID-19 pandemic to appear remotely. Plfs Ex. 36, Garcia Decl. X; Plfs Ex. 55, Casilao Dec. X; Plfs Ex. 35, Lincuna Dec. X. During their depositions, the Named Plaintiffs showed their understanding of the harms that they and other putative class members have suffered. See, e.g., Plfs. Ex. 31; Casilao Depo. Tr. 11:17-25; Plfs. Ex. 30, Lincuna Depo. Tr. 103:20-104:8. The Named Plaintiffs have participated in extensive interviews with counsel during the drafting of the complaint, the extensive discovery process, and the preparation of the present motion, and have communicated with Plaintiffs' counsel regularly regarding the progress and strategy of this case. Plfs Ex. 36, Garcia Decl. X; Plfs Ex. 55, Casilao Dec. X; Plfs Ex. 35, Lincuna Dec. X.

Finally, Named Plaintiffs' counsel are competent to conduct this action and fairly represent the interests of Plaintiffs and the class as a whole. The Equal Justice Center, Legal Aid at Work, and ACLU of Oklahoma are well-known public interest legal

services organizations with substantial experience with and involvement in class and collective action litigation on behalf of low-wage workers. <u>See</u> Plfs Exs. 56-59. They are joined by pro bono counsel with extensive, nation-wide complex civil litigation experience, which includes experience litigating class and mass actions under the TVPRA. Plfs Ex. 56, Colby Dec. Together, Named Plaintiffs' counsel have decades of experience representing victims of labor trafficking and advocating for low-wage immigrant workers and are thus uniquely qualified to prosecute this action. <u>United Food & Commercial Workers Union v. Chesapeake Energy Corp.</u>, 281 F.R.D. 641, 654 (W.D. Okla. 2012) (adequacy of class counsel implicates "the experience and competence of the attorney[s] representing the class" (citations omitted)). Moreover, they have invested significant time in identifying and investigating potential claims in this action, and are committed to advancing the costs of this litigation. Plfs Ex. 56, ¶¶ 10-14.

## C.     <u>The Requirements of Rules 23(b)(3) Are Satisfied</u>

To satisfy the requirements of Rule 23(b)(3), the proposed class representatives must show "that the questions of law or fact common to putative class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Here, common questions predominate and class treatment is far superior to other methods of adjudicating the matters at issue.

### 1.     <u>Common Questions Predominate</u>

Common issues predominate over any individual inquiries necessary to establish Defendants' liability under the TVPRA and Oklahoma contract law.

When considering whether common issues predominate under Rule 23(b)(3), the court "must characterize the issues in the case as common or not, and then weigh which issues predominate" by evaluating "how the class intends to answer factual and legal questions to prove its claim." <u>Menocal II</u>, 882 F.3d at 915 (quoting <u>CGC Holding Co. v. Broad & Cassel</u>, 773 F.3d 1076, 1086 (10th Cir. 2014)) (emphasis omitted). When assessing whether a factual question is common, the court should ask whether the Plaintiffs have provided a set of evidence that would be "sufficient to sustain a jury finding" in any class member's favor in an individual suit. <u>Tyson Foods</u>, 136 S. Ct. at 1048. In evaluating whether common issues predominate, the Court should consider whether the common questions are "more prevalent or important than the non-common" questions, and whether the "proposed class[ is] sufficiently cohesive to warrant adjudication by representation." <u>Id.</u> at 1045. Not all issues—or even all important issues—must be common for common issues to predominate:

> When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.

<u>Id.</u> (internal quotations and citation omitted). Here, common issues predominate because the factual and legal issues that will drive the outcome of class members' forced labor claim and contract claim will be decided under identical legal standards and can be resolved using common evidence.

     (a)     **Common Issues Predominate For Plaintiffs' Forced Labor Claim**

The first step in determining whether common questions predominate is to consider "the elements of the underlying cause of action." <u>Erica P. John Fund, Inc. v. Halliburton Co.</u>, 563 U.S. 804, 809 (2011). The TVPRA prohibits persons from "knowingly provid[ing] or obtain[ing] the labor or services of a person by any one of, or by any combination of" a series of "means." 18 U.S.C. § 1589(a). In other words, the Plaintiffs must show: (i) that Defendants "provid[ed] or obtain[ed]" their labor; (ii) "by means of" actions prohibited by 18 U.S.C. § 1589(a)(1)-(4); and (iii) that Defendants did so knowingly. <u>Id.</u>; <u>United States v. Toure</u>, 965 F.3d 393, 400-01 (5th Cir. 2020). If Plaintiffs establish that one Defendant is liable under § 1589(a), they can establish liability as to the remaining Defendants under § 1589(b) by demonstrating that the remaining Defendants participated in a common venture with the primarily liable Defendant, knowingly obtained something of value from their participation, and operated with either knowledge or reckless disregard of the unlawful means used to procure the class members' labor. <u>See</u> 18 U.S.C. § 1589(b); <u>Bistline v. Parker</u>, 918 F.3d 849, 873-74 (10th Cir. 2019).

     **i.    Evidence that Defendants Obtained or Provided Class Members' Labor Is Either Not In Dispute Or Will Require Only Common Evidence to Establish**

The first element for direct liability—that Defendants obtained or provided class members' labor—can be resolved with little effort using common records, such as the class list produced by Defendants, Plfs Ex. 60, DEFS-H2B007642, and Defendants' admissions in the administrative action brought by the DOL that Defendants Hotelmacher

and Steakmacher hired 27 H-2B workers as waiters and housekeepers in 2012, Plfs Ex. 61, DEFS-H2B007180, 7187; Plfs Ex. 54, SCHUMACHER00491-93. Further, substantial evidence shows that Defendants Mr. and Mrs. Schumacher exerted significant control over all of the Corporate Defendants, where they served as officers and/or managing members, Plfs Ex. 1, W. Schumacher 8/24 Dep. at 68:18-70:2, and were involved in the recruitment of these workers, e.g., Plfs Ex. 5, CASILAO-0000715; Plfs Ex. 19, DEFS-H2B007209; Plfs Ex. 63, DEFS-H2B007204. Indeed, Mr. and Mrs. Schumacher personally signed the class members' offer letters and related documentation submitted to the United States and Filipino governments, e.g., Plfs Ex. 64, DEFS-H2B007532; Plfs Ex. 32, DEFS-H2B006390, and they communicated directly with the recruiters in the Philippines throughout the recruitment process, e.g., Plfs Ex. 19, DEFS-H2B007209; Plfs Ex. 65, DEFS-H2B007241. Thus, the court will be able to determine whether Defendants provided or obtained class members' labor "in one stroke." Dukes, 564 U.S. at 350.

> **ii.    Plaintiffs Can That Show Defendants Obtained Class Members' Labor Via Prohibited Means Using Common Evidence That A Jury Can Use To Infer Class-Wide Practices**

Plaintiffs can show through common evidence that Defendants used the prohibited means set forth by 18 U.S.C. § 1589(a)(2)-(4) to obtain the class's labor. Plaintiffs must show both that Defendants used at least one of these prohibited means, and also that class members' labor was obtained or provided by Defendants "by means of" one or more such prohibited means. Although the Tenth Circuit has not yet decided exactly what showing must be made to establish this "causation element," see Menocal II, 882 F.3d at 918,

Congress's choice to use "by means of" to describe the causation requirement provides clear guidance as to what showing is required of Plaintiffs. Plaintiffs must establish "some causal connection" between the prohibited activity or activities and the provision of labor. See, e.g., In re Access Cardiosystems, Inc., 776 F.3d 30, 35-36 (1st Cir. 2015) (interpreting phrase "by means of" in securities fraud statutes) (citing Sanders v. John Nuveen & Co., 619 F.2d 1222, 1225 (7th Cir. 1980) and Jackson v. Oppenheim, 533 F.2d 826, 830 & n.8 (2d Cir. 1976)); MidAmerica Fed. Sav. & Loan Ass'n v. Shearson/Am. Exp., Inc., 886 F.2d 1249, 1254 (10th Cir. 1989) (same). See also Loughrin v. United States, 573 U.S. 351, 363 (2014), aff'g 710 F.3d 1111 (10th Cir.) (interpreting phrase "by means of" in bank fraud statute); Toure, 965 F.3d at 400-02 (stating that unlawful means was used "in order to secure [victim's] compliance"). "[I]t is 'well settled' that 'by means of' does not create a reliance requirement"; instead, to establish the "requisite connection" Plaintiffs need only show that such illegal activity "was used" to procure or obtain class members' labor. In re Access Cardiosystems, Inc., 776 F.3d at 36 (quoting Sanders, 619 F.2d at 1225). The Supreme Court recently explained that an end was reached "by means of" a given activity if "the given result (the 'end')"—in this case, the procurement of class members' labor—"[wa]s achieved, at least in part, through the specified action, instrument, or method (the 'means'), such that the connection between the two is something more than oblique, indirect, and incidental." Loughrin, 573 U.S. at 363 (emphasis omitted).

To demonstrate that Defendants procured class members' labor, at least in part, through prohibited means, Plaintiffs will use the following common proof.

23

a.  **Defendants Used A Common
    Scheme To Obtain Class Members' Labor**

The "scheme, plan, or pattern" means set forth in 18 U.S.C. § 1589(a)(4) asks

whether Defendants crafted a scheme or pattern "intended to cause [a] person to believe

that . . . that person or another person would suffer serious harm or physical restraint." In

analyzing whether such a scheme exists, the Court must look to Defendants' intent, not to

whether any class member actually believed that they would suffer serious harm. See

Neder v. United States, 527 U.S. 1, 25, (1999) ("By prohibiting the 'scheme to defraud,'

rather than the completed fraud, the elements of reliance and damage would clearly be

inconsistent with the statutes Congress enacted."); United States v. Kalu, 791 F.3d 1194,

1203 (10th Cir. 2015) (mail fraud statute requires intent to defraud); United States v.

Stewart, 872 F.2d 957, 960 (10th Cir. 1989) (noting that under mail fraud statute,

prosecution must prove the existence, not success, of the scheme). Because the analysis

of whether a scheme existed will focus on the Defendants' intent and on a reasonable

person's perception of those threats, this inquiry will not turn on, or require,

individualized determinations. Instead, a jury could infer the existence of a common

scheme intended by Defendants to cause class members to believe that they would be

subject to serious harm if they did not continue to perform work for Defendants analyzing

only common evidence.

Plaintiffs will show that in 2012, Defendant APEX withdrew from the U.S. State

Department's J-1 visa program. Plfs Ex. 8, DEFS-J1-010232-33. They will further

demonstrate that, in need of a new source of exploitable foreign labor, Defendants

24

applied to obtain workers—largely from the Philippines—under the H-2B program. Plfs Ex. 9, DEFS-H2B000001; Plfs Ex. 10, DEFS-H2B000017. Plaintiffs have alleged that Defendants made standard misrepresentations about the workers' ability to earn money in the United States knowing that the workers would incur significant debt if they accepted Defendants' job offers. Misrepresentations related to the workers' hourly wage and work schedules are contained in throughout the formulaic offer letters and documentation submitted to the DOL and the POEA. See, e.g., Plfs Ex. 33, DEFS-H2B006511-12; Plfs Ex. 28, DEFS-H2B007320-22; Plfs Ex. 22, DEFS-H2B007382. Common evidence can also be used to establish that Defendants signed POEA documents promising, and had their agents at the two recruiting agencies verbally promise class members, that Defendants would provide either cheap or free housing in Oklahoma and would reimburse the class members for their airfare once they arrived in the United States. Class Member Decls. XX. Proof that Defendants were aware that class members were required to pay high fees to Defendants' agents, see, e.g., Plfs Ex. 38, Cleto Decl. ¶ 7, and to pay for their own international airfare, see, e.g., Plfs Ex. 66, DEFS-H2B007447, Plfs Ex. 67, DEFS-H2B007080—and that class members were thus in significant debt once they arrived in the United States—is similarly common to the class. See Menocal II, 882 F.3d at 920 (question is common where Defendants' used common policy or practice, or jury could rely on same inference for each class member).

Once in Clinton, Oklahoma, Defendants, led by Mr. and Mrs. Schumacher, continued a "single, common scheme" of coercive, illegal practices. See id. at 920. Defendants' scheme consisted of a number of common practices:

- Paying wages below what was offered in the contracts approved by DOL and the POEA;

- Assigning class members to jobs other than those they were offered or allowed to work under the H-2B program;

- Overstaffing their properties so that class members did not work a full schedule and could not make a viable wage on piece-rate work or tip-dependent work;

- Requiring class members to pay for their transportation to Clinton, Oklahoma, despite contract language requiring Defendants to pay those costs;

- Not providing class members free meals and accommodations or offsetting benefits as stated in the documentation Defendants submitted to the POEA and as promised by their recruiters;

- Not providing class members with the housing described in their Offer Letters, namely accommodations for just two people per room for $70-75 per week, and directing class members to live at substandard and overcrowded housing;

- Informing class members that Mr. Schumacher had a gun and was a sheriff to threaten class members, and following class members while Mr. Schumacher was in his patrol car;

- Threatening class members that they could not leave, or would face severe immigration consequences for seeking to leave before their scheduled end date;

- Threatening class members that they would be terminated or deported for minor infractions at work, or for complaining about working conditions; and

- Searching for class members once they had left or escaped Defendants' employ and threatening them with immigration consequences.

The same actions taken against individual workers or groups of workers provide

common circumstantial evidence for each class member's claim that Defendants

implemented a scheme of policies and threats, even though Defendants' scheme may

have ultimately affected class members in different ways. See Menocal II, 882 F.3d at 920 & n.10 (defendant's official policy "provides the 'glue' that holds together the class members' reasons for" performing labor). These policies, practices, and threats can be shown through documents and policies common to the class, such as class members' initial employment contracts, e.g., Plfs Ex. 64, DEFS-H2B007532, documents submitted to government authorities, e.g., Plfs Ex. 22, DEFS-H2B007384, payroll records and timecards, and "absconder forms" drafted by the Defendants to report class members who left their employ to immigration officials, e.g., Plfs Ex. 68, DEFS-H2B006838. Defendants' own statements confirm that that these policies and practices were applied on a class-wide basis. Plfs Ex. 41, DEFS-H2B007478. Class members' and Named Plaintiffs' testimony likewise confirms that they were affected by these common practices and policies, see generally Plfs Exs. 12-18, Class Member Decls., and a jury could reasonably rely on the Defendants' treatment of a "subset of employees [as] probative as to the experiences of all of them." Tyson Foods, Inc., 136 S. Ct. at 1048.

Plaintiffs will also use common proof to establish that Defendants intended their scheme to coerce class members "to believe that, if [they] did not perform such labor or services, [they] or another person would suffer serious harm." See 18 U.S.C. § 1589(a)(4). Wrongful intent "may be inferred from circumstantial evidence considered in its totality." Kalu, 791 F.3d at 1205 & n.13 (discussing intent element under mail fraud statute), and such circumstantial evidence is regularly used to prove intent in criminal prosecutions, see, e.g., United States v. Powell, 982 F.2d 1422, 1430 (10th Cir. 1992). Certain types of conduct are particularly probative of a defendants' intent. For example,

"[i]ntent may be inferred from evidence that the defendant attempted to conceal activity" or "from the defendant's misrepresentations, knowledge of a false statement as well as whether the defendant profited or converted money to his own use." <u>Kalu</u>, 791 F.3d at 1205 (citation omitted).

For each class member, common evidence can be used to show that Mr. and Mrs. Schumacher had the requisite intent to cause class members to believe they would suffer serious harm in order to compel them to work for Defendants. Evidence of interactions between Mr. and Mrs. Schumacher and class members indicates that Defendants intended to cause the class members to believe that they would suffer serious harm if they left Defendants' employ. <u>E.g.</u>, Plfs Ex. 49, DEFS-H2B007461. Intent to make workers believe that they would suffer serious harm if they left can also be inferred from exchanges between Mr. Schumacher and recruiters in which recruiters described workers who left as "running away" and stated that Defendants would prevent class members from leaving Clinton, <u>compare</u> <u>United States v. Dann</u>, 652 F.3d 1160, 1172 (9th Cir. 2011) (use of word "escape" indicative of defendant's intent), <u>with</u> Plfs Ex. 69, DEFS-H2B007223 ("Send Me Report of each One Ran away And Specifically the Trouble. Maker . . . . I personally and Walt Will stop this persons."), and from exchanges between Mr. Schumacher and recruiters discussing plans to require future foreign workers to obtain bonds that would be turned over to the Schumachers if the workers left before their scheduled end date, Plfs Ex. 70, DEFS-H2B007239-40; Plfs Ex. 65, DEFS-H2B007241; Plfs Ex. 71, DEFS-H2B007236 ("We need to Be creative to get Filipinos under Control").

Intent can also be inferred from evidence showing that Mr. Schumacher was aware of his obligations to provide food and housing to the Filipino workers, and pay for the cost of their transportation, see, e.g., Plfs Ex. 72, DEFS-H2B007260-63, Plfs Ex. 22, DEFS-H2B007382-85, Plfs Ex. 73, DEFS-H2B007451, Plfs Ex. 21, DEFS-H2B007485, yet brazenly did not provide any such support, see, e.g., Plfs Ex. 28, DEFS-H2B007320, Plfs Ex. 42, DEFS-H2B007408, Plfs Ex. 43, DEFS-H2B007445; see also Kalu, 791 F.3d at 1205. And the jury can infer that Mr. Schumacher intentionally made false promises to the class members, inducing them to take on debt and come to the United States, through evidence that he ordered staff to destroy the POEA contracts that did not comport with the actual conditions provided to class members, see Plfs Ex. 37, DEFS-H2B006328, and evidence that he told government officials that H-2B applicants had not been charged a fee by an agent, see Plfs Ex. 5, CASILAO-0000715, despite being aware that Filipinos were in fact being charged fees, Plfs Ex. 26, DEFS-H2B007232. These efforts of concealment also provide common evidence indicating that Mr. Schumacher knew and wanted the workers he brought to United States to be under financial duress, so they would not be able to leave his employ.

### b. Defendants Used Threats Of Abuse Of The Legal Process To Obtain Class Members' Labor

Plaintiffs will also argue that Defendants and their agents utilized "threats of abuse of the legal process" to obtain the class members' labor. An H-2B worker's immigration status is directly tied to her employment: unless she is working for the employer listed on her visa, she is out of status and risks being deported and barred from reentering the

United States. Plfs Ex. 74, DeBaca Rpt. ¶ 78. Plaintiffs can establish that Defendants

repeatedly threatened workers with the possibility of termination or deportation through

class members' testimony, Plfs Ex. 29, Garcia Dep. at 140:8-13; Plfs Ex. 38, Cleto Decl.

¶ 13, and will present common evidence that Defendants threatened class members with

consequences beyond mere termination if they walked off the job, Plfs Ex. 49, DEFS-

H2B007461 ("We talked about what would happen if they walked out, that they would be

finished, and they did not seem to care about that."); see also Plfs Ex. 74, DeBaca Rpt.

¶¶ 61, 63 (opining that "warnings of immigration consequences, when used to maintain a

compliant and cheap workforce, are not mere statements of fact" and "heighten the

serious harm [foreign workers] might face" by failing to comply with an employers'

demands). Defendants also repeatedly threatened class members who had managed to

leave that they would be reported to immigration authorities. See, e.g., Plfs Ex. 38, Cleto

Decl. ¶ 13; Plfs Ex. 52, DEFS-H2B006678 ("REGINA GET AN ADDRESS TO SEND

HIS PAYCHECK TO AND THEN ADVISE HIM IMMIGRATION WILL BE

CALLING ON HIM BECAUSE WE HAVE NOTIFIED THEM HE WENT OUT OF

STATUS."); Plfs Ex. 75, DEFS-H2B007397. As discussed supra, class members still in

Clinton learned of these threats even when they did not hear them directly. Plfs Ex. 30,

Lincuna Dep. at 101:14-102:14.

    Plaintiffs can establish that these threats were part of Defendants' standard

operating procedure. The pervasive nature of oral and written notices of possible

termination to foreign workers, coupled with the contours of the H-2B visa program,

testimony by class members, and other record evidence, would allow a jury to infer that

(1) the workers as a class were directly threatened with termination or learned of such threats through their coworkers, (2) threats of termination were in fact threats to deport the class members, and (3) such threats were used to retain class members' labor. Such threats of deportation are threats of abuse of the legal process. Calimlim, 538 F.3d at 713.

### c. Defendants Used Serious Harm, And Threats Thereof, To Obtain Class Members' Labor

Plaintiffs intend to argue that Defendants used "serious harm or threats of serious harm" to coerce class members' labor, 18 U.S.C. § 1589(a)(2), using much of the same evidence discussed above to establish the existence of a scheme. To establish a violation of § 1589(a)(2), Plaintiffs will have to show that the combined actions of Defendants threatened harm or inflicted harm "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). Plaintiffs can do so through inference, using common evidence that Defendants threated the same types of financial, psychological, and immigrations harms on the entire class of H-2B workers, to show that class members faced the "same range of possible sanctions" from Defendants if they did not acquiesce to Defendants' demands. See Menocal II, 882 F.3d at 916 n.10; Kalu, 791 F.3d at 1212 (holding threats of deportation may constitute threats of serious harm); Dann, 652 F.3d at 1172 (holding that being "forced to leave the country" and being forced to stay in the country without documentation could both be serious harms).

Further, because all class members share a common set of core characteristics—being (a) a worker from the Philippines on a H-2B visa, (b) who spent a significant sum of money to come to the United States, (c) who was offered the same or similar employment terms from one of the Defendants, (d) who, upon arrival to the United States, learned they would in fact be paid the same tipped or piece-rate wages and would not receive full-time work, (e) who lived in the same overcrowded housing with no or limited kitchen facilities, (f) whose employer worked as a police officer, and (g) who needed to pay a significant sum to afford their plane ticket home at the end of their visa—the jury can determine on a class-wide basis whether such threatened sanctions would "compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2); see also Rosas v. Sarbanand Farms, LLC, 329 F.R.D. 671, 690 (W.D. Wash. 2018) (finding claim "susceptible to generalized, class-wide evidence" where "[p]laintiffs have alleged that Growers' use of the threats was pervasive and directed at the class as a whole"); Paguirigan v. Prompt Nursing Emp't Agency LLC, No. 17-CV-1302 (NG), 2018 WL 4347799, at *8 (E.D.N.Y. Sept. 12, 2018) (rejecting argument that jury would need to decide "whether each individual felt compelled to continue her employment as a result of defendants' conduct" and adopting reasonable person standard); Nunag-Tañedo v. E. Baton Rouge Par. Sch. Bd., No. LA CV10-01172 JAK, 2011 WL 7095434, at *8 (C.D. Cal. Dec. 12, 2011) (noting class-wide decision could be made where common characteristics "shared by the class members" were far more significant than any individualized circumstances).

i.    **Plaintiffs Can Also Prove Defendants'**
      **Knowledge Through Common Evidence**

The scienter requirement—the last element needed to establish direct liability—can also be established with common proof. Plaintiffs can proffer ample common evidence indicating that Defendants acted "knowingly" to cause class members "to work by prohibited means." See Toure, 965 F.3d at 402; Barrientos v. CoreCivic, Inc., 951 F.3d 1269, 1276 (11th Cir. 2020); Calimlim, 538 F.3d at 711 ("[T]he jury must find that the defendant knew that the circumstance existed."); see also United States v. Ho, 311 F.3d 589, 605 (5th Cir. 2002) ("[T]he term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense."). Plaintiffs can use common evidence to establish that Mr. and Mrs. Schumacher were aware of the facts that constitute the TVPRA offense. Indeed, the record evidence, including Mr. and Mrs. Schumacher's own testimony, indicates that the Schumachers were intimately involved in the day-to-day operations of the various businesses, including the recruitment, hiring, supervision, and discipline of putative class members. See, e.g., Plfs Ex. 3, W. Schumacher 8/13 Dep. Tr. 68:8-72:3. The evidence also indicates that they were the authors of many of the threats of termination and deportation made to Plaintiffs and class members. See supra, Part C(1)(a)(ii). Mr. and Mrs. Schumachers were also well aware of the financial and psychological duress caused by the extremely low pay, threats of termination, and other coercive conditions imposed on class members. Plfs Ex. 42, DEFS-H2B007408; Plfs Ex. 43, DEFS-H2B007445.

ii.   **Whether Plaintiffs Can Establish**
      **Venture Liability Will Be A Common Issue**

Plaintiffs intend to rely on venture liability under 18 U.S.C. § 1589(b) to impose liability on any Defendant(s) not found directly liable under § 1589(a). The existence of such liability is a common question that can also be answered via common proof. Section 1589(b) proscribes liability for those parties that: (1) have "participat[ed] in a venture which has engaged in" a violation of § 1589(a); (2) have "knowingly benefit[ed], financially or by receiving anything of value, from" such participation, and (3) knew or acted "in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means." 18 U.S.C. § 1589(b); see also Bistline v. Parker, 918 F.3d 849, 873 (10th Cir. 2019).

Each element centers on the actions and knowledge of each Defendant, not any particular class member, and can be established through common proof. To prove the first element—participation in a common venture—Plaintiffs can rely on Walter Schumacher's testimony demonstrating that each of the Corporate Defendants operated under his control, Plfs Ex. 3, W. Schumacher 8/13 Dep. Tr. 68:8-72:3, and records demonstrating that the companies acted in a coordinated fashion with regard to class members' treatment, see supra, Part C(1)(ii)(a). The same or similar evidence can be used to establish the knowledge requirements of the second and third elements, as a Corporate Defendant's knowledge of the unlawful provision or obtaining of labor can be imputed to based on the Schumachers' personal knowledge. See, e.g., United States ex rel. Trim v. McKean, 31 F. Supp. 2d 1308, 1315 (W.D. Okla. 1998) (officer's knowledge imputed to corporation). Payroll records showing that class members' labor was obtained by the Corporate Defendants can be used to show those Defendants benefitted from the scheme,

34

and testimony and evidence demonstrating Mr. and Mrs. Schumacher's ownership of the Corporate Defendants can be used to show that they benefited as well.

(b)     **Common Issues Predominate For Plaintiffs' Contract Claims**

In Counts II and III, Plaintiffs allege that the terms and conditions expressly promised to them by Defendants in the offer letters signed by Plaintiffs and Defendants, and promised by recruiters acting on behalf of Defendants, constituted employment contracts. Compl. ¶¶ 56-57. They further allege that the terms and conditions provided in the temporary labor certification, its accompanying attestations, and the laws and regulations applicable to the H-2B program, as well as the terms and conditions of employment promised in the documents submitted by Defendants to POEA/POLO, were incorporated into their employment contracts as a matter of law. Id. at ¶¶ 120-21. Finally, they allege that they were third-party beneficiaries of contracts between Defendants and POEA/POLO. Id. ¶ 129. Determination of the veracity of each of these legal contentions will resolve an issue that is central to every class member's contract claim: whether and how their employment contracts were formed. See Digital Design Grp., Inc. v. Info. Builders, Inc., 2001 OK 21, 24 P.3d 834, 843 (setting forth the elements of a contract claim under Oklahoma law). As a result, each is a common question of law. Dukes, 546 U.S. at 350; Rodriguez v. Hermes Landscaping, Inc., No. 17-2142, 2018 U.S. Dist. LEXIS 151454, at * 15 (D. Kan. 2018) ("[w]hether [H-2B] visa documents constituted contracts" is common legal question); Daye v. Cmty. Fin. Serv. Ctrs., LLC, 313 F.R.D. 147, 178 (D.N.M. 2016) (where proposed class members have materially similar contracts, contention about the nature of the contract is capable of class-wide resolution).

These common questions of law are accompanied by several common question of fact: (1) what the terms of the employment contracts were, (2) whether Defendants breached the contracts, and (3) which terms were breached.

The factfinder will answer the first of these questions by analyzing common proof: the rules, regulations, and other documents that Plaintiffs contend set forth Defendants' obligations to, inter alia, pay them wages no less than the federal minimum and H-2B prevailing wages for all hours worked, Plfs Ex. 9, DEFS-H2B000007 (attesting that the offered wage equals or exceeds the prevailing wage); Plfs Ex. 10, DEFS-H2B000031 (same), offer them eight hours of work per day, Plfs Ex. 22, DEFS-H2B007384, and provide them with housing, food, and transportation, id. The fact that each class member entered into a separate contract with Defendants is of no moment: the contracts entered into by the class members were formulaic and largely identical, as were the contract verification forms Defendants submitted to POEA/POLO that set out additional terms of employment. As shown in the attached chart, Plfs Ex. 77, each contract contained the same material terms. See Naylor Farms, 923 F.3d at 795 (certifying class in breach of contract action and rejecting the argument that "every one of the contracts will have to be considered individually, defeating commonality and predominance" where plaintiffs provided a chart summarizing the contracts' terms).

Plaintiffs intend to answer the second and third questions through common proof of "shared circumstances"—Defendants' standard practice of underpaying workers, offering fewer hours than had been promised, and failing to provide adequate housing or transportation. See supra, Part C(1)(a)(ii); see also Menocal II, 882 F.3d at 925. Courts considering motions to certify Rule 23 classes of guestworkers routinely find that the issue of breach of an H-2A or H-2B contract is common to the class, and that consequently common issues predominate. See Rosas, 329 F.R.D at 685 (whether

defendants breached H-2A contracts by changing production standard and by providing low-quality food in insufficient quantities is a question common to the class); Hermes Landscaping, Inc., 2018 U.S. Dist. LEXIS 151454, at *15 ("[d]espite the potential for differences among plaintiffs" in H-2B breach of contract action, "the potential for the proposed class action to generate common answers predominates"); Moodie v. Kiawah Island Inn Co., LLC, 309 F.R.D. 370, 379 (D.S.C. 2015) (in H-2B breach of contract action, plaintiffs "raise[d] only issues common to the class"); Garcia-Celestino v. Ruiz Harvesting, Inc., 280 F.R.D. 640, 648 (M.D. Fla. 2012) (same in H-2A contract action); Rosario-Guerrro v. Orange Blossom Harvesting, Inc., 265 F.R.D. 619, 629 (M.D. Fla. 2010) (same).

While Defendants might argue that individual class members experienced the breach of their employment contracts differently, whether and to what extent Defendants breached the H-2B contracts are questions common to the class: to answer each the Court will look at Defendants' policies, not at class members' responses to them. See Menocal II, 882 F.3d at 916 (finding commonality "[b]ecause all members of the . . . class base their claims on the [same] [p]olicy"); Bouaphakeo v. Tyson Foods, Inc., 765 F.3d 791, 797 (8th Cir. 2014), aff'd, Tyson Foods v. Bouaphakeo, 136 S. Ct. 1036 (2016) (finding no abuse of discretion where class members worked at the same plant, used similar equipment and were subject to the same pay policy, even though there was some variation in class members' experiences); Allapattah Servs., Inc. v. Exxon Corp., 333 F.3d 1248, 1260-61 (11th Cir. 2003) (affirming class certification for breach of contract claim where the contracts were materially similar and defendant had acted the same with respect to the entire class); Cruz v. TMI Hosp., Inc., No. 14-cv-1128 (SRN/FLN), 2015 U.S. Dist. LEXIS 147479, at *27 (D. Minn. 2015); Turner v. Murphy Oil USA, Inc., 234 F.R.D. 597, 607 (E.D. La. 2006).

Finally, the monetary value of each class member's contract—the baseline for a determination of damages—is a question common to the class. Under Oklahoma law, "[t]he measure of plaintiff's recovery in an action for breach of a contract for employment is prima facie the sum stipulated to be paid by the employer for the services." Sharpless Separator Co. v. Gray, 1916 OK 1037, 62 Okla. 73, 161 P. 1074, 1076 (Okla. 1916). To determine "the sum stipulated to be paid," the Court will begin by analyzing and valuing the terms of the contracts that are common to the class. Plfs Ex. 77. That a final calculation of damages may require individualized proof is not determinative. "The presence of individualized damages issues does not defeat the predominance of questions common to the . . . class." Menocal II, 882 F.3d at 922.

### 2.      Class Treatment Is Superior to Individual Litigation.

Rule 23(b)(3) sets forth a non-exclusive list of factors pertinent to the Court's inquiry into the superiority of a class action:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

With respect to the first factor, it is extremely unlikely that individual class members have any interest in instituting or controlling their own individual actions. With few exceptions, they are Tagalog speakers lacking fluency in English and, as described supra Part B(1), they are unfamiliar with the United States justice system. Plfs Exs. 12-18, Class Member Decls. ¶ 19. When confronted with putative classes of low-wage and migrant workers, courts typically find that the first factor weighs toward the superiority of class treatment. See Cortez v. Vieira Custom Chopping, Inc., No. 17-cv-01647-DAD-

38

SKO, 2019 U.S. Dist. LEXIS 162454, at *17 (E.D. Cal. 2019) (finding persuasive plaintiffs' argument that "the superiority requirement is satisfied because the proposed class consists of many low-wage workers, most of whom are seasonal workers who lack the means to finance individual lawsuits"); Hermes Landscaping, Inc., 2018 U.S. Dist. LEXIS 151454, at *16 ("geographic dispersal, the language barrier, [class members'] general legal unsophistication, and especially, the reality that it would not be economically feasible to bring these claims individually" support finding of superiority); Cuzco v. Orion Builders, Inc., 262 F.R.D. 325, 335 (S.D.N.Y. 2009) (same); Iglesias-Mendoza v. La Belle Farm, Inc., 239 F.R.D. 363, 373 (S.D.N.Y. 2007) (same); Recinos-Recinos v. Express Forestry, Inc., 233 F.R.D. 472, 482 (E.D. La. 2006) (same).

The second factor is inapplicable in the context of this case as Plaintiffs' counsel knows of no separate action commenced by any members of the class.[3] Plfs Exs. 56-59. In the absence of evidence that a separate action exists, the Court should assume that this is the only action concerning this controversy. See Saur v. Snappy Apple Farms, Inc., 203 F.R.D. 281, 289 (W.D. Mich. 2001) ("There is no mention of previous lawsuits filed and the Court assumes from the absence of mention that no such lawsuits have been filed.").

The third factor weighs heavily in favor of class certification. Defendants, Defendants' corporate representatives, and all relevant records are in the Western District of Oklahoma. See Whitton v. Deffenbaugh Disposal, Inc., No. 12-2247-CM, 2014 U.S. Dist. LEXIS 153405, at *23-24 (D. Kan. 2014) ("[I]t is desirable to concentrate the litigation in Kansas because [defendant] is located in Kansas and it likely possesses the necessary records about every class member."). Furthermore, "[l]itigating these claims in

---

[3]     As this Court is aware, two of the Defendants, Hotelmacher and Steakmacher, were previously involved in an administrative proceeding with the DOL regarding violations related to these workers. That proceeding was resolved through a settlement between the two Defendants and the DOL. (Dkt. Nos. 59, 60, 62.)

various courts raises a risk of inconsistent judgments that, if realized, would fail to establish what defendant[s] [are] required to do under law, and a risk that plaintiffs' claims will be resolved inconsistently." Hermes Landscaping, Inc., 2018 U.S. Dist. LEXIS 151454, at **16-17.

Finally, although every class action presents administrative difficulties, this case does not present insurmountable manageability issues. As outlined in the previous section, common issues predominate; the fact that final damage calculations may require individual analysis would not render a class action unmanageable. See Smith v. MCI Telecomms. Corp., 124 F.R.D. 665, 680 (D. Kan. 1989) ("[T]o the extent that individual issues, such as the amount of each class member's damages, exist, the court may address these issues following trial or in separate proceedings.").

## **CONCLUSION**

For the above reasons, this Court should grant Plaintiffs' Motion for Class Certification and (i) certify the Class; (ii) appoint the Named Plaintiffs as class representatives; and (iii) appoint the undersigned attorneys as class counsel.

Dated:  September 15, 2020                    Respectfully Submitted,

                                             */s/ Catherine Fisher*
                                             Meghan Lambert (OBA #33216)
                                             ACLU OF OKLAHOMA
                                             P.O. Box 13327
                                             Oklahoma City, OK 73113
                                             Telephone:   (405) 525-3831
                                             Facsimile:   (405) 524-2296
                                             Email:        mlambert@acluok.org

                                             George Warner, Pro Hac Vice
                                             LEGAL AID AT WORK
                                             180 Montgomery Street, Suite 600
                                             San Francisco, CA 94104
                                             Telephone:   (415) 864-8848
                                             Facsimile:   (415) 593-0096
                                             Emails:       gwarner@legalaidatwork.org

                                             Eben Colby, Pro Hac Vice
                                             Catherine Fisher, Pro Hac Vice
                                             500 Boylston Street, 23rd Floor
                                             Boston, MA 02116
                                             Telephone:   (617) 573-4800
                                             Facsimile:   (617) 573-4822
                                             Emails: Eben.Colby@probonolaw.com
                                                         Catherine.Fisher@probonolaw.com

                                             Christopher J. Willett, Pro Hac Vice
                                             Caitlin Boehne, Pro Hac Vice
                                             Rebecca Eisenbrey, Pro Hac Vice
                                             EQUAL JUSTICE CENTER
                                             510 Congress Ave., Ste. 206
                                             Austin, Texas 78704
                                             Telephone:   (512) 474-0007
                                             Facsimile:   (512) 474-0008
                                             Emails: cwillett@equaljusticecenter.org
                                                         cboehne@equaljusticecenter.org
                                                         reisenbrey@equaljusticecenter.org

                                             ***Attorneys for Plaintiffs***