Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

MADELYN CASILAO, et al.      )

             )

      Plaintiffs,     )

             )

v.               )     Case No.  5:17-CV-00800-SLP

             )

HOTELMACHER, LLC et al.   )

             )

      Defendants.   )

## DEFENDANTS' EXPERT WITNESS LIST

In accordance with the Court's Order entered July 8, 2020 [Dkt. 124] and Rule 26 of the Federal Rules of Civil Procedure, Defendants hereby identify and disclose the following expert witness:

| NO. | WITNESS | ADDRESS | EXPECTED TESTIMONY |
|-----|---------|---------|--------------------|
| 1 | Greg H. Bristol | PO Box 504<br>Front Royal, VA 22630 | See Expert Report enclosed herewith as Exhibit "1." |

Respectfully submitted,

*/s/     C. Eric Shephard*
C. Eric Shephard, OBA # 22299
A. Wayne Billings, OBA #31483
FELLERS, SNIDER, BLANKENSHIP,
   BAILEY & TIPPENS, P.C.
100 North Broadway, Suite 1700
Oklahoma City, OK 73102-9211
Telephone:   (405) 232-0621
Facsimile:    (405) 232-9659
Emails:        eshephard@fellerssnider.com
          wbillings@fellerssnider.com
***Attorneys for Defendants***

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2020, I filed the attached document with the Clerk of the Court. Based on the records currently on file in this case, the Clerk of Court will transmit a Notice of Electronic Filing to those registered participants of the Electronic Case Filing System.

*/s/ C. Eric Shephard*
C. Eric Shephard

#76901/847275



# EXPERT REPORT

Submitted to
C. Eric Shephard, Esq.
Fellers Snider, Attorneys At Law
100 North Broadway, Suite 1700
Oklahoma City, Oklahoma 73102-9211
Phone: (405) 232-0621


In the matter of
Madelyn Casilao, et al. v. Hotelmacher LLC, et al.
USDC - Western District of Oklahoma, Case No. 17-cv-800-SLP


Prepared by:
The Human Trafficking Investigations & Training Institute, LLC
Post Office Box 504
Front Royal, Virginia 22630


Report Date: July 24, 2020


By
Greg Bristol
President of The Human Trafficking Investigations & Training Institute, LLC

1

Human Trafficking Investigation Report: Human Trafficking Expert

## Table of Contents

I.     BACKGROUND & QUALIFICATIONS .......................................................... 3

II.    SUMMARY OF OPINIONS ....................................................................... 4

III.   HUMAN TRAFFICKING OVERVIEW .......................................................... 5

IV.    CASE STUDY ........................................................................................ 7

V.     THE NAMED PLAINTIFFS' EXPERT ....................................................... 14

VI.    DISCUSSION & CONCLUSIONS ............................................................ 20

APPENDIX A - CURRICULUM VITAE ................................................................ 23

APPENDIX B - LIST OF REVIEWED MATERIALS............................................. 29

APPENDIX C - FEE SCHEDULE ...................................................................... 31

Human Trafficking Investigation Report: Human Trafficking Expert

1. My name is Greg H. Bristol. I have been retained by Fellers Snider, the law firm that represents the Defendants in this case. I have been asked to provide opinions on the factual findings, opinions, and conclusions contained in the Named Plaintiffs' expert witness report, dated June 16, 2020.

2. I am a subject-matter expert in the fields of human trafficking criminal investigations and crime scene evidence collection to validate human trafficking findings in criminal courts.

3. My Curriculum Vitae is in Appendix A. A list of the materials that I have reviewed in this matter is in Appendix B. I am being compensated at my standard rates, which are listed in Appendix C.

4. I reserve the right to supplement or amend my opinions due to any further allegations, depositions, or expert reports that may occur after my report is submitted.

# I.   BACKGROUND & QUALIFICATIONS

5. I am a former Trooper with the Michigan State Police, a retired Federal Bureau of Investigation (FBI) Special Agent, and a former Special Agent with the Special Inspector General for Afghanistan Reconstruction (SIGAR). In my 34-year law enforcement career, I have investigated dozens of human trafficking cases in the U.S., one in Afghanistan and one in Iraq. I have collected evidence in human trafficking criminal investigations, testified in grand jury proceedings that led to federal indictments, and arrested human traffickers.

6. I am currently the President of The Human Trafficking Investigations & Training Institute, LLC (HTITI), which is a Virginia company that provides law enforcement officers with advanced instructor-led classroom instructions on how to investigate human trafficking crimes.

7. I am currently a paid Department of Justice (DOJ), Office for Victims of Crime (OVC), Training & Technical Assistance Center (TTAC) human trafficking consultant. OVC TTAC provides training and technical assistance for victim service providers and allied professionals who serve crime victims.

8. I am currently an unpaid consultant working on a human trafficking online training project for the Massachusetts Institute of Technology's (MIT) Lincoln Library. MIT has a contract with the U.S. Department of Homeland Security (DHS) to develop that project.

## A.   Experience in Investigating Human Trafficking Crimes

9. From September 1987 through February 2010, I was a Special Agent with the FBI, assigned to its field office in Washington, D.C. My duties included foreign counterintelligence cases and public corruption investigations. I began investigating human trafficking crimes in 2006 after being assigned to an FBI Civil Rights Squad. That assignment built upon what was then my 28 years of state and federal law enforcement experience.

3

10. In 2007 I helped develop the D.C. Human Trafficking Task Force and Northern Virginia Human Trafficking Task Force to increase prosecutions of human traffickers.

11. In 2008 I started teaching human trafficking investigation methods to D.C. area law enforcement as a certified FBI Police Trainer. I also taught courses at the FBI Training Academy and the DOJ National Advocacy Center.

12. After I retired from the FBI in February 2010, I became a Special Agent with SIGAR to investigate complex contract fraud cases in Afghanistan, including forced labor cases on U.S. reconstruction contracts.

13. I have created three human trafficking online courses for a college, written five HTITI human trafficking investigation training courses, and have taught 27 HTITI courses in 10 states. I have trained more than 600 law enforcement officers since leaving the FBI on how to identify human trafficking and given 49 HTITI human trafficking presentations, including at the United Nations Office on Drugs and Crime in Austria, and the U.S. Embassy in Egypt.

## II.  SUMMARY OF OPINIONS

14. While this case is only at the class certification stage, the current allegations and evidence in this case do not support a determination of class-wide or other human trafficking. If this case progresses to the merits stage, I reserve the right to provide further analysis in support of this opinion.

15. I have not found evidence to reasonably support the inference that any of the Defendants engaged in class-wide or other labor trafficking in this case.

16. Many of the opinions offered by the Named Plaintiffs' purported expert are flawed, improper, and subjective.

17. Migrant laborers often leave their home country and travel to the U.S. to make better wages, which can be arduous at times when it involves special visas, spending borrowed personal finances to travel, and misunderstandings of their contracts. However, those are not indicators of human trafficking of foreign nationals in the U.S. by Americans. The Named Plaintiffs' purported expert repeatedly conflates the experiences of migrant laborers in this case with the experiences of human trafficking victims identified by law enforcement agencies in criminal investigations.

18. Opinions asserted by the Named Plaintiffs' purported expert are subjective, and his views appear to be formulated by merely accepting the Named Plaintiffs' unsupported allegations and ignoring any countervailing evidence.

19. The individualized nature of the alleged human trafficking, which involves specifically overriding the unique will of individual victims, is not subject to a determination on class or group-wide basis in this case, because the experiences and circumstances of each proposed Plaintiff are so uniquely specific to each individual.

20. The totality of the circumstances is critical when making a determination of human trafficking because often only a labor dispute is present, and there is no force, fraud, or coercion involved. By contrast, it is inappropriate to ignore certain pieces of evidence and rely instead on abstract presumptions or unsupported allegations, as the Named Plaintiffs' purported expert does.

## III.  HUMAN TRAFFICKING OVERVIEW

21. Human trafficking, also known as trafficking in persons or modern-day slavery, is a crime that involves compelling or coercing a person to provide labor or services, or to engage in commercial sex acts. The coercion can be subtle or overt, physical or psychological. The exploitation of a minor for commercial sex is human trafficking, regardless of whether any form of force, fraud, or coercion was used.[1]

22. Labor trafficking is defined as the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.[2]

23. On October 28, 2000, the U.S. Congress enacted the Victims of Trafficking and Violence Protection Act (TVPA), which set up formidable actions to combat trafficking in persons. Specifically:

   A. Coordinate and monitored anti-trafficking activities through an interagency task force;

   B. Prevent human trafficking through training, education, and public awareness campaigns;

   C. Protect human trafficking survivors by not detaining them, providing them with medical care, and protecting them and their families from revictimization; and

   D. Strengthening prosecution and punishment of human traffickers.

24. Throughout my career, I have investigated about 60 human trafficking cases while with the FBI. I have now trained approximately 1,000 law enforcement officers on how to identify the red flags of trafficking.[3] Through my research, experience, and review of federal and state prosecutions of human traffickers, I have identified some common themes in human trafficking cases. They include:

   A. Human trafficking victims are typically paid less than minimum wage if they are paid at all;

   B. If victims are "paid" by their trafficker, the trafficker will often maintain control of his or her money, through access to bank accounts or maintaining physical possession;

   C. Human trafficking victims usually are not paid overtime or increased wages for working longer than eight hours per day;

---

[1] http://www.justice.gov/humantrafficking/what-is-human-trafficking.htm
[2] Title 22 U.S. Code, Section 7102(9))
[3] I trained approximately 400 while with the FBI and approximately 600 post-FBI retirement.

D. Human trafficking victims are not typically afforded days off each week, given time off for vacations, or granted time off from work when they are sick;

E. Human trafficking victims do not typically have an employment contract with their trafficker, but if they do the terms are typically not met or are agreed upon under duress;

F. Human traffickers frequently recruit through coercion, fraud, or deception. For many traffickers, threats and force are only used intermittently to maintain compliance;

G. Communication and transportation is often restricted by human traffickers when a victim is first recruited, but not necessarily after that;

H. Human traffickers typically do not provide health insurance or facilitate government-provided health care to victims;

I. If the human trafficking victim is a foreign national trying to enter the U.S., I have observed additional red flags, including:

   i. If levied, recruitment or transportation fees are typically increased after arriving in the U.S.

   ii. If collected, recruitment or transportation fees are typically exorbitantly high when compared to fees levied for the recruitment and transportation of non-trafficked persons.

   iii. If the human trafficking victim borrowed money to get to the U.S. from sources affiliated with the trafficker, the interest rates charged are typically high, to force the victim into a debt bondage situation. That arrangement is rarely outlined in a contract.

   iv. Upon arriving in the U.S., transportation or identification documents are routinely confiscated from the victims and are never returned to the victims.

   v. Human traffickers tend to isolate the victims in the community in which they are living, avoiding contact with Americans who might try and rescue them.

25. The National Human Trafficking Hotline provides information to the public on what human trafficking is and is not. Its website includes the following additional red flags of human trafficking:[4]

A. The individual is not free to leave or come and go at will;

B. High-security measures exist in the work and/or living locations (e.g., opaque windows, boarded up windows, and bars on windows);

C. The individual is living and working on-site;

D. The individual experiences verbal or physical abuse by their supervisor;

---

[4] https://humantraffickinghotline.org/human-trafficking/recognizing-signs

Human Trafficking Investigation Report: Human Trafficking Expert

    E. The individual is not given proper safety equipment;

    F. The individual is forced to meet daily quotas;

    G. The individual is not allowed or able to speak for themselves;

    H. The individual lacks knowledge of their whereabouts;

    I. The individual tells scripted, confusing, or inconsistent stories; and

    J. The individual protects the human trafficker who may be hurting them or minimizes abuse.

26. It is essential to consider the totality of the circumstances when making a determination of human trafficking. In contrast, it is inappropriate to ignore certain pieces of evidence and rely instead on abstract presumptions or unsupported allegations.

# IV. CASE STUDY

27. The following opinions are based on the factual record available at this stage. It is my understanding that this case is only at the class certification stage, and that merits discovery will not occur until later in the case. Therefore, the merits-related opinions herein represent what my views would be based on the present record only. I reserve the right to modify, supplement, or otherwise change my views and conclusions once further discovery becomes available.

28. I am not a lawyer and do not purport to offer any legal conclusions. However, I am a subject matter expert in training law enforcement officers in identifying what is, and is not, human trafficking. Part of that expertise involves staying up to date on legal decisions that explain and apply the statutes that are the subject of my training courses. I therefore offer these opinions and analyses as highly material components of my expertise as a trainer of law enforcement officers and as a former FBI investigator of human trafficking.

29. The Named Plaintiffs brought this action on behalf of themselves and all other similarly situated, against the listed Defendants, and claimed that they are survivors of human trafficking. Defendants Carolyn and Walter Schumacher owned and operated several businesses in Clinton, Oklahoma, including a hotel, a large restaurant, and a waterpark.

30. The Named Plaintiffs allege that, in order to obtain cheap and easily exploited labor for these businesses, the Defendants engaged directly in a recruitment scheme in the Philippines, whereby they induced Filipino nationals to pay hefty fees to work under the H-2B temporary foreign worker visa program. The Named Plaintiffs claim that, instead of the conditions that they were promised, they were transported to Oklahoma and forced to work under conditions that carried little resemblance to those to which they had agreed.

31. Specifically, the Named Plaintiffs claim:

    A. Defendants created a scheme designed to make Plaintiffs afraid, intimidated, and powerless to leave Defendants' employment;

Case 5:17-cv-06800-SLP   Document 157-2   Filed 10/12/20   Page 11 of 34
Case 5:17-cv-06800-SLP   Document 125-1   Filed 07/24/20   Page 8 of 31
Human Trafficking Investigation Report: Human Trafficking Expert

B.  The Named Plaintiffs were induced into paying substantial fees for recruitment, immigration processing, and travel;

C.  The Named Plaintiffs were told that, if they did not work exclusively for Defendants, they would suffer abuse or threatened abuse of the legal process, and/or serious financial and/or reputational harms;

D.  Defendants blatantly disregarded the terms of employment they had promised to the Named Plaintiffs;

E.  Defendants lowered the wage rate paid to the Named Plaintiffs significantly from what they had agreed to;

F.  Defendants failed to provide full-time employment as promised;

G.  Defendants failed to provide Plaintiffs with free housing or housing allowances;

H.  Defendants failed to reimburse Plaintiffs for their travel expenses to the U.S.; and

I.  Defendants failed to provide free food and transportation to/from their worksite, as promised.

32.  The Named Plaintiffs assert class action claims for damages against Defendants arising from violations of their rights under TVPA and class action claims for damages arising from breach of contract.

33.  The allegations and evidence in this case are not consistent with the allegations and evidence in human trafficking case law involving similar industries.

## A.  United States v. Farrell

34.  In a criminal capacity, common red flags of human trafficking at motels and hotels are evidenced in the case of United States v. Farrell (the "Farrell Case"):[5]

> Robert John Farrell and his wife, Angelita Farrell, owned a Comfort Inn & Suites hotel in Oacoma, South Dakota. In 2007, a federal jury convicted the Farrells after hearing from four victims who had been held in involuntary servitude by the Farrells. After committing visa fraud to bring Philippine workers into the United States, the Farrells then enslaved the workers to perform cleaning and front desk duties at their hotel. During the trial, the victims described how the Farrells controlled every aspect of the victims' lives, including what they ate, where they lived, and the hours they worked.
>
> The victims regularly described working 16 to 18-hour days. When they finished their duties at the defendants' hotel, the victims were then expected to work a second job at local fast-food restaurants. One victim testified that she tried to join a Christmas choir, but the defendants told her that her first

---

[5] 3:07-cr-30019-CBK (U.S. Dist. Ct. for Dist. of South Dakota)

Case 5:17-cv-00800-SLP   Document 157-2   Filed 10/12/20   Page 12 of 34
Case 5:17-cv-00800-SLP   Document 125-1   Filed 07/24/20   Page 9 of 31
Human Trafficking Investigation Report: Human Trafficking Expert

duty was to pay them back and that she could not spare two hours a week for choir practice.

The Farrells hid their activities by issuing the victims paychecks, which the Farrells then required the victims to endorse and return to the Farrells. The victims testified that they had hoped to send money back to their children and families in the Philippines.

The jury also heard evidence that the Farrells tried to isolate the victims and prevent them from meeting people who might have helped them escape. The Farrells required the Philippine victims to attend late-night debt meetings that lasted into the early morning hours. At the meetings, the Farrells would yell at the workers and berate them for their ungratefulness for all the Farrells had done to "help" them.

Other facts in the Farrell Case include the following:

- The victims entered the U.S. with H-2B visas;

- The victims were promised 40 hours a week at $6.05 hour, but were paid roughly half of what they were promised;

- The victims signed debt contracts;

- The victims handed over upwards of 90% of their earnings to the Farrells;

- When the victims arrived in South Dakota, their passports and visas were confiscated by the Farrells;

- The Farrells housed 9 workers in a rented two-room house; and

- The Farrells used threats of deportation and legal sanction as a primary means of controlling the workers.

35. When I teach HTITI's Advanced Law Enforcement Human Trafficking Investigator course, I spend about 30 minutes on the Farrell Case, because it is a classic case of labor trafficking at motels and hotels. The HTITI course manual has four pages on the Farrell Case, and my classroom PowerPoint presentation consists of 61 slides.

36. The human trafficking red flags and evidence seen in the Farrell Case are not consistent with the allegations and evidence in this case for a variety of reasons, including but not limited to those highlighted in Table 1 below.

| Table 1 (Human Trafficking Red Flags in the Farrell Case) | | |
|---|---|---|
| Red Flag(s) | Farrell Facts | Current Case Information |
| Berated | The Farrells yelled at victims and berated them. | Not reported in this case. |

Human Trafficking Investigation Report: Human Trafficking Expert

| | | |
|---|---|---|
| Community | The Farrells tried to isolate victims from meeting people. | Not reported in this case. |
| Debt Meeting | The Farrells had late-night debt meetings that victims had to attend. | Not reported in this case. |
| Debt Prioritization | The Farrells instituted a debt plan for all victims to follow. | Not reported in this case. |
| Demeanor | A local stated that victims seemed terrified of the Farrells. | Not reported in this case. |
| Deportation | The Farrells threatened deportation. | Rumors of deportation.[6] |
| DHS I-129 Petition (H-2B) | The Farrell were obligated to pay $1,200 to process the I-129. Farrell charged each victim $1,200. | Not reported in this case. |
| Documents & Identification | Victim's passport & visa seized upon their arriving at the airport. | Not reported in this case. |
| Fleeing | The Farrell stated: "I will find you." | Not reported in this case. |
| Free Time | The victims had little free time. | Not reported in this case. |
| Hours (After Shift) | The victims were expected to work a second job. | Not reported in this case. |
| Hours (Scheduled) | The victims were promised 40 hours but worked 16-18 hour days. | No long daily hours reported in this case. |
| Income | 90% of their income went to the Farrells. | Not reported in this case. |
| Indictment | There were 27 criminal counts.[7] . | No criminal indictments in this case. |
| Incoming Mail | First opened by the Farrells. | Not reported in this case |
| Movement | Victims were not permitted to leave the apartment. | Not reported in this case. |
| Outside Job | The Farrells required it, but the visa prohibited it. | Defendants did not require it. |
| Pay Checks | The victims endorsed and returned checks to a Farrell. | Not reported in this case. |
| Promissory Note | The victims were required to sign one their first week ($3,300). | Not reported in this case. |
| Reprimands | There were known reprimands for disobeying rules. | Not reported in this case. |
| Salary | The victims received half of what they were promised. | Not reported in this case. |
| Salary (Hourly) | The victims were promised an hourly wage of $6.05 (did not receive). | Defendants used a different calculation but made payment. |
| Salary (OT) | Promised holiday & OT but did not receive it. | No promised holiday or OT $ in this case |
| Sleeping | Nine workers lived in a rented two-bedroom house. | Various living choices offered to the Named Plaintiffs. |

---

[6] In Harry Lincuna's deposition on February 24, 2020, he mentions that he heard rumors that Walter Schumacher deported people, but he personally was never threatened with deportation.
[7] Document Servitude, False Statements, Force Labor, Forced Labor - Conspiracy, Harboring, Immigration Violation - Conspiracy, Peonage, Peonage - Conspiracy, Trafficking Into Servitude, Visa Fraud

Human Trafficking Investigation Report: Human Trafficking Expert

| Social Time | Victims were told that their first duty was to pay back their debts. | Not reported in this case. |
|---|---|---|
| Transportation Funds | Victims were promised to and from $ (not provided). | Named Plaintiffs claimed it was promised; Defendants state that they did not. |

37. Not only do the allegations and evidence in this case fall short of the level of trafficking in a criminal capacity, but they are also below the threshold required to support a claim for civil human trafficking arising out of "wage and hour law" violations on a class-wide or other basis. For example, in Juana Sierra Trejo, et al. v. Broadway Plaza Hotel[8]:

> "Defendants, a hotel and its management hired the five victims to clean hotel rooms. Defendants told the victims that their work would entail cleaning rooms for 8-hours per day, six days per week and that the victims would receive roughly $250 per week. However, once employed, the victims were regularly required to work seven days per week, often for 15 hours per day. They were denied any meal or bathroom breaks during working hours. After working hours, the victims were often required to clean Defendant's homes and assist Defendants with miscellaneous errands. The victims were never compensated for any overtime work. The victims were denied time off, sexually harassed, verbally abused, and threatened with deportation. The parties settled the case."

| Table 2 (Human Trafficking Red Flags in the Trejo Case) | | |
|---|---|---|
| Red Flag(s) | U.S. v. Trejo Facts | Current Case Information |
| Breaks | Victims worked without breaks. | Not reported in this case. |
| Deportation | Victims were threatened with deportation if work was refused. | See footnote 6. |
| Food | Victims were denied permission to eat, drink or use the restrooms. | Not reported in this case. |
| Hours | Victims worked 8 hours per day, six days per week, with some 15 hours a day. | Not reported in this case. |
| Income | $250 per week, less than minimum wage. | Payroll records do not reflect this. |
| Overtime | Victims were never paid overtime (OT) for their work. | Defendants report that they did pay OT.[9] |

[8] 1:04-cv-04005-LTC (USDC Southern District of New York)

[9] Defendant Walt Schumacher stated in his deposition dated March 4, 2020 that in one year at Montana Mike's restaurant, they paid out $81,000 in overtime (OT). In regard to a U.S. Department of Labor payroll review that concluded some OT was not paid, W. Schumacher stated that in some instances DOL was flat wrong. Payroll records were not reviewed in detail by this writer, and no further conclusion can be made on whether or not required OT was paid by Defendants.

11

| Private Homes | Some victims were required to clean the homes of hotel management without pay. | Not reported in this case. |
|---|---|---|
| Sexual Harassment | Victims were sexually harassed by a hotel manager. | Not reported in this case. |
| Time Off | Victims denied. | Not reported in this case. |
| Verbal Abuse | Victims were verbally abused. | Not reported in this case. |

38. During my FBI and teaching career, I have investigated dozens of human trafficking cases, trained hundreds of police officers on how to investigate allegations of human trafficking, and followed the prosecutions of human traffickers yearly by reviewing court documents. Based on this experience, I can and will confidently opine that the allegations and evidence in this case do not support a determination of human trafficking on a class-wide (or other) basis because:

   A. There are no indications that Defendants berated the Named Plaintiffs or other proposed class members, which is often seen during incidents of labor trafficking.

   B. There are no indications that Defendants isolated the Named Plaintiffs or other proposed class members, which is often seen during incidents of labor trafficking.

   C. There are no indications that Defendants managed debts of the Named Plaintiffs or other proposed class members, which is often seen during incidents of labor trafficking.

   D. There are no indications that the Named Plaintiffs or other proposed class members were in legitimate fear of Defendants, which is often seen during incidents of labor trafficking.

   E. Other than unsubstantiated rumors, there are no indications that Defendants threatened to deport the Named Plaintiffs or other proposed class members.[10]

   F. The permit or application fees requested by Defendants or required by the U.S. government or the applicants' home country, appear to be reasonable and not excessive.

   G. There are no indications that Defendants seized any Named Plaintiff's passport or visa upon their arrival at the airport in Oklahoma, which is often seen during incidents of labor trafficking.

   H. There are no indications that after any Named Plaintiff's coworker "absconded" or quit employment, a search was started for that former

---

[10] In Named Plaintiff Allan Garcia's deposition dated February 27, 2020, he stated defendant W. Schumacher told Mr. Garcia that "he can have us deported;" however, he did not describe that encounter in detail. Mr. Garcia did state that he was aware that if he violated the terms of his H-2B visa, he could be deported. In Defendant Walt Schumacher's deposition dated March 4, 2020, he discussed how he met applicants overseas for interviews and orientations and warned applicants about absconding from the U.S. visa program, as well as how DHS could deport them if they did.

employee for purposes of "bringing them back," which is occasionally seen during incidents of labor trafficking.

I.  There are no indications that the Named Plaintiffs or other proposed class members had little free time when not working, which is often seen during incidents of labor trafficking.

J.  There are no indications that the Named Plaintiffs or other proposed class members were forced to work a second job, which is often seen during incidents of labor trafficking.

K.  There are no indications that the Named Plaintiffs or other proposed class members were forced or ordered to work 15-18 hour workdays each week, which is often seen during incidents of labor trafficking.

L.  There are no indications that the Named Plaintiffs or other proposed class members had to "turn over" their paychecks to the defendants on payday, resulting in them having little or no money, which is often seen during incidents of labor trafficking.

M.  There are no indications that the Named Plaintiffs' incoming U.S. mail was first opened by Defendants, which is occasionally seen during incidents of labor trafficking.

N.  There are no indications that the Named Plaintiffs or other proposed class members had to sign a promissory note for money they borrowed from their employer, which is often seen during incidents of labor trafficking.

O.  There are no indications that the Named Plaintiffs or other proposed class members were reprimanded for disobeying a rule posted by Defendants, which is often seen during incidents of labor trafficking.

P.  There are no indications that the Named Plaintiffs or other proposed class members were not paid the amount promised; however, there are indicators that Defendants may not have explained hourly salaries and calculations in detailed fashion on occasion.[11]

Q.  There are no indicators that the Named Plaintiffs or other proposed class members were promised holiday and overtime pay, and then did not receive it (but still had to work holidays or OT), which is often seen during incidents of labor trafficking.

R.  There are no indicators that the Named Plaintiffs or other proposed class members were promised (in writing) reimbursement for all transportation costs to and from Oklahoma, and any such representations by "recruiters" overseas (if any were made) were unbeknownst to Defendants.

---

[11] In some of the employee files I have reviewed, there are notations where a new employee is told that they will be earning $2.13 per hour, plus tips. The $2.13 per hour appears to be the federal minimum wage for tipped employees, and when tips are added to it, it rises to the federal minimum wage. It appears that, on occasion, this calculation method may not have been explained fully by Defendants prior to the potential applicants' travels to the U.S.

39. The Named Plaintiffs claim that Defendants created a scheme that included paying visa holders less than what was promised and what federal law mandated. Although only two depositions of the Named Plaintiffs who had H-2B visas are currently available for review, I offer the following insight into this payroll matter: human traffickers who are engaged in labor trafficking pay little or nothing to the people they are exploiting. In Named Plaintiff Allan Garcia's February 27, 2020 deposition, he states that Defendant C. Schumacher lowered his salary to $2.13 an hour plus tips. The minimum wage in the U.S. for tipped employees is $2.13 per hour. If wages and tips do not equal the federal minimum wage of $7.25 per hour during any week, it is my understanding that the employer is required to increase wages to compensate.

40. A review of Named Plaintiff Allan Garcia's personnel file revealed a 2012 W-2 that indicated he worked 245.67 hours and earned $2,084.80. That calculates to an hourly pay rate of $8.49, which far exceeded the federal minimum wage of $7.25 per hour.

## V.   THE NAMED PLAINTIFFS' EXPERT

41. Many of the opinions asserted by the Named Plaintiffs' Expert Luis C. deBaca are improper and subjective. Mr. deBaca's views appear to be formulated by simply accepting the Named Plaintiffs' unsupported allegations and ignoring countervailing evidence or summarily rejecting such evidence as false or unreliable. Mr. deBaca inappropriately attempts to draw parallels between the current litigation and actual human trafficking cases through critical omissions of fact (see Table 3).

42. For example, on page nine of his expert witness report, Mr. deBaca lists "trends" that he claims to have identified through his experience and education, including:

   A. Breach of contract;

   B. Imbalances of power between guest-workers, recruiters, and their sponsoring employers;

   C. Overt threats and violence;

   D. The particular vulnerabilities of workers on guest-worker visas in the U.S. and other countries;

   E. The effects on foreign workers of both explicit threats and more subtle reminders of the potential for law enforcement or deportation;

   F. The effect of State power and political corruption on workers' willingness to come forward; and

   G. Withholding of contracts, or substitution of contracts during the recruitment or transportation phases.

43. Mr. deBaca does not cite any research to support these trends, which appear to have been strategically crafted to parallel the allegations in this case and

14

coincidentally omits "trends" that are inconsistent with the claims of this case. For example, Mr. deBaca does not mention:

    A. Victims who are forced to meet daily quotas (e.g., cleaning five motel rooms per hour for ten hours);

    B. Leveraging of pre-existing debt or recruitment fees;

    C. Levying additional debts in the workplace (the "company store");

    D. Physical isolation and control of movement;

    E. The holding of passports or other identification documents;

    F. Unsafe work conditions, and

    G. Victims who live and work at the same location.

44. It has been my understanding after attending DOJ and FBI human trafficking training courses and conferences that the term "trends in human trafficking" usually means a general direction in which something is developing or changing. In HTITI's course "Advanced Law Enforcement Human Trafficking Investigator," I wrote a chapter in the course manual called "Trends and Issues," and discuss topics that have recently (within the past year or two) been seen in human trafficking cases, such as street gangs getting involved in sex trafficking, sex tourism advertisements, and trafficking in persons for the purpose of organ removal. Those topics are things that I did not often see 10 years ago.

45. Mr. deBaca also inappropriately attempts to draw parallels between the current litigation and actual human trafficking cases through critical omissions of fact, as summarized in Table 3 below:

| Table 3 (Prosecutions Cited by deBaca) | | |
|---|---|---|
| Case Name | deBaca Summary | Objective Summary of Facts |
| U.S. v. Bradley | P14 (forced labor through threats of immigration consequences). He says Bradley is illustrative in the instant case. | Bradley promised $15-20/hour<br>Bradley seized passports<br>Workers paid $7 hour & injured<br>Bradley charged with 21 criminal counts.<br>Case vacated on Booker grounds |
| U.S. v. Djoumessi | P14 (Instances where a servant's burden may have been lifted do not shield their tormenters from liability.) | A 14-year old girl entered the U.S. with a false name and a fraudulent passport. She worked every day 6 AM to 10 PM.<br>No compensation, girl kept in a basement. A girl was beaten and sexually abused. A person was charged and convicted of involuntary servitude. |
| U.S. v. Pipkins | P15 (Involuntary servitude can be for any term of time.) | 265-count indictment for prostituting juvenile females, convicted of RICO violation. Endless false promises, physical violence, and financial control. |

Human Trafficking Investigation Report: Human Trafficking Expert

| U.S. v. Kozminski | P 13 (The Supreme Court noted that the particular vulnerabilities of a child or immigrant victim should be considered in assessing whether their will was overborne, and the TVPA, which through the enactment of Section 1589 clarified that service can be proven involuntary if it is obtained or maintained through psychological manipulation, threats of deportation, and other subtle forms of coercion.) | Victims worked on defendants' dairy farm seven days a week, up to 17 hours a day, and were paid very little if anything. The victims suffered psychological, physical, and verbal abuse at the hands of defendants and were deprived of medical care. |
| --- | --- | --- |
| U.S. v. Alzanki | P14 (The effect of defendant's threats to or abuse of third parties is creating a climate of fear.) | The victim was a domestic servant at the household of the defendant's family in Kuwait. The family kept her from leaving and held on to her passport. She was later sent to the Massachusetts residence of defendant and his wife. After she arrived, defendant took away the victim's passport. The victim was told by the defendant that she would be shot by the police if she left the residence or even went out onto the balcony. She was physically abused on at least two occasions, was denied dental treatment and later food, and was not provided protection from the household chemicals with which she was forced to clean. She remained at the defendant's residence for four months and was supposedly paid $120 per month. |

Human Trafficking Investigation Report: Human Trafficking Expert

| U.S. v. Booker | P14 (Defendants' creation or taking advantage of a climate of fear that permeated a workforce.) | One defendant owned a migrant camp, and the other two defendants were lieutenants at the camp. Workers were brought to the camp being promised stead work and pay but were forced to pay off "debts" before being allowed to leave. Defendants withheld wages from workers and threatened them with violence. The victims left the camp to buy personal items and were picked up by two of the defendants, who severely beat them and brought them back to the camp. Victims were told they would be beaten or killed if they tried to leave again. Representatives of Farm Workers' Legal Services arrived and drove the victims away from the camp. One defendant was sentenced to 10 years in prison, and another was sentenced to five years. The appellate court upheld the judgment. |
|---|---|---|
| U.S. v. Harris | P14 (Defendants' creation or taking advantage of a climate of fear that permeated a workforce.) | Victims were recruited by methods ranging from deception to kidnapping. Costs for food and drink were deducted from their wages, and although the laborers were supposed to be paid every two weeks, the evidence showed that they only received $5.00 each on payday.<br><br>The evidence also showed that workers were guarded at night, and any who tried to flee were picked up and returned by Harris or others. There was proof of actual and threatened physical violence to prevent workers from leaving or to force them to work faster. A house, called the "jail," was used to confine workers who had tried to run away. Harris and Dennis Warren each carried a piece of rubber hose and beat laborers with them. Workers who complained of illness or injuries were denied medical assistance. |

Human Trafficking Investigation Report: Human Trafficking Expert

| U.S. v. Bibbs | P14 (The lack of an affirmative duty to escape on the part of a victim.) | In November 1975, defendant Bibbs hired victims Richard Lee Brown and Charles Vozell Brown in Salisbury, North Carolina, promising them that they would be returned to Salisbury in a few days. The Browns quickly became indebted to Ivory Lee Wilson, and they attempted to leave his employ approximately nine days after they began working for him. Defendants William Bibbs and Ivory Lee Wilson stopped the Browns with a gun. Wilson threatened to kill them and told them that they could not leave until they paid their debts. When Richard Lee Brown attempted to escape again with victim Elliot Johnson, Rosco Wilson found them and had Bibbs and another man beat them. Although Brown suffered internal injuries in the beating, Ivory Lee Wilson forced him to work the next morning. Brown rode to the fields with the other workers, including Charles Vozell Brown, and told them he had been beaten for attempting to escape. The Browns testified that they remained in Ivory Lee Wilson's employ because they feared for their lives. |
| --- | --- | --- |
| U.S. v. Calimlim | P14 (Warnings of the possibility of arrest or deportation are not valid warnings of legitimate consequences but are a misuse of the legal process for the employers' own ends.) | In 1985, wealthy Filipino doctors, Jefferson and Elnora Calimlim, brought I.M. from the Philippines to their home to work as their housekeeper. Upon arrival, the Calimlims confiscated I.M.'s passport and other documents. I.M. was 19-years old at the time. During her 19-years of service, the Calimlims forbade I.M. to leave the house unescorted; required her to lock herself in her bedroom when guests were in the house; refused to allow her to have friends; refused to allow her to attend a church of her choice or engage in church social activities; denied her necessary medical and dental care; failed to pay her a salary, and paid her parents a total of about $20,000; and restricted I.M. 's contact and communications with her family in the Philippines. I.M. worked for the Calimlims seven days a week, on average 17 hours a day. The Calimlims coerced I.M. to work through an elaborate scheme which included her total isolation from society and her family; repeated lies about her immigration status; and continuous threats that I.M. would be arrested, jailed, and deported if anyone discovered her.<br><br>After receiving an anonymous tip concerning the Calimlims, federal agents raided their home on 29 September 2004.  I.M. was found in the basement shaking. |

46. Mr. deBaca concludes that one of the issues that needs to be examined in a forced labor claim is how the structural circumstances and direct actions compel labor,

and he claims the Named Plaintiffs were in an overarching recruitment and employment scheme controlled in its various aspects by the Defendants. That could not be further from the truth. Defendants were approved by the federal government to participate in the H-2B program, and they followed H-2B policies.

47. There are examples in employee files disclosed to Mr. deBaca of employees making $8.49 per hour (e.g., Named Plaintiff Allan Garcia's aforementioned pay stubs indicated that he worked 245.67 hours and earned $2,084.80, resulting in an hourly pay rate of $8.49). Mr. deBaca does not mention that.

48. Mr. deBaca also fails to account for the uniquely individualized facts and circumstances that are relevant to a trafficking determination in any given case. It is highly inappropriate to paint all H-2B workers with the same brush or to treat them as some homogenous group even if they are employed by a collective group of companies owned by the same individuals. The facts present in this case, which Mr. deBaca has largely ignored, indicate a wide variety of experiences and circumstances experienced by even the two Named Plaintiffs who have been deposed, meaning even those two cases are incapable of uniform treatment. For example:

   A. Contrary to the Named Plaintiffs' allegations that they and the proposed class were uniformly promised free housing, Named Plaintiff Harry Lincuna signed an offer letter before coming to the U.S. that made clear that housing was available at a rate of $70-75 per week. Lincuna Depo. at pp. 22:5-26:10.

   B. Contrary to the Named Plaintiffs' allegations that they and the proposed class were uniformly used as a malleable pool of labor for numerous businesses affiliated with the Schumachers, Named Plaintiff Harry Lincuna worked principally for Hotelmacher, LLC (at the Holiday Inn Express) cleaning rooms and serving breakfast and never worked for defendants Apex USA, Inc., Steakmacher, LLC (Montana Mike's), or the Schumachers personally. Lincuna Depo. at pp. 64:3-67:19.

   C. Contrary to the typical human trafficking red flag where workers are not given days off, Named Plaintiff Harry Lincuna testified that his typical work schedule was five days a week with two days off. Lincuna Depo. at pp. 75:3-78:18.

   D. Contrary to the Named Plaintiffs' allegations of widespread forced labor, Named Plaintiff Harry Lincuna testified that he was never forced to work at the Water Zoo nor was he threatened with force if he declined to do so. He also testified that he was never physically threatened or restrained by anyone (whether affiliated with defendants or otherwise) at any point while in the U.S. Lincuna Depo. at pp. 79:9-84:23, 113:18-115:3.

   E. Named Plaintiff Harry Lincuna was never present in any conversation wherein W. Schumacher allegedly said he would only pay for a worker's return airfare if the worker was "in a box." Lincuna Depo. at pp. 115:5-120:23.

19

Human Trafficking Investigation Report: Human Trafficking Expert

    F.  Named Plaintiff Allan Garcia claims to have heard W. Schumacher allegedly say he would only pay for his return airfare if he was going home "in a box" but was the only person present in that conversation and could not remember who else, if anyone, was told the same by W. Schumacher. Garcia Depo. at pp. 42:9-46:24.

    G.  Contrary to the Named Plaintiffs' allegations that they and the proposed class were uniformly used as a malleable pool of labor for numerous businesses affiliated with the Schumachers, Named Plaintiff Allan Garcia never worked for Hotelmacher, LLC (at the Holiday Inn Express), Apex USA, Inc., the Water Zoo, Sontag, Inc., W. Schumacher personally or C. Schumacher personally.  Garcia Depo. at pp. 52:22-55:19.

    H.  Named Plaintiff Allan Garcia always knew he would have to pay for housing and food while in the U.S. on the subject H-2B visa.  Garcia Depo. at p. 84:15-24, 123:21-124:3.

    I.  Named Plaintiff Allan Garcia testified that he was allegedly one of two people who were informed by W. Schumacher that he had a gun in the glove compartment of his vehicle on the day he arrived in Oklahoma for his H-2B visa employment.  During that conversation, Plaintiff Allan Garcia does not contend he was shown the weapon or threatened in any way; he was simply told not to open the glove compartment where the gun was allegedly located while W. Schumacher ran an errand (leaving the weapon in the vehicle with the two people present).  Named Plaintiff Allan Garcia also testified that W. Schumacher never indicated that he was going to use the gun in any way. Garcia Depo. at pp. 96:9-99:23.

These factual nuances demonstrate why uniform, class-wide treatment of the unique experiences of alleged human trafficking victims in a case like this is inconsistent with the design and purpose of the TVPA.  Common examples of such factual nuances include different employment terms (job titles, wages, hours, etc.), different employers, different working/living conditions, and differing disciplinary treatment.  *See, e.g., Panwar v. Access Therapies,* 2015 WL 329013 (S.D. Ind. Jan. 22, 2015) (denying class certification of TVPA claims because common questions did not predominate the entire proposed class of foreign workers).

## VI.   DISCUSSION & CONCLUSIONS

49.  The Named Plaintiffs claim that their action is brought by survivors of human trafficking; however, there has been no evidence shown that a U.S. agency has certified the Named Plaintiffs or any proposed class member as human trafficking victims. A foreign national adult victim of human trafficking is eligible for federal and state benefits and services to the same extent as a refugee upon issuance of a letter of certification by the U.S. Department of Health and Human Services (HHS). HHS issues a Certification Letter after notification from DHS granting a person Continued Presence, or a T visa, or that a bona fide T visa application has

not been denied.[12] I have not seen any mention during my review of documents or a search of public news stories that DHS or HHS have considered the three Named Plaintiffs or any proposed class member to be victims of a severe form of human trafficking, or that they have been issued a T visa.

50. Named Plaintiff Allan Garcia also stated in his deposition that he paid a recruiter 4,000 pesos to a medical clinic chosen by the Philippine Overseas Employment Agency (POEA), and 6,000 pesos to POEA for a seminar to be an Overseas Filipino Worker (OFW). When asked who told him that he had to pay those amounts, Mr. Garcia stated, "[t]he agency in the Philippines." Garcia Depo. at pp. 66:1-14, 68:10-14.

51. The Named Plaintiffs claim that they were promised full-time work with good pay and long-term work potential, but instead, they were forced to work under conditions that carried little resemblances to those to which they had agreed. A review of the facts shows the hours applicants were offered was consistent with what they received, and the prevailing minimum wage in Oklahoma was paid when tips were included in their wage calculation. I am not addressing situations where a newly arrived person did not want to work, or freely left employment on their terms for whatever reason.

52. A review of depositions in this case reveals some Named Plaintiffs admitting that they did not thoroughly read their offer letters, or interpreted something that a person not in the employment of a Defendant told them.

53. Allegations that Defendants' hourly wage rates were significantly reduced from what they had agreed to is without merit, especially when taking into account actual job openings when the Named Plaintiffs arrived in Oklahoma. Defendants have stated several times that they tried to find the right job for their employees, and when doing so, they complied with minimum wage rules and regulations.

54. The Named Plaintiffs claim that Defendants intentionally created a situation where the Named Plaintiffs were working few hours for little pay is an unjustified conclusion. Many records indicate that Named Plaintiffs were paid correctly by their employers (e.g., Mr. Garcia's pay stubs showing that he worked 245.67 hours and earned $2,084.80, resulting in an hourly pay rate of $8.49).

55. The Named Plaintiffs' claim that Defendant W. Schumacher made it widely known to them that he was a current and/or former police officer for purposes of intimidation is an unreasonable conclusion. There is nothing wrong with a police officer owning a motel or restaurant. Evidence shows that Defendant W. Schumacher rarely had contact with his motel or restaurant employees while performing police duties, and there is no evidence he took any actions that would have intimidated them. Although it appears that some Named Plaintiffs may claim to have had a fear of police officers based on experiences from their home country, that does not build a case against Defendants that they were human traffickers.

---

[12] Title 22, U.S. Code, Section 7105

56.	The examples of possible labor trafficking provided by the Named Plaintiffs are complex and contain many aspects and legal contracts. They each deserve a thorough review, which does not appear to have occurred here by the Named Plaintiffs or their purported expert witness. The circumstances of each individual Named Plaintiff and/or proposed class member should not and cannot be "lumped" into one catch-all allegation. There could be many reasons why a visa applicant takes a job in the U.S. that involves low pay, to include gaining experience, making business contacts, and visiting the U.S. Likewise, to allege human trafficking has occurred, one must examine the 26 "red flags of human trafficking" that I listed in Table 1 before jumping to the conclusion that a particular situation is labor trafficking, as opposed to a labor dispute or even an allegedly poor business practice.

57.	Human trafficking criminal investigations are complicated. No two cases are exactly alike, and they should not be lumped together when being examined by someone with little experience in investigating human trafficking crimes. The term "scheme" is used casually by the Named Plaintiffs when no scheme in its true nature was observed in my examination.

58.	I saw no signs of Defendants punishing workers harshly for purported minor infractions like human traffickers are known to do.  However, I did see signs of Defendants dealing with employee infractions in a typical business way, usually involving following company policy as defined in their employee handbook.

59.	The Defendants, who were approved by the U.S. government to participate in the H-2B visa program, have provided examples that they follow visa program policies in good faith. In my opinion, the claim that Defendants created a scheme to maintain a low-paid, easily controlled workforce in a human-trafficking-like manner is unjustified, especially in light of the examples of human trafficking in Table 1 that are not present in this case.  Based on this analysis, this is not a trafficking case. At best, it is a labor dispute.  *See Castellanos v. Worldwide Distribution Systems USA, LLC,* 2016 WL 11678220 (E.D. Mich. June 20, 2016) (denying class certification of TVPA claims because TVPA did not govern fraudulent enticement vis-à-vis fraudulent letters to potential workers; TVPA was designed to prevent coercion, not enticement).

60.	I reserve the right to supplement or amend my opinions due to any further allegations, depositions, or expert reports that may occur after my report is submitted.

Respectfully submitted this 24th day of July 2020

s/ *Greg H. Bristol*
Greg H. Bristol

**APPENDIX A**

# Greg H. Bristol – Curriculum Vitae

Post Office Box 53
Points, West Virginia
Email: Gbristol@HumanTraffickingTraining.expert

**PROFILE**

Reliable and people-driven professional with in-depth theoretical and practical knowledge in a wide array of safety and security practices, and 34+ years of law enforcement expertise to promote the protection of the public. Demonstrated leadership in the criminal justice response to combatting human trafficking. Expertly deliver full-spectrum instructional responsibilities and academic guidance to students of all ages and learning levels across reputable government institutions. Knowledgeable of law enforcement theory, practices, and their application to a variety of services and programs, including investigation and identification, patrol, records management, care and custody of people, property, and crime prevention. Excel at handling tasks that involve planning, coordinating, and implementing best procedures to expedite learning and promote the philosophy and goals of the organization. Perfect communication and interpersonal skills needed to establish rapport with cross-functional, multi-level, and culturally-diverse stakeholders.

---

## WORK HISTORY

**President of Bristol Public Safety Consultants Company**                    2018 - Present

- **Manage a company providing consulting services** regarding fraud, preventing elder financial abuse, public corruption, human trafficking prevention, and compliance with the U.S. Foreign Corrupt Practices Act.
- Lead the development and implementation of company goals, objectives, and priorities for each assigned service area, recommend and administer policies and procedures.
- Monitor and evaluate the effectiveness of service delivery methods and procedures, as well as allocate resources accordingly.
- **Analyze and assess safety programs**, policies, operational needs, and make appropriate adjustments.

2012 – Present

**President of The Human Trafficking Investigations & Training Institute (HTITI),** Front Royal, Virginia

- **Coordinate the HTITI's basic and advanced human trafficking investigations training** for law enforcement and NGOs.
- **Built a training company** providing basic and advanced human trafficking investigation courses for law enforcement officers.
- **Taught 27 law enforcement human trafficking investigation courses** in ten U.S. states, and internationally in Egypt and Trinidad and Tobago; participated as a panel member at a 2017 United Nations human trafficking conference in Vienna, Austria.
- Ensured the development and **implementation of comprehensive public safety programs**, policies, and procedures, emergency preparedness plans, including orientation and training.

2010 – 2012

**Special Agent, Special Inspector General for Afghanistan Reconstruction**, Kandahar Province, Afghanistan

- Investigated fraud, waste, and abuse involving U.S. federal contracts in Afghanistan.

23

- Enforced the law and involved in national security issues, monitoring ongoing situations, conducting investigations to look for threats.
- Handled undercover assignments, gathered evidence through surveillance and observation, monitored activity on court-authorized wiretaps, interviewed witnesses or suspects to obtain intelligence on illegal activities, and examining records.

**Special Agent, Federal Bureau of Investigation (FBI), Washington Field Office**                    1987 – 2010

- Investigated Foreign Counterintelligence, Public Corruption, Corporate Fraud, and Civil Rights Crimes with a focus on human trafficking.
- Led the U.S. diplomatic mission security programs to include protection of personnel, facilities, and sensitive information.

**Trooper, Michigan State Police**                    1978 – 1987

- Enforced laws to promote safety, responding to civil disorders, preventing disturbances and riots, relaying evidence to detectives, and preparing testimony for court appearances.

---

## EDUCATION AND CERTIFICATION

*Bachelor of Arts in Social Science*, MICHIGAN STATE UNIVERSITY, 1978

*Certified EEO Investigator, EEOC Training Institute, 2013*
*Certified Federal Law Enforcement Officer (FBI), 1987*
*Certified Law Enforcement Officer, Michigan Department of State Police, 1978*

---

## HONORS AND AWARDS

- Michigan Department of State Police Meritorious Service Medal
- Secretary of Defense Medal for the Global War on Terrorism
- U.S. Attorney General's Award for Exceptional Service

---

## TEACHING EXPERIENCE AT COLLEGES AND UNIVERSITIES

- American University, Washington, DC
- Columbia Southern University, Orange Beach, AL
- Georgetown University, Washington, DC
- Montgomery College, Rockville, MD
- Patrick Henry Community College, Martinsville, VA
- University of Louisville, Louisville, KY
- Saint Thomas University, Miami Lakes, FL

---

## TEACHING EXPERIENCE AT FEDERAL ENTITIES

- Department of Justice, National Advocacy Center, Columbia, SC
- FBI Training Academy, Quantico, VA

---

## SPECIALIZED KNOWLEDGE RELATED TO HUMAN TRAFFICKING

- California Transparency in Supply Chains Act of 2010

24

- End Trafficking in Government Contracting Act of 2013
- Federal Strategic Action Plan on services for victims of human trafficking
- How to conduct a forensic examination of an illicit massage business
- How to investigate human trafficking crimes
- Human trafficking task force development and management
- State laws on human trafficking and sexual exploitation
- United Nations' General Assembly protocols on human trafficking
- U.S. Department of Homeland Security's Blue Campaign
- U.S. Trafficking Victims Protection Act of 2000 and its reauthorizations

## ONLINE HUMAN TRAFFICKING COURSE DEVELOPMENT

- For Columbia Southern University, Orange Beach, AL (2017)
- For eNursingResources.com, Haddonfield, NJ (2018)
- For Savant Learning Systems, Martin, TN (2018)

## PUBLICATIONS RELATED TO HUMAN TRAFFICKING

- Combatting Human Trafficking Takes Everyone, American Gas Magazine, June 2018
- Contributor to the Virginia Department of Criminal Justice Services' Model Policy on Human Trafficking, November 13, 2014

## FILM AND PUBLIC SERVICE ANNOUNCEMENT CREDITS

Interviewed in *The Awakening, The Realities of Sex Trafficking in Michigan, produced by Girbe Eefsting,* narrated by Heavenly Hope International, (www.heavenlyhopeinternational.org/resources/)                    2016

Narrated a one-minute Public Service Announcement on child sex trafficking titled *I Just Wanted To Die - A Child Speaks Out*, produced by US Fund for UNICEF, (www.youtube.com/watch?v=j1sRy8RJBh8)                    2014

Interviewed for a three-minute video on child sex trafficking titled *UNICEF USA: Over 100,000 Children are Victims of Sex Trafficking in the U.S.* Produced by US Fund for UNICEF, (www.youtube.com/watch?v=s6hbEthqVSw) 2014

Featured in the film *Not My Life* about an FBI domestic servitude victim rescued in     Virginia      in     2009, (https://vimeo.com/50650206)                    2014

## COURSES DEVELOPED FOR HTITI

- 911 Operator Responses to Human Trafficking Calls
- Anti-Human Trafficking Training for Community Groups & Healthcare Providers
- Basic and Advanced Law Enforcement Human Trafficking Investigator
- Forensic Analysis of Fake Massage Businesses Engaged in Sex Trafficking
- Human Trafficking Awareness for Healthcare Providers

## OVERVIEW OF HTITI'S PAST COURSES AND PRESENTATIONS

*COURSE TITLES*
- Advanced Law Enforcement Human Trafficking Investigator
- Forensic Analysis of Fake Massage Businesses Engaged in Sex Trafficking

CO      Denver (2X)
FL      Aventura, Daytona Beach, Fort Lauderdale (3X), Orlando

| | |
|---|---|
| GA | Kennesaw (2X), Marietta |
| KS | Garden City, Hays |
| MD | Bel Air, Sykesville |
| MI | Lansing, Livonia |
| NC | Edneyville (2X), Fayetteville, Winston-Salem |
| NJ | Rockaway |
| NV | Las Vegas (2X) |
| VA | Fairfax, Roanoke (2X) |
| INTL | Trinidad & Tobago |

---

## HTITI PRESENTATIONS

### 2019
- Human Trafficking Awareness, Rotary Club of Chagrin Valley, Ohio
- Human Trafficking Awareness, Rotary Club of Chesterland, Ohio

### 2018
- Combatting Trafficking in Persons in Egypt, Cairo, Egypt, Guest Speaker of the U.S. Embassy in Cairo, Invited by U.S. Department of State's Speaker's Program
- Defining Human Trafficking, And The Importance of The T-Visa For Human Trafficking Victims, Georgetown Law School, Washington, DC
- Guest Speaker at *Hidden in The Shadows*, Plymouth, MI, hosted by Pearls of Great Price Coalition, a Conference About Human Trafficking in Michigan
- Guest Speaker at Hope Changes Everything Conference, Lake Placid, NY, Hosted by The Clinton, County District Attorney's Child Advocacy Center
- Understanding & Recognizing Human Trafficking in Our Public Schools, Center City Public Charter School, Washington, DC

### 2017
- Awareness of Human Trafficking Among Airport Police and Airline Flight Crews, UNODC, Vienna, Austria
- Human Trafficking Awareness, Defense Intelligence Alumni Association, McLean, VA
- Investigative Strategies for Practitioners, St. Thomas University's School of Law, Human Trafficking Academy, Miami, FL

### 2016
- Human Trafficking: How to Identify and Report It, Fairfax County, Alliance for Human Services, Annandale, VA
- Investigative Strategies for Practitioners, St. Thomas University's School of Law, Human Trafficking Academy, Miami, FL
- Law Enforcement's Role in Combating Human Trafficking, DC Rotary, Washington, DC
- Law Enforcement's Role in Combating Human Trafficking, Hermitage High School, Richmond, VA
- Law Enforcement's Role in Combating Human Trafficking, Providence Presbyterian Church, Fairfax, VA
- Screening of *Not My Life*, Royal Circle Foundation, Washington, DC
- Understanding How Homeless People Are Often Victims of Forced Labor, Georgia Alliance to End Homelessness, Savannah, GA

**2015**
- Health Effects of Human Trafficking, Regional Occupational Health Conference, Laurel, MD
- Human Trafficking Awareness For Community Groups, Hosted by Heavenly Hope International, Farmington, MI
- Human Trafficking Awareness For Community Groups, Hosted by Heavenly Hope International, Highland Park, MI
- Human Trafficking Awareness, Lunch Speaker, Defense Intelligence Alumni Association, McLean, VA
- Investigative Strategies for Practitioners, St. Thomas University's School of Law, Human Trafficking Academy, Miami, FL
- Law Enforcement's Role in Combating Human Trafficking, Hermitage High School, Richmond, VA
- Understanding How Homeless People are Often Victim of Forced Labor, Georgia Alliance to End Homelessness, Savannah, GA
- Webinar: Healthcare Providers Fighting Against Human Trafficking, National Association of County and City Health Officials, Washington, DC

**2014**
- Healthcare Providers Fighting Against Human Trafficking, NSA Occupational Health Unit, Fort Meade, MD
- Health Effects of Human Trafficking, Mary's Center, Washington, DC
- Health Effects of Human Trafficking, Royal Circle Foundation, Baltimore, MD
- Interviewed by Blogger Who Was Writing About Human Trafficking, Virginia Free Citizens, Richmond, VA
- Law Enforcement's Role in Combating Human Trafficking, DC Stop Modern Slavery, Washington, DC
- Law Enforcement's Role in Combating Human Trafficking, Georgetown University Law Center, Washington, DC
- Law Enforcement's Role in Combating Human Trafficking, Hermitage High School, Richmond, VA
- Law Enforcement's Role in Combating Human Trafficking, Montgomery College (Criminal Justice Class), Rockville, MD
- Law Enforcement's Role in Combating Human Trafficking, Montgomery County TV - Channel 10, Rockville, MD
- Law Enforcement's Role in Combating Human Trafficking, World Affairs Council, Washington, DC
- Online Community Q&A Discussion on Human Trafficking, REDDIT & UNICEF USA, New York, NY (2,406 views)
- Webinar: General Awareness of Human Trafficking, US Department of Agriculture, Washington, DC
- Webinar: The Role of Healthcare Providers in Identifying Human Trafficking Victims, FBI Occupational Health Unit, Washington, DC

**2013**
- Law Enforcement's Role in Combating Human Trafficking, The American University, Washington, DC
- Law Enforcement's Role in Combating Human Trafficking, T-Bone Films, Denver, CO
- Law Enforcement's Role in Combating Human Trafficking, DC Stop Modern Slavery, Washington, DC
- Law Enforcement's Role in Combating Human Trafficking, National Intelligence Association, Springfield, VA
- Law Enforcement's Role in Combating Human Trafficking, Patrick Henry Community College, Martinsville, VA
- Law Enforcement's Role in Combating Human Trafficking, Project Restoration Hope Festival and Human Trafficking Summit, Denver, CO
- Law Enforcement's Role in Combating Human Trafficking, Richmond Justice Initiative, Richmond, VA

Human Trafficking Investigation Report: Human Trafficking Expert

- Law Enforcement's Role in Combating Human Trafficking, The John Hopkins University, Washington, DC
- Law Enforcement's Role in Combating Human Trafficking, Worldwide Documentaries, Rochester, NY
- Law Enforcement's Role in Combating Human Trafficking, Project Restoration Hope Fest and Human Trafficking Summit, Denver, CO
- Screening of *Not My Life*, Hosted by Reston Hospital, Reston, VA
- Screening of *Not My Life*, Hosted by Holy Cross Hospital, Silver Springs, MD
- The Role Nurses Play in Identifying Human Trafficking Victims, Association of Occupational Health Nurses, Washington, DC

**2012**
- Human Trafficking Awareness, SunTrust Bank – Financial Intelligence Unit, Atlanta, GA
- Law Enforcement's Role in Combating Human Trafficking, Hermitage High School, Richmond, VA
- Radio Interview About Human Trafficking, AM 1370, by Bob Smith, Rochester, NY
- Screening of *Not My Life*, Hosted by Media Watch, Santa Cruz, CA

# APPENDIX B

a) Class Action Complaint filed in this case on July 26, 2017
b) Statement from:
   • Marygene S. Casilao
c) Depositions (Named Plaintiffs):
   • Harry Lincuna
   • Allan Garcia
d) Materials from Human Resources files of Named Plaintiffs
e) Report Prepared by Named Plaintiffs' Expert Witness

**Additional Materials Reviewed**

Castellanos v. Worldwide Distribution Systems USA, LLC, 2016WL 11678220 (E.D. Mich. June 20, 2016)

HTITI Course Manual *"Law Enforcement Human Trafficking Investigator,"* various years.

International Labour Organization report, "Recruitment Fees and Related Costs

National Guestworkers Alliance, "*Leveling the Playing Field: Reforming the H-2B Program to Protect Guestworkers and U.S. Workers"* (Feb 2012).

Panwar v. Access Therapies, 2015 WL 329013 (S.D. Ind. Jan. 22, 2015)

Polaris, *"Labor Trafficking in the U.S.: A Closer Look at Temporary Work Visas"* (Oct. 2015).

Southern Poverty Law Center, *"Close to Slavery: Guestworker Programs in the United States*" (2013).

U.S. Code, Title 18, Chapter 77 "Peonage, Slavery, and Trafficking in Persons."

U.S. Code of Federal Regulations, Title 32, Section 62.23 "Summer work travel."

U.S. Code of Federal Regulations, Title 32, Section 503.16 "Assurances and obligations of H-2B employers."

United States Department of State, *"Trafficking in Persons Reports,"* various years

United States Government Accountability Office, "*H-2A and H-2B Visa Programs: Increased Protections Needed For Foreign Workers,"* GOA-15-154 (March 2015)

U.S. v. Alzanki, 54 F.3d 994, 1001-02 (1st Cir. 1995)

Human Trafficking Investigation Report: Human Trafficking Expert

U.S. v. Bibbs, 564 F.2d 1165, 1168 (5th Circ. 1977)

U.S. v. Booker, 655 F.2d 562, 566 (4th Cir. 1981)

U.S. v. Bradley, 309 F.3d 145 (1st Cir. 2004)

U.S. v. Calimlin, 538 F.2d 706 (7th Cir. 2008)

U.S. v. Djoumessi, 538 F.3d 547 (6th Cir. 2008)

U.S. v. Farrell, 563 F.3d 364 (8th Cir. 2009)

U.S. v. Garcia, 2003 WL 22956917 (W.D. NY, 2003)

U.S. v. Harris, 701 F.2d 1095, 1100 (4th Cir. 1983)

U.S. v. Kaufman, 546 F.3d 1242 (10th Cir. 2008)

U.S. v. Kozminski, 487 U.S. 931 (1988)

U.S. v. Pipkins, 378 F.3d 1281, 1281, 1297 (11th Cir.2004)

**APPENDIX C**

**Fee Schedule**

Expert Consultation and Testimony

Deposition or trial testimony: $350 per hour (4 hour minimum)

Investigations, office meetings, research, or writing: $125 per hour

Telephone calls: $75 hour

Travel (in car or air): $75 hour

31