IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

Expert Report of Ambassador (ret.) Luis C.deBaca

Senior Fellow in Modern Slavery, Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University

and

Visiting Lecturer in Law, Yale Law School

in the matters of

Casilao, et al, v. Hotelmacher LLC, et al, Case No. CIV-17-800-M

and

Francis v. Apex, USA et al, Case No: CIV-18-583-HE

June 16, 2020

---

1. My name is Luis C.deBaca. Plaintiffs in the above-captioned matters have retained me as an expert in forced labor/involuntary servitude/human trafficking in American and international practice, domestic servitude, and document servitude. I am also qualified to opine on the trafficking in persons in the Philippines, Jamaica, India, Moldova, Indonesia, and the Dominican Republic and other migrant labor source countries, as well as on the H2 and J1 visa categories. My resume is attached as Exhibit 1 and a list of the materials I have reviewed in this matter is attached as Exhibit 2. I am being compensated at my standard rates, which are attached as Exhibit 3.

2. I reserve the right to supplement or amend my opinions in light of any further allegations, depositions, expert reports, etc. that may occur subsequent to this report.

## I. PROFESSIONAL BACKGROUND AND QUALIFICATIONS

### A. Current Activities

3. I am a member in good standing of the Michigan Bar. I retired from federal service in 2017. In my twenty-seven year legal career, I have investigated and prosecuted cases of human trafficking; formulated, coordinated, and advanced US and international policies concerning human trafficking; funded, developed, and delivered research as well as training materials for investigators, medical professionals, business entities, attorneys, judges, diplomats, and

EXHIBIT
1
exhibitsticker.com

international organizations around issues of human trafficking; and studied and taught United States and international anti-trafficking and anti-slavery law.

4. I am currently Senior Fellow in Modern Slavery at Yale University's Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition. As a visiting lecturer in law at Yale Law School, I teach the development of anti-trafficking norms and laws, and their interplay with immigration, diplomatic, and enforcement structures. I have also taught in the history department at Yale College.

5. I also maintain a consulting practice, through Chambers Lopez Strategies, in which I work with non-governmental organizations, academic institutions, businesses, foundations, and other entities on issues of forced labor and sex trafficking. Through that effort, I have served as an expert witness in three prior litigative matters, all in federal court: *Keo Ratha et al v. Phatthana Seafood Co., Ltd, et al*, No. CV16-4271-JFW (ASx)(C.D. CA)(expert report, deposition testimony); *United States v. Zhong. et al*, No. 1-16-cr-00614 (E.D.N.Y.)(trial testimony); and *Tekle v. Al Saud*, No. 1:18-cv-00211(E.D. Va.)(expert reports, deposition testimony).

### B. <u>Experience in Investigation, Prosecution, Legislation, and Policy Development in the Human Trafficking and Forced Labor Arena</u>

5. From 2009 through 2014, I served as Ambassador at Large for the Office to Monitor and Combat Trafficking in Persons at the U.S. Department of State, coordinating global and US activities against contemporary forms of slavery. This appointment by President Obama, confirmed by the U.S. Senate, built upon over a decade of work in the field of slavery/trafficking to that point. Following my Ambassadorship, I served for two years as Director of the Justice Department 's Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking.

6. From 1993 to 2009, I served as a federal prosecutor in the Criminal Section of the Civil Rights Division of the U.S. Department of Justice, becoming the national coordinator for cases of human trafficking. I investigated and prosecuted these types of offenses, in conjunction with Assistant U.S. Attorneys in the local offices around the country. In 1997, I was appointed as Involuntary Servitude and Slavery (ISS) Coordinator for the Department of Justice and began to work exclusively on cases of compelled service, as codified in Chapter 77 of the United States Code (later amended to 'include the "modern" term of human trafficking/trafficking in persons).

7. As ISS Coordinator in the Criminal Section of the Civil Rights Division, I not only investigated and prosecuted my own cases, but also took on a growing policy role, triggered by the discovery of Thai garment workers in California (the "El Monte" case) and a large Mexican begging ring in New York City (the "Deaf Mexican Case"). These forced labor cases, as well international concern about the trafficking of women into sex slavery in Western Europe after the end of the Cold War, provided an impetus to update the post-Civil War slavery statutes for the modern era.

8. Accordingly, I served as the principal Justice Department drafter of what became the Trafficking Victims Protection Act of 2000 (TVPA), P.L. 106-386 (Oct. 28, 2000), and was

part of the team that drafted and negotiated the corresponding international instrument, the United Nations Protocol to Prevent, Suppress and Punish Trafficking in Persons, especially Women and Children ("the Palermo Protocol").

9. In 2001, following the passage of these new legal instruments, the United States recast ISS cases under the new umbrella term of "Human Trafficking," and Chapter 77 of the United States Code was amended to reflect that change. In a nutshell, the umbrella term "Human Trafficking" (or "Trafficking in Persons") involves all of the activities involved in reducing a person, or holding them in, a condition of compelled service for a term (no matter how long or short). I supervised investigations and prosecutions under the updated law, developed curricula and local task force structures, and conducted countless trainings, both at home and abroad for US and international law enforcement and for non-governmental organizations (NGOs).

10. Within weeks of the passage of the TVPA, I convened national gatherings of federal prosecutors and investigators at the Justice Department's National Advocacy Center to disseminate information on the new laws. I served on the working group to formulate the Continued Presence and T-Visa immigration statuses for trafficking victims, and subsequently assisted the immigration services' adjudicators in understanding the legal requirements and psychosocial dynamics that they would encounter in weighing such claims. I coordinated the formation of task forces around the country that brought together federal, state, and local actors to train them on the new law and the modern investigatory approach. I also participated in international efforts, serving on the United Nations group responsible for implementation of the Palermo Protocol, regularly travelling to the UN Office of Drugs and Crime in Vienna for experts ' groups meetings and curriculum development. In my role as policy coordinator, I worked with Congressional staff and Members on the reauthorizations of the TVPA, most notably the Trafficking Victims Protection Reauthorization Act of 2003, P.L. 108-193 (2003) which created a private right of action in recognition that aggrieved workers should not be wholly dependent on government enforcement activities – whether through criminal or civil/administrative action. Subsequently, I helped to found and was named Chief Counsel of the Human Trafficking Prosecutions Unit, the establishment of which brought a more formalized approach to the efforts of the Criminal Section of the Department of Justice's Civil Rights Division.

11. In addition to policy and legislative work during that time, I supervised and assisted on all federal human trafficking cases from 1997 through 2007, while maintaining the largest docket of such cases myself. Representative human trafficking investigations and prosecutions that I personally litigated include, but are not limited to: *United States v. Maksimenko*, No. 05-80187 (E.D. Mich.)(forced labor of Ukrainian J-1 students in Detroit area strip clubs); *United States v. Salazar*, 287 F. Appx. 330 (5th Cir. 2008) (forced labor of Mexican and Central American women in cantinas in Houston area); *United States v. Soto*, 242 Fed. Appx. 984 (5th Cir. 2007)(domestic servitude and concubinage of migrant women in Texas); *United States v. Al Jader,* No. 05-CR-10085 (D. Mass.)(member of the Saudi Royal Family who held Indonesian guestworkers in forced labor*); United States v. Kil Soo Lee*, 159 F.Supp.2d 1241 (D. HI 2001), *upheld on appeal* 472 F.3d 638 (9th Cir. 2006) (largest servitude case prosecuted in US history, with approximately 300 guestworker victims in garment factory in American Samoa); *United States v. Kwon Soon Oh*, (9th Cir. No. 00-10131, Memorandum decision, July 2, 2002)(forced

labor and sexual servitude of Chinese/Korean guestworkers in karaoke bar/brothel in Commonwealth of Northern Marianas Islands); *United States v. Paoletti,* No. 1:97-CR-00768-NG (E.D.N.Y.)(over 60 deaf and hearing-impaired persons forced to beg on streets and subways of New York and other major cities, through beatings, rapes, and threats); *United States v. Cadena*, 207 F. 3d 633 (11th Cir. 2000)(sexual servitude of Mexican women in network ranging from South Florida to the Carolinas) , and *United States v. Flores*, 1999 U.S. App. LEXIS 28082 (4th Cir. 1999)(forced labor of dozens of farm workers in network ranging from Central Florida to South Carolina). In those cases and in my policy work, I worked closely with the Department of Labor; sometimes in the investigation and prosecution of a particular matter, and sometimes in applying the Chapter 77 statutes after a Department of Labor civil or administrative action had run its course.

12. From early 2007 through May of 2009, I served as Counsel to the House Committee on the Judiciary, where my portfolio included National Security, Immigration, and Civil Rights matters, including the 2008 reauthorization of the TVPA. Throughout the 110th Congress, I programmed hearings on the proposed reauthorization, met with stakeholders, coordinated with counterparts on Senate staff and other House committees, and worked with legislative counsel to draft statutory language. The resulting statute, The William Wilberforce Trafficking Victims Protection Act of 2008, P.L. 110-457 (December 23, 2008), created, *inter alia*: new T-visa provisions; modifications of certain employment visa categories to address contract switching or other forms of fraud, including requirements for consular interviews and "know your rights" materials to be provided to employment-based visa holders, including those under the H and J categories.

13. As mentioned above, in May 2009 I was confirmed by the United States Senate as Ambassador at Large for the Office to Monitor and Combat Trafficking in Persons (TIP Office), a capacity in which I served through November 2014. As Ambassador I coordinated efforts against contemporary forms of slavery in the United States and overseas. I served as the Secretariat of the President's Interagency Task Force on Trafficking in Persons, which convenes the Cabinet and sets policy across agencies. In that role, I continued to assist in the development of policies, procedures, training materials, regulations, and legislation at partner agencies such as the Department of Homeland Security, the Department of Health & Human Services, and the Department of Justice, among others. I assessed the legislative frameworks, legal/enforcement practices, and immigration and guestworker programs in over 190 countries, including the United States, annually for the United States' Trafficking in Persons Report. I funded the development of training and standards for medical professionals, law enforcement, labor inspectors, immigration officials, private attorneys, judges, and businesses to identify and address trafficking/servitude situations. I worked with the Bureau of Consular Affairs and the foreign Diplomatic Corps to address issues arising from maltreatment of domestic workers of diplomats in the United States and in other countries; with the Bureau of Consular Affairs and colleagues from the Departments of Labor and Homeland Security to address issues within the H-visa programs; and with the Bureau of Educational and Cultural Affairs and Bureau of Consular Affairs to address concerns about the J-1 visa program in 2011 and 2012 due to a series of abuses. As a result of our work, every guestworker admitted to the United States since mid-2009 is to receive a pamphlet setting forth their rights in America, including to be free from exploitation, intimidation, or false promises about working conditions, living conditions, or pay.

19. I have been widely recognized for my work, receiving *inter alia* the Secretary of State 's Distinguished Honor Award; the Attorney General 's John Marshall Award for Excellence in Suppo1t of Litigation; the Attorney General's Distinguished Service Award; the Director's Award from the Executive Office for United States Attorneys; and the leading honor of the trafficking survivor community- the Freedom Network's Paul & Sheila Wellstone Award. A full list of honors and recognitions is set forth in my resume, attached as Exhibit 1.

### C. **Published Work**

20. I have published on the issue of human trafficking in textbooks,[1] academic journals,[2] public health journals,[3] and law enforcement and trade publications.[4] Less formally, I authored an opinion piece for the UK Conservative Party's in-house publication in the United Kingdom about trafficking legislation pending before Parliament.[5] To my knowledge , these are the extent of my published articles on human trafficking in the last decade, other than for U.S. Government publications such as the Trafficking in Persons Report. Additionally, I issued a number of reports and issue briefs on sexual assault issues as the Director of the Justice Department's Office for Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking, drawing on current scholarship in the field, the expertise of the Office, and the work of criminologists and victimologists under various federal grants that the Office administered.[6]

21. I have given hundreds of speeches and presentations on human trafficking throughout the last twenty years, and have testified before the United States Congress on multiple occasions, in both the House and Senate, as well as joint committees such as the Helsinki Commission. Formal speeches or remarks that I gave in my role as Ambassador at Large are publicly available online in the State Department's archived websites for the Obama Administration.[7] Transcripts of my testimony before Congress are publicly available in the

---

[1] Luis C.deBaca, "What We Talk About When We Talk About Trafficking," in Rochelle L. Dalla and Donna Sabella eds., ROUTLEDGE INTERNATIONAL HANDBOOK OF HUMAN TRAFFICKING: A MULTI-DISCIPLINARY AND APPLIED APPROACH.(New York, NY: Routledge, 2020).

[2] Luis C.deBaca, "Successes and Failures in International Human Trafficking Law" 33 Michigan J. Intl. L 37 (2011).

[3] Luis C.deBaca and Jane Nady Sigmon, "*Combating Trafficking in Persons: a call to action for global health professionals*", 2(3) Glob Health Sci Pact. 261 (2014).

[4] Leslie P. King & Luis C.deBaca, "An Ancient Problem, a New Awareness: Slavery in Construction Materials Supply Chains," 21 *Under Construction* 4 (March 2020)(magazine of American Bar Association Construction Law Section); Lou de Baca & Andrea Tisi, "Working Together to Stop Modern-Day Slavery," 69 Police Chief No. 8, August 2002 (International Association of Chiefs of Police).

[5] Luis C.deBaca, "The Government 's victim protection scheme is deeply flawed. It needs reform." CONSERVATIVE HOME (December 28, 2018) available online at https://www.conservativehome.com/platform/2018/12/luis-c-debaca-modern-slavery-the-governments-victim-protection-scheme-is-deeply-flawed-it-needs-reform.html.

[6] Publicly available at https://www.smart.gov/newsletters.htm.

[7] Publicly available at https://2009-2017.state.gov/.

Congressional Record.[8] I have also testified before joint inquiring bodies of the British and Australian Parliaments, as well as in international fora such as the United Nations Human Rights Commission and the Organization for Security and Cooperation in Europe (OSCE); I am unaware if any of those interventions are publicly accessible.

22. Each year, the State Department assembles and releases the annual Trafficking in Persons Report, the statutorily-mandated analysis of each country 's response to forced labor and sex trafficking. That report is the result of diplomatic engagement and fact-finding, drawing upon submissions from U.S. Embassy and consular personnel in the particular country and third countries that the trafficking situation might impact, academic and NGO reporting and analysis, United Nations and other international organizations, information provided by the host government or other countries that the trafficking situation may have impacted, information from other U.S. government agencies, and the results of bilateral diplomacy and contact by members of the TIP Office staff. The information is gathered and assessed against a set of minimum standards set forth in the TVPA, which are organized in keeping with the "3P" approach of the TVPA and United Nations Protocol (Prevention, Protection, and Prosecution).

23. The TIP Report thus sets forth in detail the situation of each country, what the country is (or is not) doing to address human trafficking, and recommendations for how the country can come into compliance with international norms and the standards set forth by the TVPA. The Report narratives for each country over time tell the story of the ebb and flow of policy development, political will, changes in migration patterns, including employment-based immigration regimes, and corruption. As Ambassador, I reviewed and edited each country narrative closely, in order to pursue consensus with colleagues from the State Department's Regional Bureaus as to the final text as well as the countries' Tier rankings. Since my departure from my position as Ambassador at the State Department I continue to track the TIP Report from the perspective of a practitioner and academic, including how it is researched and crafted each year. I engage in regular review of subsequent country narratives and thematic content, and remain in close contact with the TIP Office, including through participation in the TIP Report release and corresponding public diplomacy.

24. Over the years that the Report has been published, the need for transparency, recommendations for further action, and policy insights have resulted in a highly-researched annual publication that provides an in-depth snapshot not only of the situation in each country but also trends and best practices in the forced labor and sex trafficking arena as a whole. The inherently coercive nature of guestworker programs – whether in the United States or in other countries – is a through-line in the TIP Reports' assessment of foreign workers' vulnerabilities and of employers' and officials' misuse of law and legal process. This assessment drove my diplomacy and policy activities in addressing guestworker abuse.

25. Another through-line of the TIP Reports and my diplomatic and policy activities is the toxic practice of recruiting fees and contract substitution – where migrants, either in transit or upon arrival at their foreign destination, are presented with a new contact with different terms to which they had agreed in the recruitment phase, too late to back out because of up-front fees and other costs already sunk into their guestworker journey. The United Nations describes the practice as

[8] Publicly available at https://www.congress.gov/congressional-record.

follows: "Workers can also be subject to contract substitution, where they sign contracts prior to their departure, but are later forced or lured into signing different contracts, often including worse conditions of work and pay." Contract substitution is not simply an issue of concern to governments or multilateral agencies: a leading social auditing consultant to major corporations, Verite, describes contract substitution as part of the "bait-and-switch" when assessing red flags for vulnerability to broker-induced hiring traps.

### D. Diplomatic Experience with Potential Class Members' Home Countries

26. As Ambassador, I regularly engaged on issues concerning forced labor/involuntary servitude/human trafficking from a variety of source and destination countries, including but not limited to the Dominican Republic, India, Indonesia, Jamaica, Moldova, and the Philippines. I regularly interacted with the Assistant Secretary for East Asia and the Pacific, the Assistant Secretary for Eurasian Affairs, the Assistant Secretary for South and Central Asia, and the Assistant Secretary for Western Hemispheric Affairs, and the corresponding country "desks" within their bureaus. Each year as Ambassador, I was responsible for country narratives not just as a whole, but specifically pertaining to the Dominican Republic, India, Indonesia, Jamaica, Moldova, and Jamaica. I coordinated U.S. diplomatic engagement with these countries in the wake of the annual Report, including bilateral engagement, legislative reform support, and funding of training and capacity-building efforts. My staff and I also worked with these countries within multilateral fora such as the United Nations or regional fora such as the Association of Southeast Asian Nations (ASEAN), the countertrafficking efforts of which Indonesia and the Philippines play key roles; the South Asian Association for Regional Cooperation (SAARC), in which India plays a central role; the Caribbean Community (CARICOM), where Jamaica takes a leadership position and the Dominican Republic has Observer status; and the Organization for Security and Cooperation in Europe (OSCE), with which I have worked on Moldovan trafficking issues since the late 1990s. I led our engagement on worker protection policies in cross-regional multilateral migration fora such as the Bali Process and the Colombo Process, which bring together source and destination countries to address abuses and migration needs.

27. I undertook diplomatic engagement throughout the years with representatives of the Governments of the Dominican Republic, India, Indonesia, Jamaica, Moldova, and the Philippines, among other countries, meeting from the Presidential and Cabinet level to line officers and social workers and embassy staff. I have traveled to the Philippines, the Dominican Republic, and Jamaica for high-level meetings as well as regularly interacting with those countries' Ambassadors and those of Indonesia, India, and Moldova in Washington DC, and supervised my staff in their travel to and interactions with these countries' officials. I have conducted hands-on training for Dominican and Filipino front-line officials, and funded or administered projects in the Dominican Republic, India, Indonesia, Moldova, and the Philippines. I have met with Indian, Indonesian, and Filipino migrant workers and the diplomats working to protect them in destination countries, especially in the Arab Gulf. My staff and I worked closely with the Bureau of Democracy, Rights, and Labor on their annual Human Rights Country Report and with the Bureau of International Narcotics and Law Enforcement on their anti-corruption activities in these countries. I continue to monitor the situation in these countries and with their citizens abroad through regular media monitoring, contact with non-governmental organizations and former and current governmental officials.

28. I am therefore deeply familiar with the situation in the Dominican Republic, India, Indonesia, Jamaica, Moldova, and the Philippines during the relevant time period, as to: prosecution and other enforcement activities; forced labor; involuntary servitude; document servitude; labor trafficking; sex trafficking; migrant labor; overseas workers, recruitment, immigration law and enforcement; protection of abused workers, both domestically and those who return from overseas; any prevention efforts that may have been undertaken; police and other official corruption; and the state of these countries' involvement in multilateral counter-trafficking, forced labor, and migration efforts.

### E. Experience Concerning "Guestworker" Programs

29. In the United States and in other countries, foreign nationals admitted under work-based visa ("guestworker") programs are recognized as particularly vulnerable to employers who are willing to harness the structure of the program to discipline or manage their workers, and while there may be variation in the facts of each particular case, such abusive situations are common and recurring fact patterns in the practice of human trafficking law. The patterns and common challenges of guestworker cases are well-known by investigators, prosecutors, and those who work with victims in forced labor and human trafficking situations, whether providing social services or legal counsel. I have gained such expertise, starting as a practitioner. In the prosecutive roles discussed above, I supervised, consulted upon, or personally prosecuted a number of cases involving such immigration programs, including but not limited to *United States v. Kwon* (CNMI guestworker provisions), *United States v. Kil Soo Lee* (American Samoa guestworker provisions), *United States v. Maksimenko* (J-1), *United States v. Bradley* (H-2B), *and United States v. Al Jader* (A-3).

30. There is not simply one "guestworker" law in the United States, but several different categories. I am familiar with the various "guestworker" provisions through which foreign nationals enter the United States, and with the abuses that occur within the various programs. At the Justice Department, I prosecuted, supervised prosecutions, and investigated cases in the A, B, G, H, J, and R classifications, and participated in policy development to address shortcomings in such systems. As principal immigration counsel for the House Judiciary Committee, I worked with the business community and immigrants' rights groups alike to monitor and balance the interests in seasonal workforces in quarries, forestry, and hospitality, and worked closely with the hospitality industry and travel/tourism associations to meet cyclical labor needs in dense seasonal tourism economies such as Cape Cod, Northern Michigan, and the Ozarks.

31. As Ambassador, I reported on problems in guestworker programs in the United States and in other countries in the annual Trafficking in Persons Report, and with my counterparts from the Bureau of Consular Affairs, the Office of Protocol, and the Bureau of Educational and Cultural Affairs I participated in reform processes for A-3 and G-5 visa programs, as well as J-1 programs and work-based classifications in general. I led diplomatic engagement with sending countries – especially the Philippines, Nepal, Bangladesh and Burma – on how to bring labor recruiting practices such as false promises, fees that create up-front debts, and material change in circumstances once on the jobsite that put workers' at risk of serious financial harm. As a professor, I teach the statutes and cases in which misuse of guestworker visas provided a portion

of the coercive force that compelled service and serve as a consultant to a large study that is tracking guestworker treatment and the activities of labor recruiters in five recruitment corridors around the world.

32. In the course of investigating and prosecuting the above-mentioned cases, I personally interviewed hundreds of human trafficking survivors, as well as dozens of employers, recruiters, and others who had engaged in human trafficking activities. On the basis of these interviews, review of the current state of the field throughout the last twenty-five years, and the practice, diplomacy, and teaching set forth above, I have identified trends and commonalities of both structural and direct coercion across different sectors, including but not limited to: breach of contract, withholding of contracts, or substitution of contracts during the recruitment or transportation stages; overt threats and violence; imbalances of power between guestworkers, recruiters, and their sponsoring employers; the particular vulnerabilities of workers on guestworker visas in the United States and other countries; the effect of State power and political corruption on workers' willingness to come forward; and the effect on foreign workers of both explicit threats and more subtle reminders of the potential for law enforcement or deportation.

### F. Experience in Assessing Claims of Compelled Service, and Common Defenses Thereto

33. In investigating and prosecuting cases, as well as through teaching and coordinating U.S. policy, diplomacy, and training, I became familiar with the common defenses to allegations of abuse in both civil and criminal cases, such as the ability of the worker to come and go, instances of entertainment or enjoyment during the period in which they were held in service, inclusion in family or enterprise social events; payments; initial consent or contractual acquiescence; the asserted absence of force, fraud, or coercion; asserted cultural differences; the immigration status of the alleged victim; the defense of consent; an asserted belief that the alleged victim was an adult; the status of the defendant in relation to subcontractors or other business entities, and even leaving the country and returning to their employers' service.

34. These defenses are recognized as common enough in the human trafficking practice area that they are set forth in bench books for judges[9] as well as being routinely included in trainings for prosecutors and investigators. I am familiar with training materials and standard operating procedures for US and international actors in how to analyze the effect of different types of coercion on vulnerable workers. I have developed many such training materials myself or as the head of relevant team, and funded research and development of materials in victimology, psychology, and the investigation of human trafficking. In the international arena, I have served on the United Nations experts ' group for the development of investigations training curricula and the United Nations Model Trafficking Law, as well as funding and supporting research and curriculum development by relevant U.N. offices. I am thus familiar with training materials and the state of research as it pertains to common defenses raised by defendants in human trafficking matters, and the psychological underpinning of employers and workers' relationships that explain such behavior.

[9] Am. Soc'y Int'l Law, BENCHBOOK ON INTERNATIONAL LAW (2014) at III.E-46 et seq.

## II. OPINIONS AND EXPERT TESTIMONY TO BE EXPRESSED

35. In this matter, I am offering my expert testimony regarding forced labor/involuntary servitude/human trafficking/labor recruiting in American and international practice, with an emphasis on forced labor and immigration law, including A) the common legal and factual issues surrounding the defendants' interlocking businesses and work-based visa scheme relevant to class certification in this matter; and B)issues concerning the application of the Chapter 77 statutes, including what legal and factual issues will likely be raised in assessing the plaintiffs' claims and what are typical, common, and thus reasonable responses of workers to direct and structural forms of coercion, especially in situations involving work-based visa categories (here, the "J Visa" and "H Visa" categories) and resultant programs and practice.

36. I offer such expert testimony to assist the Court in its determination of class action status based on my knowledge, skill, experience, training, and education. I have arrived at this testimony by applying the principles and methods commonly used in diplomacy, law, investigations , and victim care aspects of the human trafficking field in international and United States practice, as well as through the knowledge and expertise gained by me as a diplomat, prosecutor, policymaker, and academic who has practiced at the leading-edge of this field since 1994.

### A. Issues Concerning Class Certification

37. In a case also alleging forced labor across a broad group of individuals subjected to similar structural coercion in a common pattern (in that case, detainees in a privately-run immigration detention center), the Tenth Circuit upheld class certification, analyzing the requirements of Rule 23(a) and (b) in a forced labor context. This Report will address the issues and facts relevant to commonality, typicality, predominance, and superiority.

38. *Menocal v. Geo Group*, 882 F.3d 905 (10th Cir. 2018), In concluding that allegations involve common questions of law or fact, there needn't be absolute uniformity – **commonality** can be found even when there is "only a single question of law or fact common to the entire class." *Menocal*, 882 F. 2d at 914. It is my understanding from reviewing the complaints in these matters that the plaintiffs will seek to prove, *inter alia*, that they were recruited using false pretenses and kept in conditions of financial vulnerability, were bound by the terms of their guestworker visas, were commonly confronted upon arrival with contract substitution and different terms and conditions of employment after they had already become indebted and traveled to a foreign country, and worked under threat of financial, physical, and emotional harm -- all so that the Schumachers could maintain a controllable foreign workforce across their various enterprises. Because the trafficking and forced labor allegations flow from this ongoing scheme and the terms of the guestworker programs that the Schumachers' misused, the allegations raise issues of law and facts, which while given granularity by each worker's experience, are common across the proposed class.

39. From reading the complaints in this matter and reviewing certain depositions and discovery materials, just a few of the legal and factual issues that will likely be confronted in this case include (but are not limited to): the attributability to the defendants of their in-country

recruitment partners' promises to the students and workers; piercing the corporate veil of the defendants' myriad enterprises; the defendant's compliance and non-compliance with the rules and purposes of the H-2 and J-1 visa programs; the defendants' knowledge of the visa programs and American law and the resulting power imbalance between them and the students and workers; defendants' real and perceived ability to harness the power of the government through immigration programs and law enforcement affiliation; defendants' fraudulent substitution of contracts/wages/assignments/hours; the effect of defendants' and their agents' fraud on their employment scheme being coercive, including their knowledge of the students and workers' debt load and circumstances in the sending country; the effect of defendants' threatening behavior toward and around the students and workers; how to interpret the various statements made to groups or disseminated amongst the groups (who were living and working together despite differences in national origin); damages and remedies; the particular vulnerability of H-2 and J-1 workers and students to manipulation and coercion by changing their hours and earnings as punishment or as part of dominance-signaling by defendants, having already reneged on promised wages and conditions through contract substitution; the reasonableness of the students and workers' assessment of the risk of serious harm should they disobey or leave; and the effect of the defendants' use/abuse of the law and legal process to discipline, punish, and maintain a workforce. These questions – mostly flowing from defendants' ongoing and standard practice within and across their various enterprises and varying only slightly among the students' and workers' home countries -- are capable of class-wide resolution.

40. A uniform policy or practice on the part of a defendant may be the type of evidence shared across the class to allow for certification. *Menocal,* 882 F.3d at 920. The legal and factual issues surrounding the defendant Schumachers' interlocking businesses and work-based visa scheme not only raise common questions across the individual workers (and even groups of workers) in the various interlocking Schumacher employment and recruitment enterprises, but also will demand common answers. "An allegation that the defendant engaged in a common scheme or practice to coerce labor from putative class members may be sufficient to establish that the class's claim is susceptible to class-wide resolution." *Rosas v. Sarbanand Farms*, *LLC*, 329 F.R.D. 671 (W.D. WA, 2018)(certifying class involving several tranches of H-2 workers). *Rosas,* 329 F.R.D. at 689.

41. For **typicality** to be present, the fact situations of members of the class can differ, "so long as the claims of the class representative and class members are based on the same legal or remedial theory." *Menocal,*882 F.3d at 914. The duration of the harm is not determinative of typicality, so long as the questions are common. While there may be factual variation in their particular experiences (for instance, while students and workers were routinely subjected to contract substitution after they had arrived in a foreign country, in debt and dependent on the defendants, some also had assignments and earning potential curtailed as punishment for minor offenses such as tardiness or clumsiness), the potential class members' overarching legal theory – that the Schumachers obtained and maintained their labor and services through a scheme of interlocking enterprises, false recruitment, misuse of the work-based visa programs, contract substitution, and an overarching atmosphere of coercion – "does not change based on their personal interactions [with defendants]." *Menocal,* 882 F.3d at 927. Having been subjected to similar promises, fees/costs, and recantations by the defendants in the Schumacher's recruiting and placement roles, and laboring in the defendants' Clinton-area enterprises under similar contract substitution,

isolation, and coercion, from my review of materials in this matter the proposed class representatives appear typical of the members as a whole.

42. As to whether the common, aggregation-enabling issues in this matter are more prevalent than any non-common ones (**predominance)**, a majority of the issues that will likely be at issue in this case, as set forth in paragraph 39, appear to be common issues flowing from defendants' recruitment and employment schemes, which were applied across the board as well as to particular students and workers. In *Menocal*, the Tenth Circuit recognized that plaintiffs in a 1589 case will have to "prove that an unlawful means of coercion caused them to render labor," and that this causation element is "susceptible to class-wide proof" that would satisfy the predominance requirement. *Menocal,* 882 F.2d at 818. Indeed, the claims could be established through common/shared circumstantial evidence, flowing as they do from a common scheme.

43. Such treatment for class certification of common circumstantial evidence of a defendant's fraudulent misrepresentations, *CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076 (10th Cir. 2014), or forced labor practices, *Menocal*, 882 F.3d at 918, is in keeping with how caselaw interpreting the Chapter 77 offenses allows for the aggregation of workers' experiences. In Chapter 77 offenses, a trier of fact can not only ascertain the particular situation of one worker, but the general atmosphere of intimidation based on what workers heard from others, as well as the defendants' continuing course of conduct among different tranches of workers. Similarly, class certification in this matter would comport with an accurate understanding of the defendants' ongoing scheme to obtain fee revenue and a compliant workforce by overpromising working and living conditions, treating the foreign students and workers as a fungible workforce across an interlocking web of businesses, substituting wage structures and work assignments different from what was promised, placing the workers in risk of economic harm, failing to meet the purposes of the visa programs utilized, and taking advantage of coercive forces both structural and direct.

44. Finally, **superiority** is also present when class certification is the best means through which to vindicate of rights of groups of people -- the class action device being especially pertinent to vulnerable populations. *Menocal*, 882 F.3d at 915. The forced labor and trafficking statutes of Chapter 77, as well as the civil remedy provided in Section 1595, are rights-based provisions, having been promulgated via Congress' power under the Thirteenth Amendment's Enactment Clause. UNITED STATES CONSTITUTION, AMDT. XIII, SEC. 2. In its resolution marking Trafficking and Modern Slavery Prevention Month in 2019, the Senate characterized that action as follows:

> [U]nder the authority of Congress to enforce the 13th Amendment to the Constitution of the United States "by appropriate legislation", Congress, through the Trafficking Victims Protection Act of 2000 (22 U.S.C. 7101 et seq.), updated the post-Civil War involuntary servitude and slavery statutes and adopted an approach of victim protection, vigorous prosecution, and prevention of human trafficking, commonly known as the "3P" approach.

Class certification is thus particularly appropriate in multi-victim trafficking/servitude cases where, as in the instant case, foreign workers' and students' rights are alleged to have been

violated by employers' or recruiters' fraudulent misrepresentations and coercive tactics spread not only by direct confrontation but by word of mouth, standard practices, and a workforce-wide commonality of circumstantial evidence.

## B. Trafficking and Forced Labor Law and Practice

### 1. Chapter 77 in Summary

45. While the task of a class determination is not to make a determination on the merits of the putative claims, an understanding of the relevant law and practice in the areas of forced labor and trafficking, as well as its interplay with the plaintiffs' allegations, may be of assistance in determining Commonality, Typicality, Predominance, and Superiority. Since the enactment of the TVPA and promulgation of the United Nations Protocol in 2000, there has been a global consensus that compelled service, whether triggered by debt, overt force and threats (including of immigration consequences), psychological manipulation, or document confiscation, should be prohibited, and that the particular vulnerabilities and circumstances of victims should be taken into account.

46. The TVPA supplemented historical slavery and involuntary servitude statutes set forth in Chapter 77 of Title 18 of the United States Code. Taken as a whole, the Chapter penalizes those who would carry out (or benefit from) a scheme, plan, or pattern to provide, obtain, or maintain the services of another through coercive means for any term, no matter how short. The statutes set forth in Chapter 77 are used in the civil context through the application of Section 1595.[10] The standards and caselaw are the same whether a case is brought criminally or civilly, while the burden of proof is of course higher for criminal prosecution. Prior prosecution or administrative action by the government does not bar subsequent action by a private plaintiff, and the declination of a prosecution by the government does not bear on the merits of a subsequent civil suit under these statutes.

47. Domestic legislation and criminal and civil enforcement structures in the United States focus on the abuse of vulnerabilities and debts, the use of force and coercion (and threats thereof, both direct and implied), the use of false or inflated promises of salary or working conditions as a way to induce the workers to enter into employment, the taking advantage of immigration status, lack of proper documentation, the inability of workers to leave their employers' service without suffering serious harm, and fear of being deported or sent home in debt before being able to earn money promised to them. This is in keeping with *United States v. Kozminski*, 487 U.S. 931 (1988), in which the Supreme Court noted that the particular vulnerabilities of a child or immigrant victim should be considered in assessing whether their will was overborne, and the TVPA, which through the enactment of Section 1589 clarified that service can be proven involuntary if it is obtained or maintained through psychological manipulation, threats of deportation, and other subtle forms of coercion. In *United States v. Kalu*, 791 F.3d 1194, 1199 (10th Cir. 2015), the Tenth Circuit upheld a jury instruction that

---

[10] Section 1595 was created by the Trafficking Victims Protection Reauthorization Act of 2003, P.L. 108-193 (Dec. 19, 2003), and further supplemented by the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, P.L. 110-457 (Dec. 30, 2008).

directed consideration of whether "as a result of [defendant's] use of the unlawful means described above the person named in the count continued to provide labor or services where if [he] had not resorted to those unlawful means that person would have declined to perform additional labor or services," encouraging the jury to "consider all of the attendant circumstances in determining whether the person chose to perform the labor or services voluntarily or involuntarily."

48. Modern human trafficking law and practice regularly stress that: initial agreement to perform the particular service is not a waiver of subsequent involuntariness; victims have no affirmative duty to attempt escape; a climate of fear can override a person's decision-making, the period of forced labor does not to be long, or all-encompassing, and acts of kindness or evidence of good days or lack of complaint do not tell the entire story of whether someone's will had been overborne.

49. Concepts set forth in cases brought under the pre-existing slavery and involuntary servitude statutes; such as Section 1584, apply to the newer Chapter 77 statutes, such as Sections 1589 and 1590. *See United States v. Bradley*, 390 F.3d 145 (1st Cir. 2004) (Jamaican H-2 workers held in forced labor as lumberjacks through threats of immigration consequences). *Bradley* made it clear that rulings from prior slavery cases were controlling, such as the defendants' creation or taking advantage of a climate of fear that permeated a workforce, *United States v. Booker,* 655 F.2d 562 (4th Cir. 1981) and *United States v. Harris,* 701 F.2d 1095 (4th Cir. 1983); the lack of an affirmative duty to escape on the part of a victim, *United States v. Bibbs*, 564 F.2d 1165 (11th Cir. 1977); and the effect of defendant 's threats to or abuse of third parties in creating a climate of fear, *United States v. Alzanki,* 54 F.3d 994 (1st Cir. 1995). Cases such as *United States v. Calimlim*, 538 F.3d 706 (7th Cir. 2008) have sharpened understanding of these concepts in applying Section 1589 (warnings of possibility of arrest or deportation are not valid warnings of legitimate consequences but are mis-use of the legal process for the employers' own ends).

50. *Bradlev* is illustrative in the instant case: Bradley was guilty of forced labor even though the seasonal H-2 workers had been able to make friends in the community, and even go into town and go dancing in local bars -- the Jamaican workers' fear of the defendants over-rode any enjoyable or personal moments or seeming freedom of movement they had while in servitude. *See also United States v. Farrell,* 563 F.3d 364 (8th Cir. 2009)(upholding conviction despite Filipino hotel workers having been allowed occasionally to go to bar, bowling, and even to return home to Philippines for a short period of time; defendants' ominous statements that the only way the victims would go home would be "in a box" contributed to climate of fear).

51. Under Chapter 77, a victim need only be proven to have held in compelled service for "a term" - that is, any period of time. Therefore, instances within their overall length of services in which a servant's burden may have lifted or conditions may have improved do not shield their tormenters from liability. *United States v. Djoumessi,* 538 F.3d 547 (6th Cir. 2008) ("Djoumessi's argument [concerning opportunity to escape] still falls short because a rational trier of fact could conclude that Pru's labor was involuntary for at least some portion of her stay. And that involuntary portion would suffice to sustain the conviction."). *See also U S. v. Pipkins,* 378 F.3d 1281, 1297 (11th Cir.2004) (upholding conviction in which victim was not always working for

defendant: "Section 1584 requires that involuntary servitude be for 'any term,' which suggests that the temporal duration can be slight.").

52. It is thus a generally-accepted principle of human trafficking law that once a persons' will has been overborne and a climate of fear has been established, continued service, opportunity to come and go, or even payment by the defendants do not excuse liability for any time period in which they labor under coercive conditions. This is not just in U.S. law. The United Nations "Palermo Protocol" addresses this concept as follows: "[t]he consent of a victim of trafficking in persons to the intended exploitation … shall be irrelevant where any of the means set forth [e.g., coercion, fraud, deception, abuse or power or of a position of vulnerability] have been used."

53. In U.S. practice, when assessing whether workers reasonably believed they had no way to avoid continued service, the finder of fact must consider the workers' unique circumstances and vulnerabilities. While strongly subjective, this test has objective elements and has therefore sometimes also been described as a hybrid test, given that the trier of fact must assess not only the workers' subjective situation but also whether reasonable people in the victims' circumstance would have concluded they had no reasonable alternative but to serve or to remain in service. *See U.S. v. Rivera,* 799 F.3d 180, 186 (2d Cir. 2015). That "reasonable person" inquiry makes these cases appropriately aggregable for purposes of class certification, especially when the circumstances flow from uniform policies and practices of the defendants in their intertwined labor recruiting and employment schemes.

54. In Chapter 77 cases, what matters is the defendant 's creation and exploitation of a climate of fear through an atmosphere of coercion to hold someone in compulsory service, or profiting from a situation in which someone was so held. If an employer took advantage of the various coercive means set forth in the various Chapter 77 offenses or the TVPA's definitions, the worker may have been still been able to enjoy some normal or good experiences during a period of servitude that was nevertheless involuntary. Whether a particular quantum of coercion meets a threshold of compelling service is for the trier of fact. *See, e.g. United States v. Veerapol*, 312 F.3d 1128 (9th Cir. 2002)("We decline Veerapol's invitation to construct a minimum level of threats or coercion required to support a conviction beyond *Kozminski's* plausible compulsion requirement. Instead, we leave this evaluation squarely in the hands of the jury."). Coercion can be directed to the particular worker, or may be collective, as workers' understanding and perceptions of the workplace as dangerous or coercive arise from things they have learned of from others. Rumors and reputation can contribute to a climate of fear.

55. The traditional Involuntary Servitude statute, Section 1584, requires that the coercive force used to hold the person in a condition of servitude be force, threats of force, or threats of legal coercion tantamount to imprisonment (such as deportation that would involve detention). Section 1584 is not pled in this case, and those higher levels of coercion need not be proven. Rather, the Forced Labor statute, Section 1589, was enacted to allow coercion to be shown by establishing a scheme, plan, or pattern used to make the victim feel that they had no reasonable alternative but to perform (or continue to perform) the service lest they or another suffer serious harm; or by establishing the abuse or threatened abuse of the law or legal process. Thus, "the TVPA not only protects victims from the most heinous human trafficking crimes, but also [from] various

additional types of fraud and extortion leading to forced labor." *Nunag Tanedo v. E. Baton Rouge Parish School Board*, 790 F. Supp. 2d 1134 (C.D. CA 2011).

56. Chapter 77 offenses are not limited just to the person who uses coercive means, but reach those persons or entities who benefit or profit from such activity, whether knowing or in reckless disregard of the situation. In recognition that such schemes often start at the time of recruitment, the Trafficking statute, Section 1590, was promulgated in order to reach all of the acts involved in recruiting, harboring, transporting, or otherwise facilitating the servitude of another. Where an employer's combination of structural coercion and control over a foreign workforce results in profiting from the workers' inability under the guestworker visa program to find alternative employment – especially when as in this case the employer purposefully acts both as recruiting agency/sponsor and the employing entity, and carries out contract substitution themselves, they are properly held responsible under the TVPA statutes.

### 2. <u>Schemes, Plans, Patterns -- and Ominous Statements</u>

57. One of the issues that need to be examined in a trafficking/forced labor claim is how the structural circumstances and direct actions compel labor. Unlike kidnapping or false imprisonment, the legal concept of forced labor does not mean being sequestered or confined. It does not mean that it is impossible to leave service, or that leaving service negates the time in which labor was compelled. Forced labor only has to be for a term – it is not a concept that is for life, or for a specified long period of time. That there was a time in an employment relationship where there was no reasonable alternative to perform (or continue to perform) or to face serious harm does not mean that every day of that relationship involved overt coercive force. That is especially relevant where, as in these matters, the plaintiffs were in an overarching recruitment and employment scheme controlled in its various aspects by the defendants.

58. In the present case the students and workers appear to have been recruited with certain promises of what they could earn, representations were made not just to them but to the Foreign Service Officers who issued the visa and to the J-1 or H-2 program administrators as to how much money they would earn. Once they had arrived in Oklahoma and were bound to the Schumachers' employment by the terms of their visas, wage structures were changed and hours and assignments were used to punish or discipline. Much as in another Tenth Circuit case, *United States v. Kalu*, 791 F.3d 1194, 1199 (10th Cir. 2015), the Schumachers' forced labor scheme "relied on a number of fraudulent misrepresentations that allowed [them] to bring [the foreign students and workers] to the United States, keep them in the country, and profit from their labor." The interlocking Schumacher enterprises, all controlled by the same people and involved in overseas labor recruiting for years, cannot reasonably claim to not know of the debt practices, much less of the promises made by their partners overseas.

59. Given the interlocking nature of the Schumachers' ongoing scheme, statements and warnings about the immigration consequences of leaving the program or having their status terminated by the Schumachers are properly assessed as a threat of serious harm and as an abuse of law or legal process. The Schumacher companies got the students and workers to put themselves in a position of financial risk, with loans from loan sharks and extended family. The Schumachers knew that the debt-encumbered students and workers, having traveled to the United States and made their

way to Western Oklahoma, were aware of the restrictive terms of the work-based visa program, Indeed, the Schumachers and their employees made sure that the foreign workers and students knew of the consequences of leaving their employ, and subsequently used work assignments, wage manipulation, changes in hours, changes in wage structure (for instance, tips versus hourly), deductions, and other means to keep the employees compliant and working. As the State Department characterized it in discussion of guestworker programs in the U.S. Narrative of the 2011 Trafficking in Persons Report, "indebtedness prior to arrival in the United States is a common mechanism of making victims vulnerable to control." Once one is indebted and subject to deportation if they quit the job that they went into debt to acquire, they are particularly vulnerable, as the consequences are no longer simply financial, but carceral.

60. For instance, the inability of the workers to make the amounts promised would have been clear via the repeated carry-over in deductions for housing of student intern/trainee participants who had had their hours cut or work assignments changed for minor infractions such as being a few minutes late. As has been seen in prior cases in the Tenth Circuit, this created a pervasive atmosphere in which the foreign students and workers were in fear of "legal action, revocation of their visas, deportation, and financial ruin," as well as some workers having a "fear of physical harm." According to the Tenth Circuit, "[t]hese are precisely the types of threats that could 'compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.'" *Kalu*, 791 F.3d at 1212.

61. Looming over all of the deductions, non-payment of wages, or shifting work assignments and punishments were the prospect of serious financial harm as well as deportation if they were terminated from the job. Threats to terminate employment, or even firing people, are not the same in a guestworker situation; such statements are not promises to release someone from compelled service, but instead heighten the serious harm they might face on the outside. Whether overseas or in the United States, the prospect of a guestworker being fired (and thereafter deported) is a common method to compel their continued service. *See, e.g. Adia v. Grandeur Mgmt., Inc*., 933 F.3d 89, 91 (2d Cir. 2019) (threat of serious harm in "an immigrant lawfully in this country on a temporary guest worker visa alleging that his employers threatened to revoke their sponsorship, thereby subjecting him to deportation"); *Nunag Tanedo*, 790 F.Supp.2d at 1146. ("In other words, after incurring $5,000 in debt, if Plaintiffs lost their teaching jobs they would be unable to ever repay the debt. Based on Plaintiffs' allegations it is not surprising that Plaintiffs not only wanted, but *needed* to continue working in the program.").

62. That information about immigration consequences of leaving employment – whether voluntary or having been dismissed – might also be an accurate presentation of the immigration program or law does not insulate an employer from a Chapter 77 charge. *United States v. Calimlim*, 538 F.3d 706, 713 (7th Cir. 2008) ("Their vague warnings that someone might report [her] and their false statements that they were the only ones who lawfully could employ her could reasonably be viewed as a scheme to make her believe that she or her family would be harmed if she tried to leave. That is all the jury needed to convict."). The immigration consequences that an unscrupulous employer can trigger under guestworker programs such as the J-1 or H-2 categories create an environment rife for exploitation.

63. Indeed, warnings of immigration consequences, when used to maintain a compliant and cheap workforce, are not mere statements of fact, but are instead “abuse of law or legal process” – one of the bases of liability under Section 1589, that could reasonably support a conviction or judgment. Under Section 1589, “[a]buse of the law or legal process” is the “use of threats of legal action, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed in order to coerce someone into working against that person's will.” *Shukla v. Sharma*, 2012 WL 481796, at *2 (citing *United States v. Garcia*, No. 02–CR–110S–01, 2003 WL 22956917, at *4– 5 (W.D.N.Y. Dec. 2, 2003)). *See also Calimlim*, 536 F.3d at 713 (“warnings” about [immigration] consequences were directed to an end different from those envisioned by the law and were thus an abuse of the legal process … within the scope of § 1589(3).”). This matter alleges ongoing and repeated warnings of immigration consequences of leaving Schumachers’ employment – warnings that a finder of fact will have to determine were either mere cautionary statements, or were structured and had the effect of maintaining students and workers in service of Schumachers’ various enterprises.

64. The Western District of Oklahoma has recognized this aspect of Section 1589. In its unpublished order denying certain defendants’ motion to dismiss (a subsequent published opinion deals with other defendants on other aspects of the case), the Western District noted that “although an employer may legitimately advise an employee that termination may result in a change in visa status, utilizing that fact to force labor is not permitted by the law.” *Mojsilovic v. Oklahoma ex rel. Bd. of Regents*, No. CIV-14-886-R (W.D. Okla. Apr. 3, 2015).

65. Statements about immigration consequences used to compel labor are appropriately for the trier of fact. *See Camayo v. John Peroulis & Sons Sheep, Inc.,* 2012 WL 4359086, 19 Wage & Hour Cas.2d (BNA) 1382 (D. Colo. 2012)(“this Court is persuaded that the question of whether statements (and actions) by an employer must be viewed in light of all the surrounding circumstances, and thus, resolution of whether a certain statement amounts to an abuse of the legal process is one that is particularly difficult on the sparse record of a motion to dismiss.”).

66. Other threats with an underlying element of truth appear to have had an impact on workers’ perceptions of whether they were truly free to leave Schumacher enterprises’ employment without serious harm. For instance, Walt Schumacher is alleged to have told the workers that the only way they would go home without paying for their airfare was if they “went home in a box,” or words to that effect. While Walt Schumacher has characterized this in deposition testimony as simply informing the workers of his obligation under the recruitment contract to ensure that their remains were returned if something happened to them in the United States, context and purpose matter, and will need to be assessed by the trier of fact. This is not only redolent of language found by the Eighth Circuit to be a Section 1589 threat to Filipino workers in *United States v. Farrell,* 563 F.3d 364 (8th Cir. 2009), but also similar to threats and harassment noted by the Western District of Washington in recently certifying the *Rosas* class action case, *supra* at paragraph 45 (H-2 workers told in meetings that they were expected to be in the fields unless they were “on their death beds.”).

### 3. Law Enforcement in Context of a Foreign Workforce

67. So too, there is a commonality that flows from Walt Schumacher's status with the local Sheriff's Office. His law enforcement affiliation is particularly relevant to the workers' perceptions of their relevant power, with a constant menace of official action or violence. The workers – from places where the police forces have a widespread reputation of corruption – would reasonably fear the power of an employer who could harness the power of the state more so than they would if they were simply recruited via APEX and then worked in enterprises unaffiliated with the Schumachers or in a location other than the Schumachers' small hometown. Coming from countries where firearms are not prevalent and where police are corrupt, seeing Walter Schumacher armed and in uniform, driving a patrol car, associate with groups of police, or being informed that he had a gun in his car would only heighten the apprehension and assessment of Schumacher's power, and would also lend credence to workers' fears that they were being blocked in Clinton even from legitimate second jobs, permissible in the J-1 program.

68. It is reasonable for the workers in this matter to have been more afraid of Deputy Walter Schumacher than a run-of-the-mill employer, given the status and perception of police in their countries of origin. The Dominican Republic is known for corruption, with police officials using arrests to solicit bribes, and widespread extortion of foreign workers by immigration and police authorities. Widespread corruption at all levels of government is a commonly known problem in India, with "the complicity of public officials in human trafficking remain[ing] a serious problem" impeding progress in confronting trafficking according to the 2011 TIP Report; studies in the late 2000s indicated over 50% of Indians having reported paying bribes to police. In Indonesia, according to the Human Rights Report, corruption is "a part of daily life." Victims' access to court is limited by "widespread corruption and political influence," and the police carry out warrantless surveillance, break into homes and offices, and use excessive force against civilians.

69. According to the United States Department of State's Human Rights Reports, there is a culture of impunity for police corruption and abuses in Jamaica, with corruption being considered as "the largest single impediment to … sustained economic growth and development." Moldova, where impunity is a "major problem," is one of the most corrupt countries in Europe – the only European country in which over 40% of households report having to pay bribes when accessing basic services. According to the 2012 Human Rights Report, "corruption…undermine[s] the credibility and effectiveness of the police and the judiciary as well as respect for the rule of law" and "police torture and mistreatment" of detained persons posed a serious problem. Corruption is endemic in the Philippines; in 2010-2012, the country's Corruption Index scores ranged from a 24 to 34 (out of 100) indicating a very serious problem of corruption; the TIP Report expressed grave concern that cases involving official corruption might be initially brought, but get dismissed or do not proceed.

70. Accordingly, no matter their country of origin, many of the workers and students recruited and employed by the Schumachers come from places where police corruption and impunity are a major problem and simply a fact of life. For people of this background, familiar with law enforcement in their home countries and already in a position of vulnerability given the defendants' recruiting activities, their debt loads, the contract substitution they had faced, and the

terms of their visas, Walt Schumacher's status with the Sheriff's Office would reasonably had great resonance in their assessments of his power in assessing structural and overt statements as coercive. *See Alzanki*, 54 F.3d at 1008 (victim's understanding of police practices in prior country in which she served defendants was relevant to her assessment of threatening nature of defendants' statements).

### 4. Particular Vulnerability of Visa Categories J-1 and H-2

71. A number of the plaintiffs in these matters were brought into the United States by the defendants via the J-1 visa categories. The J-1 Visa category was created in order to "further foreign policy interests … by increasing mutual understanding between people of the United States and the people of other countries by means of mutual educational and cultural exchange experiences." Under the Summer Work and Travel Program, students from other countries are able to work and live temporarily in the United States, with time built into the program for travel and other cultural experiences at the end of their work period. The Trainee and Internship programs "are designed to allow foreign college and university students or recent graduates to come to the United States to gain exposure to U.S. culture and to receive hands-on experience in U.S. business practices in their chosen occupational field." Interns are to have an actual learning experience in their chosen field, and are therefore not allowed to work in "unskilled or casual labor positions."

72. The purpose of the J-1 visa category is not a purely economic one, and it is not just a way for employers to access temporary international labor outside of the H visa caps. Because the J-1 category was designed for cultural and educational exchange, it is administered by the State Department as opposed to the Department of Labor. There is not an up-front analysis of whether bringing in a foreign workforce will undercut local employment opportunities for American citizens, as in the H program. Rather, sponsoring agencies, certified by the State Department, are supposed to oversee job placement and cultural opportunities, and are supposed to serve as advocates – not employers -- for the students while they are in the United States. Interns/Trainees are to gain management experience in their chosen field – a far cry from the experience of Schumacher enterprise workers who were punished for small infractions by being assigned to dishwashing or prep work.

73. The State Department segments the various actors in the J-1 Summer Work and Travel and Internship/Trainee programs into their roles as sponsors, foreign entities, participants, and host employers. Employers in this context are not characterized in the same way as any employer, but are termed "host employers," just as the other exchange programs involve "host families." Just as with foreign exchange students, the sponsoring organizations are responsible for policing the host employers; having the sponsor and host employer as interlocking enterprises without an arms-length relationship is inconsistent with the programs' safeguards. In the instant case, APEX was not an arms-length exchange operator/sponsor, but during the time period in question served as an administrative means to obtain controllable workers for Schumacher enterprises in their hometown. This is not the spirit or purpose of the J-1 program.

74. Clinton, Oklahoma, is a town of less than 10,000 people, and unlike the typical J-1 placement locations (such as Cape Cod; Orlando; Northern Michigan; the New Jersey, DelMarVa, and

Virginia beaches; or the Ozarks) did not have an established seasonal tourism-based economy with the types of employment bubbles that tend to drive the need for temporary workers, whether under the J or H categories. In those known tourist areas, students under the J program are not isolated, but typically can interact with other students, from their own and other countries, who work in other businesses, as well as hundreds or even thousands of young Americans. Such established tourist sites not only have commonly employed J visa holders for years, but there are support structures in place in recognition of the possibility of abuse or the need for the young people to access services or help other than through their employer or sponsoring agency. For instance, churches in Rehoboth Beach, Delaware, host dinners for J-1 students four nights a week, and with the Chamber of Commerce undertake both outreach and protective activities for the students. *See* https://www.beach-fun.com/member-informationapplication/57-international-student-outreach-program. To my knowledge, and based on my review of depositions and discovery materials in this case, no such infrastructure, independent protection, or social/cultural activities were available in Clinton, Oklahoma.

75. In 2011, new procedures were announced in the Code of Federal Regulations for the Summer Work and Travel program of the J-1 visa category because of abuses within the program. As mentioned above, I and my office worked with the Bureau of Education and Cultural Affairs, which implements the Summer Work and Travel program, to address concerns that students were being mistreated by employers and sponsors were not meeting their responsibilities to protect the participants. As a result, the 2011 and 2012 programs brought stricter oversight of the working and living conditions of the students, the barring of certain job categories, a certification that the students would not displace American workers, and a recommitment to the cultural and exchange aspects of the program. It is my understanding that the Schumachers thereafter stopped utilizing J-1 workers in their businesses.

76. Critics of the J-1 temporary employment programs (the intern/trainee program, summer work and travel, the *au pair* program, etc.) rightly point out the problem of "visa-shopping," as U.S. employers in search of employees who they can exempt from U.S. or state labor laws and collective bargaining agreements test various visa categories to bring exploitable workers into their businesses. One of the other visa categories that is often used is the H2-B visa, for temporary/seasonal workers. The H-2 program has traditionally had roughly 60,000 slots per year, and requires a showing through the Department of Labor that it will not displace American workers (often through an attempt to hire Americans that falls short, typically via job notices in local newspapers of record) before the Departments of Homeland Security and State will approve such a visa.

77. Abuses in the United States' flagship guestworker (H-2) visa program are well-known, not only by investigators and prosecutors, but by those who have studied the program. A number of reports have called abuses to the public and policymakers' attention. *See, e.g.,* National Guestworker Alliance, LEVELING THE PLAYING FIELD: REFORMING THE H-2B PROGRAM TO PROTECT GUESTWORKERS AND U.S.WORKERS (Feb. 2012); Polaris, LABOR TRAFFICKING IN THE U.S.: A CLOSER LOOK AT TEMPORARY WORK VISAS (Oct. 2015); Southern Poverty Law Center, CLOSE TO SLAVERY: GUESTWORKER PROGRAMS IN THE UNITED STATES (2013); U.S. Gov't Accountability Off., GAO-15-154, H-2A AND H-2B VISA PROGRAMS: INCREASED PROTECTIONS

NEEDED FOR FOREIGN WORKERS (Mar. 2015). The H-2B program creates an environment that allows cover for those employers who would abuse their workers.

78. As the Southern Poverty Law Center has characterized it, under the H-2B program,

> [T]he balance of power between employer and worker is skewed so disproportionately in favor of the employer that, for all practical purposes, the worker's rights are nullified. At any moment, the employer can fire the worker, call the government and declare the worker to be "illegal."

As set forth above, the ability of the employer to harness the power of the immigration law is not unlimited; when an employer uses the control inherent in the H-2B program as part of a scheme, plan, or pattern to hold their workers in a condition of forced labor or other forms of servitude, they violate the criminal and civil provisions of Chapter 77. But, for a worker on the ground, far from home and in debt, typically unfamiliar with their rights in America or the prospect of protection through Chapter 77 or labor laws, the power of the employer to control immigration consequences is reasonably interpreted as plenary.

79. There is therefore a common issue of fact and law in this matter, amenable to analysis across the proposed class, as to what extent the Schumachers took advantage of this structural aspect of the H-2 program, especially in light of their co-mingling of the recruitment and employment functions concerning their H-2 workers and their corresponding knowledge of the recruitment promises, recruitment and travel fees, and debt load that the H-2 workers brought into the job with them.

## III. OPINIONS AND CONCLUSIONS

80. Given the above facts and my expertise in the area, I herein state the following opinions:

A. Aggregation of the causes of action in this matter is appropriate not only under the class action requirement, but also under the Chapter 77 statutes, which reach situations in which rumors, second-hand accounts, and collective circumstantial evidence can establish the coercive "climate of fear" that compels continued labor, especially in a situation in which their recruiter, J-1 sponsor, and employer were all the same people – the Schumachers, whose power over the students and workers was bolstered not only by the structural elements of the U.S. guestworker laws, but by their position in the community and Walt Schumacher's law enforcement status.

B. The students and workers, though from different countries and brought under various visa categories or programs, were subjected to a common scheme and pattern on the part of the Schumachers, who through their myriad interlocking recruiting, transporting, and employing entities recruited and brought people to a relatively isolated area of Oklahoma, substituted contracts that changed the calculus on which the students and workers had made their decision to take on debt and travel to the United States, restricted their activities and employment, and maintained them as a fungible and controllable workforce in lieu of local American workers through structural and overt coercion.

81. A review of materials in this matter and my expertise in the area leads me to the conclusion that the defendants carried out an ongoing pattern of bringing foreign workers to Clinton through employment-based visa programs, using APEX as a shell company. These were not arms-length transactions in which APEX could advocate for J-1 program participants against an independent host employer with whom the students or interns had issues, or in which H-2 workers could seek help from authorities or their recruiting company. Rather, the Schumachers and their agents, upon the students' and workers' arrival in the United States and transit to southwestern Oklahoma after having taken on debts commensurate with the promises that had been made to them, typically changed the terms of the students' and workers' employment through contract substitution; these contracts were presented to the plaintiffs only after they had arrived and had no other choice to accept the offer made by the people who had the power to have them deported and barred from subsequent entry. The Schumachers also at times used the modification of hours and assignment to punish minor infractions, knowing or in reckless disregard of the students' and workers' fees, debts, and reliance on the defendants' assurances. Review of Human Resources records demonstrates the same patterns happening repeatedly, across nationalities and tranches of workers, putting the Schumachers and their core employees on notice of the debt burdens not only from recruiting and associated fees, but simply from living costs in Clinton. The activities of the Schumachers as they grew their Clinton operation were not consistent with being cultural exchange sponsors who provide cross-cultural insights, train students and graduates in skills and expertise, or even to fill seasonal employment needs in an established tourist-dependent seasonal destination. Rather, the defendants' activities were carried out in order to maintain a low-paid, easily controllable, fungible and substitutable workforce for a web of businesses, through coercive structures and actions that had the result of obtaining and maintaining the students and workers in a condition of forced labor and rendering their recruitment, transportation, housing, and employment activities as a common human trafficking scheme.

82. I reserve the ability to supplement or amend my opinions, to state further opinions, or to rebut any subsequent allegations, depositions, expert reports, etc. that might arise in these matters.

Respectfully submitted, this 16th Day of June, 2020.

Luis CdeBaca

______________________________________

Ambassador Luis C.deBaca (ret.)

# EXHIBIT 1

## Resume

Ambassador Luis C.deBaca (ret.)
P.O. Box 362, Shepherdstown, WV 25443
amb@chamberslopez.com +1 (703) 470-1171

## PROFESSIONAL EXPERIENCE

**Yale University, Senior Fellow in Modern Slavery & Lecturer in Law**
Research fellowship at Yale's Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, researching modern and historical best practices in confronting labor and sexual abuse. At Yale Law School, teach history of 13th Amendment and the litigation and legislation of modern slavery including supply chains, financial flows, and Tariff Act implementation. *(Sept. 2018 – present).*

**Chambers Lopez Strategies, Director, Justice and Security Programs**
Consult with NGOs, financial institutions, the academy, and civil litigants to address modern slavery, financial crimes, and human rights. Consult with the United Nations, governments, universities, foundations, and businesses on supply chains, compliance, migration policy, and legislation. Serve as expert witness in civil and criminal actions in U.S. District Courts, and keynote speaker at academic and legal conferences. *(Feb. 2017 - present).*

**Open Society Foundations, Open Society Human Rights Fellow**
Study and advocate the intersection of human rights and law enforcement structures to address worker exploitation and abuse worldwide, especially through worker-driven social responsibility. *(Sept. 2017 – Nov. 2019).*

**U.S. Department of Justice, Director, Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking**
Managed implementation of U.S. Sex Offender Registration and Notification Act, setting and enforcing federal standards for notification and registration programs in States, Territories, and Tribes. Developed evidence-based practices for sex offender management. Oversaw grants and research projects to confront sexual abuse on college campuses. Chaired International Tracking of Sex Offenders Working Group, with INTERPOL and U.S. law enforcement. Coordinated between Tribes and federal government on information technology, information sharing, and re-entry programs. Managed grants and budgeting for approximately $20 million appropriated funds annually. Operated national sex offender public website and mobile app, with over 9 million unique visitors and 65 million page views. *(Dec. 2014-Feb. 2017).*

**U.S. Department of State, Ambassador-At-Large to Monitor and Combat Trafficking in Persons, and Senior Advisor to the Secretary of State**
Coordinated U.S. Government activities in the fight against contemporary forms of slavery. Served as Secretariat of Cabinet-level anti-trafficking task force and chaired interagency subcabinet process, working with White House, Cabinet agencies, and military commands to develop and

implement policies to increase prosecution, strengthen victim protection, sharpen intelligence gathering, establish linkages with business and civil society, and prevent modern slavery worldwide, including within U.S. diplomatic missions and overseas personnel.

As Director of Office to Monitor and Combat Trafficking in Persons, managed foreign assistance programs of approximately $30 million annually to fund law enforcement training, legal development, victim services, and worker's rights programs, including award-winning consumer- information platform slaveryfootprint.org. Led research team that investigated jurisdictions' efforts to combat forced labor and forced prostitution and issued Trafficking in Persons Report, an annual snapshot of over 180 countries' prevention, protection, and prosecution activities.

Expanded US diplomacy on issues of access to justice, law enforcement, migration, business standards, labor rights, and commercial sexual exploitation. Organized and led bilateral negotiations and diplomatic efforts, traveling to over 70 countries for meetings at the Head of State and ministerial level. Advised foreign governments on legal and policy reform, including legislative, administrative, and enforcement efforts. Conducted multilateral diplomacy in such fora as the United Nations, European Union, the Organization for Security and Cooperation in Europe, ASEAN, and the Organization of American States. With Russian counterparts, co-chaired migration sub-committee of US/Russia Bilateral Presidential Commission's Civil Society Working Group. Established and co-chaired bilateral working group with Myanmar Government on combating forced labor and sex trafficking as part of efforts to open diplomatic relations. Led U.S. negotiations with incoming administration of Pope Francis (2013) to align US and Vatican messaging and efforts against abuse of seafarers, agricultural workers, migrants, and persons in prostitution.

Managed public affairs and outreach to civil society including academia, service providers, legal community, and law enforcement; launching high-profile national initiatives with American Bar Association and National Association of Attorneys General, and international initiatives with the Holy See, International Labor Organization and International Organization for Migration, U.N. Office of Drugs and Crime, and INTERPOL. Convened business and governmental leaders to cleanse supply chains and procurement streams of slave-tainted goods and services. Pivoted federal efforts vis. business and ethical recruiting principles to norm-setting based on Government's market-making possibilities as a major consumer, leading development and promulgation of Executive Order 13627 (to prevent federal procurement of goods or services tainted through forced labor).

With the Diplomatic Security Service, Bureau of Consular Affairs, and Office of Protocol, strengthened policies to prevent abuse of workers by foreign diplomats, and to ensure that U.S. diplomats, military, and development personnel did not engage in trafficking or prostitution while deployed. Spearheaded efforts to assist victims on their journey to rehabilitation through support of the National Survivor Network, identification and support of international Trafficking in Persons Heroes, and by successfully leading formulation of U.S. National Victim Services Strategy. Worked with U.S. and international civil rights and labor rights communities to incorporate modern slavery into their activities. Maintained an aggressive presence in new media, including webcasts, chats, and blogposts, growing Office's global media impressions to almost 2 billion. Testified regularly before Foreign Affairs, Judiciary, and Oversight Committees in both US House and Senate. Testified twice before British Parliament in support of 2015 Modern Slavery Bill, with particular emphasis on need for robust supply chain transparency and victims' services, contributing to inclusion of such provisions in final Modern Slavery Act. *(May 2009 to November 2014).*

**U.S. House of Representatives, Committee on the Judiciary, Majority Counsel**
Formulated policy on foreign intelligence surveillance, immigration, refugee policy, child sex abuse, national security, civil rights/civil liberties, criminal law, and Latino politics. Coordinated activities

of Members of the Committee and their professional staff. Handled immigration portfolio for the Committee, obtaining passage of legislation to combat alien smuggling and trafficking/slavery offenses, extending liability to end-users and those who had avoided responsibility because of willful disregard of abuse. Successfully extended federal enforcement and worker protection to the Commonwealth of the Northern Marianas Islands to remedy abuses in garment industry and other sectors. Obtained critical protections for immigrant crime victims and unaccompanied alien minors. Served on staff delegation to Thailand and Cambodia concerning information-sharingto prevent child sex tourism and best practices in border control technology, anti-slavery efforts, and victim rehabilitation. Spoke on combating violence against women for hemispheric summit of women leaders in Buenos Aires. *(March 2007 to May 2009).*

**U.S. Department of Justice, Civil Rights Division, Criminal Section,
Chief Counsel, Human Trafficking Prosecution Unit**
Developed and implemented stand-alone anti-slavery prosecution unit. Supervised Civil Rights Division prosecutors in investigations and prosecutions of forced labor and sex trafficking, while maintaining own active docket of cases. Served as liaison with partner agencies within U.S. Government and non-governmental community, and with interagency smuggling/trafficking intelligence center. Supported efforts of federally funded human trafficking task forces in 42 cities. Led Department's prosecution and police training efforts in Mexico pursuant to President's Initiative to Combat Trafficking & Child Sex Tourism. Served as member of U.S. delegation to Conference of the Parties to the United Nations Transnational Organized Crime Convention; led U.S. intervention on the Supplemental Protocol to Prevent, Suppress, and Punish Trafficking in Persons. Leader in United Nations' effort to develop specialized anti-trafficking units and global anti-trafficking training curricula. *(October 2006 to March 2007).*

**U.S. Department of Justice, Civil Rights Division, Criminal Section,
Special Litigation Counsel**
Litigated and supervised complex human trafficking and slavery cases involving victims and defendants from around the world. Investigated and successfully tried largest forced labor prosecution in U.S. history: garment factory sweatshop slavery case U.S. v. Lee, receiving Attorney General's Distinguished Service Award following two-year grand jury investigation and five month jury trial as lead trial counsel. Successfully investigated and prosecuted complex and politically sensitive international matters, including Ukrainian organized crime, Saudi Royal Family domestic servant abuse, and numerous Latin American and Asian sex trafficking cases. Received highest civilian anti-trafficking award, the Paul & Sheila Wellstone Award, for development of modern victim-centered prosecution approach. Worked with governments in Latin American, Asia, Europe, and former Soviet Union on legislative development to combat corruption, money laundering, human trafficking, child abuse, and alien smuggling. As U.S. Involuntary Servitude & Slavery Coordinator, led modernization and policy improvements to post-Civil War slavery statutes. Established interagency working group (National Worker Exploitation Task Force), resulting in convictions of numerous farm labor contractors for involuntary servitude offenses. Developed training curriculum for U.S. on investigation and prosecution of worker exploitation/trafficking cases. Served as principle DOJ drafter of Trafficking Victims Protection Act of 2000, and member of team that successfully negotiated the U.N. Protocol to Prevent, Suppress and Punish Trafficking in Persons, as part of the Convention against Transnational Organized Crime. Formulated and implemented "T Visa" for victims of human trafficking. *(September 2000 to October 2006).*

**U.S. Department of Justice, Civil Rights Division, Criminal Section, Trial Attorney**
Conducted grand jury investigations and prosecuted criminal civil rights cases in U.S. District Courts, including trinket-peddling slavery case in New York; sexual slavery cases in Texas, Florida, and Saipan; migrant worker slavery cases in Florida and South Carolina; prison beating case in

Arkansas, and racial violence cases in North Carolina, Texas, Missouri, and Florida. Investigated high-profile police shooting that triggered multi-day riots in St. Petersburg, Florida. Practiced in Superior Court for District of Columbia as Special Assistant U.S. Attorney, including twelve jury trials, multiple bench trials, motions practice, case management, and witness preparation in cases of domestic assault, sexual abuse, narcotics, and violent crime. In wake of "El Monte" sweatshop case, led government/NGO partnership and use of immigration tools to ensure pathways to citizenship for victims, leading to establishment of Continued Presence status and "T visa" program. Received Attorney General's John Marshall Award as lead attorney in Florida prostitution slavery case U.S. v. Cadena, and Executive Office for US Attorneys Director's Award for New York "Deaf Mexican" begging slavery case U.S. v. Paoletti. *(September 1993 – September 2000)*.

## HONORS AND AWARDS

2019 UK Human Trafficking Foundation Media Awards: Best Opinion Piece
2019 Connecticut Institute for Refugees and Immigrants Legacy Award
2017 Iowa State University Alumni Merit Award
2017 Assent Compliance, Top 100 Global Human Trafficking/Slavery Influencers (#3)
2017 Assistant Attorney General's Commendation, Office of Justice Programs, USDOJ
2013 Distinguished Honor Award, U.S. Department of State
2012 Iowa Youth & Shelter Services Award for Outstanding Contribution to Welfare of Children
2011 PODER/Hispanic Magazine 100 Most Influential US Hispanics
2011 Mosaic Family Services' Defender of Human Rights Award
2011 Tahirih Justice Center, Good Fellas Honor Roll
2010 Selected for Membership, Council on Foreign Relations
2010 Vital Voices Global Partnership "Men Working to Prevent Violence Against Women"
2009 Alumni Achievement Award, Iowa State University College of Liberal Arts and Sciences
2009 Hispanic Business Magazine's "100 Influentials"
2009 Appreciation Award, Daewoosa Sweatshop Survivors' 10th Anniversary Reunion
2007 Special Achievement Award, Civil Rights Division, USDOJ
2006 Director's Commendation, Federal Bureau of Investigation
2005 Pioneer Award, Maryland Migrant and Refugee Cultural Support
2005 Paul & Sheila Wellstone Memorial Award for Excellence in Anti-Trafficking Activities
2004 Director's Commendation, Federal Bureau of Investigation
2003 United States Attorney General's Distinguished Service Award
2002 Meritorious Award/Quality Step Increase, Civil Rights Division, USDOJ
2001 J.T. Canales Distinguished Latino Alumnus, Michigan Law School
2000 Special Achievement Award, Civil Rights Division, USDOJ
1999 United States Attorney General's John Marshall Award for Litigation
1998 Director's Award, Executive Office for United States Attorneys, USDOJ
1998 Award for Public Service, U.S. Attorney's Office for the Eastern District of New York
1997 Special Achievement Award, Civil Rights Division, USDOJ
1992 Juan Tienda Award, Michigan Law School
1985 National 4-H Beef Award

# Exhibit 2
## Materials Reviewed

**Case-specific Materials Reviewed**

*Casilao, et al, v. Hotelmacher LLC, et al*, Case No. CIV-17-800-M and *Francis v. Apex, USA et al*, Case No: CIV-18-583-HE:

Class Action Complaints

Depositions of Plaintiffs Garcia, Kennedy, Lincuna, and Pearce

Depositions of Walter Schumacher and Carolyn Schumacher as corporate representatives of Defendant APEX USA Inc.

Materials from Department of Labor investigation

Materials from Human Resources files

Miscellaneous discovery materials

**Additional materials reviewed:**

*Adia v. Grandeur Mgmt., Inc.,* 933 F.3d 89, 91 (2d Cir. 2019).

*Aguirre v. Best Care Agency,* 961 F.Supp. 2d 427 (E.D. NY 2013).

*Amchem Prods. Inc. v. Winsor*, 521 US. 591, 623-24 (1997).

*Bistline v. Parker*, 918 F.3d 849, 871 (10th Cir. 2019).

*Camayo v. John Peroulis & Sons Sheep, Inc.,* 2012 WL 4359086, 19 Wage & Hour Cas.2d (BNA) 1382 (D. Colo. 2012).

Clinton, Oklahoma, Chamber of Commerce, https://clintonok.org/

*David v. Signal*, 2012 U.S. Dist. LEXIS 114247 (E.D. LA, 2020)

*Garcia v. Cartwright*, 2012 WL 1831865 (D. Or. 2012).

*Elat v. Ngoubene*, 993 F.Supp. 2d 497 (D. Md. 2014).

*Guobadia v. Irowa*, 103 F.Supp. 325 (E.D. NY 2015).

*Mojsilovic v. Oklahoma ex rel. Bd. of Regents* CIV-14-886-R (W.D. Okla. Apr. 3, 2015).

*Menocal v. Geo Group*, 882 F.3d 905 (10th Cir. 2018)

National Guestworker Alliance, "*Leveling the Playing Field: Reforming the H-2b Program to Protect Guestworkers and U.S. Workers*" (Feb. 2012).

*Nunag-Tanedo v. E. Baton Rouge Parish Sch. Board*, 2011 U.S. Dist LEXIS 152329 (C.D. CA, 2011).

*Paguirigan v. Prompt Nursing Empl. Agency LLC,* 286 F. Supp. 3d 430 (E.D. NY 2017).

*Peonage Cases,* 123 F. 671 (M.D. Ala. 1903).

*Panwar v. Access Therapies*, 2015 U.S. Dist. LEXIS 7584 (S.D. IN 2015).

Polaris, "*Labor Trafficking in the U.S.: A Closer Look at Temporary Work Visas*" (Oct. 2015);

*Rosas v. Sabarnand Farms,* LLC 329 F.R.D. 671, 689 (W.D. WA 2018)

*Shukla v. Sharma*, 2012 WL 481796 (E.D. NY 2012).

Southern Poverty Law Center, "*Close to Slavery: Guestworker Programs in the United States*" (2013).

Transparency International, Corruption Perception Index and Corruption Barometer, available at https://www.transparency.org/en/cpi

United Nations Office of Drugs and Crime, "*The Role of Recruitment Fees and Abusive and Fraudulent Recruitment Practices of Recruitment Agencies in Trafficking in Persons*" (Vienna, 2015).

United Nations Protocol to Prevent, Suppress, and Punish Trafficking in Persons, especially Women and Children ("Palermo Protocol") (2000), supplementing the U.N. Convention Against Transnational Organized Crime.

United States Constitution, Amdt. XIII

United States Code, Title 18, Chapter 77 "Peonage, Slavery, and Trafficking in Persons" (2018)

United States Code of Federal Regulations, Title 22, Section 62.22 "Trainees and Interns."

United States Code of Federal Regulations, Title 22, Section 62.23 "Summer work travel."

United States Code of Federal Regulations, Title 29, Section 503.16 "Assurances and obligations of H-2B employers."

United States Department of State, "Country Reports on Human Rights Practices"

U.S. Department of State, "Exchange Visitor Program," available at https://j1visa.state.gov/about-us/

United States Department of State, "Trafficking in Persons Report"
.
United States Fed. R. Civ. Pro. Rule 23

United States Government Accountability Office, *"H-2A And H-2B Visa Programs: Increased Protections Needed For Foreign Workers*," GAO-15-154 (Mar. 2015).

United States Senate, "A Resolution Supporting the Observation of National Trafficking and Modern Slavery Prevention Month During the Period Beginning on January 1, 2019, and Ending on February 1, 2019, To Raise Awareness of, and Opposition to, Human Trafficking And Modern Slavery." S.Res. 36 (Feb. 12, 2019).

United States Victims of Trafficking and Violence Protection Act ("TVPA"), P.L. 106-386 (2000) and subsequent reauthorizations: P.L.108-193 (2003); P.L.109-164 (2005); P.L. 110-457 (2008); P.L. 113-4 (2023) and P.L.115-425 (2019).

*United States v. Alzanki*, 54 F.3d 994, 1001-02 (1st Cir. 1995).

*United States v. Bibbs,* 564 F.2d 1165, 1168 (5th Cir. 1977).

*United States v. Booker*, 655 F.2d 562, 566 (4th Cir. 1981).

*United States v. Bradley*, 309 F.3d 145 (1[st] Cir. 2004).

*United States v. Calimlim*, 538 F.2d 706 (7[th] Cir. 2008).

*United States v. Callahan,* 801 F.3d 606 (6th Cir. 2015).

*United States v. Dann*, 652 F.3d 1160 (9[th] Cir. 2011).

*United States v. Djoumessi*, 538 F.3d 547 (6th Cir. 2008).

*United States v. Farrell,* 563 F.3d 364 (8th Cir. 2009).

*United States v. Garcia*, 2003 WL 22956917 (W.D. NY, 2003).

*United States v. Harris*, 701 F.2d 1095, 1100 (4th Cir. 1983).

*United States v. Ingalls,* 73 F. Supp. 76, 77-78 (S.D. Cal. 1947).

*United States v. Kalu*, 791 F.3d 1194 (10[th] Cir. 2015)

*United States v. Kaufman*, 546 F.3d 1242 (10[th] Cir. 2008)

*United States v. Kozminski,* 487 U.S. 931 (1988).

*United States v. Pipkins*, 378 F.3d 1281, 1297 (11th Cir.2004).

*United States v. Rivera*, 2012 WL 2339318 (E.D. NY 2012).

*United States v. Sabhnani*, 599 F.3d 215 (2d Cir. 2010).

*United States v. Veerapol* 312 F.3d 1128 (9th Cir. 2002).

*United States v. Warren*, 772 F.2d 827, 833-34 (11th Cir. 1985).

*Velez. v. Sanchez,* 693 F.3d 308 (2d Cir. 2012).

Verite, "*Help Wanted: Hiring, Human Trafficking, and Modern-Day Slavery in the Global Economy*" (2009).

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

*Zavala v. Wal Mart Stores Inc.,* 691 F.3d 527 (3d Cir. 2012).

# Exhibit 3

## Fee Schedule

Chambers Lopez strategies LLC

**Fee Schedule**
**Expert Consultation, Policy Consultation, and Testimony**
**Ambassador Luis C.deBaca (ret.)**

1. Review of records and other materials, along with all research in support of the retaining party: $400/hour
2. Remote work, including preparation of expert report and trial preparation (email, video conferencing, telephone): $500/hour, not to exceed $15,000.
3. In-person work, including expert consultation, investigation assistance, policy consultation, etc: $ 2,000/day domestic United States, $3,000/day International (regardless of hours).
4. Testimony (deposition or trial): $2,500 per day (regardless of hours).
5. Transportation and lodging: billed to retaining party at cost; use of personally-owned vehicle at GSA rate; business class for all air travel over five hours.
6. Travel Time: $200 per hour, not to exceed $1,000 per day.
7. Per diem (meals and incidental expenses): current U.S. Federal (GSA schedule) locality rate.
8. Cancellation: cancellation of services less than 72 hours from time of service/flight will result in payment for one day's services, plus any associated cancellation fees or penalties from carriers and/or lodging.
9. Remittance within 15 days of invoicing to:
   Chambers Lopez Strategies, P.O. Box 5539, Arlington, VA 22205
10. TAX ID number: 73-1710426

2019