## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

MADELYN CASILAO, HARRY )
LINCUNA, and ALLAN GARCIA, )
on behalf of themselves and all others )
similarly situated, )
                               )
       Plaintiffs, )
                               )
v. )      Case No. CIV-17-800-SLP
                               )
HOTELMACHER LLC, dba HOLIDAY )
INN EXPRESS, et al., )
                               )
       Defendants. )

## O R D E R

Before the Court is Plaintiffs' Motion for Class Certification and Opening Memorandum of Law in Support [ECF 139]. The briefing is complete and the matter is at issue. *See* Defs.' Resp [ECF 162], Pls.' Reply [ECF 172] and Defs.' Surreply [ECF 184]. For the reasons that follow, Plaintiffs' Motion is GRANTED.

Also at issue are the following Motions: (1) Defendants' *Daubert* Motion to Exclude Reports and Opinions of Luis C. deBaca [ECF 144]; (2) Defendants' Motion to Strike Plaintiffs' Exhibit List [ECF 150]; (3) Plaintiffs' Cross-Motion to Strike Defendants' Exhibit List [ECF 151]; (4) Defendant Apex USA, Inc.'s Motion for Summary Judgment [ECF 153]; (5) Defendants' Combined Motion in Limine [ECF 154]; and (6) Plaintiffs'

Motion to Strike the Expert Report and Testimony of Greg H. Bristol [ECF 157].[1]  These

Motions are DENIED.

## I.      INTRODUCTION

Plaintiffs, Madelyn Casilao, Harry Lincuna, and Allan Garcia (collectively,

Plaintiffs or Named Plaintiffs) are Filipino nationals who obtained H-2B visas to work for

one or more of the Defendants in the State of Oklahoma.  Defendants are individuals and

entities engaged in the hospitality industry and own or operate businesses including a hotel,

a restaurant and a water park in Clinton, Oklahoma.[2]

## II.     BACKGROUND

### A.      Factual Background

During the period January 1, 2008 through December 31, 2014, Defendants applied

with the United States Department of Labor (DOL) for temporary labor certifications to

employ foreign workers as H-2B workers.  Defendants engaged in recruitment efforts in

the Philippines to hire Plaintiffs and others to work at one or more of the Defendant entities

located in Clinton, Oklahoma.

---

[1]      Citations to the parties' briefing submissions reference the Court's ECF pagination.  The Court notes that the parties have submitted certain confidential materials under seal.  The Court has not directly included any of the confidential information in this Order.  The Court, therefore, deems it unnecessary to seal this Order.

[2]      The Defendant entities are: Hotelmacher LLC dba Holiday Inn Express; Steakmacher, LLC, dba Montana Mike's Steakhouse; and Schumacher Investments, LLC, dba Water Zoo. Defendant APEX USA, Inc. (APEX) is a not-for-profit corporation organized under the laws of Oklahoma and headquartered in Clinton, Oklahoma. Defendants Walter Schumacher and Carolyn Schumacher, husband and wife, own and/or operate the Defendant entities.

On behalf of the Defendant entities, Defendant Walter Schumacher filed with the DOL temporary labor certification applications for the admission of H-2B workers and attested that the Defendant entities would abide by applicable regulatory requirements including those related to payment of wages.

Defendants used non-party recruiters (the Recruiters) to engage in recruitment efforts in the Philippines.  The Recruiters would supply information regarding terms of employment with one or more of the Defendant entities through an offer of employment. The basic pay rates offered equaled or exceeded the wages Defendants included in their temporary labor certification applications.

Additionally, Defendants were required to obtain exit approval for Plaintiffs from the Philippine Overseas Employment Administration (POEA), a Filipino governmental entity which regulates the recruitment of nationals from the Philippines to work abroad. The POEA reviews terms of employment for Filipino workers to ensure compliance with governmental requirements.  The POEA required additional terms of employment to be included in the offers made to Plaintiffs.

Plaintiffs were charged processing, travel and other fees in order to obtain their visas and pursue work offered by the Defendants.   The fees were significant and Plaintiffs had to borrow money or use savings to pay them.  Plaintiffs did so based on the employment terms as promised.

When Plaintiffs arrived in the United States to begin working, they were paid wages less than what was promised and/or mandated by federal law.  Also, Plaintiffs were not provided full-time work as promised.  As a result, Plaintiffs were barely able to pay their

living expenses in Oklahoma and not able to send money home to the Philippines to repay the debts incurred to obtain their H-2B visas.  In some instances, class members still have not been able to repay the money they borrowed.

Defendants also did not reimburse Plaintiffs for their travel expenses.  And Defendants did not provide Plaintiffs with free food and free lodging or a housing allowance as promised.

Plaintiffs allege that during their employment, Defendant Schumacher subjected them to implied threats of harm.  For example, Defendant Schumacher told Plaintiff Garcia that he carried a firearm in his car and when Plaintiff Garcia inquired about the promised airfare to and from the United States, Defendant Schumacher said he would only pay for return airfare if Mr. Garcia were returning "in a box."  According to Plaintiffs, Defendant Schumacher also made it known to them that he was a current and/or former police sheriff and had ties to law enforcement.  And Plaintiffs allege Defendants threatened them with termination and/or deportation consequences.

### B.    Proposed Class

Plaintiffs move for class certification under Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs define the putative class as follows:

> [A]ll Filipino nationals who obtained H-2B visas at any time from January 1, 2008 through December 31, 2014, who were admitted to the United States as H-2B temporary foreign workers, and for whom one of the Defendants was the H-2B petitioner or de facto employer upon arrival in the United States.

4

Compl. [ECF 1], ¶ 94.[3]

### C.     Plaintiffs' Claims

Plaintiffs bring this putative class action raising the following claims for relief: (1) violations of the Trafficking Victims Protection Act of 2000 (TVPA) as amended by the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA); (2) breach of written employment contract under Oklahoma law; and (3) third-party beneficiary claim for breach of contract under Oklahoma law.[4]  Plaintiffs' claims are premised on allegations that Defendants subjected them to forced labor during the course of their employment and failed to pay them the wages or provide the additional benefits as promised in their employment and other contracts.[5]

The TVPA "establishes a civil cause of action for victims of prohibited trafficking activity." *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 916 (10th Cir. 2018) (*Menocal II*); 18 U.S.C. § 1595(a).  The TVPA's forced labor provision prohibits persons from:

> knowingly provid[ing] or obtain[ing] the labor or services of a person by any one of, or by any combination of, the following means –
>
> > (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

---

[3]     Although the Complaint references the relevant time period for the class as January 1, 2008 through December 31, 2014, the evidence before the Court in support of Plaintiffs' Motion pertains solely to the calendar year 2012.

[4]     The Court previously dismissed Plaintiffs' breach of contract claim against APEX USA, Inc.  *See* Order [ECF 61].

[5]     Defendants have also been sued by former workers in the United States on J-1 visas.  This related action, also alleging violations of the TVPA, is currently pending before the Court.  *See Francis v. APEX USA, Inc., et al.*, Case No. CIV-18-583-SLP (W.D. Okla.) (*Francis* action).

(2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]

*Id*. § 1589(a). The first category of conduct – force, threats of force, physical restraint or threats of physical restraint – is not at issue in this action.  Thus, the Court's analysis is focused on the second, third and fourth categories of conduct.

The term "serious harm" denotes "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a *reasonable person* of the *same background* and in the *same circumstances* to [render labor] . . . to avoid incurring that harm." *Id*. § 1589(c)(2) (emphasis added).

Plaintiffs' breach of contract claim arises under Oklahoma law.  Plaintiffs focus on "whether and how their employment contracts were formed" as the basis for class certification.  *See* Mot. 139:43, citing *Dig. Design Grp., Inc. v. Info. Builders, Inc*., 24 P.3d 834, 843 (Okla. 2001) (setting forth elements of a breach of contract claim under Oklahoma law).  Plaintiffs contend common questions of fact include: (1) what the terms of the employment contracts were, (2) whether Defendants breached the contracts, and (3) which terms were breached." *Id*. at 44.

### III.   <u>CLASS CERTIFICATION REQUIREMENTS</u>

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)).  To obtain class certification, the prerequisites of Rule 23(a) must be satisfied: numerosity, commonality, typicality, and adequacy.  Fed. R. Civ. P. 23(a).  Additionally, the class must also satisfy one of the three requirements in Rule 23(b).  Here, Plaintiffs rely on Rule 23(b)(3)'s requirements of predominance and superiority.  Fed. R. Civ. P. 23(b)(3).

"The district court must undertake a rigorous analysis to satisfy itself that a putative class meets the applicable Rule 23 requirements."  *Menocal II*, 882 F.3d at 913 (internal quotations and citation omitted).  "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."  *D.G. ex rel. Stricklin v. Devaugn*, 594 F.3d 1188, 1194 (10th Cir. 2010) (quoting *Shook v. El Paso Cty*, 386 F.3d 963, 971 (10th Cir. 2004)).  The party seeking class certification must show, by a preponderance of the evidence, that the Rule 23 requirements are met.  *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006).

"Rule 23 does not set forth a mere pleading standard."  *Walmart*, 564 U.S. at 350.  Thus, "[a] party seeking class certification must affirmatively demonstrate his compliance with [Rule 23] – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."  *Id.*  "Granting or denying class certification is a highly fact-intensive matter of practicality."  *Monreal v. Potter*, 367 F.3d

1224, 1238 (10th Cir. 2004). The Court "is not limited to the pleadings but may probe behind the pleadings and examine the facts and evidence in the case." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1227-28 (10th Cir. 2013) (quotations and citation omitted).

## IV.   DISCUSSION

### A.   Rule 23(a)'s Threshold Requirements

#### 1.   Numerosity

To satisfy the numerosity requirement, Plaintiffs must show that the "class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In the Tenth Circuit, there is "no set formula" to determine numerosity and district courts have "wide latitude" in making the determination given the "fact-specific" nature of the inquiry. *Trevizo*, 455 F.3d at 1162 (rejecting approach from other jurisdictions holding that numerosity may be presumed at a certain number); *see also Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1215 (10th Cir. 2014) ("[T]he numerosity requirement is not a question of numbers." (internal quotations and citation omitted)).

#### a.   Size of Class

The allegations of Plaintiffs' Complaint state that the class is "believed to include at least 50 to upwards of 100 individuals." Compl., ¶ 95. In moving for class certification, however, Plaintiffs state the class is "at least 26 foreign H-2B workers" and possibly more. Mot. 139:22 & n. 2.

In response, Defendants point to a list produced during discovery of H-2B temporary foreign workers employed during the relevant time period. *See* Resp. 162:19 & n. 4 (citing Defs.' Ex. 1, ECF 163:2-3. Defendants' list identifies 23 H-2B temporary

foreign workers.  *See* Defs.' Ex. 1, 163:2-3.  According to Defendants, this list *quantifiably* demonstrates joinder is not impracticable.

As set forth, in the Tenth Circuit there is no presumption regarding whether "numbers alone" do, or do not, support class certification.  Certainly "[c]lass actions have been deemed viable in instances where as few as 17 to 20 persons are identified as the class." *Rex v. Owens ex rel. Okla*, 585 F.2d 432, 436 (10th Cir. 1978).  As discussed more thoroughly infra, Plaintiffs have submitted evidence to show, inter alia, that all class members were subjected to the same recruitment/offer process and other conditions of employment.  Thus, contrary to Defendants' assertion, there is no improper reliance on the "*total* number" of class members "who worked for one or more of the Defendants under H-2B visas." *See* Resp. 162:19 (emphasis in original).  Accordingly, the Court rejects Defendants' arguments directed to the "numbers" aspect of the impracticability-of-joinder analysis.

### b.     Other Factors

Plaintiffs point to other factors to show joinder is impracticable.  Plaintiffs focus on "characteristics of the class members" "including their geographic dispersion, lack of financial resources, and lack of familiarity with the English language and the U.S. court system." Mot. ECF 139:22.   These factors are a proper matter of inquiry in determining whether joinder is impracticable. *See Colo. Cross*, 765 F.3d at 1215 (there are "several factors that enter into the impracticability issue" including "the nature of the action, the size of the individual claims, and the location of the members of the class or the property that is the subject matter of the dispute") (internal quotations and citation omitted); *see also*

*Menocal v. GEO Grp.*, 320 F.R.D. 258, 263 n. 1 (D. Colo. 2017) (*Menocal I*) (joinder impracticable based on "unique characteristics of class members" and not simply based on approximate class size of "2,000 total members").

### 1.      Geographical Dispersion

Plaintiffs offer no evidence of their own to show where class members currently are located – including the Named Plaintiffs.  Instead, Plaintiffs point to Defendants' records and argue these records "state that many of the class members traveled great distances immediately after leaving Clinton, Oklahoma."  Reply 172:8.  A review of the records Plaintiffs cited shows that in 2012 four of the twenty-three listed employees were reported to have "absconded" from their employment in Oklahoma.[6]  Otherwise, there is no evidence as to where any of the class members currently reside.  Nonetheless, based on the background characteristics of the class members, i.e., their status as foreign workers in the United States on visas, and the nature of their employment, the Court finds there is minimally sufficient evidence of geographic dispersity and this factor, therefore, weighs in favor of Plaintiffs.

### 2.      Identification of Class Members

Here, the identity of the class members is known.  This factor weighs against a finding that joinder is impracticable.  *Cf. Colo. Cross*, 765 F.3d at 1215 (recognizing that joinder of "*unknown* individuals is certainly impracticable" and concluding that

---

[6]      Two employees sought other employment in California, one employee sought employment in Florida and one employee sought employment in Arizona.  *See* Defs.' Ex. 10, ECF 162-10:12, 18, 20 and 21.

"*identifying*, locating, and joining individuals who encounter accessibility discrimination at shopping malls in 40 states would be impracticable" (emphasis added)); *see also Primavera Familienstiftung v. Askin*, 178 F.R.D. 405, 410 (S.D. N.Y. 1998) ("Knowledge of names and existence of members . . . renders joinder practicable."); *Baricuatro v. Indus. Pers. & Mgmt. Servs., Inc*., No. CIV. A. 11-2777, 2013 WL 6072702 at *4 (E.D. La. Nov. 18, 2013) (unpublished op.) (noting that putative class members, Filipino nationals, as former employees of the defendants, would be easy to identify and plaintiffs' failure to address this factor presumably was due to fact it would weigh against a finding that joinder was impracticable).

### 3.   English Proficiency

Plaintiffs argue that "the class members' English is limited to what was required to work as a server or hotel employee." Mot. 139:23. Plaintiffs point to the fact that two of the Named Plaintiffs, Mr. Lincuna and Mr. Garcia, used a translator to testify at their depositions and to communicate with counsel. *Id*. Defendants respond that both of these Named Plaintiffs "frequently answered questions in English without the aid of the interpreter." Resp. 162:22 (citing instances in which the Named Plaintiffs corrected the interpreter). Defendants also note that Mr. Garcia verified his discovery responses without an interpreter and that two of Plaintiffs' witnesses completed their affidavits without the aid of an interpreter. And Defendants point to the lack of any statement in the affidavits addressing the sufficiency of the affiants' English proficiency. *Id*., 162:23.

The Court finds, however, that Plaintiffs' evidence is sufficient to demonstrate a lack of English proficiency. Plaintiffs and the putative class members are Filipino

nationals. The H-2B visa applications identified education requirements as a "high school/GED." *See, e.g.*, Pls.' Ex. 10, 141-5:13. The employment sought was for minimum wage jobs – in the restaurant and hotel industry. The record shows a primary need for translation and/or interpretation assistance. Under these circumstances, the fact that certain individuals could intermittently answer questions during a deposition or verify discovery responses, is insufficient to demonstrate adequate proficiency with the English language. Thus, this factor weighs in Plaintiffs' favor.

### 4.    Financial Resources of Class Members

Plaintiffs' evidence of a "lack of financial resources" is similarly minimal, but sufficient. Plaintiffs submit declarations of putative class members affirmatively stating that they lack the resources to file a case individually.[7] Additionally, Plaintiffs' declarations demonstrate that they still have not been able to repay money borrowed to obtain their H-2B visas and work for Defendants.[8] Again, these individuals were working minimum wage jobs in the restaurant and hotel industry. Thus, the Court finds Plaintiffs have sufficiently demonstrated a lack of financial resources.

In sum, this Court has wide latitude in making the numerosity determination. In this regard, other courts have found joinder impracticable based on similarly situated foreign workers. *See, e.g., Menocal I*, 320 F.R.D. at 263 n. 1 (joinder impracticable based on, inter alia, class members' lack of fluency in English language or familiarity with U.S.

---

[7]    *See* Ex. 12, Sarmiento Decl. ¶ 19, ECF 140-12 and Ex. 38, Cleto Decl. ¶ 19 ECF 140-32.

[8]    *See, e.g.,* Pls.' Ex. 35, Lincuna Decl., ¶ 17 ECF 140-29:6; Pls.' Ex. 36, Garcia Decl., ¶ 17 ECF 140-30:7; Pls. Ex. 55, Casilao Decl., ¶ 17 ECF 140-49:9.

legal system"). Drawing permissible inferences in Plaintiffs' favor, and given the particular characteristics of the class members, the evidence of record, and the totality of the circumstances, the Court finds Rule 23(a)(1)'s numerosity requirement is satisfied.

### 2.    Commonality

"To satisfy the commonality requirement, a party seeking class certification must demonstrate 'there are questions of law or fact common to the class.'" *Menocal II*, 882 F.3d at 914  (quoting Fed. R. Civ. P. 23(a)(2)).  "A finding of commonality requires only a single question of law or fact common to the entire class." *Id*. (internal quotations and citation omitted).  A question of law or fact is common if it "depend[s] upon a common contention . . . of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*.  (internal quotation marks and citation omitted).

Plaintiffs have not separately addressed the commonality requirement.  Instead, Plaintiffs state that: "[i]n the discussion of predominance, infra, Part C.1, Plaintiffs set forth more than a dozen questions of law and fact."  Mot. 139:23-24.  Accordingly, the Court will address commonality in the context of its predominance inquiry. *Meyers v. Southwestern Bell Tel. Co*., 181 F.R.D. 499, 501 (W.D. Okla. 1997) ("Rule 23(b) subsumes the commonality standard under Rule 23(a)(2)" and "[t]herefore instead of concluding that the commonality requirement has been established by plaintiff, the Court will consider this issue within the analysis of whether common issues predominate over individual issues."); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997) (The predominance requirement is similar to but "far more demanding" than the commonality requirement of

Rule 23(a)); *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 325 (5th Cir. 2008) ("Since the thresholds for commonality and typicality under Rule 23(a) are not high . . . [the court] will assume that Rule 23(a) is satisfied and turn to evaluate the parties' arguments against the more exacting demands of Rule 23(b)(3)."); *Owino v. CoreCivic, Inc.*, No. 17-CV-1112 JLS, 2020 WL 1550218 at *14 (S.D. Cal. Apr. 1, 2020) (unpublished op.) ("Because Plaintiffs and Defendant have collapsed their arguments concerning the predominance of common issues under Rule 23(b)(3) with their discussion of commonality under Rule 23(a)(2), the Court discusses both commonality and predominance under the far more demanding Rule 23(b)(3) predominance analysis." (internal quotations and citations omitted)).

### 3. Typicality

"To satisfy the typicality requirement, a party seeking class certification must demonstrate that 'the claims or defenses of the representative parties are typical of the claims or defenses of the class.'" *Menocal II*, 882 F.3d at 914 (quoting Fed. R. Civ. P. 23(a)(3)). "[D]iffering fact situations of class members do not defeat typicality . . . so long as the claims of the class representative and class members are based on the same legal or remedial theory." *Id.* (quoting *Colo. Cross*, 765 F.3d at 1216).

Plaintiffs contend typicality is satisfied because the Named Plaintiffs and the class members suffered a "common legal injury." Mot. 139:24. Plaintiffs argue that they "all were promised the same material terms and conditions of employment, all acted in reliance on Defendants' false recruitment promises, all worked for Defendants under substantially

the same terms, with limited hours and no compensation for food or housing, and all possessed the same economic and immigration-related vulnerabilities." *Id*.

In response, Defendants argue personal experiences unique to certain class members and not experienced by others demonstrate a lack of typicality. *See* Defs.' Resp. ECF 162:33 (discussing experience of Plaintiff Garcia and one other individual alleging Defendant Schumacher "warned them about a gun in the glove compartment" of his car). Defendants also rely on "positive resignation letters" of ten of the twenty-three class members. *See id*. (citing Defs.' Ex. 12 [ECF 163:10-22]).

In their Reply, Plaintiffs reiterate that "the class's claims arise from the 'same harmful practices' alleged by Plaintiffs, and Plaintiffs' claims are therefore typical." Reply 172:19.

The Court finds typicality is satisfied. As more fully addressed in the Court's analysis of Rule 23(b)(3)'s predominance inquiry, the class members' claims are based on the same legal theories and the same operative conduct of Defendants as the claims brought by the Named Plaintiffs.[9]

Defendants' primary reliance on the "positive" resignation letters fails to defeat typicality. According to Defendants, "[n]one of the three Plaintiffs wrote such a letter, indicating that Plaintiffs' experiences were *not* typical of whatever these eleven experienced." Defs.' Resp. ECF 162:34 (emphasis in original). But inferences arising from

---

[9]     *See, e.g., Colo. Cross*, 765 F.3d at 1216 (10th Cir. 2014) (recognizing that commonality, typicality and adequacy requirements "tend to merge" (citing *Walmart*, 564 U.S. at 349).

the referenced letters arguably cut both ways.  While Defendants contend the letters are "positive," the fact that the class members submitted "early resignations" could plausibly have been due to the unsatisfactory and harmful working and living conditions encountered by the class members.  Thus, the import of those letters and the inferences arising therefrom delve further into the merits of the claim, not the sufficiency of the evidence as to class certification.[10]

### 4.    Adequacy

The last requirement of Rule 23(a) requires the class representative to "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Plaintiffs and their counsel maintain that they have no conflicts of interest with the proposed class members. Plaintiffs have also submitted declarations stating that they have been actively involved in the case and are committed to protecting the interests of the class members.  Plaintiffs' counsel have shown their experience with the nature of the claims at issue, their commitment to pursue the claims on behalf of the class, and the resources they will devote to the same.  Under these circumstances, the Court has no reason to question that Plaintiffs and their counsel will adequately protect the interests of the class.[11]

---

[10]    As Plaintiffs point out, certain class members who provided a resignation letter to Defendants have also submitted declarations stating that they resigned based on feeling scared and threatened.  *See, e.g.*, Defs.' Ex. 12, Cleto Resignation Letter ECF 163:17; Pls.' Ex. 38, Cleto Decl. ¶ 16, ECF 140-32.  These declarations support the "cuts-both-ways" inferential treatment of the resignation letters.

[11]    Defendants only challenge to the adequacy requirement is their reliance on the "positive resignation letters" also referenced in the context of their challenge to the typicality requirement. For the reasons stated, the Court finds Defendants place undue weight on these resignation letters and ignore the equally contrary inferences to be drawn therefrom.

**B.      Rule 23(b)(3)**

**1.      Predominance**

The Rule 23(b)(3) predominance inquiry tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation, a standard "far more demanding" than the commonality requirement of Rule 23(a)(2). *Amchem Prods., Inc.*, 521 U.S. at 623-24. "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).

**a.      TVPA Claim**

With respect to Plaintiffs' TVPA claim, the parties primarily focus on 18 U.S.C. § 1589(a)(4) and whether "common facts" exist to show Defendants' alleged forced labor scheme. Plaintiffs further argue common issues exist with respect to Defendants' threats of serious harm and abuse or threatened abuse of law or legal process. *See* 18 U.S.C. §§ 1589(a)(2) and (3).

Plaintiffs specifically identify the following issues as subject to common proof and, therefore, proper for class certification:

- Defendants "obtained or provided class members' labor"[12];

- Defendants obtained class members' labor by prohibited means, i.e., a "common scheme";

- Defendants used threats of abuse of the legal process to obtain class members' labor;

---

[12]      The parties acknowledge that this issue is not in dispute.

- Defendants used serious harm and threats thereof to obtain class members' labor; and

- Defendants acted with the requisite scienter, i.e., Defendants knowingly procured class members' labor by prohibited means,

Pls.' Mot. ECF 139:29-43.[13]

With respect to Defendants' "common scheme," Plaintiffs submit evidence to show that Filipino workers must obtain authorization from the Philippine Overseas Employment Administration (POEA) in order to be permitted to leave the Philippines and work in a foreign country. To obtain the requisite POEA approval, Defendants prepared standard job offer letters setting out basic employment terms. The job offer letters were then signed by the H-2B worker and submitted to the POEA for review. As part of the review, the Philippines Overseas Labor Office (POLO) of the Embassy in Washington, D.C. evaluated the contracts and prepared a "contract verification form." Defendants were then required to sign the form to confirm that certain additional terms were included in the offer of employment. Those additional terms included:

1. "Guaranteed wages which shall not be lower than the prescribed minimum wage in the host country, or the minimum wages set by a bilateral agreement or international convention duly ratified by the host country and the Philippines, or the minimum wages in the Philippines, whichever is highest;"

2. "Regular work hours is equivalent to 8 hrs/day;"

---

[13] Plaintiffs also contend that issues of "venture liability" under the TVPA also predominate. *See* 18 U.S.C. § 1589(b). Defendants do not contest such issues are common but instead contend only that venture liability is "completely irrelevant" unless the threshold issue of liability is established. Defs.' Resp. ECF 162:31. Because, as discussed infra, the Court finds common issues predominate with respect to this "threshold issue," the Court further finds Plaintiffs have shown common issues exist with respect to Defendants' venture liability. Notably, whether Defendants "participated in a common venture" is subject to common proof. *See* Pls.' Mot. ECF 139:41-43.

3.    "Overtime is equivalent to number of hours work in excess of 8 hours;"

4.    "Transportation cost to worksite and return to the point of hire at employer's expense;"

5.    "Free food and accommodation or offsetting benefits;"

6.    "Just causes of termination of the contract;" and

7.    sick leave and vacation pay.

*See* Pls.' Mot. ECF 139:12.[14]

Defendants made similar representations in the documentation submitted to the United States government in support of obtaining approval for H-2B visa workers.   For example, Defendants represented that the foreign workers would be paid prevailing wages, on a set hourly basis and that the positions were full-time, forty hours per week.  *See* Pls.' Ex. 9 ECF 141-4 ; Pls.' Ex. 10 ECF 141-5.[15]

Plaintiffs argue they relied on these promises when incurring significant costs to travel to the United States.  For example, Plaintiffs argue they had to pay the cost of the airfare to the United States upfront even though their employment terms required the employer to pay for those costs.  Mot. 139:13-14.

Plaintiffs also argue Defendants broke the promises set forth in the contract verification forms with respect to pay, hours, housing, food, and transportation to and from

---

[14]    *See also* Pls.' Ex. 19 ECF 140-13, Pls.' Ex. 22 ECF 140-16; Pls.' Ex. 23 ECF 141-8 and Pls.' Ex. 76 ECF 140-69; and Declarations, Pls.' Ex. 18, Sarmiento Decl., ¶ 7, ECF 140-12; Pls. Ex. 38, Cleto Decl., ¶ 7, ECF 140-32.

[15]    Defendants also represented that they were not working with any recruitment agencies. Pls.' Ex. 24 ECF 141-9; Pls.' Ex. 25 ECF 141-10.

the worksite.  *Id.*, 139:14-15.  Contrary to the promises made, the workers had to pay for their own housing and food, earned significantly less and could barely meet their living expenses or earn sufficient funds to repay the debts they incurred in the Philippines. "Filipino workers were put in a position where they were financially vulnerable and feared they would face further serious financial or immigration harm if they attempted to leave Defendants' employment, as they could not legally work elsewhere and could not repay their debts if they stopped working for Defendants."  *Id.*, ECF 139:17.  In support, Plaintiffs submit their own declarations and declarations of class members.  *See* Declarations, Pls.' Exs. 18, 35-36, 38 and 55 [ECF 140-12; 140-29; 140-30; 140-32; and 140-49].

Additionally, Plaintiffs contend common issues predominate with respect to threats of deportation and implied physical harm.  They point to evidence that Defendant Schumacher made it known to various class members that he was a police officer and that he carried a firearm and handcuffs in his car.  And they particularly rely on Plaintiff Garcia's statement, previously set forth, that Defendant Schumacher told him he would reimburse airfare to the Philippines only if Mr. Garcia were returned "in a box."  Pls.' Ex. 36, Garcia Decl. ¶ 14, ECF 140-30.  Additionally, Plaintiffs argue Defendants threatened employees with termination and/or deportation consequences.  Mot. 139:37-38.  Plaintiffs argue the threats reached the other putative class members given the fact they lived and worked together and were a relatively small group of employees.

Defendants argue these issues will require individualized proof.  For example, Defendants submit evidence that one class member "filled in the blanks" on the POEA form himself, "without Defendants' consent."  Resp. 162:26-27.  Defendants also point to

one instance in which they were "willing to pay" for the class member's return airfare upon completion of the contract. *Id.*, 162:27.[16]  Defendants also contend there is insufficient proof of any class-wide threats of harm.

Defendants further argue that "[t]he most obvious issue that will predominate in this case is that of causation or reliance." *Id.* at 36.  According to Defendants, whether the class members provided their labor voluntarily or as a result of some unlawful conduct are "inherently individualized inquiries [that] will clearly predominate in this case." *Id.* at 39.

In their Reply, Plaintiffs argue that "common circumstantial evidence" exists upon which to establish proof of their reliance.  For example, Plaintiffs argue "the common fact that every class member paid fees and airfare to come to the United States to work for Defendants can support the inference that they relied on Defendants' promises." Pls' Reply 172:14.  As to the resignation letters, Plaintiffs contend they "are common evidence that the conditions Defendants imposed were so bad that workers tried to leave before the end of their months-long term." *Id.*

The Court finds common questions predominate with respect to the manner by which Defendants made their offers of employment, the terms included (or required to be included by the POEA) in those offers, and whether Plaintiffs relied on those promises in incurring recruitment fees, travel and other expenses. *Cf. Paguirigan v. Prompt Nursing*

---

[16]     Plaintiffs have submitted contrary evidence to show the POEA contracts were filled out before Defendant Schumacher signed them and that he knew of the POEA requirements. *See, e.g.*, Pls. Ex. 19 ECF 140-14, Pls.' Ex. 21 ECF 141-7 and Pls.' Ex. 22 ECF 140-16. And Plaintiffs have submitted evidence that they were denied airfare costs.  The singular exceptions Defendants point to, therefore, are unavailing.

*Emp't Agency, LLC*, No. 17-CV-1302 (NG) (JO), 2018 WL 4347799 at *6 (E.D.N.Y. Sept. 12, 2018) (unpublished op.) (rejecting the defendants' opposition to class certification based on argument that individual issues predominated where plaintiff's claims arose out of "same nucleus of operative facts affecting the proposed class, namely her recruitment and employment by defendants"); *Tanedo v. East Baton Rouge Parish Sch. Bd.*, No. LA CV 10-01172 JAK, 2011 WL 7095434 at *6 (C.D. Cal. Dec. 12, 2011) (unpublished op.) (where plaintiffs alleged their recruiters and employers violated the TVPA through a scheme of hidden fees and contracts that compelled the plaintiffs to work, common questions predominated).

The Court agrees with Plaintiffs that these issues are subject to proof by circumstantial evidence. *See Menocal II*, 882 F.3d at 920 (reliance on misrepresentations of defendants is subject to proof by circumstantial evidence where "class members share the relevant evidence in common because their claims are based on allegations of a single, common scheme"). As addressed, the class members received "formulaic" offers and paid "upfront fees" in reliance on representations regarding ultimate earning capacity – including wages to be paid, hours to be worked and that housing and food expenses would be paid by the employer, not incurred by the employee. *Id.*

Moreover, the Court finds significant to the causation analysis the fact that the class members are a cohesive group. To show "serious harm" under the TVPA, consideration must be given to "all the surrounding circumstances" to determine whether a "reasonable person of the *same* background and in the *same* circumstances would be compelled to continue to provide labor. *See* 18 U.S.C. § 1589(c)(2).

Here, all class members came from the Philippines.  On the current record, all class members were employed during the calendar year 2012, and it appears many were employed in the same or overlapping months.  Thus, their employment with Defendants was temporally close in time, a factor that supports that they were subjected to the same circumstances and faced similar working and living conditions.  Additionally, the majority of class members worked for the same Defendant, Steakmacher, at Montana Mike's.  *See* Defs.' Ex. 1, ECF 162-1.  Moreover, these factors further support an inference of shared knowledge concerning Defendant Schumacher's law enforcement ties and the statements he made to Mr. Garcia.

Based on this record, the Court could apply a "uniform reasonable person standard" to address the serious harm component of the TVPA claim.  *Compare Rosas v. Sarbanand Farms*. LLC, 329 F.R.D. 671, 690 (W.D. Wash. 2018) (members of purported class shared "many salient characteristics, including they [were] Mexican nationals, were employed under the same H-2A contracts, worked under the same conditions, and were subjected to the same threats" such that "a uniform reasonable person standard [could] be applied" to determine whether the defendants' implied threats that class members would be sent back to Mexico if they did not meet production standards violated the TVPA) *with Panwar v. Access Therapies, Inc*., No. 1:12-CV-00619-TWP-TAB, 2015 WL 329013 at *6 (S.D. Ind. Jan. 22, 2015) (unpublished op.) (finding it inappropriate to apply "reasonable person standard" to TVPA putative class where "the employees were recruited from various countries, the terms of the contracts were different, the promissory note amounts were different, employees did not all work in the same state, and they did not have the same

working conditions."); *see also Menocal I*, 320 F.R.D. at 266 (distinguishing *Panwar* because the putative class members in *Menocal* "were all subject to a universal policy under uniform conditions").

### b.    Contract Claims

The parties focus less attention on applying class certification requirements to the breach of contract claims, presumably given the overlapping issues surrounding the breach of contract claims and the evidence of a "scheme" under the TVPA.  The terms of the offers of employment (including the POEA requirements) and the representations made in relation thereto are at play with respect to both sets of claims.

As set forth, Plaintiffs have shown the "formulaic" nature of the employment offers. Similarly, Plaintiffs have shown common issues govern Defendants' pay obligations under the governing H-2B rules, regulations and documents submitted by Defendants in relation thereto.  Therefore, the Court concludes common issues predominate with respect to the breach of contract claims.[17]  Moreover, common proof of "shared circumstances" exist with respect to whether Defendants breached the contracts and which terms were breached.  For example, common issues exist as to Plaintiffs' working conditions and whether Defendants offered fewer hours of work, or failed to provide housing or transportation as promised.

In sum, the predominance inquiry under Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem*

---

[17]    Defendants argue that individualized issues exist with respect to the rate of pay promised as compared to the rate of pay received.  *See* Defs.' Mot. at 41.  But this argument ignores that the overarching issue is whether all class members were paid less than what they were promised, regardless of individualized rates.

*Prods. Inc.,* 521 U.S. at 623.  "[C]lass status is appropriate as long as plaintiffs can establish an aggregation of legal and factual issues, the uniform treatment of which is superior to ordinary one-on-one litigation.  *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014).  Here, Plaintiffs have demonstrated the requisite aggregation of legal and factual issues.  Based on the cohesiveness of the class and the "pervasive character of the common issues," class certification is proper.  *Menocal I*, 320 F.R.D. at 270.

### 2.    Superiority

In addition to predominance, Rule 23(b)(3) requires a plaintiff to "show that a class action would be 'superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Menocal II*, 882 F.3d at 915 (quoting Fed. R. Civ. P. 23(b)(3)).  The superiority requirement is satisfied when a class action would allow for the "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all."  *Id*.  Four non-exhaustive factors govern this inquiry:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claim in the particular forum; and (D) the likely difficulties in managing a class action.

*Id*.; *see also id*., 915, n. 3 (stating that "[a]lthough Rule 23(b)(3) states that these factors are pertinent to both superiority and predominance, most courts analyze these factors solely in determining whether a class suit will be a superior method of litigation.") (quotation marks, brackets, and citation omitted).

Applying these factors, the Court finds Plaintiffs have demonstrated that a class action presents a superior method to litigate the claims.[18]  Due to the similarity of the putative class members' claims, no one member of the class has an interest in controlling the prosecution of the action.  As to the second factor, neither party has indicated there is any ongoing litigation concerning Defendants' conduct at issue here by or against any class member.[19]  Thus, the class action can resolve the issues without conflicting rulings or impediments from other litigation.  Additionally, neither party has disputed the desirability of concentrating the litigation of the claims in the current forum as Defendants and relevant records are located within this judicial district.  And finally, there are no problems identified by the parties that would render the class action format inappropriate for this particular suit.  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).

## V.     **APPOINTMENT OF CLASS COUNSEL**

Upon certification of the class, the Court must appoint class counsel.  *See* Fed. R. Civ. P. 23(c) and 23(g).  In making the appointment, the Court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handing class actions, other complex litigation, and the types of claims

---

[18]     Defendants leave the superiority inquiry unaddressed and, therefore, appear to concede Plaintiffs' satisfaction of the same.

[19]     Plaintiffs' counsel affirmatively represents that they know of no separate action commenced by any members of the class.  Pls.' Exs. 56-59 [ECF 140-50, ¶ 8; 140-51, ¶ 7; 140-52, ¶ 13; and 140-53, ¶ 7]  (Collectively, Pls.' Counsel Declarations).  They also acknowledge an administrative proceeding with the DOL regarding violations related to this action, but represent that the administrative proceeding was resolved through a settlement.  Mot. 139:47.

asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class . . . ." Fed. R. Civ. P. 23(g).

Plaintiffs have submitted the declarations of the following counsel in support of their Motion for Class Certification: Eben P. Colby; George A. Warner; Christopher J. Willett; and Megan Lambert.  *See* Counsel Declarations (identified supra, n. 18).  But Plaintiffs' counsel have not expressly moved for appointment and there are many additional attorneys who either are purported to represent Plaintiffs in declarations submitted to the Court and/or who have entered appearances on behalf of Plaintiffs in this action.[20]  Although it appears the class counsel identified above meet the requisite criteria, it is unclear to the Court whether additional counsel seek appointment as class counsel. Accordingly, Plaintiffs' counsel shall file a separate motion addressing this issue.  Plaintiffs are directed to advise the Court whether Defendants have any objection to appointment of counsel.  Based on the current record and a review of the applicable factors, the Court does not anticipate any such objection.

## VI.    <u>CONCLUSION</u>

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Class Certification [ECF 139] is GRANTED.  The class as proposed in the Motion is certified for Plaintiffs' TVPA and breach of contract claims.  Madelyn Casilao, Harry Lincuna and Allan Garcia shall serve as representatives of the class.  As directed, Plaintiffs' counsel shall file a motion for appointment of class counsel within fourteen days of the date of this Order.

---

[20]    Certain counsel have been granted admission to proceed pro hac vice but have never filed entries of appearance.  *See* LCvR 83.2(g) and 83.4.

IT IS FURTHER ORDERED that: (1) Defendants' *Daubert* Motion to Exclude Reports and Opinions of Luis C. deBaca [ECF 144]; and (2) Plaintiffs' Motion to Strike the Expert Report and Testimony of Greg H. Bristol and Memorandum in Support of Their Motion [ECF 157] are DENIED.[21]

IT IS FURTHER ORDERED that the following Motions are DENIED as MOOT:

(1)     Defendants' Motion to Strike Plaintiffs' Exhibit List [ECF 150]; Plaintiffs' Cross-Motion to Strike Defendants' Exhibit List [ECF 151]; and Defendants' Combined Motion in Limine [ECF 154]. [22]

---

[21]     The Court has reviewed the expert opinions of Mr. Bristol and Mr. deBaca in light of the governing standards.  *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  In the related *Francis* action, the parties submitted virtually identical expert reports, and motions related thereto in support of their respective positions on the issue of class certification. The Court adopts and incorporates herein its findings made in the *Francis* action.  *See* Order ECF 152:29-30, n. 21.

[22]     The Court deems the briefing submissions adequate on the issue of class certification.  In addition to the allegations of the Complaint, the Court has meticulously examined the substantial evidentiary materials submitted by the parties.  Those evidentiary materials were obtained, in part, during the course of significant discovery permitted on the class certification issue.  The Court, therefore, deems an evidentiary hearing unnecessary.  Given the extensive record and the completeness of the parties' briefing, an evidentiary hearing would not add much to the Court's analysis.  *See, e.g., Hershey v. ExxonMobil Oil Corp.*, No. 07-1300-JTM, 2011 WL 1234883 at *14 (D. Kan. Mar. 31, 2011) (unpublished op.) ("[E]videntiary hearings are not required in all cases of requested class certification.").

With respect to Defendants' Motion in Limine, the Court deems consideration of the challenged evidence, i.e., certain "redacted interview statements" made in the context of a wage and hour investigation conducted by the DOL and evidence related to Defendants' participation in the J-1 visa program – including expert opinion evidence regarding the same – unnecessary to resolution of the class certification issues.  Accordingly, the Court denies the Motion at this time, without prejudice to Defendants challenging the offered evidence at some later stage in these proceedings.

IT IS FURTHER ORDERED that Defendant Apex USA, Inc.'s Motion for Summary Judgment [ECF 153] is DENIED as premature, without prejudice to refiling.[23]

IT IS SO ORDERED this 30th day of September, 2021.

SCOTT L. PALK
UNITED STATES DISTRICT JUDGE

---

[23] The Court's current Scheduling Order [ECF 72, 116], is directed to the class-certification stage of these proceedings.  Accordingly, discovery has been limited, to date, to issues pertaining to class certification.  Under these circumstances, the Court agrees with Plaintiffs' counsel, *see* Decl. of Catherine Fisher [ECF 176-1], that any merits-based rulings are premature.  Notably, in this regard, it was the Defendants, not the Plaintiffs, who opposed combining class-based and merits-based discovery and instead requested "bifurcated discovery."  *See* Joint Status Report ECF 68:6-7.