# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

MADELYN CASILAO, HARRY LINCUNA,
and ALLAN GARCIA, on behalf of
themselves and all others similarly situated,
Plaintiffs,

v.                                                    Case No.:  CIV-17-800-SLP

HOTELMACHER LLC, dba HOLIDAY INN
EXPRESS; STEAKMACHER, LLC, dba
MONTANA MIKE'S STEAKHOUSE;
SCHUMACHER INVESTMENTS, LLC, dba
WATER ZOO; APEX USA, INC.; WALTER
SCHUMACHER; and CAROLYN SCHUMACHER,
Defendants.


### Expert Report of Dr. Kimberly Mehlman-Orozco
### CEO of Break the Chain LLC
### 15920 Fairway Drive
### Dumfries, Virginia 22025
### (703) 362-9405


*Kimberly*

_____

**SUBMITTED BY DR. KIMBERLY MEHLMAN-OROZCO under penalty of
perjury. June 6, 2022[1].**



---

[1] I may prepare graphic or illustrative exhibits based on the information reviewed and/or my analyses for
use at trial. I reserve the right to amend my analysis, opinions, and this report should additional information
be made available.

## Table of Contents

I.     INTRODUCTION ...................................................................................................4

II.    DEFINITIONS ........................................................................................................6

III.   SUMMARY OF OPINIONS.................................................................................8

IV.    HUMAN TRAFFICKING BRIEF ....................................................................10
    Background ...............................................................................................................10
    Overview ..................................................................................................................11

V.     HUMAN TRAFFICKING PARAMETERS .....................................................14
    Reliable Principles and Scientific Methods ............................................................14
    Past and Current Opinions of Plaintiffs' Purported Expert Florence Burke ........15
    Beyond Parameters of Human Trafficking .............................................................17

VI.    CURRENT CASE ................................................................................................20
    Overview ..................................................................................................................20
    Specific Allegations ................................................................................................24
        *Madelyn Casilao* ...............................................................................................24
        *Harry Lincuna* ..................................................................................................25
        *Allan Garcia* .....................................................................................................26

VII.   REBUTTAL OF FLORENCE BURKE .......................................................28

XI. CONCLUSION .........................................................................................................34

APPENDICIES ..............................................................................................................35
    APPENDIX A – CURRICULUM VITAE ................................................................35
    APPENDIX B – EXPERT WITNESS TESTIMONY ..............................................49
    APPENDIX C – ACKNOWLEDGEMENT OF PRO BONO WORK FOR  HUMAN
    TRAFFICKING SURVIVORS .................................................................................51
    APPENDIX D – DELPHI SURVEY HUMAN TRAFFICKING INDICIA .............52
    APPENDIX E – LETTER OF REFERENCE ON EXPERT WITNESS TESTIMONY ............56
    APPENDIX F – MATERIALS REVIEWED AND CONSIDERED ........................57
    APPENDIX G – SAMPLE OF HUMAN TRAFFICKING CASES..........................58

APPENDIX H – DELPHI "STRONG TRAFFICKING INDICATORS" APPLIED TO
CURRENT CASE ..........................................................................................................73

**TABLE OF FIGURES**

Figure 1. Philippine Overseas Employment Administration Document Section ............. 19

**TABLE OF TABLES**

Table 1. Purported Plaintiff Expert Florence Burke Statements and Countervailing
Information .................................................................................................................... 28
Table 2. Delphi "Strong Trafficking Indicators" Applied to Current Case ..................... 74

# I.   INTRODUCTION

I, Dr. Kimberly Mehlman-Orozco, am the Chief Executive Officer (CEO) of Break the Chain, LLC. I have been engaged by Hotelmacher LLC dba Holiday Inn Express; Steakmacher, LLC dba Montana Mike's Steakhouse; Schumacher Investments LLC dba Water Zoo; Apex USA, Inc.; Walter Schumacher and Carolyn Schumacher in the above-captioned action to provide opinions as applicable. My compensation for this engagement is my hourly rate of $750 per hour. My compensation is not contingent upon offering any specific opinions or on the outcome of this matter.

Over the past fifteen years, I have accumulated a variety of work experiences that contribute to my qualifications as an expert on human trafficking (see Appendix A for a copy of my Curriculum Vitae). As the CEO of Break the Chain, LLC and former CEO of Mahn, Mehlman & Associates, LLC, I regularly serve as an expert witness for human trafficking cases (see Appendix B for list of cases). I also provide pro-bono expert witness services for human trafficking survivors (see Appendix C for letter of reference).

I am the author of a book on the different forms of human trafficking, which is used to train law enforcement on recognizing the red flags, entitled *Hidden in Plain Sight: America's Slaves of the New Millennium*. For this book, I performed extensive primary and secondary research, including:

> (1) Conducted a systematic review of approximately 300 human trafficking cases;
> (2) Performed content analyses on nearly 1,000 media reports of human trafficking arrests;
> (3) Conducted approximately 100 interviews of human trafficking victims; and
> (4) Conducted approximately 2,000 interviews with human traffickers.

My book was incorporated into the curriculum used by ERASE Child Trafficking to train law enforcement in the United States on human trafficking identification and investigation. The book also received a variety of advanced praise from experts within the field.

In addition, I formally served as an adjunct human trafficking subject matter expert for RAND Corporation, a nonprofit institution that helps improve policy and decision-making through research and analysis. In that capacity, I worked on three study proposals:

> (1) Research design to evaluate the National Human Trafficking Hotline;
> (2) Development of an evidence based human trafficking risk assessment tool for organizations working with minors; and
> (3) Evaluating the outcomes of housing services for adult and juvenile human trafficking survivors.

In these capacities, I have had the opportunity to train various law enforcement agencies around the country on my human trafficking research for investigations, including

4

Homeland Security Investigations in Buffalo, NY; Montebello Police Department in Montebello, California; the North Carolina State Bureau of Investigation; and the Royal Canadian Mounted Police in Halifax, Nova Scotia. I have also presented my research at various human trafficking summits and conferences and served on the Greater Prince William County Human Trafficking Task Force (GPWCHTTF) as the data collection sub-committee chair, as well as on the Prince George's County Human Trafficking Task Force.

In addition to my work on human trafficking, I have received formal training, as well as quantitative and qualitative research experience, during my graduate coursework at George Mason University. Specifically, I served as a research associate on the Trinidad and Tobago Crime Reduction Project, which involved government-sanctioned surveys of both police officers and members of the community in Trinidad. I also led participant outreach for the Office of Juvenile Justice and Delinquency Prevention (OJJDP) Census of Juveniles on Probation.

In addition to my practical and research experience, I also formally taught about human trafficking as part of my course material at George Mason University and at University of Maryland, College Park, the #1 criminology department in the nation.

I hold a Ph.D. in Criminology, Law and Society from George Mason University, as well as a M.S. in Justice, Law, and Crime Policy and a B.S. cum laude in Administration of Justice.

My research on the efficacy of anti-trafficking interventions has been published in the *Journal of Social Inclusion*, which was guest edited by leading human trafficking expert Siddharth Kara, a Harvard University Lecturer and author of "Sex Trafficking: Inside the Business of Modern Slavery." My qualitative interviews with convicted human traffickers were also published in the journal *Trends and Organized Crime*. My research has also been published through magazines such as the Diplomatic Courier and in media outlets, such as USA Today, Politico, The Houston Chronicle, The Hill, The Washington Post, The Baltimore Sun, The Crime Report, Thomson Reuters, and others.

Additionally, I serve as a peer-reviewer for empirical research articles on human trafficking, for example with the Journal of Human Trafficking and American Journal of Evaluation.  I also serve as a peer-reviewer for grant applications for human trafficking research. Most recently, in June 2022, I am serving as an invited peer-reviewer for the U.S. Department of Justice, Office of Justice Programs, National Institute of Justice Research and Evaluation on Trafficking in Persons. Previously, I was invited by the Office of Justice Programs and National Institute of Justice to serve as a peer-reviewer for FY 2020 Research on Law Enforcement Responses to Sex Trafficking of Minors.

## II.   DEFINITIONS

**Labor trafficking**: the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.[2]

**Involuntary Servitude:** a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury or by the use or threat of coercion through law or the legal process.[3]

**Coercion:** the term "coercion" means: (A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of the legal process.[4]

**Serious Harm:** any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.[5]

**Abuse or Threatened Abuse of Law or Legal Process:** the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.[6]

**Secondary Exploitation:** the act of making use of or benefiting from a human trafficking survivor's victimization or the human trafficking phenomenon.[7]

**Recruiter:** Those who facilitate migrant workers to find employment.
Trafficking: Article 3 of the UN Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children (2000):

> "(a) 'Trafficking in persons' shall mean the recruitment, transportation, transfer, harbouring or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the

---

[2] 22 U.S.C. § 7102.(11)(B).
[3] This definition encompasses cases in which the defendant holds the victim in servitude by placing him or her in fear of such physical restraint or injury or legal coercion. *United States v. Kozminski*, 487 U.S. 931, 952 (1988).
[4] *Ibid*; 22 U.S.C. § 7102.(3).
[5] 18 U.S. Code § 1589 (c)(2)).
[6] 18 U.S.C. §1589(c)(1)-).
[7] Cojocaru, Claudia. (2016). 'My Experience is Mine to Tell: Challenging the abolitionist victimhood framework', Anti-Trafficking Review, 7, pp. 12—38.

purpose of exploitation. Exploitation shall include, at a minimum, the exploitation of the prostitution of others or other forms of sexual exploitation, forced labour or services, slavery or practices similar to slavery, servitude or the removal of organs;

(b)  The consent of a victim of trafficking in persons to the intended exploitation set forth in subparagraph (a) of this article shall be irrelevant where any of the means set forth in subparagraph (a) have been used;

(c)  The recruitment, transportation, transfer, harbouring or receipt of a child for the purpose of exploitation shall be considered 'trafficking in persons' even if this does not involve any of the means set forth in subparagraph (a) of this article;

(d)  'Child' shall mean any person under eighteen years of age[8]."

**Transporter:** An agent involved in the movement of migrants from one place to another (usually across the border)[9].

---

[8] Pearson, Elaine, et. Al. (2006) The Mekong Challenge: Underpaid, Overworked and Overlooked. International Labor Organization. Retrieved from: http://www.ilo.org/wcmsp5/groups/public/---asia/---ro-bangkok/documents/publication/wcms_bk_pb_67_en.pdf
[9] *Ibid.*

## III.   SUMMARY OF OPINIONS

I.      The congressional intent of human trafficking laws is to address modern slavery.

II.     Human trafficking is often conflated with other forms of crime and victims are frequently misidentified.

III.    Extant human trafficking cases illustrate a clear pattern on what falls within the legal parameters of modern slavery.

IV.     State of the science research on trafficking indicia suggests that (when combined with other factors) being deceived about the nature of the job, location, or employer, or deceived about access to education opportunities can be "strong indicia" of trafficking. The Plaintiffs do not make these allegations in this case.

V.      State of the science research on trafficking indicia suggests that (when combined with other factors) physical violence, abduction, forced marriage, forced adoption, selling of the victim, debt bondage to an employer, and explicit threats of violence can be "strong indicia" of trafficking. The Plaintiffs do not make these allegations in this case.

VI.     State of the science research on trafficking indicia suggests that (when combined with other factors) excessive working days, excessive working hours, and hazardous work can be "strong indicia" of trafficking. The Plaintiffs do not make these allegations in this case and, in fact, the Plaintiffs allege the opposite—that they did not work enough days or hours.

VII.    State of the science research on trafficking indicia suggests that (when combined with other factors) confiscation of identification documents, forced criminal activity, forced tasks, isolation, confinement, and surveillance can be "strong indicia" of trafficking. The Plaintiffs do not make these allegations in this case.

VIII.   State of the science research on trafficking indicia suggests that being completely dependent on exploiters (controlled housing, transportation, communication, sustenance, etc.)  can be "strong indicia" of trafficking when combined with other factors. The Plaintiffs do not make these allegations in this case.

IX.     Many of the opinions offered by Plaintiffs' expert appear to be based on unsupported speculation or subjective belief and are not supported by reliable principles and scientific methods.

X.   Based on the evidence in this case, my expertise on the identification of human trafficking victims, and my review of extant human trafficking cases, I concluded that the Plaintiffs' allegations, even if all accepted as true and countervailing evidence is ignored, are atypical and inconsistent with standard labor trafficking patterns and indicia.

# IV.   HUMAN TRAFFICKING BRIEF

## Background

Anti-trafficking efforts in the United States began with the 13th amendment to the U.S. Constitution. Passed by Congress on January 31, 1865, and ratified on December 6, 1865, the 13th amendment abolished slavery in the United States and provides that "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."[10]

Although the 13th amendment is credited for abolishing slavery in the United States, in reality it ended the overt buying and selling of people as chattel or personal property. Covert forms of enslavement continued and, until the passage of the Trafficking Victims Protection Act (TVPA) in 2000, were prosecuted as forced labor.

The Trafficking Victims Protection Act was adopted in response to *United States v. Kozminski*, 487 U.S. 931 (1988). In that case, the Kozminskis recruited two men with noticeable mental incapacities to live and work on their farm, where they each received $15 per week for their labor, working **seven days a week, for up to 17 hours a day**. Eventually, the men received **no pay** at all for their work, sustained actual or threatened physical abuse, and threats of re-institutionalization if they did not comply to the Kozminskis. In addition, the Kozminskis made "efforts to isolate the men from contact with the outside world through a pattern of verbal and physical abuse." The Kozminskis were convicted in District Court, but appealed the decision to the Sixth Circuit Court of Appeals, asserting that the District Court erred in broadly defining the term "involuntary servitude" to include psychological coercion.

The Sixth Circuit agreed with the Kozminskis, reversed the District Court, and remanded the case to be heard once again in Federal District Court with amended language to aid in determining the definition of involuntary servitude. Per the Sixth Circuit's decision, in order to convict the Kozminskis on the basis of psychological coercion, the U.S. Government had to prove that Robert and Louis were members of a vulnerable class – a minor, an immigrant, or mentally incompetent. However, before the case could be heard, the U.S. Government appealed the Sixth Circuit's decision to the U.S. Supreme Court, challenging the scope of the involuntary servitude's application.

The Supreme Court doubled down on the decision of the Sixth Circuit, preventing the prosecutors from expanding the definition of involuntary servitude to require threat of or sustained physical coercion. This reversed the decision of the District Court and acquitted the Kozminskis of any charge. The legislative history reveals that, in enacting §

---

[10] National Archives. America's Historical Documents. 13th Amendment to the U.S. Constitution: Abolition of Slavery. https://www.archives.gov/historical-docs/13th-amendment

1589, Congress sought to expand Kozminski's limited definition of coercion under § 1584, stating that "[s]ection 1589 will provide federal prosecutors with the tools to combat severe forms of worker exploitation that do not rise to the level of involuntary servitude as defined in Kozminski." *See* H.R. Conf. Rep. No. 106-939, at 101, as reprinted in 2000 U.S.C.C.A.N. 1380, 1393.[11]

## Overview

Human trafficking generally refers to the recruitment, transportation, transfer, harboring or receipt of persons, by means of threat, force, coercion, abduction, fraud, or deception, for the purpose of exploitation. Juveniles, unlike adults, cannot consent to exploitation and therefore should be considered victims of trafficking if they were exploited. This definition encompasses two general forms of human trafficking: labor trafficking and sex trafficking.

Labor trafficking is defined as the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

Sex trafficking, on the other hand is defined as when a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age.

The modern concept of human trafficking did not start becoming internationally popularized until the year 2000.

On October 28, 2000, the U.S. Congress enacted the Trafficking Victims Protection Act (TVPA)[12], which set up formidable actions to combat trafficking in persons. Specifically:

1. Coordinate and monitor anti-trafficking activities through an interagency task force;
2. Prevent human trafficking through vocational training, education, and human trafficking public awareness campaigns;
3. Protect human trafficking survivors by not detaining them in correctional facilities, providing them with medical care and other assistance, and protecting them and their families from revictimization and/or deportation; and

---

[11] Recognized by the Tenth Circuit in *United States v. Kaufman*, 546 F.3d 1242, 1263 (10th Cir. 2008).

[12] Trafficking Victims Protection Act of 2000 (TVPA), Pub. L. No. 106- 386. The TVPA was amended by the following: (1) the Trafficking Victims Protection Reauthorization Act of 2003 (TVPRA 2003), Pub. L. No. 108-193; (2) the Trafficking Victims Protection Reauthorization Act of 2005 (TVPRA 2005), Pub. L. No. 109-164; (3) the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA 2008), Pub. L. No. 110-457; (4) the Trafficking Victims Protection Reauthorization Act of 2013 (TVPRA 2013), Pub. L. No. 113-4; (5) the  Justice for Victims of Trafficking Act of 2015 (JVTA), Pub. L. No. 114-22.

4. Strengthening prosecution and punishment of human traffickers[13].

Less than two months after the TVPA was adopted in the United States, the United Nations met in Palermo, Italy, and adopted the Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime—colloquially known as the Palermo Protocol. The purpose of the protocol was threefold:

1. To prevent and combat trafficking in persons, paying particular attention to women and children;
2. To protect and assist the victims of such trafficking, with full respect for their human rights; and
3. To promote cooperation among states' parties in order to meet those objectives[14].

Since 2000, there has been a substantial increase in public awareness of human trafficking. There are more anti-trafficking task forces, hotlines, and survivor services than ever before. However, there are still critical gaps between the human trafficking narrative, reality, and policy.

Although more people are aware of the human trafficking concept, few understand how this crime manifests in real life, and there is little empirical data to support generalizable information. Typically, victims are coerced, defrauded, and deceived into exploitive situations, where they are manipulated into complacency. Many organizations and anti-trafficking authorities provide information on how to identify "red flags" of human trafficking, which have yet to be empirically tested, and even trained law enforcement and service providers frequently misidentify victims.

As a result, while the congressional intent behind the TVPRA is clear— to combat trafficking in persons, a contemporary manifestation of slavery—the contemporary legal application is not without challenges to interpretation. Many experts agree that "the anti-trafficking field is a strikingly 'rigor-free zone' when it comes to defining the concept's legal parameters[15]. It is believed that key aspects of the legal definition were intentionally left vague in order to achieve consensus, but this has resulted in the indiscriminate conflation of legal concepts and misidentification of victims[16].

Even the International Labor Organization recognizes:

*There are questions concerning what is meant by terms such as "coercion", "deception", "fraud", "abuse of power or of a position of vulnerability",*

---

[13] Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. H.R. 3244 (2000). http://www.state.gov/j/tip/laws/61124.htm
[14] Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime. (2000).
[15] Chuang, Janie A. (2014). Exploitation Creep and the Unmaking of Human Trafficking Law. *The American Journal of International Law*. (108) 4: 609-649.
[16] *Ibid.*

*"control over another person" and "exploitation". Without further clarification there is a risk that interpretations of these terms may continue to diverge widely from one country to another or even within countries, from one researcher or practitioner to another. Without clear operational indicators there is also a risk that researchers and practitioners may not recognize trafficking when they see it – **or see trafficking where it does not exist**[17]."*

---

[17] ILO. (2009). Operational indicators of trafficking in human beings: Results from a Delphi survey implemented by the ILO and the European Commission. Retrieved from:
http://www.ilo.org/wcmsp5/groups/public//@ed_norm//@declaration/documents/publication/wcms_105023.pdf

# V.   HUMAN TRAFFICKING PARAMETERS

## Reliable Principles and Scientific Methods

Although there is little reliable empirical data on human trafficking, some exploratory research has begun to establish themes on the nature of human trafficking crimes. For example, in 2009 the International Labour Office published the results from a Delphi survey that was used to identify Operational indicators of human trafficking. The Delphi methodology involved two successive electronic surveys of human trafficking experts: a first survey in April 2008 to collect indicators from the expert group; and a second one in July 2008 to establish a rating of the indicators. Experts were selected from the 27 EU Member States from police, government, academic and research institutes, NGOs, international organizations, labor inspectorates, trade unions and judiciaries.

Findings from the survey suggested there are six "dimensions" of trafficking indicators: (1) deceptive recruitment, (2) coercive recruitment, (3) recruitment by abuse of vulnerability, (4) exploitive conditions of work, (4) coercion at destination, and (5) abuse of vulnerability at destination. The indicia for each dimension were ranked "strong," "medium," or "weak" for each type of trafficking: (1) trafficking of adults for labor, (2) trafficking of adults for sex, (3) trafficking of children for labor, and (4) trafficking of children for sex.

Each of the six dimensions of trafficking were assessed independently from the others and the result of the assessment was positive if the dimension included at least: (1) Two strong indicators, or (2) One strong indicator and one medium or weak indicator, or (3) Three medium indicators, or (4) Two medium indicators and one weak indicator.

After an assessment was done for each dimension, the final analysis involved combining the six elements to identify potential victims of trafficking—in the case of adults, the presence of deception, coercion, abuse and exploitation and in the case of children simply the presence of exploitation.

A full scale test of these indicators took place in Moldova in the second half of 2008, using a sample of migrants. The final analysis of the dataset gave the ratio of migrants to victims of deceptive or coercive recruitment, exploitation, and coercion at destination. Based on the results, migrants were qualified as successful migrants (no deception, no exploitation, no coercion), exploited migrants (exploitation without deception or coercion), victims of deception and exploitation (without coercion) and victims of trafficking for forced labor (deception, exploitation, and coercion).

A full list of the indicia from the Delphi Survey is included in Appendix D. A summary of "Strong Indicators" are listed below:

- *Deceptive recruitment:* being deceived about the nature of the job, location, or employer, or deceived about access to education opportunities.

- *Coercive recruitment:* violence, abduction, forced marriage, forced adoption or selling of the victim, debt bondage, or threats of violence.
- *Abuse of vulnerability:* no identified strong indicators.
- *Exploitation:* excessive working days, excessive working hours, or hazardous work.
- *Coercion at destination:* confiscation of documents, debt bondage, forced into illicit/criminal activities, forced tasks or clients, isolation, confinement, surveillance, threats of violence against victim, or violence against victim.
- *Abuse of vulnerability at destination:* dependency on exploiters.

Ultimately, given the dearth of empirical research on human trafficking "red flags" it is important to consider the totality of the circumstances, as well as available qualitative research and evidence when making a determination of human trafficking. In contrast, it is inappropriate to ignore certain pieces of evidence and rely instead on abstract presumptions or unsupported generic allegations.  Close examination of extant human trafficking cases in the United States reveals a clear theme in the types of actions that rise to the level of being tantamount to forced labor or modern slavery (for example see Appendix G).

## Past and Current Opinions of Plaintiffs' Purported Expert Florence Burke

In the current case before this court, the Plaintiffs' purported expert Ms. Florence Burke opined that the Plaintiffs' allegations, if accepted as true, are similar to those of a typical labor trafficking case. However, she provides no citation or reference to any study or case to support this opinion, which ostensibly appears to be based on unsupported speculation and subjective belief, rather than reliable scientific methods and procedures. In fact, her opinions in this case appear to be remarkably different from her past reports, likely shifting to match the fact pattern of the present allegations. For example, in the case of *Simret Semere Tekle v. Nouf Bint Nayef Abul-Aziz Al Saud Mohammad Bin Abdullah Al Saud (2019)*, Ms. Burke issued a report that included the following paragraph, which is notably removed from her report in this case:

> "According to a recent study on labor trafficking, the most common form of victimization that individuals experienced at the hands of their traffickers involved methods that disoriented and deprived them from seeking alternatives to their situation.[18] Such methods **include isolation, restricted communications, and monitoring or surveillance**. The study also found that another form of victimization was **demeaning and demoralizing** the worker.[19] This method included **verbal abuse, sexual abuse, and humiliation**. For many survivors of human trafficking, the verbal abuse and shaming they were forced to endure from the perpetrators were enough to stop them from trying to seek help or escape their situation. **These**

---

[18] Colleen Owens et al., Understanding the Organization, Operation, and Victimization Process of Labor Trafficking in the United States at 80, Urban Institute (2014), https://www.urban.org/research/publication/understanding-organization-operation-andvictimization-process-labor-trafficking-united-states
[19] *Ibid.*

*findings are consistent with my experience[20]."*

The source of this study is The Urban Institute—a nonprofit research organization that provides data and evidence to help advance upward mobility and equity. The findings of this study, which Ms. Burke has cited in her prior expert witness report(s), state the most common methods of labor trafficking include isolation, restricted communications, monitoring and surveillance, as well as demeaning and demoralization through verbal abuse, sexual abuse, and humiliation. Ms. Burke goes on to state, "these findings are consistent with my experience," yet they are strikingly absent in the current report before the court in this case. If it is Ms. Burke's experience, based on her prior report(s) and testimony, that allegations of isolation, restricted communications, monitoring, and surveillance, as well as demeaning and demoralization through verbal abuse, sexual abuse, and humiliation are typical to labor trafficking cases, the current case should be viewed as atypical and inconsistent with trafficking, considering those allegations were not levied by Plaintiffs.

Similarly, in her report for *Magnifico, et al. v. Villanueva, et al.*, Ms. Burke wrote:

> *"Once in the United States, these victims typically find themselves without friends and **unable to communicate** with the outside world. Employers usually **confiscate documents** so that victims are unable to return to their home country, even if they were able to escape. Without passports, return plane tickets or other identification documents, the victims are powerless and are forced to remain in increasingly exploitative conditions. Trafficked persons **work long hours** while receiving extremely low or **no pay**. Victims have reported working **16 to 20 hours a day, seven days a week** and many are subjected to **physical, psychological and sexual abuse or threats**. If victims ask or threaten to leave, they are often **subjected to violence or the threat of violence** to themselves or their families within the country of origin[21]."*

And in her report for *Corine Elat, v. Caroline Raissa Emandop Ngoubene, Roxane Marie-Francoise Ngoubene, Dany Estell Ngoubene*, Ms. Burke wrote:

> *"Consistent with patterns in other trafficking cases was the defendants' alleged refusal to sufficiently pay the plaintiff for her services, refused to provide her with access to adequate medical care, the use of **verbal attacks, limiting her contact and communications with others**, and use of **threats, isolation, control, and interpersonal intimidation** which renders the individual too frightened to speak with others and/or law enforcement[22]."*

---

[20] *Simret Semere Tekle v. Nouf Bint Nayef Abul-Aziz Al Saud Mohammad Bin Abdullah Al Saud* (2019). Florience Burke Expert Witness Report. Pages 5-6.

[21] *Magnifico, et al. v. Villanueva, et al.* (2012) Florence Burke Expert Witness Report. Pages 3-4.

[22] Corine Elat, v. Caroline Raissa Emandop Ngoubene, Roxane Marie-Francoise Ngoubene, Dany Estell Ngoubene (2013). Expert Report of Florence R. Burke. United States District Court for the District of Maryland Southern Division.

In Ms. Burke's own prior expert witness reports, she repeatedly discussed factors that are not only evident in many other human trafficking cases (for example see Appendix G), but are also supported by reliable principles and scientific methods evidenced in empirical research such as the ILO Delphi Survey and The Urban Institute Study, which Ms. Burke has previously cited. Specifically, for example:

1. Restricted communication;
2. Long work hours;
3. Confiscated identification documents;
4. Physical abuse;
5. Sexual abuse;
6. Surveillance and Isolation.

Instead of acknowledging the fact that the indicia Ms. Burke has previously cited are strikingly absent from the Plaintiffs allegations in the current case before the court, she appears to have created a new set of indicia to fit the facts of this case, without providing any empirical or even anecdotal justification. For example, stating "the Plaintiffs' allegations and testimony are similar to other trafficking schemes with recognizable fact patterns... the Plaintiffs incurred debts through recruitment fees, travel and visa fees, and were forced to live in housing that was overcrowded and expensive for them." Even if accepted as true, the Plaintiffs allegations are not consistent established trafficking cases, and do not contain "strong indicia" identified through reliable principles and scientific methods in empirical research. As such, it is my opinion that her findings appear to be based on nothing more than unsupported speculation and/or subjective belief.

## Beyond Parameters of Human Trafficking

To that effect, courts have recognized that **"not all bad employer-employee relationships ... will constitute forced labor."[23]**  In the case of *U.S. v. Dann* the court held that the threat of harm must be serious and recognized that the intent of Congress was to address serious trafficking, or cases "where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence."[24] According to the statute, the threat, considered from the vantage point of a reasonable person in the place of the victim, must be "sufficiently serious" to compel that person to remain. *See* 18 U.S.C. § 1589(c)(2). The typical forced labor case involves an explicit and articulated threat, specifically made in the form of a statement. A statement is a threat if a reasonable person would believe that the intended audience would receive it as a threat, regardless of whether the statement was intended to be carried out.[25]

---

[23] *U.S. v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011)
[24] *Ibid*. (citing to H.R.Rep. No. 106–939, at 101 (Conf.Rep.)
[25] *See, e.g.*, *United States v. Fuller*, 387 F.3d 643, 646 (7th Cir.2004) (threat to life of President); *United States v. Hart*, 226 F.3d 602, 607 (7th Cir.2000) (threat of death with unknown object purported to be bomb during bank robbery).

Second, the scope of the statute is narrowed by the requirement of scienter.[26] The jury must find that the perpetrator intended to cause the victim to believe that she would suffer serious harm—from the vantage point of the victim—if she did not continue to work. While the serious harm need not be effectuated at the defendant's hand, the statute "requires that the plan be intended to cause the victim to believe that that harm will befall her."[27] The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall him or her[28]. **The typical forced labor case involves a combination of factors, including but not limited to: restricted communication; controlled housing, communication, transportation, and finances; long work hours; confiscated identification documents; physical and sexual abuse; surveillance and isolation; as well as explicit and repeated threats.**

Although this is a relatively new area of civil litigation, there are a growing body of cases that illustrate what actions fall outside the scope of human trafficking and when third party liability should not be permitted.

For example, in the case of *Headley v. Church of Scientology Int'l*, two former ministers claimed that the Church of Scientology forced them to provide labor in violation of the Trafficking Victims Protection Act.[29] The forced-labor claims centered on the theory that the Church and Center psychologically coerced the plaintiffs to provide labor by causing them to believe that they could not leave the ministry or that they would face serious harm in doing so. **The court held that three instances of physical force against the plaintiff in 15 years did not alone raise a triable issue of material fact on his forced-labor claim, especially since the plaintiff was able to leave the Church throughout that time and thus could have avoided providing labor.** The *Headley* Court granted summary judgment on TVPRA claim, noting plaintiffs "had innumerable opportunities to leave the defendants" but "chose instead to stay with the defendants and to continue providing their ministerial services."

In the current case, even if all of the Plaintiffs allegations are accepted as true and countervailing evidence is completely ignored, there were no instances of physical force against the Plaintiffs in the approximate six months they each spent working for the Defendants. If accepted as true, only one Plaintiff alleged one utterance which could even be misconstrued as a potential threat. Plaintiff Garcia claimed that on one occasion he asked Defendant Walter Schumacher about the refund of his plane ticket to the United States and Plaintiff Garcia states that Defendant Walter Schumacher told him that he would only provide a return ticket was if he were to "come home in a box." This was not told to the other Plaintiffs[30] and, according to Defendant Walter Schumacher, was a mischaracterization of a statement related to the repatriation of remains. It was Defendant

---

[26] *U.S. v. Calimlim*, 538 F.3d 706, 711-12 (7th Cir. 2008)
[27] *Id*.
[28] *See id*. at 709, 713.
[29] *Headley v. Church of Scientology Int'l*, 687 F.3d 1173 (9th Cir. 2012).
[30] Plaintiff Casilao had never heard of this threat, see Casilao Deposition, page 74, 22-25 and page 75, 1-8.

Walter Schumacher's understanding that the Philippine Overseas Employment Administration only required employers to provide return airfare prior to the completion of the employment contract in the event of the repatriation of remains, specifically evidenced by section seven of that form (see Figure 1).

Ultimately, similar to the case of *Headley v. Church of Scientology Int'l,* the Plaintiffs in this case were not guarded, surveilled, or monitored, and had innumerable opportunities



to leave the Defendants, but instead chose to stay working for the Defendants. During her deposition, Plaintiff Casilao even stated, "It isn't like I was forced to work. No one forced me to work."(pg 126, 13-14). Indeed, the evidence indicates that *all* potential

**Figure 1. Philippine Overseas Employment Administration Document Section**

class members, except Ms. Casilao, actually did leave their employment with the Defendants before the expiration of their visas.

19

## VI.   CURRENT CASE

### Overview

The current case involves labor trafficking allegations against Walter and Carolyn Schumacher and their businesses. According to the Complaint, the Plaintiffs alleged that they were:

1. Compelled to pay "hefty" fees for recruitment, immigration processing, and travel;
2. Promised full time work;
3. Promised "good" pay;
4. Promised free housing (or a housing allowance);
5. Promised free food;
6. Promised free transportation; and
7. Promised long-term work potential[31].

The Plaintiffs further allege in their Complaint that, in order to compel their work, the Defendants:

1. Defrauded them in the recruitment process about fees, food, housing, transportation, work schedule, and income; and
2. Used the H-2B guest worker visa process, so the Plaintiffs couldn't work for anyone else[32].

Once in the United States, the Plaintiffs claim that they were deceived about their employment because:

1. The Plaintiffs' hourly wage rate was lower than expected[33];
2. The Plaintiffs did not receive full-time employment[34];
3. The Plaintiffs did not receive free housing or housing allowances, but instead the Defendants referred them to overcrowded and costly motel room accommodations at the Plaintiffs' expense[35];
4. The Defendants failed to reimburse the Plaintiffs for their travel expenses to the United States;

---

[31] Complaint ¶ 2.

[32] Complaint ¶ 3.

[33] Complaint ¶ 53 and 54 Plaintiffs Casilao and Lincuna claim they were promised $8.29 to $8.97 per hour, but were instead paid $4.25 per room cleaned Complaint ¶ 74. Complaint ¶ 55 Plaintiff Garcia claims he was offered $9.63 per hour as a server, but instead paid $2 per hour plus tips Complaint ¶ 74.

[34] Complaint ¶ 75 Plaintiffs claim their schedules were modified based on the Defendants' business needs, which led to sometimes only working a few hours per day or three to four days per week.

[35] Complaint ¶ 77. Plaintiffs allege that they were referred to a local motel for housing, not owned or operated by the Defendants, where they paid approximately $150 to $300 per month for their shared accommodations.

5. The Defendants failed to provide the Plaintiffs return travel expenses to the Philippines;
6. The Defendants failed to provide the Plaintiffs free food; and
7. The Defendants failed to provide the Plaintiffs free transportation to and from the worksite[36].

Once in the United States, the Plaintiffs claim that they were compelled to continue working for the Defendants because:

1. On one occasion, Plaintiff Garcia claims that Defendant Walter Schumacher (a police officer) carried a firearm in his car[37];
2. On one occasion, Plaintiff Garcia claims that when he asked Defendant Walter Schumacher about promised airfare to and from the Philippines Defendant W. Schumacher informed him that the only way for him to receive return airfare to the Philippines would be if the employee was returning "in a box[38];"
3. Plaintiffs claim that Defendant W. Schumacher made it "widely known" that he was a current and/or former police sheriff and would talk to Plaintiffs from his patrol car[39]; and
4. Plaintiffs claim that they could not obtain further employment locally to supplement their wages because of the H-2B restrictions[40].

Based on these facts alleged in the Complaint, the Plaintiffs claim to be victims of human trafficking and made claim for relief under Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595, Breach of Written Employment Contract under Oklahoma State Law, and Third Party Beneficiary Claim for Breach of Contract under Oklahoma State Law.

The civil remedy provision of the TVPRA, Section 1595(a), provides: An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

Section 1595 thus requires an "underlying violation" of one of the TVPRA's criminal provisions. Even though the Plaintiffs claim they are victims of forced labor, involuntary servitude and human trafficking in violation of Title 18 U.S.C. §§ 1589, 1590, 1593A, and 1594 (Complaint ¶ 106), it is important to note that there has been no indictment or

---

[36] Complaint ¶ 78. Plaintiffs allege that transportation to and from work was not provided and instead they walked along or across a highway to get to work or paid for their own transportation.
[37] Complaint ¶ 87a.
[38] Complaint ¶ 87b.
[39] Complaint ¶ 89.
[40] Complaint ¶ 91.

conviction of the Defendants under any of these statutes in the ten years since the Plaintiffs left the Defendants employment[41].

Section (a) of Title 18 U.S.C. § 1589 outlines forced labor as:

> Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means--
>
>> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>> (2) by means of serious harm or threats of serious harm to that person or another person;
>> (3) by means of the abuse or threatened abuse of law or legal process; or
>> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished as provided under subsection (d).[42]

Moreover, it is important to note that, even if the Plaintiffs' allegations are accepted as true, they do not allege at any time that the Defendant engaged in force, threats of force, physical restraint, or threats of physical restraint to compel the Plaintiffs to continue working[43]. The Plaintiffs do not allege that the Defendants seriously harmed them or made threats of serious harm to compel the Plaintiffs to continue working. The Plaintiffs do not allege that the Defendants explicitly abused or threatened abuse of law or the legal process to compel them to continue working[44]. And at no time did the

---

[41] Note: Preponderance of the evidence (standard for civil litigation) requires a finding of more likely than not, whereas probable cause (standard for criminal indictment) is a lower standard that requires reasonable grounds to believe. Seltzer, Richard, Canan, Russell F., Cannon, Molly, and Heidi L. Hansberry. 2016. Legal Standards by the Numbers. Judicature.

[42] https://www.law.cornell.edu/uscode/text/18/1589

[43] Plaintiff Garcia claimed that on one occasion he asked Defendant Walter Schumacher about the refund of his plane ticket to the United States and claimed that Defendant Walter Schumacher told him that he would only provide a return ticket was if he were to "come home in a box." This was not told to the other Plaintiffs and, according to Defendant Walter Schumacher, was a mischaracterization of a statement related to the repatriation of remains (see above and Figure 1). Moreover, one instance of an arguable threat in the absence of physical force is not consistent with triable issues of material fact in extant forced-labor claims, especially when the Plaintiff(s) can and do exercise their agency to leave without consequence, avoiding provision of labor.

[44] Legal coercion may occur even when the threatened outcome is not an actual legal possibility. In determining the purpose behind the threats, USCIS examines any threat of legal consequences in light of all of the surrounding circumstances and considers whether the threat is being used for an end different from that envisioned by the law or for a coercive purpose designed to intimidate a worker. Examples of the types of threats that could establish abuse or threatened abuse of the legal process include, but are not limited to, explicit/over threats of imprisonment, prosecution, or imposition of criminal sanctions for failure to perform labor or services; Threats to institutionalize someone in a mental health facility; Threats to have immigration authorities arrest or deport workers, particularly for failing to comply with the trafficker's directives or as a tactic to keep the workers until the end of their contracts by exploiting their fears; or Threats to call immigration authorities, to report a worker for absconding, or to let a person's visa expire. See: https://www.uscis.gov/policy-manual/volume-3-part-b-chapter-2

Plaintiffs believe that they would suffer serious harm or physical restraint if they refused to continue working for the Defendants[45].

Title 18 U.S.C. § 1590 outlines criminal penalties with respect to Trafficking through peonage, slavery, involuntary servitude, or forced labor. While the Plaintiffs claim they are victims of forced labor, involuntary servitude and human trafficking in violation in violation of Title 18 U.S.C. §§ 1590, it is important to note that the Defendants in this case have not been indicted or convicted for any criminal offense related to this statute. According to Title 18 U.S.C. §§ 1590:

> (a) Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both. If death results from the violation of this section, or if the violation includes kidnapping or an attempt to kidnap, aggravated sexual abuse, or the attempt to commit aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title or imprisoned for any term of years or life, or both.
> (b) Whoever obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section, shall be subject to the penalties under subsection (a).[46]

Additionally, Title 18 U.S.C. § 1593A outlines criminal penalties with respect to benefitting financially from peonage, slavery, and trafficking in persons. While the Plaintiffs claim they are victims of forced labor, involuntary servitude and human trafficking in violation in violation of Title 18 U.S.C. § 1593A, it is again important to note that the Defendants in this case have not been indicted or convicted for any criminal offense related to this statute either. According to Title 18 U.S.C. § 1593A:

> Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in any act in violation of this chapter, knowing or in reckless disregard of the fact that the venture has engaged in such violation, shall be fined under this title or imprisoned in the same manner as a completed violation of such section[47].

Title 18 U.S.C. § 1594 includes general provisions for criminal violations to sections 1581, 1583, 1584, 1589, 1590, or 1591. While the Plaintiffs claim they are victims of forced labor, involuntary servitude and human trafficking in violation of Title 18 U.S.C. §§ 1594, it is once again important to note that the Defendants in this case have not been indicted or convicted for any criminal offense related to these statutes and the Defendants have not been subjected to any associated criminal penalties, including but not limited to: imprisonment, fines, and/or asset forfeiture, as outlined in Title 18 U.S.C. § 1594.

---

[45] Plaintiff Casilao even stated, "It isn't like I was forced to work. No one forced me to work."(pg 126, 13-14).

[46] https://www.law.cornell.edu/uscode/text/18/1590

[47] https://www.law.cornell.edu/uscode/text/18/1593A

The allegations in the current case, even if accepted as true, are not consistent with extant indicia and cases of modern slavery, also known as human trafficking. While the Plaintiffs allege that they did not work as many hours as they would have liked, were not paid as much as they would have liked, and did not receive free housing, food, and transportation; they were not compelled to continue working and eventually stopped on their own volition without consequence. Their food, housing, communication, finances, and transportation were not at any time controlled by the Defendants. In fact, the Defendants referred the Plaintiffs to a different business for housing, from which the Defendants received no financial benefit, for housing. The Plaintiffs worked, earned money, and maintained control over the money they earned. While the Plaintiffs allege that they accrued debts from third-parties to afford travel to the United States, they do not allege that they were indebted to the Defendants. The Plaintiffs do not allege that they were physically punished, sexually harassed or abused, or explicitly threatened for the purpose of exploitation or part of any larger condition of forced labor. The Plaintiffs do not allege that the Defendants confiscated their identification documents. Ultimately, even if one accepts all of the Plaintiffs' allegations as true and ignore the substantial body of countervailing evidence and testimony, they do not allege a single "Strong Indicator" of trafficking against the Defendants (see Appendix H).

Ultimately, there are clear threads across human trafficking cases, supported by scientific methods and procedures. However, these threads are strikingly absent from the allegations in the Complaint. Specific allegations from each Plaintiff are discussed in greater detail below.

## Specific Allegations

### Madelyn Casilao

According to the Complaint, Plaintiff Madelyn Casilao is an individual who was recruited in 2012 from the Philippines for work in the United States pursuant to an H-2B visa. Ms. Casilao alleges that in 2012 the Recruiters informed her of a housekeeping position and sent her the corresponding offer letter. Ms. Casilao claims the Recruiters explained that the position paid $8.29 to $8.97 per hour and that housing, food and transportation would be provided. Ms. Casilao also alleges that the Recruiters also promised that any processing and travel fees would be reimbursed on arrival in Oklahoma, and that her H-2B visa would be renewed to continue to work for Defendants[48].

After arriving in the United States in 2012, Plaintiff Casilao worked at Hotelmacher LLC, doing business as the Holiday Inn Express in Clinton, Oklahoma[49]. Plaintiff Casilao claims that she worked as a housekeeper, as expected, but was paid approximately $4.25 per room cleaned. The Complaint alleges that this rate did not

---

[48] Complaint ¶ 53.
[49] Complaint ¶ 11.

satisfy Defendants' contractual promises or federal wage and hour law. However, during her deposition, Ms. Casilao admitted that she averaged approximately 2 to 3 rooms per hour, for an hourly wage rate of $8.50 to $12.75 per hour. Specifically:

> **Question:** How long does it take to clean a room?
> **Answer, Plaintiff Casilao:** It all depends on how dirty or how clean the room is. Maybe -- I don't recall anymore. It would take 20 to 30 minutes. I don't recall anymore, sir.
>
> **Question:** My question was the average room -- so not super-clean, not super-dirty -- would take you 20 to 30 minutes to clean. Right?
> **Answer, Plaintiff Casilao:** Yes, sir, I can do that[50].

Additionally, the Complaint repeatedly discusses how the Plaintiffs incurred substantial debt in order to come to the United States for work[51].  However, during her deposition, Ms. Casilao admits she was never indebted to the Defendants. Instead, she claims that she borrowed over 200,000 pesos from her friend named Lorelle, without any document on the terms of the loan or repayment[52]. According to Ms. Casilao, the borrowed money was for expenses when she first arrived in the United States and 200,000 pesos for a recruiting agent named Irah Ugboracion. Plaintiff Casilao does not allege and no evidence was provided that any of the recruitment money was provided to or received by the Defendants.

### Harry Lincuna

According to the Complaint, Plaintiff Harry Lincuna was recruited in 2012 from the Philippines for work in the United States pursuant to an H-2B visa[53]. Mr. Lincuna alleges that in 2012 Recruiters informed him of a housekeeping position that paid $8.29 to $8.97 per hour and sent him the corresponding Offer Letter. Plaintiff Lincuna states that the Recruiters promised that housing, food and transportation would be provided and that any travel fees would be reimbursed on arrival in Oklahoma.

After arriving in the United States in 2012, Plaintiff Lincuna worked at Hotelmacher LLC, doing business as the Holiday Inn Express in Clinton, Oklahoma, and Schumacher Investments, LLC, doing business as Water Zoo in Clinton, Oklahoma[54]. Plaintiff Lincuna claims that he worked as a housekeeper, as expected, but was paid approximately $4.25 per room cleaned[55]. The Complaint alleges that this rate did not satisfy Defendants' contractual promises or federal wage and hour law. However, during

---

[50] Deposition Casilao Pages 86, 19-23; 87, 9-12.
[51] Complaint ¶ 67, ¶  75, ¶ 83, ¶85, ¶ 109, and ¶ 122
[52] Deposition Casilao Pages 112, 16-25 and 113 1-7.
[53] Complaint ¶ 12.
[54] *Ibid.*
[55] Lincuna Deposition Page 65, 4-7.

his deposition, Mr. Lincuna admitted that he averaged approximately 3 rooms per hour, for an hourly wage rate of $12.75 per hour—nearly four dollars more per hour than the allegedly promised hourly wage. Specifically:

> **Question:** That's not my question. My question is how many rooms on average in a given hour were you able to clean while you were employed with the Holiday Inn?
> **Answer, Plaintiff Lincuna:** In an hour, maybe three[56].

Additionally, the Complaint repeatedly discusses how the Plaintiffs incurred substantial debt in order to come to the United States for work[57]. However, during his deposition, Mr. Lincuna admits he was never indebted to the Defendants. Instead, he claims that **prior to coming to the United States** he borrowed unspecified sums of money from three different people, who he called "loan sharks[58]." He has no documentation of the amount that he borrowed and can't remember how much was borrowed or how much was repaid, but he claimed it was a "substantial" sum[59]. According to Mr. Lincuna, the borrowed money was, in part, for fees and airfare and admitted that he only expected the Defendants to reimburse him for the airfare and document fee, but failed to disclose that expected amount[60]. Plaintiff Lincuna does not allege and no evidence was provided that any of the loan or recruitment money was provided to or received by the Defendants. In addition, once in the United States, Plaintiff Lincuna discussed borrowing money from Plaintiff Casilao[61].

### *Allan Garcia*

According to the Complaint, Plaintiff Allan Garcia is an individual who was recruited in 2012 from the Philippines for work in the United States pursuant to an H-2B visa. Mr. Garcia alleges that in 2012 recruiters informed him of a server position that paid $9.63 per hour and sent him the corresponding Offer Letter. Plaintiff Garcia claims that the recruiters promised that housing, food and transportation would be provided and that any travel fees would be reimbursed on arrival in Oklahoma[62].

After arriving in the United States in 2012, Plaintiff Garcia worked at Steakmacher LLC, doing business as Montana Mike's Steakhouse in Clinton, Oklahoma[63]. Plaintiff Garcia claims that he worked as a server, as expected, but was paid approximately $2.13 per hour plus tips[64]. The Complaint alleges that this rate did not satisfy Defendants' contractual promises or federal wage and hour law. However, according to the Department of Labor, "An employer of a tipped employee is only

---

[56] Lincuna Deposition Page 65, 12-15.
[57] Complaint ¶ 67, ¶ 75, ¶ 83, ¶85, ¶ 109, and ¶ 122
[58] Lincuna Deposition Page 88.
[59] Lincuna Deposition Page 44.
[60] Lincuna Deposition Page 45.
[61] Lincuna Deposition Page 96, 13-18.
[62] Complaint ¶ 55.
[63] Complaint ¶ 13.
[64] Garcia Deposition Pages 58-59.

required to pay $2.13 per hour in direct wages if that amount combined with the tips received at least equals the federal minimum wage[65]." During his deposition, Mr. Garcia had no idea how much money he earned per hour after tips or whether it equaled minimum wage.  Specifically:

> **Question:** Mr. Garcia, how much were you paid, actually paid, per hour during your time at Montana Mike's.
> **Answer, Plaintiff Garcia:** It's $2.13 per hour.
>
> **Question:** That's it? Nothing more?
> **Answer, Plaintiff Garcia:** Plus tip.
>
> **Question:** So how much money did you actually make for every hour that you worked for the entire time that you were at Montana Mike's?
> **Answer, Plaintiff Garcia:** I don't know. I don't have a calculator. I can't calculate it.[66].

Additionally, the Complaint repeatedly discusses how the Plaintiffs incurred substantial debt in order to come to the United States for work[67]. However, during his deposition, Mr. Garcia admits he was never indebted to the Defendants. Instead, he claims that **prior to coming to the United States** he took out several loans in the amounts of: $2,450, $1,500, and $750[68]." At the time of his deposition, Mr. Garcia claimed he only owed $400 to his in-law, from whom he had borrowed the $750[69].

According to Mr. Garcia, the borrowed money was, in part, for fees and airfare and admitted that he expected the Defendants to reimburse him for the airfare and document fee ($1,400 airfare, $550 processing fee, and $1,200 to April Tan)[70]. It is worth noting, that even if accepted as true, the alleged costs, fees, and loan repayment agreements are very different than trafficking situations, which are typically exponentially higher. Ultimately, like Plaintiff Casilao and Plaintiff Lincuna, Plaintiff Garcia does not allege and no evidence was provided that any of the loan or recruitment money was provided to or received by the Defendants.

---

[65] https://www.dol.gov/general/topic/wages/wagestips
[66] Garcia Deposition Pages 58-59.
[67] Complaint ¶ 67, ¶  75, ¶ 83, ¶85, ¶ 109, and ¶ 122
[68] Garcia Deposition Page 70.
[69] Garcia Deposition Pages 70-71.
[70] Garcia Deposition Page 67.

# VII.  REBUTTAL OF FLORENCE BURKE

In her report, Ms. Burke claims that her opinions are founded in patterns typically present in trafficking situations and how these methods affect workers. On the first page of her report, she asserts that the "presence of many or all of these factors tends to indicate a situation involving human trafficking."

Ms. Burke claims that after reviewing case materials and documents, and given her experience with an unspecified number of "similar cases," she "concluded that Plaintiffs' allegations contain many indicators of a trafficking situation and, if true, Plaintiffs' and the class members' experiences are similar to those of a typical labor trafficking case (Page 2)."

Upon reading her report, it is abundantly clear that Ms. Burke's opinions are strikingly unsupported by any empirical evidence and even include multiple instances of misinformation (See Table 1 for example, not comprehensive).

**Table 1. Purported Plaintiff Expert Florence Burke Statements and Countervailing Information**

| Page # | Burke Statement | Countervailing Information |
|---|---|---|
| 4 | "There is no official estimate of the total number of human trafficking victims in the U.S. With 100,000 children estimated to be in the sex trade in the United States each year, it is clear that the total number of victims nationally reaches into the hundreds of thousands when estimates of both adults and minors and sex trafficking and labor trafficking are aggregated. See Bridgette Carr, Sex Trafficking: An American Problem Too, CNN (Nov. 25, 2009), http://www.cnn.com/2009/OPINION/11/25/carr.human.trafficking/index.html." | In 2015, The Washington Post fact checked this claim and determined the 100,000 estimate was "conjured out of thin air" from old and discredited data[71]. |
| 4 | "Victims of severe forms of trafficking in the United States typically share certain characteristics... Trafficked persons often, but not always, come from the lower socio-economic groups in their countries of origin."[72] | It is a well-documented fact that "Anyone can be a victim, regardless of their race, color, national origin, disability, religion, age, gender, sexual orientation, gender identity, socioeconomic status, or citizenship status[73]." While traffickers may attempt to prey on individuals who are impoverished, most people from lower socio-economic groups (including migrants) are not trafficked. Suggesting otherwise is |

---

[71] Klessler, Glenn. September 2, 2015. The fishy claim that '100,000 children' in the United States are in the sex trade. The Washington Post. Retrieved from https://www.washingtonpost.com/news/fact-checker/wp/2015/09/02/the-fishy-claim-that-100000-children-in-the-united-states-are-in-the-sex-trade/

[72] Note: Ms. Burke fails to provide any citation to support this statement.

[73] For example, see U.S. Department of Justice, Office of Justice Programs, Office for Victims of Crime. An Introduction to Human Trafficking in the United States. Retrieved from: https://ovc.ojp.gov/sites/g/files/xyckuh226/files/media/document/HT_Intro_to_HT_fact_sheet-508.pdf

| | | based on a logical fallacy and not reliable scientific method. |
|---|---|---|
| 5 | "Human trafficking today often takes the form of an exploitative employer who tricks a victim into becoming an employee by using not violence, but rather deception and false promises of a better life. The employer then changes the game, vastly altering the employee's working and living conditions and employing psychological tactics in order to manipulate and control the employee. Although some trafficking cases involve overt threats or actual physical or sexual violence, many do not.[74]" | Since Ms. Burke neglected to provide any citation in support of her statement, it is unclear what scientific methods or procedures she relied upon to support her contention. While victims of trafficking often conceal threats, physical, and sexual violence from third parties, many if not most trafficking cases, especially labor trafficking, do involve overt threats and/or violence at some point during the trafficking period (see Appendix G for examples, as well as in the sections above and "strong indictors" from the Delphi Survey). Moreover, the TVPA states that "victims are often forced through physical violence to engage in sex acts or perform slavery-like labor. Such force includes rape and other forms of sexual abuse, torture, starvation, imprisonment, threats, psychological abuse, and coercion." |
| 5 | "Congress has found that "[b]ecause victims of trafficking are frequently unfamiliar with the laws, cultures, and languages of the countries into which they have been trafficked, because they are often subjected to coercion and intimidation including physical detention and debt bondage, and because they often fear retribution and forcible removal to countries in which they will face retribution or other hardship, these victims often find it difficult or impossible to report the crimes committed against them or to assist in the investigation and prosecution of such crimes." 22 U.S.C. § 7101(b)(20)." | In this same document, Congress also found that "Traffickers primarily target women and girls" and "Victims are often forced through physical violence to engage in sex acts or perform slavery-like labor. Such force includes rape and other forms of sexual abuse, torture, starvation, imprisonment, threats, psychological abuse" among other forms of violence, which are not alleged in this case. 22 U.S.C. § 7101(b)(20)." |

**Burke Reference of Madelyn Casilao**

In her report, Ms. Burke makes two substantive mentions of Madelyn Casilao to support her opinion that Plaintiff Casilao's allegations and testimony are similar to other trafficking schemes with recognizable fact patterns:

1.  On page 9 of her report, Ms. Burke referenced Plaintiff Casilao's deposition, where she described 'being in a place where you couldn't do anything' and she 'didn't know what to do anymore' because they 'were placed in a situation that we didn't like, but we had to do it anyway.'

---

[74] Note: Ms. Burke fails to provide any citation to support this statement.

2.  On page 10 of her report, Ms. Burke referenced Plaintiff Casilao's deposition where she described perceived threats to be "not simply physical. It can be emotional, as well. If you say you did something or you are going to do something, I can become afraid emotionally, as well."

Even if accepted as true, these two examples are not consistent with reliable principles and scientific methods on trafficking indicia. Moreover, Ms. Burke appears to have mischaracterized the facts and omitted countervailing information.

For example, regarding the first quote, when Ms. Burke referenced Plaintiff Casilao's deposition where she described not being able to "do anything," this appears to be taken out of context. Ms. Casilao clearly states, "It isn't like I was forced to work. No one forced me to work. It's simply, I had — I couldn't do anything else so I was forced to work."[75] Ms. Casilao admits that she was NOT forced to work by any person even though she may have felt her options were limited by virtue of the legal immigration requirements under the H-2B visa program—a program that the Defendants have no control over and that is monitored for compliance. Nevertheless, Ms. Casilao was admittedly free enough to look for a second job[76].

Similarly, regarding the second quote, where Plaintiff Casilao described what a threat is, as "not simply physical. It can be emotional, as well. If you say you did something or you are going to do something, I can become afraid emotionally, as well" that was in response to the abstract question, "Can you tell me what your understanding of the word "threat" is?" not about the Defendants or the allegations of the complaint per se.

Moreover, Ms. Burke appears to ignore the fact that Ms. Casilao admittedly never met Defendant Schumacher personally[77] and even by her own admission, Ms. Casilo stated that Defendant Schumacher never made any threats to her while she was employed by him or his company[78]. Unlike most trafficking situations, Ms. Casilao does not state that she was overworked, but instead worked about eight hours per day, five days per week[79].

As such, Plaintiff Casilao's allegations, even if all accepted as true and countervailing information is ignored, are not consistent with reliable principles and scientific methods on trafficking indicia.

**Burke Reference of Harry Lincuna**

In her report, Ms. Burke makes three substantive mentions of Harry Lincuna to support her opinion that Plaintiff Lincuna's allegations and testimony are similar to other trafficking schemes with recognizable fact patterns:

---

[75] Casilao Deposition Page 126, 11-15.
[76] Casilao Deposition Page 140, 9-22.
[77] Casilao Deposition Page 56, 20-23.
[78] Casilao Deposition Page 57, 4-12.
[79] Casilao Deposition Page 40, 18-21.

1. On page 7 of her report, Ms. Burke cites Mr. Lincuna's deposition, stating, "The Plaintiffs have testified that they were unsure of the management structure of their work. They saw several names on documents, such as W. Schumacher, C. Schumacher, Apex USA, Hotelmacher, Steakmacher and Schumacher Investments, but did not understand the relationship between the recruiters and the employers."

2. On page 7 of her report, Ms. Burke cites Mr. Lincuna's deposition, stating, "Plaintiffs claim that housing and food were not provided by the Defendants. The Plaintiffs and the class members had to crowd together in rooms in a budget motel. They had to purchase their own food, but they had no way to prepare or cook anything."

3. On page 8 of her report, Ms. Burke cites Mr. Lincuna's deposition, stating, "Plaintiff also allege that transportation was not provided to work sites, so the Plaintiffs and the class members were expected to pay for this themselves. They did not earn enough to be able to do this and instead, they walked to work sites by crossing dangerous highways."

Even if accepted as true, these three examples are not consistent with reliable principles and scientific methods on trafficking indicia.

First, even though the Plaintiffs were unsure of the management structure between the recruiters and the employers, that is not an indicia of trafficking. Moreover, the Defendants were not in any way legally or financially affiliated with the recruiters and received no direct or indirect financial benefit from the money the Plaintiffs claim to have paid the recruiters. In fact, the Defendants claim to have paid the recruiters as well.

Second, while Ms. Burke claims that Plaintiff Lincuna testified that he had to purchase his own food, but had "no way" to prepare or cook anything, Mr. Lincuna's own testimony provides countervailing information. When asked about what he would eat, Mr. Lincuna testified that they would have eggs, hot dogs, cup of noodles, and rice[80]. Moreover, Plaintiff Lincuna testified that he paid $250 per month for his housing accommodations, which he shared with four other people by his choice—Defendants did not own, operate, control, or receive any financial benefit from the Plaintiffs housing accommodations.

Third, the Plaintiff's worksite and residence were within a short walking distance. The Plaintiff's do not allege they were compelled in any way to pay for transportation and as such the Plaintiffs did not at any time pay for transportation. Further, the Defendants did not financially benefit from the Plaintiffs' transportation.

---

[80] For example see Page 87, 18-25 of Lincuna Deposition.

Ultimately, Plaintiff Lincuna's allegations, even if all accepted as true and countervailing information is ignored, are not consistent with reliable principles and scientific methods on trafficking indicia.

**Burke Reference of Garcia**

In her report, Ms. Burke makes four substantive mentions of Allan Garcia to support her opinion that Plaintiff Garcia's allegations and testimony are similar to other trafficking schemes with recognizable fact patterns:

1. On page 7 of her report, Ms. Burke cites Mr. Garcia's deposition alongside Mr. Lincuna's deposition, stating, "The Plaintiffs have testified that they were unsure of the management structure of their work. They saw several names on documents, such as W. Schumacher, C. Schumacher, Apex USA, Hotelmacher, Steakmacher and Schumacher Investments, but did not understand the relationship between the recruiters and the employers." (Again, as discussed above, this is not indicia of trafficking).

2. On page 8 of her report, Ms. Burke cites Mr. Garcia's deposition, stating, "The presence of a gun and the statements about it by Defendant W. Schumacher frightened Plaintiffs, who had just arrived in Oklahoma."

3. On page 9 of her report, Ms. Burke cites Mr. Garcia's deposition, stating, "One Plaintiff described the lack of choice that resulted from learning the terms of the work agreement had been changed."

4. On page 11 of her report, Ms. Burke cites Mr. Garcia's deposition, stating, "They were not given full-time work as promised and, as a result, they were not able to earn enough money to pay expenses or repay loans. This placed them in a very vulnerable position."

Even if accepted as true, these four examples are not consistent with reliable principles and scientific methods on trafficking indicia.

The first example, regarding the recruiter versus employer management structure, is discussed above under the subsection on Plaintiff Lincuna. However, to reiterate, the recruiters are not formally or financially affiliated with the Defendants and the Defendants. As such, this example is of many non sequiturs.

Second, the one and only time Defendant Walter Schumacher mentioned a gun was when he left Plaintiff Garcia in the car alone with it and instructed him not to touch it, while running an errand. Ms. Burke appears to have misrepresented this to infer the presence of a gun or mentioning of it was done with the intention to compel labor. Again, a non sequitur, based in unsupported speculation or subjective belief. According to the Plaintiffs own testimony, Defendant Walter Schumacher said "I have a gun in that compartment. Don't open it." Plaintiff Garcia went on to testify that the Defendant never

took it out to show it to the Plaintiff, never pointed it at the Plaintiff, and in no way ever hurt the Plaintiff with the gun or any other weapon nor threatened to hurt the Plaintiff.

Third, Ms. Burke's opinion—that Plaintiff Garcia lacked "choice"— is based on the following exchange in his deposition:

> **Question:** By signing this form, you agreed to this wage rate. Right?
> **Plaintiff Garcia Answer:** I did not agree. That's why we were complaining, but my hands were tied. We had no choice. We had no money and we were already here in Oklahoma.

Ms. Burke's interpretation that Mr. Garcia completely lacked the agency to choose is again, based on unsupported speculation and/or subjective belief. By his own admission, Mr. Garcia demonstrated his lack of fear of the Defendants and agency to choose when he admittedly raised his voice to his supervisor and accused him of lying, which resulted in his subsequent termination from his position[81].

Last, Ms. Burke attempts to paint the picture that Mr. Garcia's part-time work schedule—atypical to a trafficking situation—put him in a very "vulnerable position" to pay back the loans he took out in order to come to the United States. This is a misrepresentation of facts, considering that by his own admission Mr. Garcia never received any negative consequence for failing to pay back his loans, other than "frequent calls[82]" and he borrowed money from a legitimate lending company and his in-law[83].

Ultimately, Plaintiff Garcia's allegations, even if all accepted as true and countervailing information is ignored, are not consistent with reliable principles and scientific methods on trafficking indicia.

---

[81] For example see Page 113 of Garcia Deposition.
[82] Garcia Deposition, Page 150, 8-10.
[83] Garcia Deposition, Page 69, 10-12.

# XI. CONCLUSION

The congressional intent of the Trafficking Victims Protection Reauthorization Act (TVPRA) is unequivocally to combat modern slavery. This intent is echoed in legislation and judicial decisions, as well as by anti-trafficking experts and advocates across the United States. The allegations in this present case, even if accepted as true, are objectively not consistent with reliable principles and scientific methods on the indicia of human trafficking—a form of modern slavery. The Plaintiffs did not have their housing, food, finances, transportation, or communication controlled. The Plaintiffs had multiple opportunities to leave and actually did leave under their own discretion, without any adverse consequence. The Plaintiffs were not defrauded as to the nature of the work, the location, or the employer. The Plaintiffs were never forced to work extraordinarily long hours or for long periods without a day off. The Plaintiffs were never sexually or physically assaulted during their employment or by the Defendants at any time.

As courts continue to hear TVPA/TVPRA cases, it becomes increasingly important to recognize that the congressional intent behind human trafficking laws is aimed at combating modern slavery. Judicial decisions on human trafficking cases provide ample precedent on the types of allegations that fall within the scope of the Trafficking Victims Protection Act. Categorizing the allegations in this complaint as human trafficking is not in any way based in reality, congressional intent, or legal precedent. The redress afforded under the TVPA/TVPRA is intended for survivors of human trafficking and that is who it should be limited to. As an anti-trafficking advocate, I fear that using the TVPA/TVPRA as a means to an end for labor disputes, which some may view as a form of secondary exploitation, could create litigation barriers for actual victims of modern slavery in the future.

# APPENDICIES

## APPENDIX A – CURRICULUM VITAE

### DR. KIMBERLY B. MEHLMAN-OROZCO

(703) 362-9405 • kim@mehlmanorozco.com • www.mehlmanorozco.com

---

EDUCATION

**Doctor of Philosophy**                          Criminology, Law and Society
                                                 George Mason University

*Dissertation:* The "Crimmigration" Affect: An Analysis of 287(g) and Latino/a Representation in the U.S. Juvenile Justice System
*Expertise:* Human Trafficking, Human Smuggling, Immigration, Survey Methods and Systematic Review

**Master of Arts**                                Justice, Law, and Crime Policy
                                                 George Mason University

*Thesis:* Foreign Nationals and Crime: An Exploratory Analysis of Undocumented Migrants in Northern Virginia

**Bachelor of Science**                           Administration of Justice
                                                 George Mason University

*Cum Laude*

TEACHING EXPERIENCE

**Surviving and Thriving Beyond Sex Trafficking** SP18
                                                 Ph.D. Research Course
                                                 Sustainability Education
                                                 Prescott College

**CRIM307 Social Inequality, Crime, and Justice** FA17
                                                 Criminology, Law and Society
                                                 George Mason University

**CRIM405 Law and Justice Around the World**      SP17, SP18
                                                 Criminology, Law and Society
                                                 George Mason University

**CRIM308 Human Rights and Justice**              FA16
                                                 Criminology, Law and Society
                                                 George Mason University

**CCJS100 Intro to Criminal Justice**             FA12-SP14
                                                 Department of Criminology & Criminal Justice
                                                 University of Maryland College Park

**CCJS370 Race and Crime**                        FA12-SP14
                                                 Department of Criminology & Criminal Justice
                                                 University of Maryland College Park

35

**CCJS432 Law of Corrections**                          FA12
                                                        Department of Criminology & Criminal Justice
                                                        University of Maryland College Park


**CCJS418J Foreign Nationals and Crime**                FA12-SP13
                                                        Department of Criminology & Criminal Justice
                                                        University of Maryland College Park

**CRIM490 Foreign Nationals and Crime**                 SU09, SU10, SU11, SU12
                                                        Criminology, Law and Society
                                                        George Mason University

**GED, Work Place Essential Skills,**
**and Adult Basic Education**                            SU05-SU06
                                                        Adult Detention Center
                                                        Prince William County

RESEARCH EXPERIENCE

**Executive Director**                                   WI18– Present
                                                        Freedom Light

**Partner/Human Trafficking Expert Witness**             FA16– WI18
                                                        Mahn, Mehlman & Associates

**Human Trafficking Subject Matter Expert**              SU16-FA17
                                                        RAND Corporation

**Executive Director/Human Trafficking Consultant**      WI12– FA16
                                                        The Justitia Institute

**Director**                                             FA10 – WI12
                                                        Latino Policy Institute
                                                        Roger Williams University

**Research Associate**                                   SU11 – WI12
                                                        Cochrane Collaboration College for Policy
                                                        George Mason University

**Lead Clinical Trials Search Coordinator**              SU10 – WI12
                                                        Justice Health Field
                                                        The Cochrane Collaboration

**Senior Research Associate**                            SU08 – SU11
                                                        OJJDP Census of Juveniles on Probation
                                                        George Mason University

**Graduate Research Assistant**                          SU10 – FA10
                                                        Violence and Victimization Research Division
                                                        National Institute of Justice (On Contract)
                                                        Office of Justice Programs

36

| | |
|---|---|
| **Senior Fellow** | SU08 – FA10<br>The Lloyd Society |
| **Graduate Research Assistant** | SU06 – SU08<br>Trinidad & Tobago Crime Reduction Project<br>George Mason University |
| **Graduate Research Assistant** | WI07-SP07, SP08<br>OJJDP Vaccines for Children Project<br>George Mason University |

PUBLICATIONS

**Mehlman-Orozco, Kimberly B**. (2019). "Jeffrey Epstein's deal with Alexander Acosta wasn't out of line with what I have seen." USA Today.

**Mehlman-Orozco, Kimberly B.** and Sheriff William D. Snyder. (2019). "Robert Kraft spa scandal: Sex trafficking is hard to prove, that doesn't mean it's a lie." USA Today.

**Mehlman-Orozco, Kimberly B.** and William D. Snyder. (2019). "Legalizing prostitution could end sex-trafficking investigations." The Hill.

**Mehlman-Orozco, Kimberly B.** (2019). "How to Fight Sex Trafficking." Politico.

**Mehlman-Orozco, Kimberly B.** (2019). The Jihadi Next Door: How ISIS is Forcing, Defrauding, and Coercing Your Neighbor into Terrorism. SkyHorse.

**Mehlman-Orozco, Kimberly B.** (2018). "Sex trafficking bill likely to do more harm than good." The Baltimore Sun.

**Mehlman-Orozco, Kimberly B.** (2018). "Why cracking down on websites won't stop online sex trafficking." *Thomson Reuters Foundation*.

**Mehlman-Orozco, Kimberly B.** (2018). "Legislation Aiming to Stop Sex Trafficking Would Hurt Investigations." *Homeland Security Today*.

**Mehlman-Orozco, Kimberly B.** (2017). "Trafficking victims get lost under unjust criminal convictions." *The Hill*.

**Mehlman-Orozco, Kimberly B.** (2017). "Projected Heroes and Self-Perceived Manipulators: Understanding the Duplicitous Identities of Human Traffickers." *Trends in Organized Crime*.

**Mehlman-Orozco, Kimberly B.** (2017). Hidden in Plain Sight: America's Slaves of the New Millennium. ABC-CLIO/Praeger.

**Mehlman-Orozco, Kimberly**. (2017). "Why we should question the FBI's recent human trafficking sting." *Thomson Reuters*.

**Mehlman-Orozco, Kimberly**. (2017). "Decriminalize sex work to bring trafficking victims out of the shadows." *The Hill*.

**Mehlman-Orozco, Kimberly**. (2017). "Decriminalizing sex work would help bring victims out of the shadows." *The Washington Post.*

**Mehlman-Orozco, Kimberly B.** (2017). "Why the Stop Enabling Sex Traffickers Act is the Wrong Solution." *The Crime Report.*

**Mehlman-Orozco, Kimberly B.** (2017). "Identifying Victims of Human Trafficking." *Dimensions of Dental Hygiene.*

Syme, Sheryl, Camardese, Susan, and **Kimberly Mehlman-Orozco.** (2017). "Human Trafficking: Red Flags for Dental Professionals." *Decisions in Dentistry.*

**Mehlman-Orozco, Kimberly B.** (2017). "Vilifying Backpage.com won't help fight sex trafficking" *The Washington Post.*

**Mehlman-Orozco, Kimberly B.** (2017). "Child Trafficking: The Tragedy of 'Princess'" *The Crime Report.*

**Mehlman-Orozco, Kimberly B.** (2017). "To sue or not to sue third-party businesses for sex trafficking?" *Thomson Reuters Foundation.*

**Mehlman-Orozco, Kimberly B.** (2017). "Hunting the Internet's Sex Predators." *The Crime Report.*

**Mehlman-Orozco, Kimberly B.** (2017). "Will shutting down Backpage.com end the scourge of child sex trafficking in America?" *Thomson Reuters Foundation.*

**Mehlman-Orozco, Kimberly B.** (2017). "Sex Trafficking: A Surprising Rescue Story." *The Crime Report.*

**Mehlman-Orozco, Kimberly B.** (2017). "What every parent should know about sex trafficking." *Baltimore Sun.*

**Mehlman-Orozco, Kimberly B.** and Simon Hedlin**. (2017). "Mehlman-Orozco, Hedlin: Stop criminalizing victims of sex trafficking." *The Houston Chronicle.*

**Mehlman-Orozco, Kimberly B.** (2017). "Why Do We Criminalize Young Victims of Sex Trafficking?" *The Crime Report.*

**Mehlman-Orozco, Kimberly B.** (2016). "The Plight of Sex-Trafficking Survivors." *The Gay and Lesbian Review Worldwide.*

**Mehlman-Orozco, Kimberly B.** (2016). "Sex Trafficking is often hidden in plain sight." *The Hill.*

**Mehlman-Orozco, Kimberly B.** (2016). "Will Legalized Prostitution End the Sex Trafficking Scourge?" *The Huffington Post.*

**Mehlman-Orozco, Kimberly B.** (2016). "What happens after a human trafficking victim is rescued?" *The Hill.*

**Mehlman-Orozco, Kimberly B.** (2016). "The Reality of Sex Trafficking in Washington's Red Light District." *Baltimore Sun.*

**Mehlman-Orozco, Kimberly B.** (2016). "America's Symbolic, Not Effective, Anti-Trafficking Policy. *Diplomatic Courier.*

**Mehlman-Orozco, Kimberly B.** (2016). America's Anti-Trafficking Efforts: Hollow victories for public accolade. *Connection Newspapers*: Chantilly, Centerville, Great Falls, Herndon, McLean, & Vienna.

**Mehlman-Orozco, Kimberly B.** (2016). "Sex Slaves or Prostitutes?: How Human Trafficking is Hidden in Plain Sight in America's Capital." *Diplomatic Courier.*

**Mehlman-Orozco, Kimberly B.** (2015). "Safe Harbor Legislation for Juvenile Victims of Sex Trafficking: A Myopic View of Improvements in Practice. *Social Inclusion.*

**Mehlman-Orozco, Kimberly B.** (2015). "Tor and the Bitcoin: An Exploration into Law Enforcement Surveillance Capability Online". *Diplomatic Courier.*

**Mehlman-Orozco, Kimberly B**. (2014). "Human Trafficking in the Philippines: A Blemish on Economic Growth". *Diplomatic Courier, Recovery in the Philippines.*

**Mehlman-Orozco, Kimberly B.** (2014). "Devoid of Research: An Evaluation of Human Trafficking Interventions". *Diplomatic Courier, Special Issue: Breaking the Cycle of Human Trafficking.*

Martinez, Ramiro, and **Mehlman-Orozco, Kimberly B.** (2014). "Hispanic Immigration and Crime". Oxford Handbook of Ethnicity, Crime, and Immigration. Eds. Michael Tonry and Sandra Bucerius. Oxford University Press.

**Mehlman-Orozco, Kimberly B.** (Contributing Author) (2010) "Breaking It Down: Justice, Law & Society Abstracts for Policymakers and Practitioners". *Center for Justice Law and Society.*

<u>REPORTS</u>

**Mehlman-Orozco, Kimberly B.** (May, 2017). Expert Witness Report. *State of Ohio v. Michael Moore.* CR 16-3191.

**Mehlman-Orozco, Kimberly B.** (2011). The Effects of In-State Tuition for Non-Citizens: A Systematic Review of the Evidence. *Latino Policy Institute at Roger Williams University.* http://www.rwu.edu/depository/lpi/lpi-report.pdf

**Mehlman-Orozco, Kimberly B.** (2008). Race and Reporting Burglary, Robbery, and Assault in Trinidad and Tobago. (Completed under a grant from the Trinidad and Tobago Government*).*

<u>SCHOLARLY PRESENTATIONS</u>

**Mehlman-Orozco, Kimberly B.** (2019). Keynote Speaker: National Capital Region Threat Intelligence Consortium  (NTIC) Human Trafficking Seminar.

**Mehlman-Orozco, Kimberly B.** (2019). Law Enforcement's Role in  Combating  Human

Trafficking and Assisting Victims. Police Executive Research Forum (PERF).

**Mehlman-Orozco, Kimberly B.** and Marisa Trasatti (2019). Human Trafficking: The Silent Risk. The RIMS (Risk Management Society) Conference.

**Mehlman-Orozco, Kimberly B.** (2019). Social Policy and Justice Panelist. Harvard College Project of Asian and International Relations. Harvard University.

**Mehlman-Orozco, Kimberly B.** (2018). Women in Homeland Security Human Trafficking Symposium Panelist. Marymount University.

**Mehlman-Orozco, Kimberly B.** (2017). Human Trafficking Symposium Panelist. Liberty University School of Law.

Martin, Favian, **Mehlman-Orozco, Kimberly**, and Wooditch, Alese. (2014). Mexican Migration to the United States: An Exploratory Study into Illegal Border Crossings. Academy of Criminal Justice Sciences. Philadelphia, PA

**Mehlman-Orozco, Kimberly B.** (2010). "Justice Health Systematic Review Methods," Presented at the annual colloquium of the Cochrane and Campbell Collaborations: Keystone, CO.

**Mehlman-Orozco, Kimberly B.** (2010). "Open Access Systematic Reviews for Juvenile Probation Information," Presented at the first annual OJJDP Probation Summit: Washington, D.C.

**Mehlman-Orozco, Kimberly B.,** Chirieleison, J., Sebold, C. M., Douds, A., Gallagher, A.M., and Gallagher, C.A. (2010). "Characteristics of Juveniles on Probation: Collecting Data from Atlantic to Pacific". Presented at the 2010 American Probation and Parole Association Conference: Washington, D.C.

**Mehlman-Orozco, Kimberly B.** (2010). "Justice Health Search Methods: PubMed and More," Presented at the International Network for Justice Health Meeting: Scottsdale, AZ.

Gallagher, C.A., Douds, A.S., **Mehlman-Orozco, Kimberly B.,** Chirieleison, J., and Olaghere, A. (2010). "Justice Health Bibliographic Data Mapping," Presented at the International Network for Justice Health Meeting: Scottsdale, AZ.

**Mehlman-Orozco, Kimberly B.** (2010). "Smuggling and the Likelihood of Detention among Undocumented Migrants," Law and Society Association Conference: Chicago, IL.

Douds, A.S. and **Mehlman-Orozco, Kimberly B.** (2010). "FASD in Justice Facilities: What does the research tell us?", Meeting of the Interagency Coordinating Committee on Fetal Alcohol Spectrum Disorders: Rockville, MD.

Gallagher, Catherine, Taxman, Faye, Kinner, Stuart, Doyle, Jodie, Pardo-Rengifo, Monica, **Mehlman-Orozco, Kimberly B.,** Olaghere, Ajima, Royle, Nick, Gabriel Cuervo, Luis. (2009). "Knowledge mapping for research prioritization: examples from the Network for Justice Health". 17th Cochrane Colloquium, Singapore.

**Mehlman-Orozco, Kimberly B.** (2009). "Justice Health Systematic Review Methods," Presented at the International Network for Justice Health Meeting: Orlando, FL.

**Mehlman-Orozco, Kimberly B.** (2008). "Foreign Nationals and Crime: An Exploratory Analysis of Undocumented Migrants in Northern Virginia," American Society of Criminology Conference: St. Louis, MO.

OTHER PRESENTATIONS

**Mehlman-Orozco, Kimberly B.** (2018). Invited Trainer on Human Trafficking Provided to the Advancing the Business of Healthcare Medical Coding Chapter in Woodbridge, Virginia (2 CEUs).

**Mehlman-Orozco, Kimberly B.** (2018). Invited Trainer on Human Trafficking for the Canadian Police College Human Trafficking Investigator's Course, Royal Canadian Mounted Police and Halifax Regional Police, Canada.

**Mehlman-Orozco, Kimberly B.** (2018). Invited Annual Speaker for the College of Humanities and Social Sciences Degree Celebration, George Mason University.

**Mehlman-Orozco, Kimberly B.** (2018). Invited Presenter for the Well Library Honors Event, George Mason University.

**Mehlman-Orozco, Kimberly B.** (2017). Invited Training Presentation on Human Trafficking Red Flags for Prevent Abuse and Neglect through Dental Awareness (P.A.N.D.A).

**Mehlman-Orozco, Kimberly B.** (2017). Invited Guest Speaker for Human Trafficking Awareness Event with Kappa Delta Phi International Sorority, George Mason University.

**Mehlman-Orozco, Kimberly B.** (2017). Invited Guest Speaker at the Mother's Union International Conference Human Trafficking Forum.

**Mehlman-Orozco, Kimberly B.** (2017). Invited Guest Speaker at the Keeping Our Youth Safe Conference. Bernadette's House.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker for Girls at High-Risk of Sex Trafficking. Manassas City Police Department.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker on Human Trafficking. Woodbridge Woman's Club.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker for TEAM Summer Quest: High-Risk Youth Diversion Program. Manassas City Police Department.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker on Human Trafficking. Soroptimist International, Alexandria Chapter.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker on Human Trafficking. Republican Women of Clifton.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker on Human Trafficking in Northern Virginia. Westminster at Lake Ridge.

**Mehlman-Orozco, Kimberly B.** (2016). Keynote Speaker. Soroptimist Human Trafficking Awareness Event.

**Mehlman-Orozco, Kimberly B.** (2015). Invited Guest Speaker on Human Trafficking. Trinity Episcopal Church.

**Mehlman-Orozco, Kimberly B.** (2015). Invited Guest Speaker for TEAM Summer Quest: High-Risk Youth Diversion Program. Manassas City Police Department.

**Mehlman-Orozco, Kimberly B.** (2014). Invited Guest Speaker for TEAM Summer Quest: High-Risk Youth Diversion Program. Manassas City Police Department.

**Mehlman-Orozco, Kimberly B.** (2014). Invited Guest Speaker on Mapping Suspected Human Trafficking Networks through Advertisements. Homeland Security Investigations, DHS, Buffalo, NY.

**Mehlman-Orozco, Kimberly B.** (2013). Exhibitor. Governor's Summit on Human Trafficking. Richmond, VA.

**Mehlman-Orozco, Kimberly B.** (2013). Invited Guest Speaker on Labor Trafficking. St. Francis of Assisi Catholic Church.

**Mehlman-Orozco, Kimberly B.** (2011). Keynote Speaker. First Annual Quetzal Award Gala. Guatemalan Center of New England.

EXPERT WITNESS CASES—CONSULTATION AND/OR TESTIMONY

| | |
|---|---|
| Forthcoming | Woodhull Freedom Foundation et al. v. United States. |
| 2020 | United States v. Cornelius Galloway, United States District of New Mexico |
| 2018 | RCMP Federal Serious and Organized Crime R vs. Downey & Beals C/O Human Trafficking 2016-465660, Halifax, Canada |
| 2018 | United States of America vs. Savanah April Via, U.S. District Court for the District of Arizona |
| 2018 | Commonwealth of Virginia v. Corey Cardoza, Henrico County |
| 2018 | People v. Kareem Abdur-Razzaaq, Ind. No. 3154/2013, and People v. Lemuel Skipper, Ind. No. 2409/2015, Bronx County |
| 2017-2018 | United States of America v. Miguel Scott Arnold, Terrence Hawkins, Tevin Bynoe, Emonie Murphy, and Joshua Guity-Nunez, United States District Court for the Middle District of Pennsylvania. |
| 2017- 2018 | Doe v. Subh Properties, et al., Civil Litigation, State of Maryland |
| 2017-2018 | State of Ohio v. Michael Moore, Lucas County Court |

| | |
|---|---|
| 2017-2018 | People of the State of California Plaintiff v. Tracy Sims Superior Court of California, County of Los Angeles |
| 2017 | Keo Ratha; Sem Kosal; Sophea Bun; Yem Ban; Nakry Phan; and Sok Sang v. Phatthana Seafood Co., Ltd; S.S. Frozen Food Co., Ltd.; Doe Corporations 1-5; Rubicon Resources, LLC; and Wales & Co. Universe, Ltd. United States District Court for the Central District of California |
| 2017 | In re: REFLEX MEDIA, INC., a Nevada corporation, Claimant, vs. VIBE MEDIA, INC. d/b/a CityVibe.com, a California corporation; SOPHIA THOMPSON, an individual; PEAKRIDGE d/b/a SugarModels.com, an Anguilla company; DANIEL ROMAN a/k/a Daniel Romanesse, an individual; ALI ASKARI, an individual; and DOES 1 through 10, inclusive |
| 2016-2017 | J.S., S.L., and L.C. v. Village Voice Media Holdings LLC, Supreme Court of the State of Washington |
| 2016-2017 | People of the State of California Plaintiff v. Joseph, et. al. Contra Costa County Court |
| 2016 | People of the State of California Plaintiff v. Young Kyung Cho Superior Court of California, County of Los Angeles |
| 2016 | People of the State of California Plaintiff v. Mixon-Givens   Santa Clara County Court |

SELECTION OF MEDIA

| | |
|---|---|
| August 9, 2019 | ABC. This Week with George Stephanopoulos. Panel discussion on Jeffrey Epstein. |
| July 9, 2019 | CBS News. Sex trafficking expert discusses Jeffrey Epstein case and sexual abuse. |
| May 10, 2019 | Hollywood Reporter. Sex Trafficking mars the Mystique of Cannes Film Festival. |
| April 12, 2019 | The Hill. Expert says it's 'very unlikely' Robert Kraft prostitution case would yield human trafficking convictions. |
| January 11, 2019 | The Seattle Times. Documentary puts new attention on R. Kelly sex allegations. |
| August 22, 2018 | The Crime Report. Backpage Founders: We're Victims of Attack on Free Speech. |

| | |
|---|---|
| May 5, 2018 | Delaware Online. Human Trafficking Court shut down, to be merged with other treatment courts in Delaware. |
| May 1, 2018 | Delaware Online. Despite good intentions, Delaware slow to address human trafficking. |
| April 24, 2018 | ABC. Will new law protect women from sex trafficking? |
| April 23, 2018 | The Ringer. How Sex Ads Became a Battleground for the Future of the Internet. |
| April 22, 2018 | Miami Herald. He pimped a minor at Santa's Enchanted Forest. He got slapped with federal prison. |
| April 13, 2018 | Yahoo Lifestyle. Women's March lambasted for criticizing shutdown of Backpage.com. |
| April 10, 2018 | Miami Herald. Florida's sex industry 'in a panic' after feds shut down notorious Backpage website. |
| April 9, 2018 | The Crime Report. With Backpage Closed, Where Will The Sex Slave Trade Go? |
| March 22, 2018 | Washington Post. Bill enabling prosecutors, victims to pursue websites that host sex traffickers heads to White House. |
| March 2, 2018 | Governing. 3 Cities Lead Fight Against Human Trafficking. |
| February 1, 2018 | Vanity Fair. The Republican Party is Having Another Todd Akin Fiasco. |
| February 1, 2018 | New York Magazine. Missouri GOP Senate Hopeful Goes Off the Deep End on the Sexual Revolution and Human Trafficking. |
| January 31, 2018 | Kansas City Star. Josh Hawley blames sex trafficking on 'sexual revolution' of 1960s in leaked audio. |
| January 25, 2018 | Homeland Security Today. Expert Delves Into Real Face of Human Trafficking: Victims and Perpetrators. |
| January 23, 2018 | Huffington Post. Study Finds More Than 9,000 Brothels Masquerading As Legit Businesses. |
| January 11, 2018 | International Business Times. Human trafficking: Why we are all guilty of supporting the modern slave trade. |
| January 8, 2018 | Majority Report Radio. America's Slaves of the New Millennium with Dr. Kimberly Mehlman-Orozco. |

44

| | |
|---|---|
| December 21, 2017 | Fast Company. Hotels Are Key In The Fight To End Human Trafficking. |
| December 12, 2017 | WNPR. The Colin McEnroe Show. Child Labor In America And Abroad. |
| November 4, 2017 | C-SPAN. Hidden in Plain Sight Book Talk. |
| September 22, 2017 | Gray Media. Interview by Kyle Midura. Sex Trafficking Internet Crackdown Proposal. |
| August 8, 2017 | i24 news. Interview for Stateside with David Shuster. Model allegedly kidnapped for dark web auction. |
| August 2, 2017 | Newsy. Interview for "The Why" on human trafficking on the Internet. |
| July 30, 2017 | Al Jazeera. Segment Produced by Ruairi Casey. World Day Against Human Trafficking. |
| July 25, 2017 | Fox News Radio. Interviewed by Eben Brown. "Security America" segment on human smuggling deaths in San Antonio. |
| July 25, 2017 | Dallas News. Interviewed by Sarah Mervosh. New trick of the sex trade: Pimps can use retail gift cards to buy Backpage.com ads. |
| July 24, 2017 | WJLA. Interviewed by Stephen Loiaconi. Human smuggling deaths underscore need for immigration reform, experts say. |
| July 18, 2017 | The Washington Post. Interviewed by Tom Jackman. Under attack, Backpage.com has its supporters as anti-trafficking tool. But many differ. |
| June 11, 2017 | PJ Media. Interviewed by Karl Herchenroeder. Expert Notes Gap in Human-Trafficking Laws as Senators Press for Fund Renewal. |
| April 19, 2017 | WYPR. Interviewed by Tom Hall. Misinformation Sparked #DCMissingGirls Outrage, But It Highlights Real And Overlooked Issues. |
| March 30, 2017 | CBS. Interviewed by Jennifer Earl. Mom's warning about "human trafficking" at IKEA goes viral; what you need to know. |
| March 29, 2017 | Women's Health. Interviewed by Korin Miller. This Mom Claims She Encountered Human Traffickers At IKEA And People Are Freaking Out. |

| | |
|---|---|
| February 10, 2017 | Miami Herald. Interviewed by David Ovalle. Florida lawsuit targets website decried as hub for human trafficking. |
| February 3, 2017 | Miami Herald. Interviewed by David Ovalle. The 'adult' section might be closed but Miami sex workers still on the job. |
| January 1, 2017 | OutSmart Magazine. Interviewed by Dr. Laura McGuire on Human Trafficking. Hidden in Plain Sight: Researcher Dr. Mehlman-Orozco Discusses the Realities of Human Trafficking. |
| February 3, 2015 | NBC. Interviewed by Tracy Connor. Shoe Bomber has 'Tactical Regrets' Over Failed American Airlines Plot. |
| January 19, 2015 | CNN. Interviewed by Pam Brown. 'Jihad Jane' moved by 'love' and feminine 'pride.' |
| August 15, 2013 | USA Today, Interviewed by Yamiche Alcindor. Dozens of States Pass Laws to Fight Human Trafficking. |
| June 6, 2013 | USA Today. Interviewed by Yamiche Alcindor. Blue Campaign by DHS aims to combat human trafficking. |
| August 12, 2012 | Fox 5 News (DC/MD/VA). Television interview on in-state tuition report on Maryland. Interview by reporter Shawn Yancy. |
| May 18, 2011 | Chronicle of Higher Education. Interviewed for an in-state tuition story by Katherine Mangan, "In-State Tuition for Illegal Immigrants Can Be a Plus for Both States and Students." |
| March 24, 2011 | NBC 10 (RI). Television interview on Latino population growth, "Digging Deeper: Hispanics on the Rise." |
| February 18, 2011 | The Yale Herald. Interviewed for a story on racial profiling against immigrants by police. Story by Lucas Iberico-Lozada, "East Haven Police Accused of Brutality, Racism." |
| June 2, 2010 | Style Weekly. Interviewed for a human trafficking story by Peter Galuszka, "The New Slavery: Virginia becomes haven for human trafficking." |

OTHER PROFESSIONAL TRAINING

| | |
|---|---|
| **"Freedom Together" D.C., M.D., and V.A. Regional Anti Human Trafficking Task Force Conference** | D.C., M.D., and V.A. Task Forces |
| Spring 2018 | Conference |

| | | |
|---|---|---|
| **Virginia Forum on Human Trafficking**<br>Fall 2015 | Conference | Dept. of Criminal Justice Services |
| **Regional Conference of Human Trafficking Task Forces**<br>Fall 2015 | Conference | DMV Anti-Trafficking Working Group |
| **Maryland Freedom Conference**<br>Winter 2015 | Conference | Towson University |
| **Sharing Lessons, Sharing Responsibility: Combating Human Trafficking**<br>Spring 2013 | Conference | Migration Policy Institute |
| **Freedom Network Annual Conference**<br>Spring 2013 | Conference | Freedom Network |
| **Human Trafficking Panel Discussion**<br>Spring 2013 | Working Group | George Washington Law |
| **Analytic Statistics and Meta Analysis**<br>Spring 2011 | Paid Training | Stata |
| **Systematic Review and Meta Analysis**<br>Spring 2009, Fall 2010 | Independent Graduate Study | GMU |
| **PubMed, NLMGateway, ToxNet and ClinicalTrials.gov**<br>Summer 2009 | Search Certifications | National Library of Medicine |
| **Ovid, ProQuest, and Web searches**<br>Summer 2009 | Search Certifications | AHRQ |
| **Introduction to ArcGIS Workshops**<br>Fall 2009-Summer 2010 | | George Mason University |
| **Hand Searching Systematic Review Workshop**<br>Fall 2009 | Search Certifications | Cochrane Collaboration |

<u>AWARDS</u>

| | |
|---|---|
| *Independent Publisher Award, 2019* | Silver Medal for Current Events (<u>Jihadi Next Door</u>). |
| *Independent Publisher Award, 2018* | Bronze Medal for Social Issues/Humanitarian (<u>Hidden in Plain Sight: America's Slaves of the New Millennium</u>). |
| *Dissertation Completion Award,* 2012 | George Mason University, College of Humanities and Social Sciences. |
| *Deans Challenge,* 2009 | George Mason University, College of Humanities and Social Sciences. |

<u>SERVICE</u>

| | |
|---|---|
| Reviewer | Justice Quarterly, WI18-Present |

| | |
|---|---|
| Advisory Board Member | Empower Her Network, FA17-Present |
| Survey Methodologist Advisor | United Against Slavery, FA17-Present |
| Advisory Board Member | Dressember (Anti-trafficking foundation), SP17-Present |
| Panel of Expert Witnesses | Los Angeles Superior Court, WI17-Present |
| Member | Prince William County Human Trafficking Task Force, SU13-Present |
| Member | Prince George's County Human Trafficking Task Force, SU12-Present |
| Reviewer | Journal of Human Trafficking, FA2014-Present |
| Member and Former President | Soroptimist International of Woodbridge, FA15-SP18 |
| Reviewer | American Journal of Evaluation, FA2014-FA2015 |
| Member | Prince George's County Human Trafficking Task Force, SU13-2015 |
| Reviewer | Columbia University Press, FA2013 |
| President and Founding Officer | Student Center for Immigration Research, George Mason University, FA08 – FA10 |
| Member | Criminology, Law & Society Student Association, George Mason University, FA09 – WI12 |
| Volunteer | Prince William County Jail, Classification Department, 500 hours, SP 2005 |

PROFESSIONAL MEMBERSHIP

National Society for Collegiate Scholars
Phi-Alpha Delta Pre-Law Fraternity
Alpha Chi Honors Fraternity
American Society of Criminology
National Criminal Justice Honors Fraternity
Alpha Phi Sigma Honors Society

## APPENDIX B – EXPERT WITNESS TESTIMONY

*I have testified/issued a report in the following cases, but have been retained in many others:*

**Criminal Prosecution**

People of the State of California Plaintiff v. Mixon-Givens Santa Clara County Court

People of the State of California Plaintiff v. Joseph, et. Al. Contra Costa County Court (Case No: 5-160639-1)[84]

People v. Kareem Abdur-Razzaaq, Ind. No. 3154/2013, and People v. Lemuel Skipper, Ind. No. 2409/2015, Bronx County[85]

Commonwealth of Virginia v. Corey Cardoza, Henrico County[86]

United States v. Cornelius Galloway, United States District of New Mexico[87]

**Criminal Defense**

United States of America v. Emonie Murphy, U.S. District Court for the Middle District of Pennsylvania

People of the State of California Plaintiff v. Young Kyung Cho Superior Court of California, County of Los Angeles (Case No: 6CJ10198-01)[88]

*I have issued expert witness reports in the following cases:*

**Criminal Prosecution**

State of Ohio v. Michael Moore, Lucas County Court (Case No. CR 16-3191)
Criminal Defense

United States of America v. Landrum et. Al. Via. U.S. District Court for the District of Arizona (Case No. 4:16-cr-01560-RM-JR)

---

[84] Testified at grand jury on 4/13/2016 and at trial on 7/12/2017. Prosecutor's name is Aron DeFerrari: ADeFerrari@contracostada.org.
[85] Testified at Frye motion for another expert witness on behalf of the prosecution.
[86] Testified at Daubert hearing and prevailed as an admitted expert. Case settled before trial (see attached letter of reference in Appendix E).
[87] Testified at Daubert hearing and prevailed as admitted expert. Ruling attached separately from report as Exhibit I.
[88] Testified in trial on 11/7/2016 and 12/2/2017.

**Criminal Defense**

United States of America v. Emonie Murphy, U.S. District Court for the Middle District of Pennsylvania

People of the State of California v. Diane Mirabal. Superior Court of the State of California for the County of Santa Clara. Case No.: 98312[89]

People of the State of California v. Rachele Eschenburg. Superior Court of the State of California (Case Number: FCR350232)

**Civil Defense**

M.B. v. Roosevelt Inn LLC (MARCH TERM, 2017 NO.: 00712)

Keo Ratha; Sem Kosal; Sophea Bun; Yem Ban; Nakry Phan; and Sok Sang v. Phatthana Seafood Co., Ltd; S.S. Frozen Food Co., Ltd.; Doe Corporations 1-5; Rubicon Resources, LLC; and Wales & Co. Universe, Ltd. United States District Court for the Central District of California.[90]

Jane Doe v. TRX Insurance Services, Inc and Richard Metz. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 2:20-cv-04095-MMB

Hedi Gilbert, Amber Means, Mandy Meloon, Gabriela Joslin, and Kay Poe, v. U.S.A Taekwondo, Inc. and Steven Lopez. United States District Court for the District of Colorado. Civil Action No. 1: 18-cv-00981-CMA-MEH

**Civil Plaintiff**

Woodhull Freedom Foundation et al. v. United States[91]

---

[89] Declaration only, not report.
[90] Also deposed in this case. Dismissed on summary judgement.
[91] Not an expert witness report, but rather a declaration: https://www.eff.org/document/declaration-dr-kimberly-mehlman-orozco-support-woodhull-et-al-motion-preliminary-injunction

## APPENDIX C – ACKNOWLEDGEMENT OF PRO BONO WORK FOR HUMAN TRAFFICKING SURVIVORS



**Jose Z. Marin**
Attorney at Law

Jose Marin Law
Address: 2537 Irving Street
San Francisco, CA 94122
Phone: (415) 753-3539
Web: www.JoseMarinLaw.com
E-Mail: Jose@JoseMarinLaw.com

March 16, 2021

Dr. Kimberly Mehlman-Orozco
15920 Fairway Drive
Dumfries, Virginia 22025

Dear Dr. Mehlman-Orozco,

I wanted to thank you for your unparalleled commitment to working with human trafficking survivors. It is rare to find an expert who is willing to dedicate this much of her time, share her analysis and insights into the case, and provide such detailed, persuasive expert reports—all pro bono. This type of philanthropy truly stands out.

Your passion for educating the institutions that have power over survivors' fates is inspirational. The expert report you contributed to a recent T-Visa case was instrumental to our success! You had a lasting impact on our client and her children's lives. They now have a path toward permanent residency and citizenship in the United States after surviving terrible trauma from human trafficking.

It was wonderful to work with you and I look forward to collaborating on future cases. I would recommend you to any attorney who assists human trafficking survivors.

Sincerely,

Melanie Kehr, Esq.

51

## APPENDIX D – DELPHI SURVEY HUMAN TRAFFICKING INDICIA

### Indicators of trafficking of adults for labour exploitation

**INDICATORS OF DECEPTIVE RECRUITMENT**

<u>Strong Indicator</u>
Deceived about the nature of the job, location or employer

<u>Medium Indicators</u>
Deceived about conditions of work
Deceived about content or legality of work contract
Deceived about family reunification
Deceived about housing and living conditions
Deceived about legal documentation or obtaining legal migration status
Deceived about travel and recruitment conditions
Deceived about wages/earnings
Deceived through promises of marriage or adoption

<u>Weak Indicator</u>
Deceived about access to education opportunities

**INDICATORS OF COERCIVE RECRUITMENT**

<u>Strong Indicator</u>
Violence on victims

<u>Medium Indicators</u>
Abduction, forced marriage, forced adoption or selling of victim
Confiscation of documents
Debt bondage
Isolation, confinement or surveillance
Threat of denunciation to authorities
Threats of violence against victim
Threats to inform family, community or public
Violence on family (threats or effective)
Withholding of money

**INDICATORS OF RECRUITMENT BY ABUSE OF VULNERABILITY**

<u>Medium Indicators</u>
Abuse of difficult family situation
Abuse of illegal status
Abuse of lack of education (language)
Abuse of lack of information
Control of exploiters
Economic reasons
False information about law, attitude of authorities
False information about successful migration
Family situation
Personal situation
Psychological and emotional dependency
Relationship with authorities/legal status

<u>Weak Indicators</u>
Abuse of cultural/religious beliefs
General context

Difficulties in the past
Difficulty to organise the travel

**INDICATORS OF EXPLOITATION**

<u>Strong Indicator</u>
Excessive working days or hours

<u>Medium Indicators</u>
Bad living conditions
Hazardous work
Low or no salary
No respect of labour laws or contract signed
No social protection (contract, social insurance, etc.)
Very bad working conditions
Wage manipulation

<u>Weak Indicators</u>
No access to education

**INDICATORS OF COERCION AT DESTINATION**

<u>Strong Indicators</u>
Confiscation of documents
Debt bondage
Isolation, confinement or surveillance
Violence on victims

<u>Medium Indicators</u>
Forced into illicit/criminal activities
Forced tasks or clients
Forced to act against peers
Forced to lie to authorities, family, etc.
Threat of denunciation to authorities
Threat to impose even worse working conditions
Threats of violence against victim
Under strong influence
Violence on family (threats or effective)
Withholding of wages

<u>Weak Indicator</u>
Threats to inform family, community or public

**INDICATORS OF ABUSE OF VULNERABILITY AT DESTINATION**

<u>Medium Indicators</u>
Dependency on exploiters
Difficulty to live in an unknown area
Economic reasons
Family situation
Relationship with authorities/legal status

<u>Weak Indicators</u>
Difficulties in the past
Personal characteristics

## Indicators of trafficking of children for labour exploitation

*The Palermo Protocol specifically states that, in the case of children under 18, there is no need to prove "the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability" in order to establish the crime of trafficking. Nevertheless, it was decided to retain indicators of deception, coercion and abuse of vulnerability in order to analyse trafficking in children with harmonised tools within Europe*

### INDICATORS OF DECEPTIVE RECRUITMENT
<u>Strong Indicator</u>
Deceived about access to education opportunities
Deceived about the nature of the job, location or employer
<u>Medium Indicators</u>
Deceived about conditions of work
Deceived about content or legality of work contract
Deceived about family reunification
Deceived about housing and living conditions
Deceived about legal documentation or obtaining legal migration status
Deceived about travel and recruitment conditions
Deceived about wages/earnings
Deceived through promises of marriage or adoption

### INDICATORS OF COERCIVE RECRUITMENT
<u>Strong Indicators</u>
Abduction, forced marriage, forced adoption or selling of victim
Debt bondage
Threats of violence against victim
Violence on victims
<u>Medium Indicators</u>
Confiscation of documents
Isolation, confinement or surveillance
Threat of denunciation to authorities
Threats to inform family, community or public
Violence on family (threats or effective)
Withholding of money

### INDICATORS OF RECRUITMENT BY ABUSE OF VULNERABILITY
<u>Medium Indicators</u>
Abuse of cultural/religious beliefs
Abuse of difficult family situation
Abuse of illegal status
Abuse of lack of education (language)
Abuse of lack of information
Control of exploiters
Difficulties in the past
Difficulty to organise the travel
Economic reasons
False information about successful migration
Family situation
General context

Personal situation
Psychological and emotional dependency
Relationship with authorities/legal status

### INDICATORS OF EXPLOITATION
<u>Strong Indicators</u>
Excessive working days or hours
<u>Medium Indicators</u>
Bad living conditions
Hazardous work
Low or no salary
No access to education
No respect of labour laws or contract signed
Very bad working conditions
Wage manipulation

### INDICATORS OF COERCION AT DESTINATION
<u>Strong Indicators</u>
Confiscation of documents
Debt bondage
Forced into illicit/criminal activities
Forced tasks or clients
Isolation, confinement or surveillance
Threats of violence against victim
Under strong influence
Violence on victims
<u>Medium Indicators</u>
Forced to act against peers
Forced to lie to authorities, family, etc.
Threat of denunciation to authorities
Threat to impose even worse working conditions
Threats to inform family, community or public
Violence on family (threats or effective)
Withholding of wages

### INDICATORS OF ABUSE OF VULNERABILITY AT DESTINATION
<u>Medium Indicators</u>
Dependency on exploiters
Difficulties in the past
Difficulty to live in an unknown area
Economic reasons
Family situation
Personal characteristics
Relationship with authorities/legal status

53

## Indicators of trafficking of adults for sexual exploitation

**INDICATORS OF DECEPTIVE RECRUITMENT**

<u>Strong Indicator</u>
Deceived about the nature of the job or location
<u>Medium Indicators</u>
Deceived about conditions of prostitution
Deceived about content or legality of work contract
Deceived about family reunification
Deceived about housing and living conditions
Deceived about legal documentation or obtaining legal migration status
Deceived about travel and recruitment conditions
Deceived about wages/earnings
Deceived through promises of marriage or adoption
<u>Weak Indicator</u>
Deceived about access to education opportunities

**INDICATORS OF COERCIVE RECRUITMENT**

<u>Strong Indicators</u>
Abduction, forced marriage, forced adoption or selling of victim
Debt bondage
Threats of violence against victim
Violence on victims
<u>Medium Indicators</u>
Confiscation of documents
Isolation, confinement or surveillance
Threat of denunciation to authorities
Threats to inform family, community or public
Violence on family (threats or effective)
Withholding of money

**INDICATORS OF RECRUITMENT BY ABUSE OF VULNERABILITY**

<u>Medium Indicators</u>
Abuse of difficult family situation
Abuse of illegal status
Abuse of lack of education (language)
Abuse of lack of information
Control of exploiters
Difficulties in the past
Difficulty to organise the travel
Economic reasons
False information about law, attitude of authorities
False information about successful migration
Family situation
General context

Personal situation
Psychological and emotional dependency
Relationship with authorities/legal status
<u>Weak Indicator</u>
Abuse of cultural/religious beliefs

**INDICATORS OF EXPLOITATION**

<u>Medium Indicators</u>
Bad living conditions
Excessive working days or hours
Hazardous work
Low or no salary
No respect of labour laws or contract signed
No social protection (contract, social insurance, etc.)
Very bad working conditions
Wage manipulation

**INDICATORS OF COERCION AT DESTINATION**

<u>Strong Indicators</u>
Confiscation of documents
Debt bondage
Forced tasks or clients
Isolation, confinement or surveillance
Threats of violence against victim
Violence on victims
<u>Medium Indicators</u>
Forced into illicit/criminal activities
Forced to act against peers
Forced to lie to authorities, family, etc.
Threat of denunciation to authorities
Threat to impose even worse working conditions
Threats to inform family, community or public
Under strong influence
Violence on family (threats or effective)
Withholding of wages

**Indicators of abuse of vulnerability at destination**

<u>Medium Indicators</u>
Dependency on exploiters
Difficulty to live in an unknown area
Economic reasons
Family situation
Personal characteristics
Relationship with authorities/legal status
<u>Weak Indicator</u>
Difficulties in the past

# Indicators of trafficking of children for sexual exploitation

*Exploitation is inherent to the situation of children under 18 used or offered for prostitution or pornography and there is no need for indicators to prove it. The indicators of additional exploitation below are given to characterize other elements of exploitation children may suffer. In addition, the Palermo Protocol specifically states that, in the case of children, there is no need to prove "the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability" in order to establish the crime of trafficking. Nevertheless, it was decided to retain indicators of deception, coercion and abuse of vulnerability in order to analyse trafficking in children with harmonised tools within Europe.*

## INDICATORS OF DECEPTIVE RECRUITMENT

<u>Strong Indicator</u>
Deceived about the nature of the job or location

<u>Medium Indicators</u>
Deceived about access to education opportunities
Deceived about conditions of prostitution
Deceived about content or legality of work contract
Deceived about family reunification
Deceived about housing and living conditions
Deceived about legal documentation or obtaining legal migration status
Deceived about travel and recruitment conditions
Deceived about wages/earnings
Deceived through promises of marriage or adoption

## INDICATORS OF COERCIVE RECRUITMENT

<u>Strong Indicators</u>
Abduction, forced marriage, forced adoption or selling of victim
Debt bondage
Isolation, confinement or surveillance
Threats of violence against victim
Violence on victims

<u>Medium Indicators</u>
Confiscation of documents
Threat of denunciation to authorities
Threats to inform family, community or public
Violence on family (threats or effective)
Withholding of money

## INDICATORS OF RECRUITMENT BY ABUSE OF VULNERABILITY

<u>Medium Indicators</u>
Abuse of cultural/religious beliefs
Abuse of difficult family situation
Abuse of illegal status
Abuse of lack of education (language)
Abuse of lack of information
Control of exploiters
Difficulties in the past
Difficulty to organise the travel
Economic reasons
False information about law, attitude of authorities
False information about successful migration
Family situation

General context
Personal situation
Psychological and emotional dependency
Relationship with authorities/legal status

## INDICATORS OF ADDITIONAL EXPLOITATION

<u>Strong Indicator</u>
Hazardous work

<u>Medium Indicators</u>
Bad living conditions
Excessive working days or hours
Low or no salary
No social protection (contract, social insurance, etc.)
Very bad working conditions
Wage manipulation

## INDICATORS OF COERCION AT DESTINATION

<u>Strong Indicators</u>
Confiscation of documents
Debt bondage
Forced into illicit/criminal activities
Forced tasks or clients
Isolation, confinement or surveillance
Threats of violence against victim
Under strong influence
Violence on victims

<u>Medium Indicators</u>
Forced to act against peers
Forced to lie to authorities, family, etc.
Threat of denunciation to authorities
Threat to impose even worse working conditions
Threats to inform family, community or public
Violence on family (threats or effective)
Withholding of wages

## INDICATORS OF ABUSE OF VULNERABILITY AT DESTINATION

<u>Strong Indicator</u>
Dependency on exploiters

<u>Medium Indicators</u>
Difficulties in the past
Difficulty to live in an unknown area
Economic reasons
Family situation
Personal characteristics
Relationship with authorities/legal status

55

## APPENDIX E – LETTER OF REFERENCE ON EXPERT WITNESS TESTIMONY

 

OFFICE OF THE
COMMONWEALTH'S ATTORNEY FOR HENRICO COUNTY

Shannon L. Taylor
Commonwealth's Attorney

June 7, 2018

Dr. Kimberly Mehlman-Orozco
3721 Dalebrook Drive
Dumfries VA 22025

      RE: Commonwealth v. Corey Cardoza
      CR17-2160F
      Trial Date: June 5, 2018 – Convicted of Two Counts of Commercial Sex Trafficking

Dear Dr. Mehlman-Orozco:

      On behalf of the Henrico County Commonwealth Attorney's Office, I am writing to sincerely thank you for your invaluable service and commitment to our successful prosecution of Corey Cardoza. Without your capable and professional testimony, I am certain we would not have been able to convince the jury to convict Mr. Cardoza. Your wiliness to come to our jurisdiction on several occasions sets you apart from many experts I have dealt with in the past, and I look forward to working with you in the future.

      I have enclosed the Supreme Court form for your List of Allowances. The form should be self-explanatory, but if you need assistance please do not hesitate to contact me. From what I understand, you must attach an itemized list of your expenditures upon returning the form to our office.

      Once again, I thank you for your outstanding service to our community and, moreover, to the victims in this matter.

                  With Sincere Gratitude,

                  B.J. McGee
                  Assistant commonwealth's Attorney

CC: BQS, File

4301 East Parham Road, Henrico, Virginia  23228  –  P.O. Box 90775, Henrico, Virginia  23273-0775
Telephone: (804) 501-4218  –  Fax: (804) 501-4110 or 5028
Juvenile & Domestic Div.: (804) 501-4338  –  Victim/Witness Program: (804) 501-1680
Website: www.co.henrico.va.us/com-atty

**APPENDIX F – MATERIALS REVIEWED AND CONSIDERED**

In addition to the materials specifically cited or mentioned in my report, I considered the following documents in forming my opinions:

Class Action Complaint
Transcript and Exhibits of Plaintiff Madelyn Casilao's Deposition
Transcript and Exhibits of Plaintiff Harry Lincuna's Deposition
Transcript and Exhibits of Plaintiff Allan Garcia's Deposition
Transcript and Exhibits of Walter Schumacher's Deposition (August 13, 2020)
Transcript and Exhibits of Walter Schumacher's Deposition (August 24, 2020)
Florence Burke's Report and Exhibits

# APPENDIX G – SAMPLE OF HUMAN TRAFFICKING CASES[92]

| CASE NAME | SUMMARY |
|---|---|
| *U.S. v. Aleksandr Maksimenko*, 2006 WL 5348263 (E.D. Mich) Trial Pleading | Defendants Maksimenko, Aronov, and Gonikman were the ringleaders in a conspiracy to force Eastern European women to work as exotic dancers in Detroit area strip clubs.  Veniamin Gonikman and his son, Aleksandr Maksimenko, are naturalized United States citizens. Defendant Aronov is a Lithuanian citizen who formerly resided in the Chicago area. Under the guise of a legitimate business – Beauty Search Inc. – Maksimenko, Aronov and at least 8 other people smuggled victims into the United States. Once in the country, Defendants controlled the victims by **threats of physical violence, confiscating their passports and other forms of identification, confining victims to their apartments when they were not working, and threatening to turn them over to immigration authorities**. The Defendants also convinced the victims that they **owed large debts** for their entrance into the United States. Defendant Maksimenko was further found to have sexually abused two of the women. The Defendants pleaded guilty to involuntary servitude, as well as money laundering and illegal immigration conspiracies. Defendant Maksimenko was sentenced to fourteen years imprisonment and ordered to pay over $1.5 million in restitution to the women for **wages that had been unlawfully withheld** by the defendants; more than $560,000 of this restitution was claimed from money and assets seized from Maksimenko's home and safe deposit boxes. |
| *U.S. v. John Robert Farrell*, 563 F.3d 364 (Apr. 17, 2009) | Defendants, husband and wife John and Angelita Ferrell, owned and operated a Comfort Suites hotel in Oacoma, South Dakota. In 2005 and 2006, Defendants brought workers from the Philippines to South Dakota using temporary H-2B visas. The Ferrells promised the victims employment at the hotel for 40 hours a week at $6.05 per hour. When the workers arrived, the Farrells confiscated their visas and passports. The **Ferrells forced the victims to work for up to 18 hours a day at the hotel and local fast food restaurants**. The Farrells also compelled the workers to sign **debt contracts for the costs of transportation to the United States and for purported visa fees**. Because of their low wages - the **Ferrells paid the workers roughly half of their promised wage** - and charges incurred under the debt contact -  the **victims handed over upwards of 90 percent of their earnings to the Ferrells**. The Defendants housed the nine workers in a rented two-room house.

 The Ferrells used **threats of deportation and legal sanction** as a primary means of controlling the workers. |

---

[92] Provided by the Michigan Law Center Human Trafficking Database in 2011.

| | |
|---|---|
| *U.S. v. Abdel Nasser Youssef Ibrahim*; https://sherloc.unodc.org/cld/case-law-doc/traffickingpersonscrimetype/usa/2006/united_states_v._abdel_nasser_youssef_ibrahim.html?lng=en&tmpl=htms | Defendants, formerly husband and wife, are Egyptian nationals who purchased the victim from her parents in Egypt. The sale was made after the Defendants' **threatened to turn over the victim's sister, who had been working for the Defendants and accused by them of stealing, to the Egyptian police**. Defendants used a fraudulently-obtained temporary visitor's visa to bring the victim - then 10 years-old - into the United States in August 2000. Defendants **controlled the victim's passport** at all times while she was in Defendants' custody. Defendants forced the victim to clean their home, located in a gated community in Orange County, California, and to cook and care for the Defendants' five children. The victim **slept on a dirty, fold-up mattress in a small, windowless converter room in Defendants' garage**. The victim received **no compensation for her 20 months of work**. The victim was not permitted to attend school or religious services. Defendants verbally abused the victim and physically assaulted her on at least three occasions. An anonymous phone call alerted authorities to the victim. |
| *U.S. v. Harrison Norris, Jr.*, 2007 WL 7321552 (N.D. Ga. 2007) (Trial Brief) | Defendant Harrison Norris, Jr., a former professional wrestler, ran a sex trafficking ring prostituting women in Northern Georgia and North Carolina. His victims included women who **had been kidnapped,** as well as others who were lured to his home by the promise that Norris would train them as professional wrestlers.  Norris preyed on women who were particularly vulnerable, often targeting victims who were homeless or addicted to drugs. Norris controlled the victims through threats and physical abuse, including numerous incidents of sexual assault. At his trial, witnesses testified that Norris imposed a military-style system of discipline and control over his victims; he assigned each woman to a "squad" that was overseen by Defendants Smith, Allen, and Achuff. Witnesses also revealed that Norris **kept track of each victim's "rank" by marking them with skin piercings. Norris also forced the victims to perform manual labor, such as hauling trees, laying sod, and painting, at his private residences**. Norris established draconian house rules and **fined victims** for such offenses as talking too much or failing to exercise. To keep the women **financially indebted to him, Norris charged them for cigarettes, medicine, and food**. He frequently **increased the debt** he claimed the victims owed to him and forbid the women from leaving until they repaid their debts.<br>Defendant Jackson wan an Atlanta-area pimp who provided women to Norris. As "team leaders" in Norris's trafficking scheme, Allen, Smith, and Achuff recruited and monitored women and also enforced his methods of discipline.<br>Norris was convicted by a federal jury on charges including sex trafficking and forced labor. He was sentenced to life in prison.<br>Defendants Jackson, Allen, Smith and Achuff pled guilty to charges related to the investigation into Norris's sex trafficking operation and received sentences ranging from three years' probation to five years imprisonment. |
| *U.S. v. Akouavi Kpade Afolabi*. 2013 WL 55670 (3d. Cir. 2013) | From October 2002 to September 2007, Defendant Akouavi Kpade Afolabi, a successful textile merchant from Togo, led a criminal operation that used fraudulently obtained visas to traffic over 20 West African girls to the United States. The victims were between the ages of 10 and 19 years-old. Kpade Afolabi used emotional and physical abuse to force the girls to **work up to 14 hours-a-day** at hair and nail salons in Newark and East Orange, New Jersey.  Defendant Lassissi Afolabi was also found to have sexually abused several of the girls. Additionally, Kpade Afolabi **confiscated the victims' identity documents and exploited the girls' cultural fear of voodoo curses to control and manipulate them**. To further isolate the girls, Defendants imposed strict rules against learning English or contacting people outside of the house. The Defendants **forced the girls to turn over all of their earnings.**<br><br>In September 2010, Kpade Afolabi was sentenced to 27 months in prison after being convicted by a federal jury on 22 criminal counts related to her role as the leader in the trafficking scheme. In July 2010, Defendants Lassissi Afolabi and Dereck Hounakey were sentenced to prison terms of 292 and 55 months, respectively, on trafficking-related charges. Defendants Geoffrey Kouevi was convicted for conspiring with Kpade Afolabi to commit visa fraud and was sentenced to 26 months in prison. |

| | |
|---|---|
| *U.S. v. Timothy H. Bradley*, 390 F.3d 145 (1st Cir. 2005); Bradley v. U.S., 125 S. Ct. 2543 (2005) | During the period from 1999 to September 2001, Defendants Bradley and O'Dell lured a total of five seasonal workers from Jamaica to work at Defendants' tree removal company in New Hampshire. On two separate occasions, the Defendants travelled to Jamaica to recruit workers. The men who agreed to come to the United States were **promised wages of between $10-20 per hour and lodging on Defendants' property**. <br> Once in the United States, victims were **paid less than the promised wage and were housed in substandard conditions**. Force example, the first two workers were **forced to live in a camping trailer which initially lacked basic necessities like running water and heat**. To maintain control over the victims, the Defendants subjected the workers to verbal assaults, threats, and physical abuse. Defendants also **confiscated victims' identity documents and plane tickets**. When one of the initial recruits fled to New York, Bradley, in the presence of the remaining worker, **threatened to travel to New York with his gun to track down the runaway**. After the Defendants recruited a second group of workers to New Hampshire, O'Dell told the three men that Bradley planned to **hire someone in Jamaica to "destroy" the victim who fled to New York**. Defendants also **impeded the victims' access to medical care and closely monitored their movements outside of Defendants' property**. <br> Eventually, several workers fled the property and contacted local law enforcement. A federal jury convicted the Defendants on a number of counts related to the forced labor scheme. In January 2004, Bradley and O'Dell were each sentenced to 70 months imprisonment. <br> An appeals court vacated Defendants' sentences and remanded the case for more proceedings to address possible mitigating circumstances that might have reduced Defendants' sentence.  In 2006, the district court declined to alter the sentences. |
| *U.S. v. Joseph Djoumessi*, 538 F.3d 547 (6th Cir. 2014) | From 1996 to 2000, Defendants Joseph and Evelyn Djoumessi held a young Cameroonian woman in a state of involuntary servitude in their Detroit-area home. Defendants, both from Cameroon, used a fraudulent passport to bring the then fourteen-year-victim into the United States. Defendants had promised the victim that they would support her and provide her with access to education; in exchange the girl agreed to perform domestic tasks and care for the Defendants' two young children. <br> Once in the United States, **Defendants forced the victim to work daily, without compensation**, from 6:00am to 10:00pm as a domestic servant. She was housed in a "dilapidated" area of Defendants' basement and was not permitted to attend school.  To hold the victim in involuntary servitude, the Defendants used physical violence and threats of physical violence. Defendant Joseph Djoumessi sexually assaulted the victim on at least three occasions. Defendants further **controlled and manipulated the victim by convincing her that she would be arrested** for being in the country illegally if she ever reported Defendants to the police. <br> The victim was removed from Defendants' home in February 2000, after a neighbor alerted local law enforcement. <br> Defendants Evelyn Djoumessi was convicted by a federal jury for conspiring to hold the victim in involuntary servitude and sentenced to 218 months imprisonment. Joseph Djoumessi was found guilty after a bench trial of involuntary servitude, conspiracy to commit involuntary servitude, and harboring an alien for private financial gain. He was eventually sentenced to 60 months' imprisonment. Defendants were also order to pay the victim $100,000 in restitution. |

| | |
|---|---|
| *U.S. v. Kil Soo Lee*, 2001 WL 36117468 (D. Hawaii 2001) (Trial Pleading) | Kil Soo Lee operated a garment factory in American Samoa, at which he enslaved more than 250 workers, mostly young women from Vietnam and China.  Workers paid Defendant between $4000 and $8000 for their work contracts.  They were locked for 12-18 hour days, 7 days a week, in a secured compound surrounded by barbed wire and guards.  **Pay, which was intermittently withheld, was $1.22-$2.25 an hour** (depending on the news report), from which expenses such as room and board were deducted. <br><br> The workers' living conditions were provided by Defendants and were squalid.  The workers **slept in rat- and cockroach-infested dormitories, often two to each 36-inch wide bed.  The facilities were dirty.**  The food provided to the workers was inadequate and prepared in an unsanitary kitchen. <br><br> Lee enforced discipline with **threats of deportation; beatings, starvation, sexual assaults, false arrests, and exploitative debt repayment schemes**.  Enforcement was carried out by guards at the compound. |
| *U.S. v. Louisa Satia*, 68 Fed. Appx. 428 (4th Cir. 2003) | Defendants brought two then-teenage girls (age 14 and age 17) to the United States from Cameroon. Defendants told the girls and their families that, in exchange for performing light housework, the girls would have the opportunity to attend school in the United States. Once here, Defendants used **threats and physical violence, including sexual abuse, to force the victims to work long days as domestic servants and nannies**. The Defendants also controlled and manipulated the girls by **threatening to deport them. The victims received no compensation** and were not permitted to attend school. <br><br> Vivian Satia and Etiondem Daniel Achamorfaw pleaded guilty to trafficking-related charges. A federal jury convicted Louisa Satia and Kevin Nanji of involuntary servitude, conspiracy to illegally harbor and induce an alien to enter the United States, and harboring an alien for financial gain. Satia was also convicted of conspiracy to commit marriage fraud and passport fraud. |
| *U.S. v. Elnora Calimlim*, 2008 WL 4893785 (2008) | In 1985, wealthy Filipino doctors, Jefferson and Elnora Calimlim, brought I.M. from the Philippines to their home to work as their housekeeper. Upon arrival, the Calimlims confiscated I.M's passport and other documents. I.M. was 19-years old at the time. During her 19-years of service, the Calimlims **forbade I.M. to leave the house unescorted; required her to lock herself in her bedroom when guests were in the house; refused to allow her to have friends; refused to allow her to attend a church of her choice or engage in church social activities; denied her necessary medical and dental care; failed to pay her a salary, and paid her parents a total of about $20,000; and restricted I.M. 's contact and communications with her family in the Philippines**. I.M. worked for the Calimlims seven days a week, **on average 17 hours a day**. The Calimlims coerced I.M. to work through an elaborate scheme which included her total isolation from society and her family; repeated lies about her immigration status; and continuous **threats that I.M. would be arrested, jailed, and deported** if anyone discovered her. <br><br> After receiving an anonymous tip concerning the Calimlims, federal agents raided their home on 29 September 2004.  I.M. was found in the basement shaking. |
| *Elma Manliguez v. Martin and Somanti Joseph*, 226 F. Supp 377 (E.D. New York 2002) | Plaintiff had been employed by Defendants as a domestic servant in Malaysia and then came with them to the US.  Plaintiff was **locked in their apartment and worked 18 hour days**.  She was also responsible for nighttime care of Defendants' daughter.  Defendants **held her passport, refused to allow her to talk to other people, denied her personal hygiene items and tried to cut off her communication with her mother**.  When Defendants moved for dismissal on all the charges, their motion was denied in its entirety.  The court found that 18 USC 1584, the enabling statute of the 13th Amendment, includes a private right of action in a civil suit.  Defendants settled all charges with Plaintiff in a sealed agreement. |

| | |
|---|---|
| *U.S. v. Miguel A. Flores*, 199 F.3d 1328 (4th Cir. 1999) | Defendant Miguel Flores operated a business that provided agricultural workers to farmers in South Carolina. Two of Flores's employees recruited undocumented migrant farm workers from Mexico. Once the workers arrived in South Carolina, they were housed in secluded labor camps. Flores informed the workers that they would be required to work to pay off their smuggling debt. **Flores threatened to kill any worker who left the camps. He buttressed these threats by carrying and occasionally discharging a firearm.** After one worker complained about the conditions, **Flores beat him with a pistol.** <br><br> Flores pleaded guilty to a number of charges relating to his trafficking scheme, including involuntary servitude and concealing and harboring illegal aliens. He was sentenced to 180 months imprisonment. |
| *U.S. v. Fermin Pedro Ramos-Ramos*, 2007 WL 1467250 (W.D. Mich. 2007) | The Defendants, husband and wife Fermin Pedro Ramos-Ramos and Laurie Ann Ramos, held a young woman in a state of involuntary servitude in their Detroit area home. The victim was forced to work, **without pay**, as a housekeeper. The Defendants recruited and transported the victim from Mexico.  Fermin Pedro Ramos-Ramos and his wife used threats and physical violence to control of the victim. Defendants also **confiscated the victim's identity documents and threatened that the police would arrest her** if she was found. The Defendants were charged with human trafficking related crimes, including forced labor and harboring an illegal alien. Defendant Fermin Pedro Ramos-Ramos was also indicted for aggravated sexual abuse. In June 2007, Fermin Pedro Ramos-Ramos pleaded guilty to harboring and transporting an illegal alien, and was sentenced to 18 months imprisonment, followed by deportation. Laurie Ann Ramos pleaded guily to harboring an illegal alien and was sentenced to one year probation. Fermin Pedro Ramos-Ramos was also order to pay the victim $26,820 in back wages and liquidated damages. |
| *U.S. v. Supawan Veerapol*, 312 F.3d 1128 (9th Cir. 2007) | Defendant Veerapol, a Thai citizen and the common-law wife of a Thai ambassador to the United States, forced three Thai nationals to work as domestic servants and as workers at defendant's Thai restaurant in Los Angeles. Beginning sometime prior to 1989, Veerpol recruited the victims from Thailand. Veerpol was able to obtain a visitor's visa for at least one of the victims through her husband's contacts at the Thai embassy. <br><br> Once in the United States, the Defendant forced the victims to work long hours performing housework and childcare. Defendant opened bank and credit card accounts in the victims' names, which she used for her own benefit. Veerpol used **threats of legal action, verbal abuse, and physical violence** to maintain control over the workers. At one point, the Defendant **threatened to kill one of the workers** if she returned to Thailand. <br> In addition to confiscating the victim's passports, the Defendant further isolated the women by prohibiting them from using the mail or telephone, and by denying them access to Thai-language newspapers. The victims were not permitted to speak to defendant's house guests. The Defendant permitted one victim to return to Thailand, after a Thai consular official intervened at the request of the victim's siblings. The two other workers eventually escaped from defendant. |
| *U.S. v. Esperanza Vargas*, 988 F.2d 126 (9th Cir. 1993) | Defendant Esperanza Vargas was convicted of holding a Mexican national in involuntary servitude. Defendant brought the then 17-year-old victim to the United States from Mexico. Once in the United States, the victim was kept as a domestic servant in the Vargas home. The victim testified that the Defendant maintained control over her through threats and physical violence. The victim also testified that she **did not receive a salary and that she was denied access to medical  care**. Authorities found the victim after receiving an anonymous tip. <br><br> Media reports indicate that Esperanza Vargas's adult children, Raul Vargas and Claudia Vargas, were also indicted on federal charges related to trafficking.  Raul Vargas is listed in the district court's docket, but no charges are listed as brought or pending. According to a Los Angeles Times article, Raul Vargas pleaded guilty to a single count of assaulting victim J.H.O. and was sentenced to an eight-month jail term. |

| | |
|---|---|
| *U.S. v. Sante Kimes*. 939 F.2d 776 (9th Cir. 1991) | Defendants Sante and Kenneth Kimes, Sr. held a number of undocumented workers in involuntary servitude as domestic servants. Sante Kimes used **physical abuse and threats of deportation to control the victims**, all of whom were women.  She also **prohibited the victims from contacting their families and from using the mail and telephone**.<br>Three victims were initially held at the Defendants' home in Hawaii. In 1984, the Kimes and the victims moved to the Kimes's home in Las Vegas, Nevada. One of the victims escaped from Defendants and subsequently cooperated with the F.B.I.   After her arrest, Sante Kimes escaped from a hospital while in custody, only to be re-arrested four days later. Sante Kimes was convicted by a federal jury and sentenced to five years imprisonment.  Kenneth Kimes, Sr. accepted a plea deal and was sentenced and received a three year suspended sentence. |
| *Marichu Suarez Baoanan v. Lauro Liboon Baja, Jr.*, 627 F. Supp.2d 155 (S.D.N.Y. 2009) | Defendant Lauro Baja was a representative from the Philippines to the United Nations in New York City.  Plaintiff alleges that she met with Mrs. Baja and made a deal with her:  that Plaintiff would pay her **$10,000 in exchange for a visa, transportation to the US and assistance in finding a nursing position.  This price was later lowered to $5,000, which Plaintiff asserts she paid, in three installments.**<br>Defendants instructed Plaintiff to tell the US Consulate that she was going to be a domestic worker, ostensibly to expedite the visa/passport process.  Employees of diplomats are entitled to diplomatic passports.  After about a week at a hotel that was owned partly by Defendant Labaire International Travel.  A worker from Labaire also gave Plaintiff a new, diplomatic passport.<br>Plaintiff traveled to the US in January, 2006.  She was met at the airport and driven straight to Defendants' home.  Once there, she was told she **had to work for the Defendants for 6 months to pay off the $5,000 that Defendants had "discounted" off her agreement.**<br>For the three months that Plaintiff worked for the Defendants, she was in charge of all the household chores, cooking for parties, childcare and some nursing duties.  She was **only allowed to eat leftover food, was not allowed warm clothing or bedding, nor was she allowed to contact anyone outside the home.**  Plaintiff was also beaten and insulted during her three months with the Defendants. |
| *Hasmat Ara v. Sakina Khan*, 2007 WL 1726456 (2007) | Plaintiff was hired to be a live-in nanny for Defendants two young children.  When she started working, she was forced, in addition, to do all the cooking, cleaning, and washing for the entire household, including Defendant's mother.  Plaintiff was forced to sleep in the same room as the children, so she could provide 24 hour care to the infant.  During the 16 months she lived with Defendants, Plaintiff was **locked in the house** during the day, **threatened with arrest, deprived of her passport, beaten, humiliated and insulted by Defendants.**  Defendants also **did not allow her to call her family in Bangladesh, nor to receive phone calls.** |
| *Celedonia Cruz v. Elmer A. Toliver*, 2004 WL 3712694 (W.D. KY 2004)(Compl.) | Plaintiff traveled to the United States to work as a domestic servant to the Defendants.  She was promised $500/week, but was paid only $250 (later $300/week when Defendants had a third child).  When she arrived in the US in 2001, Plaintiff said the Defendants **took her passport and kept her locked up for the next three years**.  Plaintiff's duties included cooking, cleaning, and yard work.  She states that she **worked up to 18 hours a day, every day.  Plaintiff was not given her wages directly, but they were wired to her family in The Philippines, minus living "expenses."**   Defendants kept Plaintiff in their house by **threatening her with arrest and accusations of theft.  They said she had to work for them for 5 years in order to pay off her $8000 debt for the service of bringing her to work in the US.** |

| | |
|---|---|
| *Alejandra Ramos v. Javier Hoyle*, 2010 WL 11505867 (Apr. 9, 2010) (Report and Recommendations) | Plaintiffs were employed as housekeepers and childcare providers by Defendants.  Plaintiff Ramos worked for Defendants from 2002 until 2005 and Plaintiff Castro worked for Defendants from 2006 until 2008. Plaintiffs allege that in addition to keeping their passports and immigration papers, Defendants, among other things, restricted their food, violated their previous agreement made before Plaintiffs came to this country by increasing their work responsibilities, failing to pay them their promised wages and failing to offer the medical insurance that was promised.  Defendants also forced Plaintiffs to live in a converted closet, instructed at least Plaintiff Castro not to talk to certain persons because they had encouraged Plaintiff Ramos to escape, **threatened to report Plaintiffs for detention and deportation if they tried to escape, and threatened to encourage and urge law enforcement and immigration officials to pursue Plaintiffs if they ever escaped.** |
| *Devendra Shukla v. Sat Prakash Sharma*, 2007 WL 3113884 (E.D.N,Y 2007) | Plaintiff came to the United States on a R-1 religious worker visa to work for Mr. and Mrs. Sharma (defendants) as a Hindu priest.  He worked in this capacity for seven years while also performing janitorial work and other labor for the defendants.  The plaintiff alleges he was subjected to exploitative working conditions and prevented from leaving by seizure of his passport.  He also states that Defendants refused to renew his visa and forced him to sleep in a "bathroom-like" room.<br><br>In addition to claims stated above, Plaintiff brought common law claims for intentional infliction of emotional distress, breach of contract, quantum merit, unjust enrichment and fraud. |
| *John Doe I v. Moises Rodriguez*, 2006 WL 3851737 (D. Colo. 2006) | Defendants contracted with smugglers to bring Plaintiffs across the US-Mexico border in order to work on their farms in Colorado.  When they reached their living quarters, the "compound," the Plaintiffs were informed that they owed a **debt of $1300** to the Defendants for their transportation costs.  In Colorado, Plaintiffs lived 4-6 to a room, and some people were forced to sleep on the floor each night.  The water on the compound was undrinkable.  The bathrooms and showers were grossly inadequate and the entire compound was infested with insects.<br> The farms on which Plaintiffs worked were 60 to 90 minutes away from the compound.  Between traveling and working on the crops, Plaintiffs were **on duty for over 16 hours, 6 or 7 days a week**.  Plaintiffs believed that they would be found and harmed if they left the Defendants' company; they also believed that if they left, their co-workers would be forced to pay off their debts.  Defendants also brought guns to work, and at least once, fired the gun to prove that it worked.  Defendants were insulting, threatening and harmful to Plaintiffs, in order to keep them in fear.<br> Plaintiffs were **paid once a month, and their pay was reduced through a variety of illegal deductions for rent, cleaning, tools, travel, the repayment of the smuggling fee, etc**. Social Security was also deducted, fraudulently, since none of the Plaintiffs had Social Security numbers.  The number of hours each Plaintiff worked was rounded down--with **many days clocking in at exactly 12 hours**.<br> In October of 2005, Plaintiffs escaped from the Defendants and started this action.  In 2009, the court entered a default judgment for Plaintiffs. |
| *Elisier Yael Velasquez Catalan v. Vermillion Ranch Limited Partnership*, 2007 WL 604890 (D. Colo. 2007) | Defendants, Colorado cattle ranchers, brought the six Plaintiffs to the United States from Chile on an H-2A visa.  The Plaintiffs asserted that they were treated poorly by Defendants while here working for them.  Their **passports were confiscated, and they were not paid minimum wage** but instead were paid $2 - 3/day and were forced to work up to 16 hour days.  Further, Plaintiffs allege that they were **not allowed to seek proper medical treatment** when it was needed. |

| | |
|---|---|
| *U.S. v. Varsha Mahender Sabhnani*, 539 F. Supp. 2d 617 (2008) | The victims, two women from Indonesia, traveled to the United States to work as domestic servants in Defendants' home. The first victim arrived in 2002, the second in 2005. Once the victims arrived in the United States, the Defendants **confiscated their passports and other identity documents**. The victims were then made to **work long days with little food**. The Defendants provided the victims' families in Indonesia with $100 per month, but the victims did not receive any direct compensation from defendants. The victims also testified that they were subjected to physical and psychological abuse by Defendant Varsha Sabhnani; **including beatings, when the Defendant pouring scalding water on one victim's arm and threatened to send embarrassing letters to her family in Indonesia**.  A federal jury convicted Defendants of forced labor, illegally harboring aliens, holding a person in a condition of peonage, and document servitude. Defendants appealed and restitution was modified on remand (although the appellate court upheld the convictions on all other grounds). |
| *U.S. v. Willie Warren, Jr.*, 772 F.2d 827 (11th Cir. 1988) | Defendants operated a labor trafficking ring that supplied agricultural workers to farms in Florida and North Carolina.  Evidence presented at trial showed that Defendants recruited and transported laborers from Atlanta, Georgia to labor camps in Florida and North Carolina. The victims received **little or no compensation for their work** and were told that they owed Defendants money for room and board and transportation. Defendants controlled the victims through **threats of physical violence.  Other witnesses reported being beaten and observing the Defendants capture and beat laborers who attempted to flee from the camps.** |
| *U.S.v. Gladys Vasquez Vasquez Valenzuela*; 495 Fed. Appx. 817 (9th Cir. 2007) | Defendants operated a large-scale sex-trafficking ring in the Los Angeles area. According to a press release from the Department of Justice, the Defendants used promises of legitimate jobs to lure vulnerable Guatemalan women - including minors - into the United States. After smuggling the women into the United States, the Defendants forced the victims to engage in prostitution to pay off **smuggling debts of as much as $20,000**. The Defendants collected all the money the victims earned. To control and manipulate the victims, the Defendants **threatened the victims and the victims' families in Guatemala and exploited the victims' fears of witch doctors**.

Five Defendants - Gladys Vasquez Valenzuela, Gabriel Mendez, Mirna Jeanneth, Vasquez Valenzuela,   Maria de los Angeles Vicente, Maribel Rodriquez Vasquez - were found guilty by a federal jury of trafficking and trafficking-related charges and received sentences ranging from 30 to 40 years in prison. Four additional Defendants - Albertina Vasquez Valenzuela, Luis Vicente Vasquez, Pablo Bonifacio, Flor Morales Sanchez – pleaded guilty to charges related to the trafficking scheme and received sentences ranging from 24 to 71 months in prison. |
| *Fredi Garcia v. Audubon Communities Management*, LLC, 2008 WL 1774584 (E.D. La. 2013) | Plaintiffs worked, without visas, for Defendant and subsidiary companies.  Plaintiffs had been promised housing and worksite living accommodations in exchange for their work, but they were **not paid regularly, or were underpaid for their labor**.  They were **never paid overtime wages**, but regularly worked **over 40 hours a week**.  When they complained about the low wages, Defendants illegally **threatened to retaliate by calling Immigrations and Customs Enforcement to deport Plaintiffs.  Defendants also threatened to evict Plaintiffs from their housing in retaliation for wage complaints**.  In February of 2008, ICE agents raided the Defendants' worksite and detained 7 of the named Plaintiffs, some for as long as 9 weeks. |

| | |
|---|---|
| *U.S. v. Sung Bum Chang*, 237 Fed. Appx. 985 (5th Cir. 2007); 2010 WL 4786260 (N.D. Texas 2010) | Defendant Sung Bum Chang pled guilty to conspiracy and forced labor for coordinating with members of a human trafficking network to smuggle 50-60 women between 2003 and 2005 from South Korea. The women lived at Chang's residence and were **forced to work at his Club 6 or 7 days a week, in order to pay off their smuggling debts**, Chang **docked the women's pay and extended their time of servitude for room and board and fines for breaking rules he laid down**.  The women were required to act as hostesses at the karaoke bar, to spend time with the customers and convince them to buy more alcohol.  Chang **confined the women to his home with guards and surveillance equipment and withheld their passports**.  Chang also required the women to tell him the names and addresses of some of their family members in South Korea, with the implication that the victims' families would be harmed if they tried to escape. Chang appealed sentencing enhancements and was denied.<br><br>Chang's wife, Hyang Kyung Chang was aware of her husband's business, and participated in the conspiracy.  She pled guilty as well.<br><br> In December, 2008, a related civil case was filed by some victims. The civil suit alleges that the women were sometimes forced to have sex with customers in order to keep them satisfied and to convince them to return to the Club. |
| *U.S. v. Lueleni Fetongi Maka*, 2020 WL 2544408 (D. Haw. 2020) | Defendant had smuggled about seven men from Tonga and forced them to work in his pig-farming and landscaping businesses for **little and sometimes no pay**. The men **lived in shacks, were not given adequate food, and were beaten as punishment**.  Defendant also lied to the victims and told them that he had gotten them adequate visas, but in reality, had not. |
| *U.S. v. Armando Soto-Huarto*, 2004 WL 177004 | At least eight men were involved in this smuggling ring, but the eighth person charged, Hector Soto, was at large at the time of the sentencing of the other seven charged. Hector Soto was subsequently tried in a separate trial. The Defendants plead guilty to confining women in alien smuggling "safe houses" in the Edinburg, Texas area near the US-Mexico border, where they raped the women repeatedly.  The victims were young women from Mexico and Central America (including Guatemala, Honduras, and El Salvador) and were held in those houses against their will and forced to do work for free. The women were **held against their will until their "debt" to the organization, incurred largely from their smuggling fees, was repaid**.  It was the victim's family who were to pay the debt or the victims' themselves through forced labor, which included cooking, cleaning and submitting to the sexual demands of the smugglers. Defendant Juan Carlos Soto would brandish a handgun, use force and **threats of physical violence** to hold the women in the houses. The captors **punished efforts to escape or seek help through further violent and sexual abuse**, and did not allow the women to tell anyone about their circumstances. The 23 year sentence imposed was, at the time, the longest sentence ever received under the TVPA. |
| *U.S. v. Herri Nasution*, 2004 WL 1064318 | Husband and wife, Herri Nasution and Mariska Trisanti, held two undocumented women as domestic servants from 1996 through 2000.  The women were from Indonesia and were brought in to Los Angeles on tourist visas. The victims were promised work as housekeepers and domestic servants, but when they arrived in the US, Defendants forced them to work for at least **17 hours a day, seven days a week, with no pay**.  Trisanti confiscated their passports and kept them at the house through threats and physical abuse. The Defendants although **threatened that the women would be arrested and put in jail if they tried to escape**. In 2000, Trisanti took a trip to Indonesia and left the women at home with Nasution, they took that opportunity to escape. |

| | |
|---|---|
| *U.S. v. Salazar et. al.*, 2018 WL 6975671 (S.D. Tex. 2018) | The six charged defendants, all Mexican citizens, lured young Mexican girls and women into the United States under false pretenses and then forced them into prostitution.  In one case, a minor victim was smuggled while she was still 15 and **forced into prostitution** by Jose Luis Moreno Salazar who had lured her from her family by claiming his love for the girl and promising to marry her. Once in the US, the women were forced into prostitution in Houston area bars, through physical violence and threats. The Defendants maintained their control over the women through threats of harm, physical force and psychological coercion. The **beatings were done with a belt, a wire hanger or a cable**. The victims lived in apartments leased by the Defendants and were transported to bars for the purposes of prostitution. The Defendants **collected from the women and girls all of their prostitution proceeds**. The sex trafficking organization operated from the early months of 2004 until the summer of 2005. Defendant Gerardo "El Gallo" Salazar, the uncle of Angel Moreno Salazar and the father of Juan Carlos Salazar, was the leader of the sex trafficking organization. |
| *Hernandez v. Maria Garcia*; 2009 WL 5002231 (W.D.N.Y. 2009) | Defendants ran migrant labor camps in New York, east of Buffalo, held 40 undocumented Mexican boys and men virtually as their slaves. Defendants are middlemen who provide low-cost workers from Guatemala, Mexico and other countries to big farms in the US.  The victims performed agricultural work in Orleans and Genesee Counties in New York. The Defendants prevented the workers from leaving by threats of physical harm in case they tried to escape before paying off more **than $1,000 in debt for housing, transportation and living expenses**. Defendants used operation guards to **follow the workers' movement and threatened the workers with physical harm, deportation and arrest if they tried to escape**. The deductions which Defendants were taking for the alleged debt to them from the workers' earnings were so large that the workers were **left with virtually no pay**. The victims, desperate for work, were transported to Buffalo from Arizona in the summer of 2001 in crowded and extremely hot vans without any seats or windows that could be opened. Upon arrival in New York, 30 of the workers were put to live in a farmhouse so small that **11 workers slept in a small room with three beds.** <br><br> Defendants each eventually pled guilty to lesser charges.  Maria Garcia pled to one count of forced labor; Elias Botello pled guilty to a charge of forced labor conspiracy (37 months); Jose I. Garcia pled guilty to harboring illegal aliens (12 months of probation); Jose J. Garcia pled guilty to harboring illegal aliens (14 months). |
| *U.S. v. Theresa Mubang*, 2011 WL 3511078 (D. Md. 2011) | Defendant Mubang, a naturalized US citizen, originally from Cameroon, kept in involuntary servitude a minor girl from Cameroon for approximately 2 years. Defendant Mubang took the girl from her parents in Cameroon, promising them that the girl, Evelyn Chumbow, would receive American education and would lead a better life than in Cameroon.  She then transported the girl through London using a false passport for Chumbow. Once at Defendant's home in Greenbelt, Maryland, however, Chumbow was forced to serve as a nanny to Defendant's sons, was required to cook and clean, and was **isolated from the Maryland community and never allowed to speak with her family back in Cameroon**.  Chumbow **slept on the floor and cared for the children around-the-clock**.  Defendant Mubang **prohibited her from opening the door of the house or leaving the house for any reason other than the completion of specific household tasks**.  Chumbow was **never sent to school** or allowed to communicate with children her age.  Defendant Mubang subjected Chumbow to continued verbal and physical abuse, often **beating her with belts and high-heel-shoes to the extent that the girl would start bleeding or the girl's skull would ooze bodily fluids from the hits with the high-heel shoe**. Chumbow escaped from Defendant's house while Defendant Mubang was at a weekend conference. Notably, about a year prior to Chumbow's enslavement, Defendant Mubang had similarly enslaved another young girl from Cameroon. She had sent her back to Cameroon, however, because the girl had started calling the police.  Additionally, after Chumbow escaped, Mubang brought over another girl from Cameroon, enslaving her as well.  That victim ran away, as well. Mubang fled the United States after she was convicted, but before sentencing took place.  She was sentenced to 17.5 years in prison in absentia.  In May, 2005, she was caught in Cameroon and sent back to the United States to begin to serve her sentence. |

67

| | |
|---|---|
| *U.S. v. Barbara Coleman-Blackwell*, 8:02CR00311 (docket) | The victim was a native of Ghana who worked as a domestic servant in Defendants Kenneth and Barbara Blackwell's Takoma Maryland Park, Maryland home, for approximately **17 months without pay**. Grace Coleman, a high government official in Ghana and the mother of Barbara Blackwell, had submitted fraudulent visa application at the US Embassy in Ghana to obtain visa for the victim. In February 2000, Coleman brought the victim into the United States and delivered her to Defendants, who confiscated her passport and visa to prevent the victim from leaving the Takoma Park home. Defendants ensured her services through **threats of deportation and imprisonment in Ghana**. Coleman has also been charged, however despite requests to the government of Ghana has not been extradited to the United States. |
| *U.S. v. Jose Tecum*, 2002 WL 32163165 (11th Cir. 2002) | Defendant Jose Tecum **kidnapped** a young Guatemalan woman from her family home in a remote village in Guatemala, and smuggled her across the US-Mexico border. He **threatened to murder her or any of her family members if they tried to stop him**, and also used **witchcraft threats to scare her into submission**. Before leaving Guatemala, while Jose Tecum and his victim were at Defendant's house along with the victim's newborn baby, the baby died because Defendant denied medical attention to the baby. After they entered the US, Defendant Jose Tecum forced her to do agricultural work in California and then transported her to his home in Florida, where his wife Maria Tecum and their three children resided. The victim was forced there to be Jose Tecum's sexual slave and to do domestic and agricultural work. In Florida, Defendant Jose Tecum obtained false identification and immigration documents for the victim. |
| *U.S. v. Lev Trakhtenberg*, http://www.usdoj.gov/usao/nj/press/files/track0603_r.htm | Defendants Lev Trakhtenberg, his wife, Defendant I'lina, and Malchikov were forcing Russian women to dance at strip clubs in the US. The Defendants were luring young women in Russia with attractive offers for dancing at New York strip clubs, for which opportunity the women paid a hefty fee. The women were brought in into the US with fraudulently obtained visas, the visa applications falsely claimed that the women were highly specialized and internally-acclaimed singers and dancers. When the women arrived in New York, Defendants collected their passports and return tickets. They had also collected emergency contact information from the women with regard to the women's family members in Russia, which Defendants later used to **threaten their families and the women in order to prevent the women from leaving Defendants' control**. Defendants required that the **women paid them $200 a day proceeds from their work, even on days when they earned less or were too exhausted or ill to work**. The women lived in apartments in Brooklyn and were transported by a van to the nude dancing establishments in New Jersey by Defendant Serge Malchikov, among other drivers. |
| *U.S. v. Oscar Mondragon*, 340 Fed. Appx. 963 (5th Cir. 2009) | Defendants were part of a scheme to smuggle Central American women and girls into the United States. The Defendants lured their victims with promises of legal jobs in the United States. Once in the country, however, the victims were forced to work in restaurants, bars and cantinas in the Houston area, and in some instances, were required to respond to the sexual advances of customers. The women **were threatened with physical harm or harm to their families if they attempted to escape before paying off their smuggling debt**; some were sexually assaulted by the defendants. The money the women made was turned over to the Defendants to pay off their debts. |
| *U.S. v. Yelena Aleksandrovna Telichenko*, 2006 WL 4918478 (M.D. Fl. 2006) | Defendant kept a 24 year old woman as a slave in her apartment. She beat the victim regularly, and forced the young woman to stay out of sight so no one would see the bruises and cuts all over her face. She was regularly **threatened with harm (physical and economic) to her family in Russia**. The victim told reporters that she was forced into prostitution, but Defendant did not plead guilty to any charges of forced prostitution.<br><br>The victim was **never left alone, and was watched while she called her mother in Russia**. Some other tenants in the apartment building heard her cries, but did nothing about it. Employees of the apartment complex also saw her injuries, but likewise did not call the police. Finally, the victim's mother felt that something was wrong, and called Russian authorities who called US law enforcement. |

| | |
|---|---|
| *U.S. v. Lynda Dieu Phan, Justin Phan, Duc Cao Nguyen*, 2008 WL 7414473 (M.D. Pa. 2008) | Defendant Lynda Dieu Phan brought two Vietnamese women to the United States on fraudulent fiancé visas.  She promised to pay for the women's plane tickets and immigration paperwork in exchange for the women working in her nail salon.  Defendant required the two women to enter sham marriages in order to stay in the United States (to co-Defendants Justin Phan and Duc Cao Nguyen).<br><br>Defendant **kept all of the victims' paperwork and documents**.  At least one of the victims was taken to the bank on a regular basis where she was **forced to sign documents she did not understand**.  The women lived in Defendant's house, where they were **required to pay Defendant rent—they lived in a room that had bunk beds, but no mattresses, so the women slept on the floor.**<br><br>The victims **worked 7 days a week, up to 11 hours on most days**.  Also, they were required to cook and clean at Defendant's home.  **Defendant did not pay them anything**, but they were allowed to keep some tip money.  The women were instructed to not tell customers anything about themselves.  Defendant told the women that **if they worked for 3 years they would have paid her back, but after 3 years, Defendant did not begin paying the women for their work**.  When the victims confronted Defendant about their wages, she began to charge them $200/month in rent and $300/month in utilities and demanded other amounts for fees and travel expenses.<br><br>One woman finally left Defendant with the help of a customer, when she realized that Defendant had not renewed her immigration status and that she was in the US illegally. |
| *U.S. v. Prosper Emeka Udogwu*, 2003 WL 21344749 (S.D.N.Y. 2003) | In 1987 the Defendants (husband and wife) brought a 10-year-old girl from Nigeria to the U.S. by saying that she was the daughter of the wife's brother. This girl was a domestic servant for one year and **was never paid**. She was subjected to both **emotional and physical abuse**. She was eventually sent home by the defendants. In 1989, while the wife was in Nigeria, the family of a 13-year-old girl agreed to let the girl go to the U.S. thinking she would be getting an education. This girl also worked at a restaurant, and her **all of her pay from this job was taken by the Defendants**. The Defendants were convicted of all eight counts on the indictment. In addition to the five counts listed above, of which both Defendants were charged and convicted, the husband was charged with and convicted of making false statements to the Immigration and Naturalization Service (18 U.S.C. 1001) and the wife was charged with and convicted of making false statements at her naturalization interview (18 U.S.C. 1015(a)) and mail fraud in an effort to obtain social security benefits fraudulently (18 U.S.C. 1341). |
| *U.S. v. Talal H. Alzanki*, 54 F.23d 994 (N.D. Ga 2007) | The victim was a domestic servant at the household of defendant's family in Kuwait. The family kept her from leaving and **held on to her passport**. She was later sent to the Massachusetts residence of Defendant and his wife. After she arrived, Defendant took away her passport in August 1992. She was told by the Defendant that **she would be shot by the police if she left the residence or even went out onto the balcony**. She was physically abused on at least two occasions, was **denied dental treatment and later food, and was not provided protection from the household chemicals** with which she was forced to clean. She remained at defendant's residence for four months and was supposedly **paid $120 per month**. She escaped in December 1992. |

| | |
|---|---|
| *U.S. v. Mussry*, 726 F.2d 1448 (9th Cir. 1984) | Defendants enticed Indonesian servants to travel to the United States with promises to pay them for domestic work.  Once victims arrived in United States, Defendants **took away their passports and return plane tickets**.  Victims were forced to work up to **fifteen hours a day for seven days a week, doing domestic work, cooking, massages, household construction, landscaping, and gardening**.  Defendants **withheld pay and did not allow victims to have visitors or vacation time**.  The district court dismissed most counts, but the appellate court reversed and remanded. |
| *U.S. v. Tony Booker*, 655 F.2d 562 (4th Cir. 1981) | One Defendant owned a migrant camp and the other two Defendants were lieutenants at the camp.  Workers were brought to the camp being promised steady work and pay, but were **forced to pay off "debts"** before being allowed to leave.  Defendants **withheld wages from workers and threatened them with violence**.  The victims left the camp to buy personal items and were picked up by two of the Defendants, who **severely beat them and brought them back to the camp**.  Victims were told they **would beaten or killed if they tried to leave again**.  Representatives of Farm Workers' Legal Services arrived and drove the victims away from the camp.  One Defendant was sentenced to 10 years in prison, another was sentenced to 5 years.  The appellate court upheld the judgment. |
| *Babu Thanu Chellen v. John Pickle Co.*, Inc., 446 F.Supp. 1247 (N.D. Okla. 2006) | Over fifty men were brought from India to the United States by Defendants John Pickle Company, Inc and its president, John Pickle, Jr.  The victims were promised high-paying jobs and possible permanent residency status in the United States.  Once the victims arrived in Oklahoma, they **had their passports, visas, and return plane tickets confiscated**.  The victims were forced to live in **cramped living conditions patrolled by an armed guard and were not allowed any "unauthorized departures."**  Many of **their activities were monitored, their food was rationed, and they were not provided adequate medical care**.  The victims were forced to work under hostile work conditions and were **paid below minimum wage**.  Additionally, the victims were verbally abused and **threatened with deportation**.  Eventually, the victims were able to escape with the help of a local church.

The victim's case was joined with an action by the Equal Employment Opportunity Commission.  The trial took place in three phases and the Defendants were found liable on all counts. |
| *Pusha Topo v. Ashwin Dhir*, 2004 WL 527051 (S.D.N.Y. 2004) | The victim was brought from India to work as a domestic servant, caring for the Defendants child and cleaning their home.  When the victim arrived in the United States, Defendants confiscated her passport.  The victim worked for two years, for **119 to 133 hours per week with almost no time off**.  The **Defendants paid the victim $.22 per hour for the first eight months of employment, then $50 for the remaining seventeen months**.  The case was settled right before its trial date and the complaints were withdrawn. |
| *Zipora Mazengo v. Alan S. Mzengi*, 542 F.Supp.2d 96 (D.D.C. 2008) | Defendants, a husband and wife, lured the victim to the United States by promising her $900 per month for domestic work.  The work was for child care and normal household work, and was to include five 8-hour work days per week, two full days off per week, two weeks of paid vacation per year, and overtime compensation.  When the victim arrived in the United States, the Defendants immediately **seized her passport and employment contract**.  The victim regularly worked 17-hour days, 7 days per week.  She was **verbally and physically abused, denied medical care, and not permitted to leave the house unattended**.  She was also **not paid for her work**.  The victim escaped through the aid of a customer of the Defendants' catering business.

Defendants failed to answer the Complaint and a default judgment was entered for the Plaintiff. |

| | |
|---|---|
| *Alexander Aguilar v. Imperial Nurseries*, 2007 WL 1183549 (D. Conn 2007) | The victims, adult males from Guatemala, were promised jobs planting trees for $7.50 per hour.  The victims were **required to pay visa and travel fees** and needed to take out Guatemalan loans to cover these fees, for which they were never reimbursed.  When the victims arrived in the United States, they had their **passports confiscated and were immediately transported to another State without their consent**.  The victims were forced to **live in unsanitary conditions, regularly work 80-hour weeks, and were paid far less than minimum wage**.  The victims had **restricted contact with others, restricted travel, and were denied medical care**.  Defendants regularly **threatened the victims with deportation and/or jail, and verbally and psychologically abused the victims**.<br><br>The parties reached a settlement, the details of which were not disclosed. |
| *Juana Sierra Trejo v. Broadway Plaza Hotel*, 2006 WL 738439 (S.D.N.Y. 2006) | Defendants, a hotel and its management, hired the five victims to clean hotel rooms.  Defendants told the victims that their work would entail cleaning rooms for 8-hours per day, 6 days per week and that the victims would receive roughly $250 per week.  However, once employed, the victims were regularly required to work **7 days per week, often for 15 hours per day**.  They were **denied any meal or bathroom breaks during working hours**.  After working hours, the victims were often required to clean Defendants homes and assist Defendants with miscellaneous errands.  The victims were **never compensated for any overtime work**.  The victims were **denied time off, sexually harassed, verbally abused, and threatened with deportation**.<br><br>The parties settled the case. |
| *U.S. v. Ike Kozminski*, 487 U.S. 931 (1988) | Defendants are a husband and wife and their son. The victims, Robert Fulmer and Louis Molitoris, are two mentally incompetent men in their 60's. They worked as farm workers on Defendants' dairy farm seven days a week, **up to seventeen hours a day**, and **were paid very little if anything**. The victims suffered psychological, physical, and verbal abuse at the hands of Defendants, and were **deprived medical care**. At the time they began working for the Defendants, Molitoris was homeless and Fulmer was working at another farm, and was recruited by Mrs. Kozminski when seen walking down the street. |
| *Javier Hernandez v. Maria Garcia-Botello*, 2011 WL 4344045 (W.D.N.Y 2011) | Defendants would travel to Mexico to recruit farm workers. Plaintiffs were held in debt peonage upon arriving in the U.S. Among the Defendants are both labor contractors and farms. Defendants "conducted and operated a criminal worker-exploitation scheme." (Plaintiffs' Compl. Oct. 2005.) Defendants threatened Plaintiffs with force (including discussing guns in front of Plaintiffs) and some were physically abused. They were forced to live under **inhumane and unsanitary conditions, without sufficient bed space, water, or food**. Some of the victims were told that t**hey would be deported if they were to escape and/or report the situation**. Defendants **were not paid for all of their work**. Four years after Farmworker Legal Services of New York (FLSNY) began monitoring the sites at which Plaintiffs worked, six workers escaped and contacted FLSNY.<br>Plaintiffs claimed violations of the Migrant and Seasonal Agricultural Worker Protection Act (AWPA), 29 U.S.C. 1801. Plaintiffs' motions for an expedited hearing and for extension of time to file a motion for class certification were denied in February 2007.<br>Named Defendants Maria Garcia-Botello, Elias Botello, and Jose J. Garcia had pled guilty to related criminal charges in 2004 (forced labor, harboring illegal aliens). Garcia-Botello got four years in prison. Her son Elias got thirty-seven months, her son Jose and her husband got less than one year. |

| | |
|---|---|
| *U.S. v. Fang Ping Ding*, 2010 WL 4681870 (DOJ 2010) | The victim, a Chinese national, was recruited by Defendants in China and entered the United States on a B1/B2 visa, which she obtained upon Defendants' instruction and advice. Once in the United States, Defendant Ding **confiscated the victim's passport, visa, and other documents** and forced the victim to **work without pay** as a live-in domestic servant. Ding also maintained **control over the victim through physical abuse and by threatening to falsely report her to law enforcement**. To avoid detection by law enforcement, Defendants instructed the victim not to leave the house. The victim was forced to work for Defendants from approximately April 2008, when she arrived in the United States, to April 2009, when it appears she was rescued by local law enforcement.<br>Wei Wei Liang and Bo Shen, Ping's daughter and son-in-law, respectively, were convicted on related a charge of illegally harboring the victim. |
| *U.S. v. Mabelle de la Rosa Dann*, 652 F.3d 1160 (Dist. Nev. 2011) | U.S. citizen Mabelle de la Rosa Dann recruited Peruvian victim Zoraida Peña Canal to come to the United States as her nanny and housekeeper, promising Peña Canal that she would be paid $600 per month plus free room and board in exchange for working five days per week during regular business hours. But once Peña Canal arrived, Dann **seized Peña Canal's passport, and refused to pay her for two years**. Peña Canal regularly worked from 6 a.m. until 9 p.m., and was **prohibited from communicating with others or listening to Spanish radio and television**. At one point, Dann told Peña Canal that **she owed her $13,000 and needed to work to repay the debt**. |

**APPENDIX H – Delphi "Strong Trafficking Indicators" Applied to Current Case**

**Table 2. Delphi "Strong Trafficking Indicators" Applied to Current Case**

| Strong Trafficking Indicators | Casilao | Garcia | Lincuna |
|---|---|---|---|
| Deception about the nature of the job. | No Allegation [93] | No Allegation [94] | No Allegation [95] |
| Deception on the location of the job. | No Allegation [96] | No Allegation [97] | No Allegation [98] |
| Deception about employer. | No Allegation [99] | No Allegation [100] | No Allegation [101] |
| Deception about access to education opportunities. | No Allegation [102] | No Allegation [103] | No Allegation [104] |
| Acts of Violence | No Allegation [105] | No Allegation [106] | No Allegation [107] |
| Abduction | No Allegation [108] | No Allegation [109] | No Allegation [110] |
| Forced Marriage | No Allegation [111] | No Allegation [112] | No Allegation [113] |
| Forced Adoption | No Allegation [114] | No Allegation [115] | No Allegation [116] |
| Selling of the Victim | No Allegation [117] | No Allegation [118] | No Allegation [119] |
| Debt Bondage | No Allegation [120] | No Allegation [121] | No Allegation [122] |
| Explicit Threats of Violence | No Allegation [123] | No Allegation [124] | No Allegation [125] |
| Excessive Working Days | No Allegation [126] | No Allegation [127] | No Allegation [128] |
| Excessive Working Hours | No Allegation [129] | No Allegation [130] | No Allegation [131] |
| Hazardous Work | No Allegation [132] | No Allegation [133] | No Allegation [134] |
| Confiscation of Documents | No Allegation [135] | No Allegation [136] | No Allegation [137] |
| Forced Criminal Activities | No Allegation [138] | No Allegation [139] | No Allegation [140] |
| Forced Tasks or Clients | No Allegation [141] | No Allegation [142] | No Allegation [143] |
| Isolation | No Allegation [144] | No Allegation [145] | No Allegation [146] |
| Confinement | No Allegation [147] | No Allegation [148] | No Allegation [149] |
| Surveillance | No Allegation [150] | No Allegation [151] | No Allegation [152] |
| Dependency on Exploiters | No Allegation [153] | No Allegation [154] | No Allegation [155] |

[93] As indicated in documents provided in Casilao Deposition Exhibit 2 and Casilao Deposition (Page 12-13), Plaintiff Casilao was told she would be working in housekeeping and worked as a housekeeper.

[94] As indicated in Garcia Deposition Pages 58-59, Plaintiff Garcia was told he would be working as a server in Oklahoma and worked as a server.

[95] As indicated in documents provided in Lincuna Deposition Page 65, 4-7, Plaintiff Lincuna was told he would be working in housekeeping and worked as a housekeeper.

[96] As indicated in Casilao Deposition (Page 117), Plaintiff Casilao was aware that she was to be working in Clinton, Oklahoma and does not allege any deception.

[97] As indicated in Garcia Deposition, Plaintiff Garcia was aware that he was to be working in Clinton, Oklahoma and does not allege any deception.

[98] As indicated in Lincuna Deposition, Plaintiff Lincuna was aware that he was to be working in Clinton, Oklahoma and does not allege any deception.

[99] As indicated in documents provided in Casilao Deposition Exhibit 2 and Casilao Deposition (Page 96), Plaintiff Casilao knew she was going to be working for Hotelmacher, LLC prior to arriving in the United States and worked for Hotelmacher, LLC upon arriving in the United States.

[100] As indicated in Garcia Deposition, Plaintiff Garcia knew he was going to be working for Steakmacher LLC prior to arriving in the United States and worked for Steakmacher, LLC upon arriving in the United States.

[101] As indicated in Lincuna Deposition, Plaintiff Lincuna knew he was going to be working for Hotelmacher, LLC prior to arriving in the United States and worked for Hotelmacher, LLC upon arriving in the United States.

[102] Plaintiff Casilao makes no mention of false promises for the provisions of education or educational opportunities in her complaint, deposition, or associated documents.

[103] Plaintiff Garcia makes no mention of false promises for the provisions of education or educational opportunities in his complaint, deposition, or associated documents.

[104] Plaintiff Lincuna makes no mention of false promises for the provisions of education or educational opportunities in his complaint, deposition, or associated documents.

---

[105] Plaintiff Casilao makes no mention of acts of violence committed against her by the Defendants in her complaint, deposition, or associated documents.

[106] Plaintiff Garcia makes no mention of acts of violence committed against him by the Defendants in his complaint, deposition, or associated documents.

[107] Plaintiff Lincuna makes no mention of acts of violence committed against him by the Defendants in his complaint, deposition, or associated documents.

[108] Plaintiff Casilao makes no mention of abduction by the Defendants in her complaint, deposition, or associated documents.

[109] Plaintiff Garcia makes no mention of abduction by the Defendants in his complaint, deposition, or associated documents.

[110] Plaintiff Lincuna makes no mention of abduction by the Defendants in his complaint, deposition, or associated documents.

[111] Plaintiff Casilao makes no mention of forced marriage by the Defendants in her complaint, deposition, or associated documents.

[112] Plaintiff Garcia makes no mention of forced marriage by the Defendants in his complaint, deposition, or associated documents.

[113] Plaintiff Lincuna makes no mention of forced marriage by the Defendants in his complaint, deposition, or associated documents.

[114] Plaintiff Casilao makes no mention of forced adoption by the Defendants in her complaint, deposition, or associated documents.

[115] Plaintiff Garcia makes no mention of forced adoption by the Defendants in his complaint, deposition, or associated documents.

[116] Plaintiff Lincuna makes no mention of forced adoption by the Defendants in his complaint, deposition, or associated documents.

[117] Plaintiff Casilao makes no mention of being sold by the Defendants in her complaint, deposition, or associated documents.

[118] Plaintiff Garcia makes no mention of being sold by the Defendants in his complaint, deposition, or associated documents.

[119] Plaintiff Lincuna makes no mention of being sold by the Defendants in his complaint, deposition, or associated documents.

[120] Plaintiff Casilao makes no mention of being indebted to the Defendants in her complaint, deposition, or associated documents. Her only discussion of debt is in regard to borrowing money from her friend, Lorelle. Casilao Deposition, pages 112-116.

[121] Plaintiff Garcia makes no mention of being indebted to the Defendants in his complaint, deposition, or associated documents. His only discussion of debt is in regard to borrowing money from a loan company and in-law.

[122] Plaintiff Lincuna makes no mention of being indebted to the Defendants in his complaint, deposition, or associated documents. His only discussion of debt is in regard to borrowing an unknown sum of money from "loan sharks," who were unaffiliated with the Defendants, prior to coming to the United States.

[123] Plaintiff Casilao makes no mention of explicit threats or acts of violence made toward her by the Defendants in her complaint, deposition, or associated documents during the course of her employment. In fact, she never even spoke to Defendant Schumacher until after she left her employment (Casilao Deposition, pg. 55).

[124] Plaintiff Garcia makes no mention of explicit threats or acts of violence made toward him by the Defendants in his complaint, deposition, or associated documents during the course of his employment.

[125] Plaintiff Lincuna makes no mention of explicit threats or acts of violence made toward him by the Defendants in his complaint, deposition, or associated documents during the course of his employment.

[126] Plaintiff Casilao does not allege that she worked excessive days in the complaint, deposition, or associated documents; in fact, she alleges the exact opposite of this "strong trafficking indicator," as she alleges that she didn't work enough days.

[127] Plaintiff Garcia does not allege that he worked excessive days in the complaint, deposition, or associated documents; in fact, he alleges the exact opposite of this "strong trafficking indicator," as he alleges that he didn't work enough days.

[128] Plaintiff Lincuna does not allege that he worked excessive days in the complaint, deposition, or associated documents; in fact, he alleges the exact opposite of this "strong trafficking indicator," as he alleges that he didn't work enough days.

[129] Plaintiff Casilao does not allege that she worked excessive hours in the complaint, deposition, or associated documents; in fact, she alleges the exact opposite of this "strong trafficking indicator," as she alleges that she didn't work enough hours per day.

[130] Plaintiff Garcia does not allege that he worked excessive hours in the complaint, deposition, or associated documents; in fact, he alleges the exact opposite of this "strong trafficking indicator," as he alleges that he didn't work enough hours per day.

[131] Plaintiff Lincuna does not allege that he worked excessive hours in the complaint, deposition, or associated documents; in fact, he alleges the exact opposite of this "strong trafficking indicator," as he alleges that he didn't work enough hours per day.

[132] Plaintiff Casilao explicitly denies the existence of any hazardous or dangerous working condition while working as a housekeeper for the Defendants See exchange from Casilao Deposition, pgs 121-122.
*Q In your work as a housekeeper, were you forced to do any physically dangerous or difficult tasks?*
*A Dangerous? No.*
*Q Were you ever forced to work in unsafe conditions?*
*A As I recall, no.*
*Q Are you aware of any other H-2Bs working in Clinton who said they were subjected to unsafe working conditions?*
*A No one said anything like that to me.*

[133] Plaintiff Garcia makes no mention of hazardous or dangerous working condition while working as a server for the Defendants.

[134] Plaintiff Lincuna makes no mention of hazardous or dangerous working condition while working as a housekeeper for the Defendants and Plaintiff Casilao (see above) claims there were none.

[135] Plaintiff Casilao makes no mention of her identification or travel documents being confiscated by the Defendants in her complaint, deposition, or associated documents.

[136] Plaintiff Garcia makes no mention of his identification or travel documents being confiscated by the Defendants in his complaint, deposition, or associated documents.

[137] Plaintiff Lincuna makes no mention of his identification or travel documents being confiscated by the Defendants in his complaint, deposition, or associated documents.

[138] Plaintiff Casilao makes no mention of her being forced to commit criminal activities by the Defendants in her complaint, deposition, or associated documents.

[139] Plaintiff Garcia makes no mention of his identification or travel documents being confiscated by the Defendants in his complaint, deposition, or associated documents.

[140] Plaintiff Lincuna makes no mention of his identification or travel documents being confiscated by the Defendants in his complaint, deposition, or associated documents.

[141] During her deposition, Plaintiff Casilao described her duties as those of a conventional housekeeper.

[142] Plaintiff Garcia did not allege any forced tasks or duties and described his job function as a conventional server. For example, see page 118 of Garcia deposition, 17-22:
*Q Tell me in general what your duties were as a server at Montana Mike's?*
*A Our duties were to take orders, serve, clean the station, help with coworkers if needed, help in the kitchen, like making salad and mise en (sic) place and clean the restaurant.*

[143] During his deposition, Plaintiff Lincuna described his duties as those of a conventional housekeeper.

[144] Plaintiff Casilao does not allege that she was isolated. She could come and go to work as she pleased, communicate freely with friends and family abroad, and didn't describe any explicit restriction to communication by the Defendants.

[145] Plaintiff Garcia does not allege that he was isolated. He could come and go to work as he pleased, communicate freely with friends and family abroad, and didn't describe any explicit restriction to communication by the Defendants.

[146] Plaintiff Lincuna does not allege that he was isolated. He could come and go to work as he pleased, communicate freely with friends and family abroad, and didn't describe any explicit restriction to communication by the Defendants.

[147] Plaintiff Casilao does not allege that she was confined or that her movement was restricted in any way by the Defendants.

[148] Plaintiff Garcia does not allege that he was confined or that his movement was restricted in any way by the Defendants.

[149] Plaintiff Lincuna does not allege that he was confined or that his movement was restricted in any way by the Defendants.

[150] Plaintiff Casilao does not allege that the Defendants surveilled her movement during or after employment.

[151] Plaintiff Garcia does not allege that the Defendants surveilled his movement during or after employment.

[152] Plaintiff Garcia does not allege that the Defendants surveilled his movement during or after employment.

[153] Plaintiff Casilao's evidence and testimony suggests that the Plaintiffs were self-reliant, resilient, and could depend on each other, family, and friends before, during the course of their employment, and thereafter.

[154] Plaintiff Garcia's evidence and testimony suggests that the Plaintiffs were self-reliant, resilient, and could depend on each other, family, and friends before, during the course of their employment, and thereafter.

[155] Plaintiff Lincuna's evidence and testimony suggests that the Plaintiffs were self-reliant, resilient, and could depend on each other, family, and friends before, during the course of their employment, and thereafter.

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

_____

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                      No. 1:17-cr-01235-WJ

MATTHEW WOODS

      Defendant[1].

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANT WOOD'S JOINT MOTION TO EXCLUDE GOVERNMENT'S EXPERT WITNESSES

THIS MATTER comes before the Court upon Defendant Wood's Joint Motion to Exclude Government's Expert Witnesses or in the Alternative to Hold a *Daubert* Hearing, filed March 30, 2018 (**Doc. 190**). Defendant Woods ("Defendant" or "Woods") is charged with crimes related to alleged involvement in a commercial sex trafficking ring referred to by the Government as the "Galloway Organization."  Woods motion is granted in that the Court conducted a *Daubert* hearing; however, after hearing testimony from the proposed expert witnesses and after considering the oral and written arguments of counsel, the Court DENIES the motion to exclude the Government's expert witness testimony.

### BACKGROUND

In this *Daubert* motion, Defendant seeks to exclude the testimony of several Government expert witnesses, specifically: Kim Mehlman-Orozco and Special Agent Morgan Langer ("SA

---

[1] The original indictment was filed against five defendants.  One defendant was dismissed from the case and three defendants have entered into plea agreements with the Government, so Defendant Matthew Woods is the sole remaining defendant in this case.

Langer").[2] The Government's objective is to offer their testimony to counter Defendant's position that the victims in this case were active and willing participants in the organization.  Dr. Mehlman-Orozco is expected to testify regarding the clandestine nature of human trafficking crimes; the trauma bond that exists between victims of human trafficking; and the complex reactions due to trauma bonding with their offender."  SA Langer will testify regarding the various characteristics of human traffickers based on training & experience.

## DISCUSSION

A district court's gate-keeping function involves a three-step analysis. First, the Court must determine whether the expert is qualified by "knowledge, skill, experience, training or education" to render an opinion. See Fed.R.Evid. 702.  Second, if the witness is so qualified, the Court must determine whether the expert's opinions are "reliable" under the principles set forth under *Daubert v. Merrell Dow Pharm., Inc.*, and *Kumho Tire Co., Ltd. v. Carmichael*. 509 U.S. 579, 597 (1993) and 526 U.S. 137 (1999); *see also Ralston v. Smith & Nephew Richards, Inc.* 275 F.3d 965 (10th Cir. 2001). Third, Rule 702 further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition goes primarily to relevance. *Daubert,* 509 U.S. at 591 (". . . Rule 702's "helpfulness" standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility").

*Qualifications*: Defendant's objections to the Government's experts focus on reliability and relevance.  Defendant does not offer any challenge to the qualifications of either expert, but the Court will quickly review these qualifications for the record.

*Reliability:* The district court must ensure that any expert testimony admitted rests on a reliable foundation and is relevant to the task at hand.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). The burden of proof is on the proponent of the expert, in this case the

---

[2]  Defendant's challenges to the Government's expert witnesses were narrowed at the hearing.

Government.  *See U.S. v. Baines*, 573 F.3d 979, 985 (10th Cir. 2009) (quoting Fed. R. Evid. 702).  In *Daubert*, the Supreme Court set out a non-exhaustive set of factors that trial courts may consider in determining whether proposed expert testimony is based on reliable methods and principles: (1) whether the particular theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the techniques operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community. 509 U.S. at 593-94.  *Daubert* itself was limited to scientific evidence, *see U.S. v. Baines*, 573 F.3d 979, 985 (10th Cir. 2009), but in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court made clear that the gatekeeping obligation of the district courts described in *Daubert* applies, not just to scientific testimony, but to all expert testimony.  *Id.* at 141. While a district court may consider the *Daubert* factors in determining the admissibility of non-scientific expert testimony to the extent they are relevant, *id.* at 150, the test of reliability is flexible, and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. The law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination.  *Id.* at 141-42; *see Witherspoon v. Navajo Ref. Co., LP*, 2005 WL 5988649 at *3 (D.N.M., July 18, 2005) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

**Relevance**: To be relevant, proposed expert testimony must logically advance a material aspect of the case," *Norris v. Baxter Healthcare Corp*., 397 F.3d 878, 884 n. 2 (10th Cir. 2005), and be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute," *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 591(1993). (quotation omitted). In assessing whether testimony will assist the trier of fact, district courts consider several factors,

including whether the testimony "is within the juror's common knowledge and experience," and "whether it will usurp the juror's role of evaluating a witness's credibility." *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006) (footnote omitted). Pursuant to Rule 702, courts must conduct a "common-sense inquiry" into whether a juror would be able to understand certain evidence without specialized knowledge. *United States v. Becker*, 230 F.3d 1224, 1231 (10th Cir.2000).

## I.     Dr. Mehlman-Orozco

### A.     Qualifications

Dr. Mehlman-Orozco considers herself a leading expert in cases on sex trafficking and the Court agrees with that self-description. She has participated extensively and been a speaker at conferences on the issue; has conducted training for law enforcement personnel in recognizing and dealing with sex trafficking cases; has written numerous articles, including a book which is used as a training manual for law enforcement. Dr. Mehlman-Orozco is the only human trafficking expert qualified on the Los Angeles Superior Court panel of experts, and has testified mostly in state court, but has also testified in federal court. Defendant raises no specific issue regarding her qualifications and the Court finds that she satisfies *Daubert*'s requirements.

### B.     Reliability of Opinion Testimony

Dr. Mehlman-Orozco described how her training guides her approach in developing an opinion in the area of sex trafficking:

- She is trained in survey methodology as well as the collection and analysis of data and uses these methods in approaching the subject matter on which she provides opinions;

- Dr. Mehlman-Orozco has kept current on research methods, although she noted that it is difficult in this area to identify sex trafficking cases;

- She uses quantitative data to focus on prevalence/prediction/causation and quantitative studies rather than relying solely on qualitative information based on interviews.

However, her books focus more on qualitative information. Dr. Mehlman-Orozco pointed out that because human trafficking involves human relationships, this is an area where quantitative information is more difficult to come by.

- Dr. Mehlman-Orozco uses the Michigan Law Center Human Trafficking data base to set up interviews with victims as well as numerous interviews with about a half dozen people convicted of sex trafficking in order to understand how they recruit/control their victims. These interviews corroborated other studies that were done and were included in her publications:

> (1) a 2017 scholarly, peer-reviewed publication entitled "Projected Heroes and Self-Perceived Manipulators: Understanding the Duplicitous Identities of Human Traffickers" that was published in Trends in Organized Crime. Doc. 201-1. That article was the end product of Dr. Mehlman-Orozco's qualitative research that delved into portrayed and self-identities of sex traffickers. This peer-reviewed article was also recently accepted for presentation at the 2018 American Society of Criminology academic conference in Atlanta, Georgia;

> (2) In 2015, Dr. Mehlman-Orozco's peer-reviewed, scholarly article "Safe Harbor Legislation for Juvenile Victims of Sex Trafficking: A Myopic View of Improvements in Practice," was published in the Journal of Social Inclusion, which was guest edited by Siddharth Kara, author of Sex Trafficking: Inside the Business of Modern Slavery and Director of the Program on Human Trafficking and Modern Slavery at the Kennedy School of Government at Harvard University and is attached hereto as Exhibit 2. For this article, Dr. Mehlman-Orozco analyzed yearly court data on juvenile prostitution arrests aggregated at the state level to explore the criminalization of commercial sexually exploited children post safe harbor policy implementation; and

> (3) in the fall of 2017, Dr. Mehlman-Orozco published Hidden in Plain Sight: America's Slaves of the New Millennium, a book that examines trends in sex and labor trafficking in the United States, and is used as a manual to train law enforcement.

- Dr. Mehlman-Orozco has also conducted an extensive review of available case law, relying on what she referred to as a "triangulating data source" by looking at what information is available and then filling in gaps by interviewing people convicted of sex trafficking and understanding how they recruit/control their victims. Much of her content analysis focused on Michigan state case law, which Dr. Mehlman-Orozco stated had a "robust collection" of case law pertaining to sex trafficking.

Despite Dr. Mehlman-Orozco's description of the methodological approach, Defendant characterizes her work as anecdotal, but this characterization is unfounded based on the

testimony given at the hearing. Dr. Mehlman-Orozco's expertise may have been derived to a large degree from qualitative studies, but her expertise is undeniably based on scholarly and peer-reviewed work regarding how the sex trafficking industry works. She has published peer-reviewed journal articles and research papers; has appeared on TV discussing trafficking and trends; and served as a peer reviewer for journals and grant applications. Dr. Mehlman-Orozco stated that in developing her research, she does not rely on any one journal, but rather focuses on specific researchers who have published on human trafficking issues in various journals, such as the Journal of Human Trafficking and criminal article journals.

The basis for Dr. Mehlman-Orozco's opinion testimony is hardly premised on mere "observation," as Defendant contends. Rather, the Court finds that (1) these numerous publications contain the intellectual rigor to meet *Daubert's* vigorous peer-review standards; (2) that Dr. Mehlman-Orozco's opinion testimony is tied scientifically to qualitative experience through interviews with victims, traffickers and sex workers; and (3) that it includes some quantitative methodology based on her own research and her studies related to published research by colleagues in the field and through her participation in conferences on the subject.

Defendant also questions the reliability of Dr. Mehlman-Orozco's methodology by claiming that her opinion is based on her own "interpretation" of the case law, and that in identifying whether conduct qualifies as sex trafficking, Dr. Mehlman-Orozco simply keys off the legal elements of the federal sex trafficking statute, 18 U.S.C. §1591 as a benchmark (using force, threats of force, fraud or coercion to cause a person to cause the person to engage in a commercial sex act, or causing a person under 18 years of age to engage in a commercial sex act).

The Court soundly rejects this challenge as well, finding that Dr. Mehlman-Orozco's opinion testimony is not merely a "gloss" on the federal statutory elements, nor is her review of cases premised on her own "interpretation" of the law. Dr. Mehlman-Orozco testified that she approaches case law by conducting a systematic qualitative review from the viewpoint of a researcher, not as a lawyer and reviews cases looking for what occurs commonly across these cases as well as what does not occur. She stated that she does not apply or interpret the law. As a researcher she does not use anecdote to form her opinions, nor does she use an *a priori* opinion as a starting point. Rather, she studies the case law to determine whether the elements contained in the cases are consistent with her research experience and with the work she has done independently. The Court does not consider any part of this approach to constitute a "gloss" on the federal sex trafficking statute nor on the relevant case law.

The Court therefore finds that the opinion testimony offered by Dr. Mehlman-Orozco satisfies the reliability requirements set forth under *Daubert*.

C.    Relevance

The next question is whether Dr. Mehlman-Orozco's testimony will be relevant in that it will assist the jury.

At the hearing, Dr. Mehlman-Orozco described the topics on which she would offer testimony, beginning with her observation that depictions of sex trafficking by the mainstream media are misinformed. For example, she noted that so-called "experts" are skeptical that a child can be engaged in sex work, when the erroneous criminalization of victims is more the reality, where children are quite often criminalized and arrested for prostitution. Another misconception is encouraged through the mainstream media's glamorization of pimping—which involves consenting relationships, are victimless and is a concept distinct from sex trafficking. Still

another misconception is that trafficking works through physical force, discounting the element of coercion through a formed relationship or through trauma bonding. In sex trafficking trauma bonding, the victim develops a positive affinity and emotional bond, with the trafficker making it difficult for victims to leave or to cooperate with law enforcement.  Dr. Mehlman-Orozco also noted that while a victim can have trauma bonds with various people in the trafficking organization, they are not usually developed with the trafficker's "enforcer" who assists in gaining compliance from the victim.

Dr. Mehlman-Orozco described the different methods used by traffickers to sustain their hold over victims, such as debt bondage and rewards (clothing, jewelry, treatment—which in turn increases the trafficker's profit margin in making the victim more attractive as an asset), and which keep the victim returning to the trafficker.  Victims become compliant to the particular brand of exploitation, and traffickers themselves fall into different categories showing different psychologies and approaches to recruitment and control methods, for example: (1) the "Romeo-style" approach; (2) the "heavy-handed guerilla" approach utilizing physical abuse where traffickers have sex with victims showing dominance by raping and traumatizing them; and the use of other women as well as other victims to recruit—which often leads to victims becoming traffickers themselves).

Dr. Mehlman-Orozco's opinion testimony will also include a description of the factors that render an individual at a higher risk and more inclined to victimization (a need for some kind of basic need such as housing or food; love and belonging; and even self-esteem) and which create a void that a trafficker seeks to fill. For example, victims with violent traffickers will often present with domestic violence issues that become part of that trauma bond.  Age can play into

recruitment, as younger victims are easier to target and control, and parents can themselves allow trafficking to happen.

On cross-examination, defense counsel asked Dr. Mehlman-Orozco to distinguish between sex trafficking and consensual pimping, referring to domestic violence situations as an example. Dr. Mehlman-Orozco responded that in making a determination whether a situation was sex trafficking or a consensual relationship, one could not make this conclusion based on any one or two specific factors (such as how many times one slapped a domestic partner or how the individuals involves split the profits from commercial sex).[3] Rather, one could only draw conclusions after considering whether certain elements are consistent with trauma bonding which has been determined to exist in other cases, such as: Did the victim return to the offender? Is the victim cooperating with law enforcement? Does the victim wish to disclose the abuse?

Dr. Mehlman-Orozco's testimony will touch on topics of consent, the existence of trauma bonds and characteristics of victims and sex traffickers. All of these are relevant to providing the jury with the information necessary to determine the issues to be tried in this case. In light of the misrepresentations fostered by the mainstream media about sex trafficking versus consensual commercial sex, her testimony becomes all the more critical in ensuring that the jury is well-informed.

Nevertheless, Defendant seeks to limit Dr. Mehlman-Orozco's opinion testimony to that of a general principles expert. Specifically, defense counsel requests that the Court bar her from using hypotheticals that might allude to the facts of this cases and from describing the characteristics of sex trafficking. The Court denies the request. The Court notes that Dr. Mehlman-Orozco was not provided and did not review, any records in this case. As she

_____

[3] To illustrate, defense counsel asked Dr. Mehlman-Orozco whether making false promises to a girlfriend to obtain sex qualified as sex trafficking, but she responded that this kind of a situation was distinguished from sex trafficking because it did not involve *commercial* sex.

explained, the purpose of her testimony was to describe the different facets of sex trafficking and trauma bonding, but in the end the jury would have to decide whether and how it has any connection to the instant case. Limiting the testimony as defense counsel suggests serves no useful purpose and in fact will hamper the ability of Dr. Mehlman-Orozco to provide helpful information to the jury which she is well-qualified to give.

The information offered by Dr. Mehlman-Orozco is not within the common knowledge of laypersons. In fact, the very questions asked by defense counsel on cross-examination demonstrate the lack of common misperceptions misinformation laypersons might bring with them to deliberate on these matters. The Court therefore finds that Dr. Mehlman-Orozco's testimony will help the jury decide the issues that remain to be tried in this case and will not usurp the jury's function in assessing credibility.

D.   Rule 403 Balancing

Under Fed.R.Evid. 403, the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Defendant does not explicitly argue that Dr. Mehlman-Orozco's testimony would violate Rule 403, but the Court has considered this as a possible reason behind defense counsel's request to limit the scope of that testimony. However, the Court finds that none of Rule 403's balancing factors are at risk if Dr. Mehlman-Orozco's testimony is allowed. While some of the testimony may hit close to home in this case, none of the testimony to be given is *unfairly* prejudicial under Rule 403.

- 10 -

Accordingly, the Court finds that Dr. Mehlman-Orozco meets all the pertinent *Daubert* qualifications as an expert.

## II.   Special Agent Morgan Langer ("SA Langer")

### A.   Qualifications

SA Langer is a special agent with Homeland Security Investigations ("HSI") and has investigated sex trafficking cases since 2012.  He has a Masters Degree in Criminal Justice and offers training to other law enforcement officers, prosecutors, judges, health professionals, teachers and politicians, as well as those who provide services to victims of sex trafficking. Other law enforcement agencies also contact him because they have less experience in sex trafficking cases, such as Alcohol Tobacco and Firearms ("ATF"), Drug Enforcement Administration ("DEA") and other non-governmental and non-profit organizations ("NGO"). He explained that teachers or health care providers need training in this subject area because they might come into contact with victims of abuse or who have sexually transmitted disease and their familiarity with sex trafficking could prevent these victims from slipping between the cracks. Also, knowing more about sex trafficking could encourage these providers to contact HSI when they see "red flags" that could be signs of sex trafficking victims.  SA Langer has investigated over 500 sex trafficking cases, has interviewed hundreds of victims (with minors accounting for under 5%).

Defendant does not challenge SA Langer's qualifications, and based on the above information, the Court finds SA Langer to be qualified as an expert under *Daubert* standards.

### B.   Reliability of Opinion Testimony

SA Langer will testify regarding the various characteristics of human trafficking based on his training and experience and will describe how the sex trafficking industry works, beginning

with advertising for commercial sex on certain websites such as Backpage.com.  Identifying sex trafficking websites is not an exact science, but he is familiar with certain indicia of sex trafficking websites, such as the  use of exploitive photos of women of very young individuals.[4] Customers do not consider that websites that advertise for commercial sex could be part of a sex trafficking ring.

SA Langer is also familiar with how the commercial sex operations are run and with the terminology that is used in sex trafficking. For example, sex traffickers know that customers don't like to talk to a male on the phone when setting up calls since a male voice signifies a "red flag," and so women usually answer the phone in these operations and do the talking.  Also, the trafficker is generally not present in the room where the transaction is carried out, but rather in the background as an observer.  SA Langer will testify, based on his experience and training, about the methods used by traffickers to control victims which vary according to the particular characteristics of the traffickers and about the characteristics of victims, who are reluctant to disclose information about the experience and who see law enforcement as the enemy.

Some victims have been coached not to trust by traffickers who describe threats of "detox" in jail. SA Langer noted that these victim characteristics affect how interviews are conducted since SA Langer is a law enforcement officer.  Victims are as a result, often hostile, introverted and closed off and it sometimes requires four or five encounters/interviews with the victims before any information can be obtained.  He stated that he makes it clear to the victims during the interviews that he is not there to arrest them and offers them services.

Defendant challenges the reliability of SA Langer's opinion testimony because it is not based on a scientific method in determining whether an advertisement or website is actually

---

[4] Backpage.com was a website address relevant to this case which is no longer operational.

connected to sex trafficking. The Court rejects this argument because opinion testimony does not have to be "scientific" in order to meet *Daubert* standards. As mentioned previously, while *Daubert* itself was limited to scientific evidence, in *Kumho Tire Co.*, the Supreme Court made clear that the gatekeeping obligation of the district courts described in *Daubert* applies, not just to scientific testimony, but to all expert testimony. 526 U.S. 137, 141 (1999); *United States v. Baines*, 573 F.3d 979, 985 (10th Cir. 2009). Thus, the test of reliability is flexible, and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination. *Id.* at 141-42.

SA Langer's testimony is clearly not based on scientific evidence but rather on SA Langer's training and experience which is extensive on the subject of sex trafficking. *See United States v. Monteiro*, 407 F.Supp.2d 351, 357 (D. Mass. 2006) (compiling cases) (noting that many courts have recognized that the list of factors the Supreme Court outlined in *Daubert* "may not perfectly fit every type of expert testimony, particularly technical testimony based primarily on the training and experience of the expert.").[5] Based on the proffered testimony of SA Langer, as well as his experience and training, the Court finds that this expert meets *Daubert's* reliability requirements.

---

[5]   The Sixth Circuit offers an interesting analogy to distinguish between scientific and non-scientific expert testimony:

> By way of illustration, if one wanted to explain to a jury how a bumblebee is able to fly, an aeronautical engineer might be a helpful witness. Since flight principles have some universality, the expert could apply general principles to the case of the bumblebee. Conceivably, even if he had never seen a bumblebee, he still would be qualified to testify, as long as he was familiar with its component parts. . .  On the other hand, if one wanted to prove that bumblebees always take off into the wind, a beekeeper with no scientific training at all would be an acceptable expert witness if a proper foundation were laid for his conclusions. The foundation would not relate to his formal training, but to his firsthand observations. In other words, the beekeeper does not know any more about flight principles than the jurors, but he has seen a lot more bumblebees than they have.

*Berry v. City of Detroit* 25 F.3d 1342, 1349  1350 (6th Cir. 1994).

C.     Relevance

Defendant contends that SA Langer's testimony will not be helpful to the jury because the information SA Langer offers is within the grasp of any lay person.  Counsel distinguished this case from drug trafficking cases where an expert would be helpful to testify as to drug amounts that constitute non-personal use.

Pursuant to Rule 702, courts must conduct a "common-sense inquiry" into whether a juror would be able to understand certain evidence without specialized knowledge. *United States v. Becker*, 230 F.3d 1224, 1231 (10th Cir.2000). The Court disagrees with Defendant's assessment of SA Langer's testimony and finds that the testimony will both assist the jury and not usurp the jury's function in assessing credibility. First, sex trafficking is not within a layperson's common knowledge and experience.  Most laypersons obtain information about the subject from the mainstream media which itself depicts many misconceptions about sex trafficking—particularly in how it affects younger individuals. Second, sex trafficking differs with geographic locations, and SA Langer is knowledgeable regarding local sex trafficking operations. Third, while aspects of SA Langer's testimony potentially overlap somewhat with Dr. Mehlman-Orozco's testimony, their opinions are helpful in different ways.  Dr. Mehlman-Orozco offers a scientific and scholarly perspective on how sex trafficking affects victims: why victims react the way they do and the methods traffickers use to get victims to comply. SA Langer brings a local, "on the ground," law enforcement view to the subject: how sex trafficking advertises for customers, how it actually operates—much like DEA experts.   SA Langer can testify on matters through in his experience that Dr. Mehlman-Orozco cannot do from her research and interviews.  Laypersons are not familiar with such matters and the Court finds that SA Langer's testimony meets *Daubert's* relevance criteria.

D.    Rule 403 Balancing

Again, Defendant does not explicitly argue that SA Langer's testimony violates Rule 403, and the Court find that no reason to exclude this testimony for reasons of unfair prejudice, confusion, misleading the issues or needlessly presenting cumulative evidence.  As the Court has just discussed, Dr. Mehlman-Orozco and SA Langer offer different viewpoints and information on sex trafficking.

**THEREFORE,**

Defendant Wood's Joint Motion to Exclude Government's Expert Witnesses or in the Alternative to Hold a *Daubert* Hearing (**Doc. 190**), is GRANTED in that the Court held an evidentiary *Daubert* hearing, but Defendant Woods' request to exclude the testimony of Dr. Mehlman-Orozco and SA Langer is DENIED for reasons described in this Memorandum Opinion and Order.

WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE