# EXHIBIT 2

1

1

2          *** UNCERTIFIED ROUGH DRAFT ***

3      UNEDITED REALTIME/ROUGH DRAFT DISCLAIMER

4

5          CASILAO vs. SCHUMACHER

6

7   DATE:     07/08/2022

8   WITNESS:  KIMBERLY MEHLMAN-OROZCO

9          This transcription has not been

10  proofread. It is a draft transcript, NOT a

11  certified transcript. As such, it may

12  contain computer-generated mistranslations

13  of stenotype code or electronic

14  transmission errors, resulting in

15  inaccurate or nonsensical symbols which

16  cannot be deciphered by non-stenotypists.

17          Corrections will be made in the

18  preparation of the certified transcription,

19  resulting in differences in content, page

20  and line numbers, punctuation and

21  formatting.

22

23

17    labor -- the historical interpretation of

18    forced labor, especially via the U.S. v.

19    Kozminski case, is physical methods of

20    force were necessary and the impetus of the

21    TVPA was to expand upon that.  So they're

22    not one and the same.

23         Q.    And is forced labor under the

24    TVPA equivalent to modern slavery?

25         A.    Is forced labor -- I would say

                                                    18


1    no because modern slavery includes other

2    forms of trafficking.  So modern slavery

3    includes sex trafficking, for example,

4    which I would not say is akin to forced

5    labor.

6         Q.    And so forced labor and sex

7    trafficking are different forms of let's

8    call it abuse, is that correct?

9         A.    Sure, but I wouldn't

10    conceptualize it that way.  I mean, I don't

11    disagree with you, but if I were to

12    conceptual lies human trafficking I would

13    say there's an umbrella notion of human

14    trafficking and that two major subsections

15    are labor trafficking and sex trafficking.

16    And in each of those there are different

17    forms of labor trafficking and sex

18    trafficking.

19         So for example, in the

20    database -- part of the cases that I

21    excluded from the database included

22    international sex tourism.  The indicia of

23    international sex tourism is not relevant

24    for this case.  But that is a very unique

25    form of sex trafficking, is a very unique

                                        19


1    form of abuse, as you say, that could be

2    addressed under the TVPA.  And I apologize,

3    I'm trying to talk slow.

4         Q.    So you mentioned that sex

5    tourism has unique indicia.  So would it be

6    fair to say that labor trafficking and sex

7    trafficking generally have different forms

8    of indicia?

9         A.    I would say -- I mean, if I

10   were -- I think that there are indicia that

11   apply to trafficking as a whole.  There are

12   methods of recruitment that apply to

13     trafficking as a whole.  For example, in my

14     book I talk about how traffickers often

15     look for voids in a potential victim's life

16     and make a false promise to fulfill those

17     voids.  And I use Maslow's, M-A-S-L-O-W-S,

18     hierarchy of needs to demonstrate that.

19     For example, a trafficker might make the

20     false promise -- a domestic sex trafficker

21     in particular or even international could

22     make the false promise to fulfill a

23     victim's basic physiological needs, need

24     for safety, esteem, love and belonging and

25     self actualization.

                                          20


1             And so I would say that there

2     is considerable overlap, but there are some

3     unique methods of recruitment and control

4     by type of trafficking.  If that makes

5     sense.

6          Q.    Sure.  And to keep us moving

7     forward, if we could focus when we talk

8     about indicia on indicia that are relevant

9     to labor trafficking, so we can keep things

10    going forward.  Does that make sense?

11      A.    Sure.

12      Q.    Great.

13            So you've talked about your

14   report, what you believe is the scope of a

15   trafficking claim under the TVPA.  What are

16   you basing your opinion on?

17      A.    So my opinions were looking at

18   is this consistent with trafficking.  Is

19   this consistent with trafficking.  And I

20   base my opinions as I always do on state of

21   the science research and information.  So

22   I'm looking at a combination of cases that

23   I personally reviewed for seams and threads

24   which include I believe over 300.

25            I'm looking at -- I'm basing it

                                              21


1    off of the interviews that I've conducted

2    of human trafficking victims, of human

3    traffickers.  I've written a peer reviewed

4    journal article based on my interview of

5    convicted human traffickers.

6            I know you said focus on labor

7    trafficking but also just distinctions

8    between things that trafficking is similar

```
 9   to.  So for example, what is the difference

10   between a labor law violation and

11   trafficking.  What are the difference

12   threads and seams in those types of cases

13   and making as much of a distinction as I

14   can to show what is consistent with

15   trafficking.  In addition to the Delphi

16   survey, I think Urban Institute has

17   published a protocol for identifying

18   trafficking as well as the Vera Institute.

19   My recollection is since 2009 I believe --

20   the reason why I relied upon in part the

21   Delphi apparitional indicators, I believe

22   it was the first, if my recollection serves

23   me, it was the first and it's been the most

24   long-standing method for looking at kind of

25   consistencies or identifying potential
```

                                        22

```
 1   cases.  But since then there have been well

 2   over a dozen that are used by law

 3   enforcement, that are used by expert

 4   witnesses of indicia protocol for

 5   identifying trafficking.

 6              So it really is a combination
```

7    of a number of things.  But also just given

8    my expertise, I'm looking at the specific

9    information that's presented in a case.

10   What are the plaintiffs saying, what are

11   the defendants saying.  I have never and

12   would never take everything of what one

13   side is saying as true.  I'm doing

14   independent evaluation.  And quite

15   honestly, I've turned down more cases than

16   I've accepted in my expert witness career.

17   So all that's to say I'm looking at a

18   combination of factors.

19        Q.   Okay, I'm going to walk through

20   a couple parts of your answer.  And you

21   mentioned that you personally reviewed over

22   300 cases.  When you refer to cases, are

23   you referring to legal cases or interviews

24   with potential trafficking victims?

25        A.   When I'm referring to cases,

                                          23


1    I'm referring to legal cases.

2         Q.   So you're basing your opinion

3    in part on your review of legal opinions or

4    complaints?

5        A.    Legal opinions or complaints.

6   I would say a combination thereof.  Because

7   many of the complaints don't necessarily

8   yield opinions either by federal JSHGS or

9   plea bargain.  It's hard to say.  So the

10  300 case I reviewed include a combination

11  thereof.

12       Q.    And do you have any legal

13  training?

14       A.    What do you -- as far as going

15  to law school?  No.  But my department is

16  criminology.  I took a number of law

17  related classes taught by attorneys.

18       Q.    But you're not an attorney?

19       A.    No, absolutely not, no.

20       Q.    And you've never been to law

21  school.

22       A.    No, ma'am.

23       Q.    I'm just reading back over your

24  answer.  You mentioned that part of your

25  experience on which you're basing your

                                        24


1   opinion are interviews that you've

2   conducted.  Can you just tell me what the

3       context of those interviews are?

4            A.    Some of them are qualitative

5       interviews that were conducted for research

6       purposes.  Some of them were interviews

7       conducted for specific cases.  The

8       qualitative interviews that I conducted for

9       research purposes, some of them are

10      discussed in my book, some of them are

11      discussed in my peer reviewed journal

12      articles.

13                 I know that this isn't directly

14      related, but I also received formal

15      training on trafficking as well as methods

16      for conducting these interviews.  While in

17      graduate school.  Specifically I took

18      graduate level course work on human

19      trafficking, human smuggling, immigration

20      related issues, crime, things like that.

21                 But the interviews were a

22      combination of cases that I worked on and

23      qualitative interviews for research.

24           Q.    And you mentioned that you --

25      when you base your opinions on the state of

1    the science research and information, can

2    you describe to me what is the state of the

3    science research that you're basing your

4    opinions on?

5         A.    And I talk about this a lot in

6    my book as well as in the number of

7    articles that I've written, unfortunately

8    due to the clandestine nature of the crime,

9    trafficking remains very, very difficult to

10   research and identify.  And therefore,

11   there is I would say a dearth of reliable

12   information.  So when I'm saying the state

13   of science research, it is the best

14   research that is available.  However, it is

15   not without limitation.

16            So case in point, in the field

17   of criminology, many criminologist like

18   myself office use the uniform crime report.

19   The uniform crime report didn't even have a

20   date point on trafficking until 2013.  And

21   to this day it is very limited in that a

22   number of police agencies still don't

23   report trafficking, they misidentify things

24   of that nature.  So I'm relying upon the

25   best information that's available, but it

22    career.

23         Q.    Okay, so let's look back at

24    page 8 if we can.

25         A.    Sure.

                                              28


 1         Q.    Look at opinion 4.

 2         A.    Okay.

 3         Q.    Here you opine that the data

 4    science research on tracking indicia

 5    suggests that the indices of the nature of

 6    the job, location, employer JSHGS access to

 7    educational opportunities can be strong

 8    indicia of trafficking."

 9         A.    Mm-hmm.

10         Q.    What is the state of the

11    science research that you are referring to

12    in this opinion?

13         A.    In this opinion it includes the

14    Delphi survey, it includes the -- which I

15    think since that's the first, it has been

16    replicated and supported by substantial

17    other sources.  So I would say that the

18    Delphi survey is one and perhaps the first,

19    but we see those strong indicia or we see

20    that those themes of trafficking indicia

21    replicated for example in the Polaris

22    projects identification protocol that came

23    out two years later in 2011.  We see

24    them -- similar indicia in the Urban

25    Institute, Vera Institute, and I believe

29

1    the Department of Health and Human Services

2    also released one.  So I would say Delphi

3    was probably the first, but it is supported

4    thereafter and there hasn't been anything

5    to I guess falsify what they have included.

6         Q.   Okay, so --

7         A.   And I would also just say, like

8    state of science research also includes my

9    review of extant cases.  So the cases that

10    I reviewed, those strong indicia tend to be

11    prevalent in other cases where trafficking

12    is found to be present.  And they're not

13    all present, so again, you do need to take

14    the totality of those circumstances, but

15    there are consistent threads across

16    trafficking cases.

17         Q.   And how do you identify whether

16    it's a strong or not a strong indicator, is

17    that fair?

18         A.    It's one I would say.  It's one

19    in a combination of factors.

20         Q.    Do you generally agree with the

21    way that the fell die survey has

22    characterized the indicia?

23         A.    Do I generally agree with the

24    way the Delphi survey has characterized

25    indicia.  I'm not sure I understand what

                                                  31

1     you're asking there.

2          Q.    Let me rephrase it then.  You

3     mentioned that nothing has -- you're not

4     aware of anything that has come out since

5     the Delphi survey to falsify what they

6     included.  Is that a fair characterization

7     of what you said?

8          A.    Yeah, I'm not aware of any

9     rigorous empirical research that has

10    completely undermined the strong indicia

11    that they identified in that particular

12    survey, no.  I'm not aware of any.

13         Q.    Are you aware of any empirical

14      research that has completely undermined

15      medium indicia that they've identified in

16      that survey?

17          A.    The medium indicia were a

18      little bit more expansive.  So I'd have

19      to -- I mean, there were more of them, but

20      no, I'm not aware of any that have

21      completely undermined the medium indicia.

22              The only thing that I would say

23      with the medium indicia is there is a lot

24      of overlap between cases that might not

25      necessarily be trafficking, which is why

32

1       they put it at a level lower.  But I this I

2       that from what I found, there is more

3       consistent support for the strong indicia,

4       which is essentially probably why they made

5       it strong indicia because there was greater

6       consistency than the medium indicia.

7               So I'm not aware of any

8       empirical research that has invalidated it,

9       but in my experience, I don't think that

10      there is as strong support from the other

11      corroborating sources; for example, reviews

12      of case law, reviews of extant state of the

13      science research, so on and so forth.

14          Q.    And do you agree with the

15      Delphi characterization of what are strong

16      and what are medium indicators?

17          A.    And by do I agree with the

18      characterization, do I agree with what

19      level they placed those indicia at?

20          Q.    Exactly.  Yes.

21          A.    I would say I agree with the

22      strong for sure.  For some of the medium, I

23      perhaps would have moved them to weak.

24          Q.    I guess to be complete, I

25      should ask are you aware of any empirical

33

1       research that has completely undermined the

2       weak indicia that are identified in the

3       Delphi survey?

4           A.    I mean, to tell you the truth,

5       I'm not even aware of any study that has

6       specifically evaluated -- and I talk about

7       this I think in my report.  Or if not in

8       that report, in other reports.  I'm not

9       aware of any study that has specifically

10   since the -- tested the sensitivity and

11   specificity of each of those levels of

12   indicia.  So -- or a study that I would

13   rely upon to say that it completely

14   invalid.  We're just looking at those

15   indicia, are they seen often, have they

16   been replicated in other operational

17   indicators and other protocols.  So I

18   haven't seen anything to undermine the weak

19   indicia, no.

20        Q.    And it sounds like that's

21   because generally there have not been

22   surveys either way testing kind of the

23   scientific validity of these indicators.

24        A.    I would say there have been

25   studies, but as far as the method logical

                                        34


1   rigor of those studies and whether they're

2   saying they're specifically testing the ILO

3   operational indicators, those are different

4   questions.  So for example, I know the

5   Kimball collaboration in 2011 did a

6   systematic review of all of the

7   interventions to combat trafficking

17      ask the question.  Some of the indicia that

18      have been included in the Delphi survey you

19      indicated or other surveys are present in

20      this case, whether they're strong or weak.

21      You're not testifying today on whether or

22      not the fact that those indicators are

23      false positives.  Just the fact that they

24      exist is not enough in your view to make it

25      trafficking.

43

1           A.   My opinion for this case is the

2       facts in this case are not consistent with

3       trafficking.  They're not consistent with

4       trafficking as far as stay of the science

5       research is concerned, as far as extant

6       case law is concerned, as far as

7       operational indicators are concerned.

8       They're not consistent with the interviews

9       that I've conducted with victims of

10      trafficking and with traffickers, although

11      I did not conduct any interviews of any

12      party in this particular case, I did review

13      the transcripts from deposition testimony.

14      So my opinion is that there is not

15     consistency between those factors in this

16     particular case.

17          Q.    And does the fact that a

18     victim's experience may be atypical or

19     inconsistent with other victims mean that

20     they've not been trafficked?

21          A.    Does the victim's experience

22     that they're atypical or not consistent

23     with -- I think that even though there are

24     nuances -- so absolutely, take the totality

25     of the circumstances, there are nuances

                                              44

1      across methods of recruitment and control,

2      the types of trafficking that exist, the

3      types of victims that are susceptible to

4      being trafficked.  Even though there are

5      nuances though, there is sort of a common

6      thread of modern slavery, of kind of the

7      underlying factors that you do see exist in

8      each and every case.  And there might be

9      different combinations thereof, but there

10     are absolutely common threads.

11               So I would not say there is an

12     atypical case that doesn't have these

13    common threads.  So therefore, even though

14    there are nuances in the details or

15    circumstances, the recruitment control

16    methods, there are common threads across

17    cases.

18         Q.    And what are those common

19    threads?

20         A.    So not in exploitative case,

21    but a common thread that you see across

22    many cases is, in particular, international

23    cases is confiscation of identification

24    documents.  Again, not exploitative case

25    but in quite a few cases.  But generally,

                                            45


1     the control of somebody's housing, their

2     finances, their access to communication,

3     their transportation, their general being,

4     there is some sort of control over them as

5     a person that is akin to modern slavery.

6     In many cases you do see -- or in cases

7     where you do see debt, the debt and the

8     indebtedness is to the trafficker.  There

9     is a common thread across cases of victims

10    being forced to work longer hours, more

11   work days than anticipated.

12            So those are just a few common

13   threads.  But again, the combination

14   thereof might be a little bit different.

15   But those are absolutely common themes that

16   you see across cases.

17   Q.    You mentioned that there are

18   factors that exist in exploitative single

19   and each and every case.  What are the

20   factors that exist in each and every

21   trafficking case?

22            MR. BILLINGS:  Objection.

23      Misstates the testimony.

24   Q.    I'll start by reading your

25   testimony for you.  There is a sort of

46

1   modern thread of modern slavery of the kind

2   of underlying factors that you do see exist

3   in each and every case.  What are those

4   underlying factors that exist in each and

5   every case?

6      A.    The underlying factor is being

7   enslaved.  Modern slavery.  That is the

8   common thread.  It is a modern form of

9     slavery that you see in each and every

10    trafficking case.  How that manifests --

11        Q.    Where does --

12        A.    -- can differ.  But modern

13    slavery is in each and every trafficking

14    case.

15        Q.    So in order to establish a

16    trafficking claim, you need to show some

17    evidence of modern slavery.  Is that your

18    testimony?

19        A.    Yes, ma'am.

20        Q.    If you look back at your

21    opinions, your opinion 8 you criticize

22    Ms. Burke's report because you believe that

23    her opinions are not supported by reliable

24    principles and specific methods.

25        A.    Opinion 8?

                                    47


1         Q.    Sorry, opinion 9.

2         A.    Yes.

3         Q.    What are the scientific methods

4     that are the basis of your opinion?  I just

5     want you to name the methods, not explain

6     all the details of it.

9       Q.     So in addition to recruiting,

10   harboring and/or transporting individuals

11   for trafficking, 1590 also prohibits

12   providing or obtaining the labor of any

13   person, is that correct?

14       A.     No.  It does not.  And that is

15   not correct.  It says the providing or

16   obtaining of any labor or services in

17   violation of this chapter.  Providing or

18   obtaining labor is not -- that's not --

19   it's in violation of the chapter, which is

20   the TVPA, which is trafficking.

21       Q.     I guess -- I understand that

22   you also have to prove that there was a

23   violation of the chapter.  But my point is

24   that in addition to providing for liability

25   for people who are involved in the

72

1   recruitment, transportation and transfer,

2   it also provides liability for people who

3   are involved in providing or obtaining the

4   forced labor.  Is that a fair read?

5       A.     Say that again.  In all

6   honesty, I think that the read of the

7   letter of the law is clear.  I'm not sure

8   why you're using different terms there as

9   to whether or not it provides for

10  liability.  This is a criminal statute.

11  And I think that it lays out in another

12  area, which it doesn't look like it's

13  provided, what specifically is violation of

14  the chapter.  I do have -- I don't know if

15  I included it -- I don't think I included

16  that section -- or I didn't talk about this

17  section in my report for you.  But I have

18  talked about it in other cases.  And

19  there's a specific -- they delineate what's

20  in violation of the chapter.  So I don't

21  feel comfortable --

22      Q.    It's your view that the TVPA is

23  very clear?  That the letter of the law is

24  clear?

25          MR. BILLINGS:  Objection.

73

1      Misstates the testimony.

2      A.    No, that is not my opinion and

3  that's not what I said.

4      Q.    So when you say that the letter

1    did a quick scan.

2         Q.    So as far as you know, showing

3    evidence of slavery or trafficking is not

4    required to prove a violation of 1589, is

5    that correct?

6         A.    Slavery or trafficking is not

7    required to prove 1589?

8              MR. BILLINGS:  I'm going to

9         object to the extent it calls for a

10        legal conclusion.  I understand

11        that's sort of what we're talking

12        about here, but I will say that the

13        statute speaks for itself.

14        A.    I know that legal conclusions

15   are not admissible.  So I'm just going to

16   say that I think that -- I'll just state

17   that it doesn't mention the words

18   "trafficking" in the statute or "slavery"

19   in the substitute, but the title of the

20   chapter is peonage slavery.  So it's

21   mentioned in the title.  Peonage slavery

22   and trafficking person.  So I think it's

23   pretty clear that it does encompass slavery

24   and trafficking.

25        Q.    So in this case you are not

1    providing a legal opinion, is that correct?

2        A.    A legal conclusion?  Drawing

3    legal conclusions, opining on legal

4    conclusions?  No, and that's why I have not

5    said that the victims are or are not -- I

6    mean, the purported plaintiffs -- the

7    plaintiffs are not -- they are or are not

8    victims of trafficking.  I cannot -- that's

9    a legal conclusion.  That is left up for

10    the trier of fact.  My role is to educate

11    on trafficking related issues, on state of

12    the science research, on technical facts

13    and to assist the trier of facts based off

14    of the specialized information that I have.

15    And so I would never opine somebody is or

16    is not a victim.  But I can opine whether

17    this allegations in the case are consistent

18    with trafficking.  So legal conclusion --

19        Q.    But when you're opining about

20    whether the allegations are consistent with

21    trafficking, you're not offering a legal

22    opinion about what trafficking means under

23    the TVPRA, is that correct?

24      A.    On what trafficking means under

25  the TVPRA?  I think that I have opined on

77

1   that, and I have stated and offered my

2   specialized understanding based on state of

3   the science research on what is consistent

4   with trafficking and what was the

5   congressional intent behind the trafficking

6   laws.  And so I don't -- I think it's sort

7   of difficult to answer your question

8   because that isn't one of my specific

9   opinions.  But absolutely I am looking at

10  these statutes and I'm stating whether the

11  allegations, even if accepted as true, are

12  consistent with trafficking.

13      Q.    When you refer to trafficking

14  you're referring to trafficking as it's

15  defined by these statutes.

16      A.    Trafficking as defined by these

17  statutes, trafficking as -- based on my

18  specialized experience and understanding

19  cases where it has been -- trafficking has

20  been demonstrated and the trier of facts

21  have determined trafficking.  So a number

22    of things in addition to these statutes.

23         Q.    I'm just trying to clarify what

24    you mean by -- when we refer to

25    trafficking, are you specifically referring

                                              78

1     to actions that would be a violation of the

2     TPRA?

3          A.    The TPRA or TVPRA?

4          Q.    TVPRA.

5          A.    Yes.  Things that are in

6     violation of the TVPRA, correct.

7          Q.    And in fact, if we look at

8     pages 21 through 24 of your report, you

9     spend some time describing the different

10    provisions of the TVPRA, is that fair?

11         A.    21 to 24.  Correct.

12         Q.    And one of the points that you

13    make in that section repeatedly is that

14    it's important to note that defendants in

15    this case have not been indicted or

16    convicted of any criminal offense.  Do you

17    see that?

18         A.    Yes, I think that's important

19    to note.

10    protocol.  And they have engaged in

11    empirical validation here in the United

12    States on indicia that -- again, it's not

13    set up exactly like this, but there's

14    inconsistencies across the two.

15         Q.    Do your Urban Institute

16    indicators or any other indicators created

17    by U.S. sources determine whether or not

18    U.S. law has been violated?

19         A.    Again, a trier of facts, so a

20    judge or a jury, ultimately makes the

21    determination whether U.S. law has been

22    violated.  And I have not opined to that

23    effect in my report.  Because that would be

24    a legal conclusion.

25         Q.    So in your report you focused

                                        84


1     on what you called the strong indicators

2     from the Delphi survey.  Do you need to

3     have strong indicators -- does the delta

4     survey say that you need to have strong

5     indicators in order for there to be

6     trafficking?

7          A.    I wouldn't say my report

8    focuses on the strong indicators, but in my

9    reference to the ILO -- in my reference to

10   the ILO survey, I did discuss the strong

11   indicators as opposed to to the medium or

12   weak indicators.  And that was done

13   purposely because those factors are more

14   consistently seen across cases here in the

15   United States, specifically trafficking

16   cases as opposed to other types of cases.

17           So do they need to be present?

18   No.  But are they often present?  At least

19   some of them in trafficking cases?  Yes.

20   And are they consistent with the cases that

21   I've seen and worked on, yes.

22       Q.    And does the Delphi survey

23   actually provide that in order to assess

24   the positive -- strike that.

25           Does the Delphi survey agree

                                                    85

1    that in order to be assessed as a positive

2    trafficking -- or potential trafficking

3    victim, you need to have at least one

4    strong indicator?

5        A.    Say that again.  Because you

25    bureau which is not relevant to my research

114

1    expertise for human traffics.  I have

2    served -- I guess it's technically -- could

3    be under oath, but I have taught at George

4    mason University in the universe of

5    Maryland Park but it's not listed under my

6    expertise.

7            Let me see, there are other

8    positions that -- I mean, different

9    consulting positions.  So for example, I

10   think it's mentioned in my summary of

11   expertise, but served as a pier reviewer

12   for Department of Justice in reviewing

13   grant applications.  But those are, like,

14   smaller positions; again, not research

15   based and not focused on human trafficking.

16   Q.    And if we look at your list of

17   expert witness cases on page 42, can you

18   please identify for me which of those cases

19   involve labor trafficking as opposed to sex

20   trafficking?

21   A.    On page --

22   Q.    42.

23       A.      So Keo Raths in 2017 is a labor

24   trafficking case, or alleged labor

25   trafficking case.

                                        115

1        Q.      Any other of those cases listed

2    on 42 and 43?

3        A.      Not on 42 or 43.  But on 50 --

4        Q.      I'm going to ask you about 50

5    right now.  So not on 42 or 43.  Okay.  So

6    if we look at 49 and 50, other than the rat

7    that case, are there any other cases that

8    involve trafficking on this list?

9        A.      Well, so the Gilbert versus Tai

10   Quan Do case, I don't know if that's

11   listed -- yeah, I don't think it's listed

12   on the first one.  That one -- there were

13   allegations of sex but they conceptualized

14   sex as labor trafficking.  So that's the

15   USA-Tai Quan Do.  So it was treated as a

16   labor trafficking case.  I think those are

17   the only two.

18       Q.      Okay.  I'm going to ask you a

19   couple of questions about your engagement

20   in this case.  If you could just tell me

11          Q.    We can turn to tab 14.  Include

12     File Not Found?

13          Q.    Can you please read the top of

14     the page, the sentence that begins "this

15     paper challenges."

16          A.    At the top of which page?

17          Q.    The top of the first page of

18     the article.

19          A.    "This paper challenges the

20     abolitionist JSHGS of all women engaged in

21     sex work as victims of traffic -- as

22     victims -- sorry, as victims trafficked in

23     the seconds industry and introduces the

24     concept of secondary exploitation where

25     these representations are reframed and

                                        146


1      repackaged for consumption by opportunistic

2      actors while arguably further stigmatizing

3      and marginalizing already vulnerable women.

4          Q.    And has the plaintiff in

5      pursuing this action done anything that

6      stigmatizes or marginalizing already

7      vulnerable women?

8          A.    No.  Well, I think that you can

9    look at repackaging or pleading

10   non-trafficking claims, potentially

11   non-trafficking claims as trafficking

12   claims could be stigmatizing and

13   marginalizing to actual survivors of

14   trafficking who are found in situations of

15   modern slavery.  But would I conclude that

16   the plaintiffs in this case did that?  No.

17       Q.    If we can turn to appendix G of

18   your report.

19       A.    Um mum.

20       Q.    I think you testified earlier

21   that you had created this report starting

22   from a database of about 300 trafficking

23   cases, is that correct?

24       A.    I believe that mischaracterized

25   what I testified to.  I did testify that

147

1    the sample of human trafficking cases --

2    well, I did testify that I have reviewed in

3    the past 300 cases.  I testified to this

4    particular sample came from the Michigan

5    mall center of human trafficking database

6    that was provided to me in 2011 which did

7      include I think 195 causes.  And this is a,

8      as the Appendix G states, a sample of those

9      cases.

10          Q.    And it's a sample that you

11     created for this case?

12          A.    Yes -- well, I wouldn't say

13     that I created it for this case.  I've used

14     it in other cases.  But I've referred to it

15     in other cases as well.  But yes, I

16     included it in this case because I thought

17     it was relevant.

18          Q.    I guess I just want to

19     understand.  So you started with a list of

20     195 cases, and you got down to a smaller

21     list.  Is this smaller list a smaller

22     subset that you identified particularly for

23     this case or is it a subset that you've

24     used in the past as representative

25     examples?

                                    148


1          A.    I've used it in the past as

2      representative examples.

3          Q.    And it's based on a database

4      that you received in 2011, is that correct?

5        A.    Correct.

6        Q.    So it doesn't have any cases

7   after 2011?

8        A.    No because I think, as your

9   purported expert also identified, the

10  Michigan law center no longer has this

11  database up.  I think it had transferred to

12  the Texas Christian University at one

13  point.  But as far as I know, it's no

14  longer in existence.  So I mean, all I have

15  is -- I've reviewed, obviously, cases that

16  have come out since then, but as part of

17  this database, no.  But the reason why I

18  wanted to include it is very much to kind

19  of pre-empt any type of accusation that I

20  specifically chose the worst cases or that

21  I wrote these summaries.  These summaries

22  were provided as part of that database in

23  2011.  I did, however, highlight or bold

24  certain pieces of information that I

25  thought were particularly relevant.

                                          149


1        Q.    And when you were making

2   decision, and I'm really here not trying to

3    call any kind of criticism.  I just want to

4    understand your process.  When you're

5    making the decision to go from 195 to this

6    set of cases, what were the criteria you

7    were using to choose which cases to

8    include?

9         A.    So since this -- IP mean, there

10   were a number of so one criteria was did it

11   include enough information to actually draw

12   any type of I guess thread across cases.

13   Some of their summaries included one or two

14   lines.  And there was just not enough

15   information.

16             Two, if the descriptions did

17   not include any indicia of trafficking and

18   focused solely on just kind of sex with

19   minors; so for example, some of the cases

20   were saying the minor was raped, the minor

21   was pimped out, the minor was prostituted,

22   things like that I didn't think were

23   particularly relevant or it just was kind

24   of redundant to other cases that might have

25   been included.  Some of the cases, as I had

151

1    necessarily.  But I think that this sample

2    has a -- I think it's a representative

3    sample.

4         Q.    And you mentioned that you --

5    if the description wasn't long enough, you

6    kept it out of the sample.  For the ones

7    that they did have a description, and I

8    think you said these descriptions were

9    written by the people that put the database

10   together, did you review the actual case

11   document as well?

12        A.    For some of them, yes.  For all

13   of them, no.

14        Q.    And you didn't make any changes

15   to the description based on what you

16   reviewed in the case documents?

17        A.    Based on what I reviewed in the

18   Michigan law center provided database, not

19   to my recollection, no.

20        Q.    And who was it who was putting

21   the Michigan law center database together?

22        A.    I don't really remember.  I

23   honestly don't remember.  I want to say

24      that it was law students that were working

25      for the Michigan law center at the time.  I

152

1       know -- I think Bridget car is over it now,

2       but I don't think that -- I don't believe

3       that she was over it at the time this was

4       provided to me.  So I really don't recall.

5           Q.      And do you know what the

6       criteria was for including cases in the

7       database?

8           A.      I don't recall.

9           Q.      Have you -- since you issued

10      your report, have you attended any of the

11      depositions in this case?

12          A.      No.  Well, no, excuse me, I did

13      attend Ms. Burke's deposition.

14          Q.      But you didn't attend any of

15      the other depositions.

16          A.      No.

17          Q.      Have you reviewed any

18      transcripts from the other depositions?

19          A.      As of present, no.

20          Q.      You previously referred to --

21      I'll call them indicators, and you can

22    correct me, but indicators created by I

23    think the Urban Institute, is that correct?

24    It might have been a protocol.  Does that

25    sound familiar?

153

1         A.    Yes.  I think the Urban

2    Institute has a few publications, and I

3    know that they're presently retesting -- I

4    kind of don't want to breach any

5    confidentiality, but they're currently

6    refining some of their past protocol and

7    indicia through research.

8         Q.    And can you turn to tab 19.

9    You can tell me if it's probably referred

10    to as a protocol or an indicia report from

11    the Urban Institute that you're familiar

12    with.

13        A.    It's a research report that I'm

14    familiar with.  This one was published in

15    2014.  I'm familiar with the work of Jack

16    McDevitt, Amy Farrell and Meredith Dank.

17        Q.    Is this part of what you

18    consider as the state of science research

19    on trafficking?

14      when they're required -- yeah, absolutely,

15      when they're required to pay them to the

16      employer.  So for example, paying the

17      alleged trafficker fees for transportation,

18      paying the alleged trafficker fees for

19      housing, for food.  So on and so forth.

20      But there's just a little bit of an

21      inconsistency that I'm having a hard time

22      reconciling because he said his manager

23      said they would have to pay for food and

24      then he fours lines down say everything was

25      free is what he was told.  I don't know --

                                    182

1           Q.    So if there was a situation

2       where the recruiter told them in the

3       Philippines that everything was free and

4       then when they arrived on the job site the

5       manager told them that they would have to

6       pay for it, would that be kind of an

7       evidence of deceptive recruiting?

8           A.    Again, you have to look at the

9       totality of the circumstances.  Does

10      alleged employer know what the recruiter is

11      telling them.  Are the fees being -- is the

12    alleged -- is the employer requiring the

13    potential victim to be paying those fees

14    for transportation, for food, for housing

15    to the employer.  And in which case --

16    again, it depends on the direction of the

17    payments.

18              So in a trafficking situation,

19    more often than not, if fees were levied

20    that were not expected is being paid to the

21    trafficker, it makes -- we're talking about

22    exploitation.  We're talking about modern

23    slavery.  It makes absolutely no sense

24    where it's paid to a third party where the

25    alleged trafficker receives no financial

                                            183

1    benefit.

2         Q.   Well, they receive a financial

3    benefit because they're not paying for

4    housing, food or transportation that they

5    told the employee they would provide.

6    Right?

7         A.   Again, you're kind of -- so

8    they told -- that the employer told the

9    employee that they would provide?

10          Q.    Let's assume for this

11    hypothetical that the employer is aware of

12    what the recruiter is telling employees.

13    If the employer knew that employees were

14    being told in the Philippines that they

15    would have their food and housing and

16    transportation provided and then he did not

17    pay it to them when they arrived in

18    America, is that a form of deceptive

19    recruiting?

20          A.    If the employer is aware that

21    the recruiter is telling them that you're

22    going to receive free food, housing,

23    transportation and then deliberately does

24    not allow that in that hypothetical,

25    certainly it could be deceptive in

                                            184


1    recruiting if he's aware of what's being

2    said by the recruiter.

3          Q.    And is that type of deceptive

4    recruiting something that might occur in a

5    trafficking situation?

6          A.    Again, typically in a

7    trafficking situation, if there is

8      deception in recruiting, there's still an

9      element of control over the housing, the

10     food, the transportation, the slavery

11     aspect of it.  So even if there was --

12     again, deception alone isn't tantamount to

13     trafficking.  You need to look at

14     exploitation and you need to look at how

15     many indicia are present.  So the totality

16     of the circumstances.  So is someone being

17     told you are going to receive free food,

18     housing and transportation, is that alone

19     trafficking?  No.  And I would actually say

20     there would be -- if that was the only

21     indicia, there would be a number of false

22     positives based on that alone, just based

23     off of regular employment disagreement.

24         Q.    So you don't think fraud by

25     itself is a sufficient indicia of

                                          185

1      trafficking.

2          A.    Fraud alone?  No.

3          Q.    Let's turn back to your report,

4      page 19.  Unfortunately, the printout I

5      have did not fully print out this picture.

6      I don't know, does yours look better than

7      mine?

8              So on page 19 you stated that

9      the evidence indicates that all potential

10     class members except for Ms. Casliao

11     actually did leave their employment with

12     the defendants before their expiration of

13     the visas.  Did that your understanding of

14     the record based on the evidence you've

15     reviewed?

16     A.    Based on the evidence I

17     reviewed, yes.

18     Q.    So you believe that Ms. Casliao

19     stayed through the expiration of her visa?

20     A.    As far as I can recall.

21     Q.    And --

22             MR. BILLINGS:  Sorry,

23        Catherine, would it be possible to

24        share on your screen the pages you're

25        looking at so we can see the whole

                                        186


1        thing?  Because mine didn't print out

2        either.

3               Thank you.

4        Q.    I'm speaking specifically?

5        Q.    Your understanding is that all

6    of the other potential class members

7    actually did leave their employment with

8    the defendants before their visas expired,

9    is that correct?

10       A.    When I'm referring to the class

11   members I'm referring to Casliao, link

12   KWIEN and Garcia.  Is so you're only

13   referring to the three named plaintiffs.

14       A.    Yes.

15       Q.    Because you haven't reviewed

16   any testimony or really any documents that

17   the other class members have --

18       A.    Not that I recall.  I know for

19   a fact I have not reviewed their

20   depositions.

21       Q.    And so in your view, if an

22   individual is able to leave a trafficking

23   situation, is that evidence that they're

24   not actually trafficked?

25       A.    In and of itself, no.  But

                                           187

1    again, I'm talking about the totality of

2    the circumstances.

3         A.    For example, Ms. Casliao did

4    not leave.  Is that indicia that she was

5    trafficked?  No.  Especially considering by

6    her own testimony she said it isn't like I

7    was forced to work.  No one forced me to

8    work.  So I don't think that in and of

9    itself it is indicia or not.  However, in

10   trafficking situations, you do see --

11   typically see forced, fraud, coercion,

12   deception, threats after initial

13   recruitment, period, to coerce or compel

14   them to stay in an exploitive situation in

15   a trafficking case.

16        Q.    Okay, so you'll usually see the

17   employer take steps to compel them to stay

18   at the worksite even if they wish to leave.

19        A.    Yes.  Typically.

20        Q.    If you turn to page 26 at the

21   bottom of page 26 you write Garcia claims

22   that he worked as a server as expected but

23   was paid approximately 2.3 per hour plus

24   tips.

25        A.    Yes.

25     not?  Again, you need to take it in the

189

1      totality of the circumstances.  I've seen

2      situations, allegations of trafficking

3      where minimum wage was met, where it wasn't

4      met.  So I think you need to take the

5      totality of the circumstances.

6          Q.     Okay, so in and of itself,

7      whether or not a worker received minimum

8      wage isn't evidence of trafficking.

9          A.     Absolutely not, no.  I mean,

10     I've worked as a server during graduate

11     school and I did not make minimum wage when

12     I was a server at times.

13         Q.     So why did you include in your

14     report the fact that he was being paid --

15     received minimum wage?

16         A.     Because again, I'm looking at

17     the totality of the circumstances here.  I

18     think the fact that, you know, whether you

19     do receive minimum wage, whether you -- I

20     mean, again, it's the totality of the

21     circumstances.  Whether there were overt

22     threats, whether you do have a class member

23    saying I was not forced to work, I think --

24    I mean, all of this is potentially

25    important.  But in and of itself, the fact

190

1    that he was paid minimum wage, that alone

2    might not make a difference.  But in

3    looking at the totality of the

4    circumstances saying whether this is

5    consistent with trafficking, whether it's

6    housing, food, transportation, whether he

7    was surveilled, all of that is important to

8    say whether this is consistent with

9    trafficking, whether they were forced and

10   compelled to work longer than expected work

11   hours, a very, very typical allegation in

12   trafficking cases.  All of that is very

13   important to look at and to review when

14   stating and opining whether something is or

15   is not consistent with trafficking.

16        Q.    And what do you understand to

17   be the amount of wages that Mr. Garcia was

18   promised by the recruiters?

19        A.    I believe I have that on page

20   26.  He says that he was supposed to get

21    $9.63 per hour.  Right?

22         Q.    Yup.  And the fact that he was

23    given a different wage when he got there,

24    you don't think is -- do you think that's a

25    material indicator of trafficking, not

                                        191


1    relevant to trafficking?

2         A.    I'm not sure how else I can say

3    this.  I'm not trying to be difficult, but

4    I think you need to take it in the totality

5    of the circumstances.  Right?  In and of

6    itself, does that mean he was trafficked,

7    absolutely not.  Is it something that was

8    considered in addition to a multiple

9    other -- a number of other factors?  Yes.

10    But does that alone suggest -- even if I

11    accept that it's true, even if I say this

12    is true and that's what he was promised and

13    all parties knew about that promise and it

14    wasn't received, that alone is not

15    tantamount to trafficking.  It is not

16    consistent with trafficking.  That alone is

17    not enough to say this is consistent with

18    trafficking.

21    $9.63 per hour.  Right?

22        Q.    Yup.  And the fact that he was

23    given a different wage when he got there,

24    you don't think is -- do you think that's a

25    material indicator of trafficking, not

191

1    relevant to trafficking?

2        A.    I'm not sure how else I can say

3    this.  I'm not trying to be difficult, but

4    I think you need to take it in the totality

5    of the circumstances.  Right?  In and of

6    itself, does that mean he was trafficked,

7    absolutely not.  Is it something that was

8    considered in addition to a multiple

9    other -- a number of other factors?  Yes.

10    But does that alone suggest -- even if I

11    accept that it's true, even if I say this

12    is true and that's what he was promised and

13    all parties knew about that promise and it

14    wasn't received, that alone is not

15    tantamount to trafficking.  It is not

16    consistent with trafficking.  That alone is

17    not enough to say this is consistent with

18    trafficking.

3    indicia of trafficking.  Is non-explicit

4    threats of violence also an indicia but

5    just weaker or do you think it's not an

6    indicia of trafficking at all?

7         A.    Again, you need to look at what

8    is considered a threat or not.  It's

9    certainly not a strong indicia.  I mean, in

10   trafficking cases, when there are threats

11   of violence they tend to be pretty overt.

12             So for example, in the case

13   which is included in my appendices of U.S.

14   v. Maximum /PHEPBG /KOEU, I believe it was

15   a trafficking case but the women were labor

16   trafficked in strip clubs, one of the

17   specific threats the trafficker made was if

18   you don't do as you're told, I'm going to

19   stomp you so hard in your forehead that the

20   shoe size on the bottom of my boot would be

21   imprinted.  That's a type of pretty

22   specific -- I have a pretty good memory

23   when it comes to the cases I reviewed.  I

24   try to remember as much as I can.  But that

25   was a very specific threat that was made

```
 1    against the labor trafficking victims in
 2    that case.
 3            Typically when you're talking
 4    about strong indicia, there are overt
 5    threats.
 6        Q.    So it's your testimony that
 7    when there are threats of violence, they
 8    tend to be pretty overt?
 9        A.    In trafficking cases the
10    threats that I have seen, they can be
11    violent, nonviolent, but they're pretty
12    clear to the average person, or in a
13    criminal or civil case the trier of fact of
14    what was intended.  And I think that if you
15    look at case law, the intent behind the
16    statement certainly does matter.  And so
17    intent to compel exploitation, the intent
18    to use that threat for the purpose of
19    exploitation.
20            So when I'm saying it's overt,
21    it doesn't necessarily need to be I guess
22    as violent as the example that I just gave
23    you.  But it tends to be pretty clear of
24    what the intent was.
25            In this particular case, I
```

1   don't really -- my recollection is the

2   plaintiffs were suggesting that being told

3   about a gun in the glove compartment of a

4   car was a threat.  I do not believe that is

5   clear, I do not believe that was the intent

6   behind the statement.  And I think that

7   that is a very kind of -- not consistent

8   with the types of threats that I've seen in

9   trafficking cases.

10       Q.    So you wouldn't agree with the

11   statement that traffickers can also use

12   more subject tell forms of control?

13       A.    They can use more absolutely

14   more subtle forms of control.  But when

15   you're talking about a threat, I don't

16   think that that's what we're talking about.

17   When we're talking about -- when experts

18   are talking about more subtle forms of

19   control, they're talking about, for

20   example, Joanne Reed has published

21   extensively about how trafficker will

22   pretend to be faux families or faux lovers

23   or use romantic relationships to coerce or

24    deceive them into an exploited situation.

25    That is a more subtle form of control.

202

1         But I don't think that we're

2    referring to threats, subtle threats that

3    are left open to wide interpretations when

4    we're speaking of what constitutes a threat

5    and what's interpreted as a threat in the

6    situation of trafficking.

7         Q.    Could you tell me some examples

8    of subtle forms of control that would exist

9    in the labor trafficking context rather

10    than outside sex trafficking content?

11         A.    Okay, a subtle form of

12    control -- again, I'm not aware of a subtle

13    threat that I can refer to.  But subtle

14    forms of control I've seen in labor

15    trafficking cases, particular for -- within

16    the nail salon industry of subtly

17    controlling them in exploitive situations,

18    like you're almost about to pay your debt

19    off to us now, it's only one year more or

20    three months more, and then you're kind of

21    extending that debt over time.

6          Q.     Are you aware that Ms. Casliao

7     testified that she was afraid of

8     Mr. Schumacher?

9          A.     Based on a specific threat?

10    I'm not aware of that, no.  Or a

11    specific --

12         Q.     Are you aware that she

13    testified that she was afraid of him?

14    That's what I asked.

15         A.     I think I recall her saying

16    something to that effect in a general

17    sense.  But not anything specific.

18         Q.     Do you recall her testifying

19    that Mr. Schumacher contacted her after she

20    left to tell her that he had reported her

21    to immigration?

22         A.     I don't recall that specific

23    component of testimony.  After she left his

24    employment?

25         Q.     Mm-hmm.

                                        211


1          A.     No.  I don't recall that

2     specific.

3          Q.     And do you recall Ms. Casliao

4    testifying that she learned Mr. Schumacher

5    was going to the hotel where the workers

6    lived?

7         A.    That he was going there?

8         Q.    That he was visiting the motel

9    on some regular basis.

10        A.    I don't recall that.  I mean,

11   again, not in any, like, specific sense.

12   Like he went to the hotel to threaten me,

13   he went to the hotel to speak to me, he

14   went to the hotel -- I don't remember any

15   allegation to that effect.  If it was

16   mentioned in passing, like he was

17   physically present at the hotel, I don't

18   recall whether she said that or not.  But I

19   wouldn't put a lot of weight or any weight

20   on that.

21        Q.    Has anything we've discussed

22   today caused you to alter the opinions that

23   you've written in your report?

24        A.    No.

25        Q.    As of today you don't have any

                                             212


1    alterations to the opinions you've stated